UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ORBIT ONE COMMUNICATIONS, INC.,<br>and DAVID RONSEN,<br><br>                        Plaintiffs,<br><br>     - against -<br><br>NUMEREX CORP.,<br><br>                      Defendant. | Civil Action No. 08-0905 (LAK)<br><br>**ANSWER AND<br><u>COUNTERCLAIMS</u>**<br><br>**<u>JURY TRIAL DEMAND</u>** |

## INTRODUCTION

1.     Plaintiffs' action is a concocted "preemptive strike." David Ronsen is the 84% owner of Orbit One Communications, Inc. ("Old Orbit One"). In August 2007, Old Orbit One sold substantially all of its assets to a subsidiary of Numerex Corporation ("Numerex"), and Numerex hired Ronsen to serve as president of its Satellite Division, which sells machine-to-machine satellite-based communication systems and services. The parties' agreements are governed by an extensively negotiated contract called the Asset Purchase Agreement, which incorporates other agreements including an Earn Out and a Severance and Non-Competition Agreement. The Asset Purchase Agreement (together with its Exhibits and Schedules, the "APA") is incorporated into this Answer and Counterclaim by reference.

2.     The APA provided for a generous multi-million dollar guaranteed cash payment to Old Orbit One, *plus* generous executive pay, cash bonuses, and benefits for Ronsen. The APA also calls for even larger incentive-based stock and cash bonuses if the Satellite Division performs in accordance with Ronsen's pre-closing financial projections. The contract documents call these bonuses an "Earn Out." The APA ties the

level of the bonus to the degree to which the Satellite Division achieves or exceeds a Revenue Target and an EBITDA Target. These targets—derived directly from the projections prepared by Ronsen himself—were incorporated into the APA as Schedule 1.6 and called the "Business Plan."

3.    The future success of the Satellite Division—and the achievement of the Earn Out revenue and earnings targets—depends to a large degree on the success of a new product called the SX-1. Before the August 1 execution of the APA, Ronsen bought supplies to build 10,000 units of the SX-1. In addition, he ordered another 20,000 units of the key component of the SX-1, a transmitter called the STX. Ronsen assured Numerex's senior management that he would be able to sell the 30,000 SX-1s. But in the first seven months following the acquisition, Ronsen sold only 144 units of the SX-1. If the current level of poor financial performance continues, Old Orbit One will not earn further Earn Out bonuses and indeed Ronsen himself will be subject to termination for "cause" pursuant to the contract documents.

4.    On information and belief, Ronsen hired counsel after recognizing that he was likely to fail to meet his projections. Under the APA, a termination by Ronsen of his employment with Numerex for "good reason" (including a substantial diminution of his responsibilities) would trigger immediate acceleration of all Earn Out bonuses. In order to come within the "good reason" clause of his contract, Ronsen began making contrived assertions that he lost "control" and "authority" within the Satellite Division. In other words, Ronsen hopes to use the court system to recover the entire Earn Out even though he has not earned it and may never earn it.

5.      Ronsen thus began to focus extensively on manufacturing evidence to support his impending lawsuit rather than selling products that he had projected he could sell.  Ronsen has thus discharged his executive responsibilities in a manner designed to buttress his lawsuit against Numerex rather than achieve success for the company.  His day-to-day communications with Numerex exhibit themes from his lawsuit rather than good faith decision making.  He has peppered senior management with complaints that he does not have adequate control over the Satellite Division and conversely that Numerex has not provided adequate "support."  By making these false claims and using Numerex's facilities and employees to manufacture evidence to support the false claims, Ronsen has breached his contractual and fiduciary duties to Numerex.

**ANSWER**

1.      Numerex admits that it entered into the APA with Old Orbit One to acquire substantially all of the assets of Old Orbit One and that Numerex and plaintiff Ronsen entered into a Severance and Non-Competition Agreement, which was incorporated into the APA.  Numerex states that since the Closing, and in accordance with the APA, Numerex has been conducting the business of Old Orbit One as the Numerex "Satellite Solutions Division."  (The APA defines this business unit as the "Satellite Division").  Numerex states further that the contract documents specify that Ronsen would be employed as President of the Orbit One "Division."  Numerex further admits that Ronsen represented himself to be the founder and 84% shareholder of Old Orbit One.  Numerex respectfully refers the Court to the APA and denies any allegations in paragraph 1 inconsistent with the terms thereof.  Numerex otherwise denies the allegations in paragraph 1.

2.      Numerex respectfully refers the Court to the APA, denies any allegations in paragraph 2 inconsistent with the terms thereof, and otherwise denies the allegations in paragraph 2.

3.      Numerex denies the allegations in paragraph 3.

4.      Numerex denies the allegations in paragraph 4.

5.      On information and belief, Numerex denies the allegations concerning plaintiffs' aversion to risk described in paragraph 5.  Numerex respectfully refers the Court to the APA, and denies any allegations in paragraph 5 inconsistent with the terms thereof, and otherwise denies the allegations in paragraph 5.

6.      Numerex respectfully refers the Court to the APA, denies any allegations in paragraph 6 inconsistent with the terms thereof, and otherwise denies the allegations in paragraph 6.

7.      Numerex respectfully refers the Court to the APA, denies any allegations in paragraph 7 inconsistent with the terms thereof, and otherwise denies the allegations in paragraph 7.

8.      Numerex respectfully refers the Court to the APA, denies any allegations in paragraph 8 inconsistent with the terms thereof, and otherwise denies the allegations in paragraph 8.

9.      Numerex respectfully refers the Court to the APA, denies any allegations in paragraph 9 inconsistent with the terms thereof, and otherwise denies the allegations in paragraph 9.

10.      Numerex denies the allegations in paragraph 10.

11.     Numerex admits that Old Orbit One is organized under the laws of the State of Montana, that Old Orbit One was engaged in the business of providing satellite-based telephones and GPS tracking devices and services. Numerex otherwise denies sufficient knowledge and information to form a belief as to the truth of the allegations in paragraph 11.

12.     Numerex admits that Ronsen is a resident of Montana. Numerex states that Ronsen currently serves as Senior Vice President of Numerex and President of Numerex's Satellite Division as defined in the APA. Numerex otherwise denies sufficient knowledge and information to form a belief as to the allegations in paragraph 12.

13.     Numerex admits the allegations in the first four sentences of paragraph 13 and but otherwise denies the allegations of paragraph 13.

14.     Numerex admits that section 9.7 of the APA provides for jurisdiction and venue of courts located in the Borough of Manhattan for any action arising out of or relating to the APA, and respectfully refers the Court to the APA for its contents.

15.     Numerex lacks information sufficient to form a belief as to the truth of the allegations set forth in paragraph 15.

16.     Numerex lacks information sufficient to form a belief as to the truth of the allegations set forth in paragraph 16.

17.     Numerex lacks information sufficient to form a belief as to the truth of the allegations set forth in paragraph 17.

18.     Numerex lacks information sufficient to form a belief as to the truth of the allegations set forth in paragraph 18.

19.    Numerex admits that Old Orbit One sold satellite GPS tracking devices and services, states that substantially all its revenue came from a single customer called Stratix Corporation ("Stratix"), under which Old Orbit One acted as a subcontractor and Stratix acted as the prime contractor with the Department of Homeland Security's Federal Emergency Management Agency ("FEMA"), and, on information and belief, otherwise denies the allegations set forth in paragraph 19.

20.    Numerex lacks information sufficient to form a belief as to the truth of the allegations set forth in paragraph 20.

21.    Numerex lacks information sufficient to form a belief as to the truth of the allegations set forth in paragraph 21.

22.    Numerex denies the allegations of paragraph 22 and states that it provides fixed and mobile machine-to-machine ("M2M") wireless solutions, as well as a broad range of reliable, competitive network services and technologies that enable real-time wireless data communications, monitoring, tracking, and service management tailored to the needs of each application, customer, and industry.

23.    Numerex states that its Chairman and Chief Executive Officer, Stratton Nicolaides, owns shares and options to purchase shares totaling approximately 2.5 percent of the fully diluted issued and outstanding shares of Numerex and that certain trusts of which he has disclaimed ownership own shares of Numerex. Numerex respectfully refers the Court to its most current proxy statement and Forms 4 on file with the Securities and Exchange Commission and denies any allegation in paragraph 23 that is inconsistent therewith.

24.    Admitted.

25. Numerex admits that it discussed a potential transaction with Old Orbit One beginning in late 2006, and otherwise denies the allegations in paragraph 25.

26. Numerex lacks information sufficient to form a belief as to the truth of the allegations concerning Ronsen's state of mind set forth in paragraph 26 and otherwise denies the allegations.

27. Numerex respectfully refers the Court to the APA for its terms, denies any allegation in paragraph 27 inconsistent with that agreement, and otherwise denies the allegations in paragraph 27.

28. Numerex respectfully refers the Court to the APA for its terms, denies any allegation in paragraph 28 inconsistent with that agreement, and otherwise denies the allegations in paragraph 28.

29. Numerex denies the allegations in paragraph 29.

30. Numerex denies the allegations in paragraph 30.

31. Numerex lacks information sufficient to form a belief as to the truth of the allegations concerning Ronsen's state of mind set forth in paragraph 31, admits that it had an established commercial customer base and experience in machine-to-machine communications, and otherwise denies the allegations.

32. Numerex lacks information sufficient to form a belief as to the truth of the allegations set forth in the first sentence but otherwise denies the remaining allegations of paragraph 32.

33. Numerex denies the allegations in paragraph 33.

34. Numerex denies the allegations in paragraph 34 and states that Ronsen developed the Business Plan attached to and made a part of the APA.

35.    On information and belief, Numerex denies the allegations concerning plaintiffs' aversion to risk described in paragraph 35. Numerex lacks information sufficient to form a belief as to the truth of the allegations of Ronsen's state of mind set forth in paragraph 35, and otherwise denies the remaining allegations of paragraph 35.

36.    Numerex admits that Numerex entered into the APA with Old Orbit One to acquire substantially all of the assets of Old Orbit One and that integrated into the APA were a number of other contract documents including a Severance and Non-Competition Agreement between Numerex and Ronsen. Numerex respectfully refers the Court to the APA, and denies any allegations in paragraph 36 inconsistent with the terms thereof.

37.    Numerex lacks information sufficient to form a belief as to Ronsen's state of mind, respectfully refers the Court to the APA denies any allegations in paragraph 37 inconsistent with the terms thereof.

38.    Numerex respectfully refers the Court to the APA and denies any allegations in paragraph 38 inconsistent with the terms thereof.

39.    Numerex respectfully refers the Court to the APA and denies any allegations in paragraph 39 inconsistent with the terms thereof.

40.    Numerex respectfully refers the Court to the APA and denies any allegations in paragraph 40 inconsistent with the terms thereof.

41.    Numerex respectfully refers the Court to the APA and denies any allegations in paragraph 41 inconsistent with the terms thereof.

42.    Numerex respectfully refers the Court to the APA and denies any allegations in paragraph 42 inconsistent with the terms thereof.

43.    Numerex denies the allegations in paragraph 43.

44.    Numerex respectfully refers the Court to the APA and denies any allegations in paragraph 44 inconsistent with the terms thereof.

45.    Numerex denies that Schedule 1.6 was "inadvertently omitted" at closing. Numerex respectfully refers the Court to the APA and denies any allegations in paragraph 45 inconsistent with the terms thereof.

46.    Numerex respectfully refers the Court to the APA and denies any allegations in paragraph 47 inconsistent with the terms thereof.

47.    Numerex denies the allegations in paragraph 47.

48.    Numerex denies the allegations in paragraph 48 and states that Ronsen currently serves as the President of the Satellite Division as defined in the APA.

49.    Numerex denies the allegations in paragraph 49.

50.    Numerex denies the allegations in paragraph 50.

51.    Numerex denies the allegations in paragraph 51.  Numerex states further that Rosenzweig solicited and obtained a non-revenue contract for approximately one dozen "demo units" of the SX-1.  Numerex states further that this figure may indeed be "substantial" (as plaintiffs allege) when measured by total SX-1 sales to date, it is not "substantial" when measured against the tens of thousands of unsold units in inventory or the projections that gave rise to the contractual Business Plan.

52.    Numerex respectfully refers the Court to the document referred to in paragraph 52 for its contents, denies any allegation inconsistent with the document, and otherwise denies the allegations contained in paragraph 52.

53.    Numerex denies the allegations in paragraph 53.

54.    Numerex admits that Ronsen projected a successful launch of the SX-1 product, respectfully refers the Court to the APA, denies any allegation in paragraph 54 inconsistent therewith, and otherwise denies the allegations in paragraph 54.

55.    Numerex states that at all times it made a good faith effort to integrate the business of Old Orbit One, that it provided appropriate marketing support, and denies any allegation in paragraph 55 inconsistent therewith.

56.    Numerex denies the allegations in paragraph 56.

57.    Numerex denies the allegations in paragraph 57.

58.    Numerex denies the allegations in paragraph 58.

59.    Numerex denies the allegations in paragraph 59.

60.    Numerex denies the allegations in paragraph 60.

61.    Numerex lacks information sufficient to form a belief as to the truth of the allegations concerning Ronsen's state of mind, respectfully refers the Court to the documents referenced in paragraph 61, denies any allegation inconsistent with such documents, and otherwise denies the allegations.

62.    Numerex denies the allegations in paragraph 62.

63.    Numerex denies the allegations in paragraph 63.

64.    Numerex denies the allegations in paragraph 64.

65.    Numerex admits that Ronsen traveled to California to meet with a former vendor of Old Orbit One and current vendor of the Satellite Division but otherwise denies the allegations in paragraph 65.

66.    Numerex denies the allegations in paragraph 66.

67.    Numerex denies the allegations in paragraph 67.

68.    Numerex denies the allegations in paragraph 68.

69.    Numerex denies the allegations in paragraph 69.

70.    Numerex denies the allegations in paragraph 70.

71.    Numerex denies the allegations in paragraph 71.

72.    Numerex denies the allegations in paragraph 72.

73.    Numerex denies the allegations in paragraph 73.

74.    Numerex denies the allegations in paragraph 74.

75.    Numerex admits that Ronsen traveled to Philadelphia in December, visited with Zeroto5 but otherwise denies the allegations in paragraph 75.

76.    Numerex denies the allegations in paragraph 76.

77.    Numerex lacks information sufficient to form a belief as to the truth of the allegations set forth in the last two sentences of this paragraph but otherwise denies the allegations contained in paragraph 77.

78.    Numerex denies the allegations in paragraph 78.

79.    Numerex denies the allegations in paragraph 79.

80.    Numerex denies the allegations in paragraph 80.

81.    Numerex denies the allegations in paragraph 81.

82.    In response to the allegations set forth in paragraph 82, Numerex reasserts and incorporates by reference its responses to paragraphs 1 through 81 of the Complaint as if restated herein.

83.    Numerex states that the allegations set forth in paragraph 83 are legal conclusions to which no response is required.

84.    Numerex denies all allegations in paragraph 84.

85.    Numerex denies all allegations in paragraph 85.

86.    Numerex denies all allegations in paragraph 86 and respectfully refers the Court to its Counterclaim.

87.    Numerex denies all allegations in paragraph 87.

88.    Numerex respectfully refers the Court to the APA (including the Non-Competition and Severance Agreement) and denies all allegations in paragraph 88 inconsistent therewith.

89.    Numerex denies all allegations in paragraph 89.

90.    In response to the allegations set forth in paragraph 90, Numerex reasserts and incorporates by reference its responses to paragraphs 1 through 89 of the Complaint as if restated herein.

91.    Numerex states that the allegations set forth in paragraph 91 are legal conclusions to which no response is required.

92.    Numerex denies all allegations in paragraph 92.

93.    Numerex denies all allegations in paragraph 93.

94.    Numerex denies all allegations in paragraph 94.

95.    Numerex denies all allegations in paragraph 95.

96.    In response to the allegations set forth in paragraph 96, Numerex reasserts and incorporates by reference its responses to paragraphs 1 through 95 of the Complaint as if restated herein

97.    Numerex respectfully refers the Court to the APA, denies all allegations in paragraph 97 inconsistent therewith, and otherwise denies the allegations of paragraph 97.

98.    Numerex denies all allegations in paragraph 98.

99.    Numerex denies all allegations in paragraph 99.

100.    Numerex denies all allegations in paragraph 100.

101.    Numerex denies all allegations in paragraph 101.

102.    Numerex denies any and all factual allegations in paragraph 102. To the extent paragraph 102 states a legal conclusion, no response is required.

103.    Numerex states that the allegations set forth in paragraph 103 are legal conclusions to which no response is required.

104.    Numerex denies all allegations in paragraph 104.

105.    Numerex denies all allegations in paragraph 105.

106.    Numerex denies all allegations in paragraph 106.

## DEFENSES

1.    Defendant Ronsen is not entitled to any recovery because he has breached his fiduciary duties to Numerex.

2.    Defendants' claims are barred by the doctrine of unclean hands.

3.    Defendants' claims are barred by the doctrine of prior material breach.

4.    Defendants' claims are barred by their superior knowledge and negligent or reckless misrepresentations to induce Numerex to acquire the assets of Old Orbit One.

5.    Defendants' claims are barred by their negligence or recklessness in the preparation of projections for the post-acquisition performance of the Satellite Division.

## COUNTERCLAIMS

**Negotiations**

1.    Numerex is a provider of machine-to-machine, or "M2M," services. An M2M system uses a device to capture real-time data about an asset, such as the location

of a car or the flow rate of petroleum at a well head. The M2M device relays the data to a centralized computer for monitoring and analysis. Buyers of M2M services generally have unique needs and require customized applications. Numerex's business strategy is to be a single source provider for all M2M needs of its clients. Numerex has acquired and successfully integrated under its brand name several companies providing various M2M capabilities. In 2006, John Altamura, a representative of one of Numerex's vendors approached Numerex about Old Orbit One.

2.     Old Orbit One provided satellite based communications services and asset tracking. The potential acquisition of Orbit One offered Numerex the opportunity to further diversity its M2M offerings into satellite-based communications. However, the vast majority of Old Orbit One's business came from one contract, with a company called Stratix Corporation ("Stratix"), under which Old Orbit One acted as a subcontractor and Stratix acted as the prime contractor with FEMA.

3.     Ronsen admitted during negotiation of the transaction that 2006 was an unusually profitable year for Old Orbit One. This unusual profitability arose in part due to a number of extraordinary natural disasters including Hurricane Katrina, and in part because Stratix chose Old Orbit One to supply a product called the T3 in 2005. In 2006, FEMA deployed the T3 in over 20,000 FEMA assets. While Old Orbit One had customers besides Stratix, Stratix was by far its largest customer. Old Orbit One told Numerex that sales to Stratix contributed approximately 66% of Old Orbit One's total sales for 2005 and 68% for 2006. For 2007, Old Orbit One projected that sales to Stratix would contribute approximately 65% of its total sales.

4.      In addition, Ronsen acknowledged to Numerex that Old Orbit One was developing a replacement for the T3 product. The post-acquisition success of the Satellite Division would depend on a successful development and deployment of a replacement for the T3. During 2007, Old Orbit One was developing this replacement, called the SX-1, while the transaction was being negotiated. (By the time of closing, the SX-1 still had not been launched.)

5.      During negotiations, Ronsen admitted that it is "difficult to project with any degree of certainty what our sales will be looking forward each year." Nonetheless, he asked that almost all consideration to Old Orbit One be paid at closing and without conditions subsequent. Numerex rejected Ronsen's request. Numerex requested that Ronsen prepare financial projections and insisted that post-closing performance in accordance with the financial projections have financial consequences for Ronsen.

6.      From April through July 2007, Ronsen prepared several drafts of a detailed set of financial projections. In those projections, Ronsen set forth detailed information about the T3 and SX-1, such as the number of sales for each product per month, the type of buyers (government or commercial), and the cost of goods sold for both products. Ronsen's projections were the subject of extensive negotiations. In the evolution of these projections, Ronsen scaled down his forecasts at the urging of Numerex.

7.      At no time did Ronsen or anyone else representing Old Orbit One ever communicate to Numerex orally or in writing that Ronsen's projections could only be achieved with sales support from Numerex's pre-existing sales team.

**The APA**

8.      On August 1, 2007, after seven months of negotiations, Old Orbit One and a Numerex subsidiary called "Orbit One Communications, LLC" (the "LLC") executed the APA as of July 31, 2007.   Pursuant to the APA, Old Orbit One received $5.5 million in cash at closing and an additional $732,000 in cash within sixty days following closing. The APA provided for an additional cash payment to Orbit One if the Satellite Division succeeded in renewing the Stratix contract.

9.      At the Closing, Numerex also hired Ronsen to serve as "President of NMRX's Orbit One division (the 'Division')" pursuant to a contract document called the Severance and Non-Competition Agreement, which was integrated into the APA. Ronsen was to report to "NMRX's Chief Executive Officer, and, from time to time as reasonably required by the business needs of the Division, to such other members of NMRX's senior management team as NMRX's Chief Executive Offer directs."  Section 9.13 of the APA defines the Satellite Division as "the subsidiary or division of Numerex that conducts the Business after the Closing."

10.      At the Closing, a Business Plan (submitted by Ronsen and tied to his over-200-page financial projections) became a schedule of the APA and the fundamental economic driver of the APA's post-closing payment structure.  Ronsen and Numerex both committed "to operate the [Satellite Division] substantially in accordance with" the Business Plan.  The parties carefully negotiated the Business Plans' financial targets, agreeing to the following "Revenue Targets" and "EBITDA Targets":

| Year | Revenue Target | EBITDA Target |
|------|----------------|---------------|
| 2007 (July to Dec.) | $6.00 million | $1.62 million |
| 2008 | $16.57 million | $4.59 million |
| 2009 | $21.72 million | $5.98 million |

11.     Meeting, exceeding, or falling short of the objectives set forth in the Business Plan has important consequences, as follows:

12.     *First*, the Earn Out, incorporated into the APA as Exhibit B, provides for Old Orbit One to receive shares of Numerex's common stock and additional cash bonuses in accordance with a sliding scale tied to the extent to which the Satellite Division falls short of, meets, or exceeds specified revenue and cash-flow performance objectives called the Revenue Target and the EBITDA Target. In other words, if the Satellite Division achieves a percentage of the Targets, and subject to its terms and conditions, the APA calls for payment to Old Orbit One of a percentage of the incentive award. If the Satellite Division exceeds the Targets by 125% and 150%, again subject to terms and conditions, the APA calls for payment to Old Orbit One of additional stock and cash bonuses. The Business Plan thus provides a cushion for Numerex in the event that the Satellite Division's financial performance falls short of Ronsen's projections, and provides a bonus for Old Orbit One if Ronsen's financial projections prove to have been too conservative.

13.     *Second*, after March 31, 2008, if the Satellite Division misses the EBITDA Targets by 25% or more in two consecutive quarters (beginning with the fourth quarter of 2007), Numerex is "entitled to unilaterally implement budgetary changes to restore the Satellite Division's profitability in accordance with the Business Plan." *Id.* Ex. B § 4.1.

The Business Plan thus provides a mechanism for Numerex to exercise unilateral control over the Satellite Division's budget in the event that the Satellite Division underperforms in comparison to Ronsen's projections.

14.     *Third*, after June 30, 2008, Ronsen can be terminated for cause if the Satellite Division "fails to attain 65% of the Revenue Target or 50% of the EBITDA Target." *Id.* Ex. D. § 2(a)(iv). The Business Plan thus provides further protection for Numerex to remove Ronsen for cause in the event that the Satellite Division substantially underperforms in comparison Ronsen's projections.

15.     Ronsen agreed to provide a series of quarterly budgets within 60 days of closing and to update his projections as a Final Budget in advance of each calendar year of the earn-out period. Section 2.4 of Exhibit B to the APA states, in part, that "not later than forty-five (45) days prior to [January 1], the Satellite Division shall submit to NMRX [Numerex] a proposed budget for the Satellite Division for the upcoming [calendar year]. NMRX and [Old Orbit One] shall negotiate in good faith to finalize such budget (the "Final Budget") prior to the commencement of the [calendar year]."

**Projected and Actual Sales of the SX-1**

16.     In preparing the Business Plan, Ronsen projected that the Satellite Division would have two main sources of revenue:  (a) a continuing stream of revenue from sales and service to Stratix; and (b) a successful launch of the new SX-1 product to government agencies and commercial businesses.  For the remainder of 2007, Ronsen projected that revenue from Stratix would represent 65% of the Satellite Division's revenues.  For subsequent years, Ronsen projected that sales to Stratix would constitute a smaller portion of revenue of the Satellite Division as its revenues from other sources

- 18 -

grew—so that revenue from Stratix would be 40% of all revenues in 2008 and 36% in 2009.

17.    For 2007, Ronsen projected the sale of 7,300 SX-1 units.  He projected that this figure would rise to approximately 26,000 units for 2008 and approximately 3,000 units for 2009.

18.    Ronsen projected the following SX-1 sales, by month, from August 2007 to February 2008:

| Month | Sales (units) |
|-----------|---------------|
| August | 900 |
| September | 2,150 |
| October | 2,150 |
| November | 1,500 |
| December | 600 |
| January | 500 |
| February | 500 |

19.    In an August 13, 2007 presentation to senior management, Ronsen and his team set forth his marketing plan for the Satellite Division, with an emphasis on the SX-1.  According to Ronsen's marketing plan, the Satellite Division was to pursue a "Shotgun Approach" to this product promotion.  Ronsen intended to "spend a little to get the message out broadly" about the SX-1 through industry articles and trade show participation and then "respond to those who express interest."

20.    At the August 13 presentation, Ronsen presented what he called a "partial list" of existing Old Orbit One customers and predicted that they, as well as other and unidentified "existing customers" would be interested in buying SX-1s.  The total units described in the presentation's opportunity funnel (of Old Orbit One customers and leads) was a multiple of the unit volumes in Ronsen's projections.  Ronsen summarized his marketing plan as "Build it and they will come."

21.    A key component of the SX-1 is called the STX.  Manufacturing glitches delayed delivery of completed SX-1 units until mid-September of 2007.  Additionally, the SX-1's principal satellite communication provider, Globalstar, did not certify the SX-1 for use on its network until October 1, 2007.  Thus the Satellite Division did not launch the SX-1 product until late October 2007.

22.    In October 2007, Ronsen induced Numerex to take delivery of and pay for 20,000 STX units that Old Orbit One had ordered prior to closing.  Senior management of Numerex asked Ronsen if he could sell 20,000 units (on top of the 10,000 units already built or on order).  Ronsen said that he could.  Based on that representation, Numerex's senior management approved the payment.

23.    The following chart shows the number of SX-1 units actually sold by the Satellite Division from August 2007 to February 2008, according to Numerex's accounting records:

| Month | Sales (units) |
|---|---|
| August | 8 |
| September | 3 |
| October | -6 |
| November | 5 |
| December | 2 |
| January | 78 |
| February | 54 |

24.    Compounding this woeful performance in the sales of the SX-1, Stratix significantly curtailed its contract for T3 services.  On information and belief, Ronsen knew that this was probable for an extended period before disclosing this fact to Numerex senior management in late December 2007.  The Stratix curtailment will diminish the Satellite Division's effective monthly revenue from Stratix—its most important customer—by approximately 40% for 2008 as compared to 2007.

25.    So far in 2008, the Satellite Division's performance has fallen dramatically short of Ronsen's projections.

**Ronsen Retains Counsel and Begins Blaming Numerex**

26.    By the beginning of October, Ronsen understood that if the Satellite Division continued to perform at the level it had performed since closing, its financial performance would fall short of the Business Plan. He knew that if the Satellite Division's performance fell short of the Business Plan, he would personally suffer adverse financial and other consequences. He understood that such consequences would include not receiving Earn Out payments. He understood that such consequences could include losing his job for "cause."

27.    Although Ronsen had become a very wealthy man by selling Old Orbit One to Numerex, he deemed falling short of the Business Plan—with its consequent financial bonanza—to be a "failure." So he conceived and put into action a plan to avert this personal failure by pointing the finger at Numerex's senior management and, in the process, collecting the entire Earn Out whether he earned it or not.

28.    Before the closing, in an e-mail message dated July 13, 2007, counsel for Old Orbit One, the Lowenstein Sandler law firm, stated that it was acting "as counsel to Orbit One and not to any of the individual members of management."

29.    At some point following the closing, Ronsen retained Lowenstein Sandler to advise him personally in anticipation of this litigation.

30.    On October 5, 2007, Ronsen delivered a ten-page single-spaced letter to Numerex's senior management. On information and belief, the Lowenstein Sandler firm advised Ronsen in connection with the preparation of this letter.

31.    Guided by counsel, Ronsen complained that the "environment" at Numerex was "materially adversely affecting my ability to do my job as I understood it to be, and therefore achieve our (Orbit One's) revenue and EBITDA targets." This was false. In fact, by the time Ronsen delivered the October 5 letter, he was already personally aware of many efforts by Numerex to address the alleged administrative roadblocks cited in the letter.

32.    In the October 5 letter, Ronsen asserted that "my duties as President of Orbit One have been reduced considerably." This was false and was specifically designed to trigger Ronsen's ability to invoke his "good reason" termination clause. Ronsen also asserted that the Satellite Division was "being (or will be very soon) charged for services we simply do not receive." That too, was false and was designed to afford Old Orbit One relief from its contractual commitments in the APA.

33.    On October 8, 2007, Ronsen asked senior management of Numerex to "hold off" on the product launch of the SX-1 "until we work out some issues that you and I can discuss."

34.    Ronsen met with Numerex's senior management and attended an executive retreat and planning session among Numerex's very top executives in mid-October 2007. Senior management at Numerex made extensive efforts to discuss the topics cited in Ronsen's letter and to facilitate integration of the Satellite Division into Numerex. Indeed, during the retreat, Ronsen acknowledged that Numerex was already addressing the complaints in the letter.

35.    Following the executive retreat, senior management at Numerex accelerated efforts to help Ronsen and his team integrate smoothly into Numerex. These

included weekly and in some cases daily conference calls addressing human resources, financial and accounting support, back office support, and a variety of other integration issues.

36.    The Satellite Division did not make any SX-1 sales in October.

37.    On November 1, Numerex's CEO Stratton Nicolaides asked Ronsen to update his sales plan for the SX-1 units. Four days later, Ronsen responded with a list of 24 companies that had received demonstration units and an additional 27 companies that had expressed any interest in learning about the SX-1. Ronsen also re-circulated a marketing document he had prepared before the August 1 closing. Ronsen presented no detailed information about these potential customers, no dates for contacting them, and assigned no probability to their buying SX-1 units. Ronsen did not suggest that he would fail to achieve the sales he projected in advance of the August 2007 closing. To the contrary, during November, Ronsen advised senior Numerex management that he would sell at least 2,000 SX-1 units by year end.

38.    The Satellite Division sold 7 SX-1 units in November and December.

39.    On December 19, 2007, Numerex's Nicolaides visited the Satellite Division's office in Bozeman, Montana. At the meeting, Ronsen gave a presentation in which he blamed senior Numerex management for the Satellite Division's poor SX-1 sales. Ronsen then attempted to hand Nicolaides a letter from his attorneys. In this letter, Ronsen's counsel repeated allegations made by Ronsen in his presentation and subsequently made in his complaint in this case. Ronsen's counsel threatened to sue Numerex unless it negotiated a settlement before January 1.

40.    Ronsen and Old Orbit One then commenced this action on January 8.

**Ronsen's Breaches of Fiduciary Duty**

41.    Ronsen has neglected his responsibilities as a fiduciary of Numerex, peppered senior management with baseless and transparently self-serving e-mail messages, undermined senior management's efforts to help the Satellite Division achieve financial success, encouraged his subordinates to engage in the same behaviors, and made decisions as an executive that placed his own personal economic interests ahead of Numerex's.

42.    These activities are taking place on a daily basis. Several examples are set forth here, but these are not intended to be an exclusive list.

43.    *First,* Ronsen projected that the Satellite Division would have a staff of 21 employees. Yet Ronsen kept the staff at 16 through the end of December 2007. In the fall of 2007, senior management specifically approved Ronsen's request to hire two employees to provide marketing and sales support. Ronsen did not fill these positions. By failing to hire budgeted staff, Ronsen cut costs in the short run, helping him to meet the December 2007 EBITDA Target despite the shortfall in revenue. In this way, Ronsen placed his own short-term financial interests ahead of Numerex's interests.

44.    *Second,* in October 2007, Ronsen advised Numerex to pay a supplier called Axonn LLC ("Axonn") for 20,000 units of the key component for the SX-1 product, even though Axonn and Old Orbit One had unresolved disagreements as to which Old Orbit One and Ronsen have indemnified Numerex. Numerex agreed to make the payment on the representation of Ronsen that he could sell the 10,000 SX-1 units already built plus another 20,000 SX-1 units that would use the new components. (By the time he made that representation, he had already sent his October 5 letter of complaint.) Through February 2008, the Satellite Division sold only 144 SX-1 units. By

causing *Numerex* to pay millions of dollars to Axonn for units that were not promptly

saleable, Ronsen derived direct financial benefit for himself, to the extent that those

payments reduce damages that Axonn might otherwise claim against Old Orbit One. In

other words, if Ronsen understood that he could not sell the SX-1s, Ronsen was causing

Numerex to make payments to Axonn in lieu of payments that Old Orbit One (and

ultimately Ronsen) would otherwise have had to pay out of their own pockets.

45.     *Third*, in January 2008, Ronsen submitted a budget for the calendar year

2008 in an effort to comply with Section 2.4 of the Earn Out. This budget was submitted

late. The budget was also submitted in bad faith and did not honestly reflect realistically

achievable results and operating needs of the Satellite Division. Most prominently, the

budget projects sales of the SX-1 of 31,000 units. The Satellite Division sold virtually no

SX-1 units from August 2007 through February 2008. Ronsen justified this jump from

zero to 31,000, not based on any prospective or actual sales, but based on his supposed

hope for a "significant increase in support and ability to operate the business unit, as

previously promised and as expected."

46.     *Fourth*, Ronsen engaged in subterfuge in order to obtain a $1.75 million

payment for renewal of the Stratix contract. Schedule 1.3(a)(iii) of the APA provides for

a cash payment to Old Orbit One upon extension of the Stratix contract "on similar terms,

conditions, economics and quantity" as the original contract. The APA specified that "if

there are changes to the terms and conditions of the Original 2007 Stratix Agreement

agreed to as a part of the extension described above, and NMRX shall have agreed to

such changes, then the conditions to payment contained in this provision will be deemed

to have been met, **with such provisions as to which NMRX and Seller will have agreed at the time.**" Schedule 1.3(a)(iii) (emphasis supplied).

47.     Although, on information and belief, Ronsen had known for an extended period of time that the Stratix contract would be renewed on worse terms, he did not disclose this to senior Numerex Management responsible for the negotiation of the APA until late December.  Rather, he sent an e-mail to another executive on the Friday before Christmas, saying that the size of the contract has "decreased somewhat" and asked him to "please approve today so that we can commit to our services to them in time to get their contract signed before the end of the year." That executive—who was not involved in the APA negotiations, and who would not have known the consequences of "acceptance" for the APA—responded that Ronsen should "move forward."

48.     Ronsen then applied extensive pressure on this executive to approve the Stratix reduction by January 7, without disclosing his own self-interest.  When the executive gave a verbal approval, Ronsen sent a self-serving e-mail asking for confirmation that the executive had "accepted" Stratix's purchase order—again without disclosing the context in which he was asking for "acceptance." Indeed, Ronsen's email falsely made it appear that there was an urgent business reason to wrap up the negotiations with Stratix and that doing so would benefit Numerex.

49.     The executive's unknowing confirmation came on January 8. Immediately after the confirmation, Ronsen filed this action.  Numerex paid the amount Ronsen demanded under Schedule 1.3(a)(iii) with a reservation of its rights.

50.     In short, Ronsen has not acted and is not acting in good faith.  He is not attending to the business of the Satellite Division.  Rather, he is taking every opportunity

to manufacture "evidence" that other executives within Numerex are responsible for the

Satellite Division's failure to reach the agreed-upon Earn Out milestones for 2008 and

2009.

51.     Ronsen admitted to a confidential source that the source of the complaints

he has made to this Court are due to personality conflicts.

**Ronsen's Financial Conflict**

52.     The motivation for Ronsen to complain falsely that he has been stripped of

his authority is a massive financial windfall:  If Ronsen is allowed to terminate his

employment for "good reason" (as that term is defined in the contract documents

integrated into the APA), then Ronsen will have been deemed to have earned the stock

and cash based portions of the Earn Out.

53.     Because of Ronsen's abysmal performance at the helm of the Satellite

Division, this is the only way that he has to obtain the funds available under the Earn Out.

Indeed, if he continues to perform anywhere near the levels that he has achieved to date,

he can be terminated for cause in July 2008.

**COUNT ONE**
**(Breach of Fiduciary Duty against Ronsen Individually)**

54.     Numerex hereby incorporates by reference, as if fully stated herein, each

and every one of the foregoing paragraphs.

55.     As an executive of Numerex, Ronsen owes fiduciary duties of loyalty,

care, and good faith to Numerex.

56.     As the 84% shareholder of Old Orbit One, Ronsen has an actual conflict of

interest and of necessity engages in self-dealing in the execution of his fiduciary duties to

- 27 -

the extent that any decision he makes affects the revenues or EBITDA of the Satellite Division.

57.     Therefore, Ronsen's decisions affecting revenues and EBITDA of the Satellite Division are subject to review under the intrinsic fairness test rather than the business judgment rule.

58.     Ronsen has flunked that test.  He failed to hire the sales and marketing staff he had projected would be required, enhancing the short-term EBITDA performance of the Satellite Division at the expense of the long-term performance of Numerex.  He used Numerex funds to pay Axonn for thousands of SX-1 components that he has been unable to sell, thereby decreasing his personal indemnification obligations to Numerex.  He has peppered Numerex senior management on almost a daily basis with manufactured and contrived complaints to bolster his lawsuit and in order to deflect responsibility for the abysmal sales performance of the Satellite Division.  And he lured a Numerex executive into supposedly "accepting" the Stratix contract without mentioning that the "acceptance" supposedly would waive the opportunity to negotiate a commensurate reduction in the Schedule 1.3(a)(iii) payment to reflect the reduced economic value of the Stratix contract extension.

59.     In sum, Ronsen has elevated his own financial interests ahead of those of Numerex.  He has misused his position as a fiduciary to enrich himself.  He has devoted his own time to manufacturing evidence to use in his lawsuit against Numerex.  He has induced his subordinates to do the same.

60.     As a direct and proximate result of Ronsen's breach of fiduciary duty, Numerex has incurred substantial financial losses including, but not limited to, the costs

associated with nearly 30,000 unsold SX-1 units and the $1.75 million that Numerex paid

to Old Orbit One with a full reservation of rights.

61.     Numerex is entitled to recover any and all damages it has sustained as a

result of Ronsen's breaches, including recovery of his entire salary, all benefits and all

payments made pursuant to the Earn Out from the time of Ronsen's first disloyal act, net

of any set-offs.

## COUNT II
### (Breach of the Covenant of Good Faith and Fair Dealing)

62.     Numerex hereby incorporates by reference, as if fully stated herein, each

and every one of the foregoing paragraphs.

63.     Ronsen, acting for himself and for Old Orbit One, has breached the

covenant of good faith and fair dealing. He used subterfuge to extract a $1.75 million

payment from Numerex for renewal of the Stratix contract without full and honest

disclosure of the adverse economic consequences of that renewal. He has failed to make

an honest effort to achieve the objectives agreed to in the Business Plan. He has failed to

devote his full time and efforts to the business of the Satellite Division. Instead, Ronsen

devoted substantial time in October through December to developing his lawsuit against

Numerex. He has peppered senior Numerex management with daily e-mail messages

transparently designed to bolster his litigation position without regard to the

consequences for Numerex. He has taken opportunistic advantage of his position as

President of the Satellite Division to divert resources for the purpose of enriching

himself.

64.     As a direct and proximate result of Ronsen's breaches and misconduct,

Numerex incurred losses including, but not limited to, the costs associated with the nearly

30,000 SX-1 units Ronsen has not sold and the $1.75 million that Numerex paid to Old Orbit One with a full reservation of rights, as well as lost profits and lost management time.

65.     For these reasons, Numerex is entitled to recover any and all damages sustained by it and resulting from Ronsen's and Old Orbit One's breaches, net of any set-offs.

**COUNT III**
**(Indemnification)**

66.     Numerex hereby incorporates by reference, as if fully stated herein, each and every one of the foregoing paragraphs.

67.     Before closing, Ronsen disclosed that he had a long-running dispute with Old Orbit One's principal supplier, Axonn.

68.     In the APA, Old Orbit One indemnified Numerex against losses arising out of that dispute, and Ronsen and the other Old Orbit One shareholders personally guaranteed that indemnity obligation.

69.     Numerex has expended and expects to expend considerable management time and other resources attempting to resolve the dispute. Despite these efforts, the dispute has not been resolved.

70.     Pursuant to Section 7.2 and Exhibit I of the APA, Numerex is entitled to payment for all losses, damages, liabilities, expenses or costs, including reasonable attorneys' fees, incurred to date or in the future in connection with the Axonn dispute, including the payments to Axonn for components of SX-1 units that Ronsen has been unable to sell.

## COUNT IV
### (Set-Off and Declaratory Judgment)

71.    Numerex hereby incorporates by reference, as if fully stated herein, each and every one of the foregoing paragraphs.

72.    Orbit One and Ronsen contend that Orbit One has a future right to receive cash and stock pursuant to the APA.

73.    Numerex disputes that contention. Further, Numerex has a common-law and contractual right to withhold payments and to set off its damages. Numerex intends to exercise those rights.

74.    A right of set-off is waived if not timely exercised. Therefore, in order to preserve its rights, Numerex may exercise set-offs of debts allegedly owed to Plaintiffs as they arise.

75.    However, in order that the parties' rights and obligations with regard to the anticipated set-offs are fully preserved, Numerex respectfully requests that the Court adjudicate the availability of such set-offs.

### DEMAND FOR JURY TRIAL

Numerex demands trial by jury for all issues so triable.

### RELIEF REQUESTED

WHEREFORE, Numerex respectfully requests the following relief:

A.    Denial of plaintiffs' requests for any and all relief under any theory that is asserted or could be asserted with respected to the Complaint, including all requests for relief as stated with respect to each Count in the Complaint.

B.    Disgorgement by Ronsen of the value of all compensation and benefits received by him from Numerex since the date he began breaching his fiduciary duties;

C. An award of compensatory damages in an amount to be proved at trial, plus

   interest;

D. Punitive damages commensurate with Ronsen's disloyal conduct;

E. Indemnification for all losses, damages, liabilities, expenses or costs, including

   reasonable attorneys' fees, incurred to date or in the future in connection with the

   Axonn dispute;

F. Declaratory relief that any set-offs it exercises are just and proper;

G. Attorneys fees and costs; and

H. Such other relief as may be just and proper.

Dated: New York, New York
       March 10, 2008

                                    ARNOLD & PORTER LLP

                                    By _____
                                         Kent A. Yalowitz
                                         Kent.Yalowitz@aporter.com
                                         Brandon H. Cowart
                                    399 Park Avenue
                                    New York, NY 10022-4690
                                    Telephone: (212) 715-1000
                                    Facsimile: (212) 715-1399

                                    *Attorneys for Defendant, Numerex Corp.*