John J.D. McFerrin-Clancy (JM-C 6937)
**LOWENSTEIN SANDLER PC**
1251 Avenue of the Americas
New York, New York  10220
(212) 262-6700
*Attorneys for Plaintiffs*


## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ORBIT ONE COMMUNICATIONS, INC., DAVID RONSEN, | Civil Action No. 08-CV-0905 (LAK) |
| Plaintiffs, | |
| -against- | **Document Filed Electronically** |
| NUMEREX CORP., | |
| Defendant. | |


## PLAINTIFFS'/COUNTERCLAIM DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ..................................................................... ii

PRELIMINARY STATEMENT ................................................................. 1

FACTS .................................................................................................... 6

ARGUMENT ........................................................................................... 16

    I.     Standard and Timing for Summary Judgment and Judgment on the
           Pleadings ...................................................................................... 16

    II.    Plaintiffs Are Entitled to Immediate Payment on Each Payment Default ........... 17

           A.    Plaintiffs Are Entitled to the First Tranche of the Earn Out .................... 17

           B.    Plaintiffs Are Entitled to the Hold Back .................................................. 17

           C.    Plaintiffs Are Entitled to the Gross-up for Insurance ............................. 18

           D.    Plaintiffs Are Entitled to the Full Bonus ................................................ 18

           E.    Numerex Cannot Use the Counterclaims as a Set Off ............................ 19

    III.   Numerex's Various Payment Defaults Have Triggered the Guarantee
           Provision ...................................................................................... 27

           A.    Failure to Pay the Earn Out and Hold Back Has Triggered the
               Earnout Guarantee ................................................................. 28

## <u>TABLE OF AUTHORITIES</u>

**Pages**

**CASES**

*BWA Corp. v. Alltrans Exp. U.S.A., Inc.,*
   112 A.D.2d 850, 493 N.Y.S.2d 1 (1st Dep't 1985)............................................... 29

*Carvel Corp. v. Diversified Management Group, Inc.,*
   930 F.2d 228 (2d Cir. 1991)...........................................................................29, 31

*Chappelow v. Savastano,*
   195 Misc.2d 346, 758 N.Y.S.2d 782 (N.Y. Sup. Ct. 2003) ................................ 30

*Commercial Oil v. Advance Food Svs. Equip.,*
   991 F.2d 49 (2d Cir. 1993)...........................................................................29, 30

*D&L Holdings, LLC v. RCG Goldman Co., LLC,*
   287 A.D.2d 65 (1st Dep't 2001) .......................................................................... 32

*Ferguson v. Lion Holding, Inc.*
   312 F.Supp.2d 484 (S.D.N.Y. 2004) ...............................................................19, 20

*Gibbs v. Cigna Corp.,*
   440 F.3d 571 (2d Cir. 2006)................................................................................ 33

*Lucente v. IBM,*
   310 F.3d 243 (2d Cir. 2002)................................................................................ 17

*Ricci v. Stefano,*
   530 F.3d 88 (2nd Cir. 2008)................................................................................ 16

*Willett v. Lincolnshire Mgmt., Inc.,*
   302 A.D.2d 271, 756 N.Y.S.2d 9 (1st Dep't 2003)............................................. 19

**RULES**

Fed. R. Civ. Pro. 12(c)..................................................................................................... 16

Fed. R. Civ. Pro. 56(a).................................................................................................... 16

Fed. R. Civ. Pro. 56(b) and 12(c) .................................................................................... 1

Rule 56(b) ....................................................................................................................... 16

Plaintiffs/Counterclaim Defendants Orbit One Communications, Inc. ("Orbit") and David Ronsen (collectively, "Plaintiffs") submit this memorandum of law in support of their motion for summary judgment and/or judgment on the pleadings pursuant to Fed. R. Civ. Pro. 56(b) and 12(c). For the reasons set forth below, the motion should be granted, and judgment entered in Plaintiffs' favor on their claims and on the counterclaims brought by Defendant/Counterclaim Plaintiff Numerex Corp. ("Numerex").

## PRELIMINARY STATEMENT

**Summary of the Action**

On July 31, 2007, Orbit and its principal, David Ronsen, sold substantially all of the assets of Orbit to Orbit One Communications LLC ("New Orbit") a specially created subsidiary of defendant Numerex, pursuant to an Asset Purchase Agreement (the "APA"). Most of the sale price was in the form of an "earn out", governed by various exhibits and schedules expressly integrated into the APA. The Complaint describes the breaches of those agreements by Numerex that both inhibited Plaintiffs from reaching the earn out targets, and also triggered the guarantee of the entire $15-20 million earn out.[1]

**Nature of the Motion**

However, this motion concerns breaches of the parties' agreement that occurred after the filing of the Complaint. Since the commencement of this action, Numerex has refused to honor any of its obligations under the APA. In particular, the APA required Numerex to make certain additional payments to Plaintiffs totaling some $3.75 million:

1) Numerex has refused to pay the first tranche of the earn out, due March 31, 2008. Numerex has stated in writing and reflected in its SEC filings that, based on the performance of New Orbit through December 31, 2007, Plaintiffs are entitled to 320,288 shares of Numerex stock (valued at $10.25 a share in the APA). However, Numerex has refused to direct the release of these shares from escrow.

---

[1]    Most of the earnout is payable in Numerex stock, over time, hence the uncertainty of its total value.

2)  Pursuant to Paragraph 1.4(a) of the APA, $550,000 (the "Hold Back") of the initial purchase price was escrowed against any expressly indemnified claims.  No such claims have been asserted.  As a result, Numerex was required to release the Hold Back on July 31, 2008, which it has refused to do.

3) Pursuant to Paragraph 4(c) of Exhibit D of the APA, Numerex was required to maintain Ronsen's health insurance through his "non-competition period",[2] once he terminated his employment, on April 24, 2008. Instead, Numerex deliberately terminated Ronsen's health insurance upon the termination of his employment.  Only after receipt of Plaintiffs' notice of default did Numerex make any offer to cure.  Numerex's offer to cure was materially deficient, because the proposed payments are taxable as 1099 income, and thus the net benefit to Mr. Ronsen from the employer "contribution" has decreased by net 50%, and his cost of health insurance have commensurately increased.

4)  Pursuant to Paragraph 1(d) of Exhibit D of the APA, Numerex was obligated to pay Mr. Ronsen a bonus based "upon the achievement of Numerex **company-wide** EBITDA and revenue objective [sic] . . . annually under Numerex's executive bonus plan."  However, Mr. Ronsen's bonus was not calculated on company-wide EBITDA or revenue.  Rather, Numerex has admitted that his bonus was based on Numerex's financial results **without** counting the EBITDA and revenue contributed by New Orbit, one of Numerex's divisions.

These four items are referred to herein as the "Payment Defaults."

Numerex purports to justify its payment defaults based on the pendency of its counterclaims.  It has contended, in response to various demand letters, that it is entitled to self-help, to set off the counterclaims against the more than $3.75 million value of the payments overdue and owing.  Numerex's attempts at set off are insufficient to withstand this motion for two reasons:

(a)    Plaintiffs' claims under the Payment Defaults are certain in amount, due and owing, that is, they are "liquidated" claims.    Numerex's counterclaims are uncertain and (highly) contingent.  It is black letter law that one may not assert unliquidated claims as a set off against liquidated claims; and

---

[2]    Actually, because Ronsen terminated his employment with "Good Reason" as defined in the agreement, Plaintiffs do not contend that the severance is owed.  However, if as defendant claims, Ronsen terminated without Good Reason, defendant is liable for a payment default for failure to continue the benefits.

(b)      Numerex's counterclaims are spurious, and refuted by the parties' agreements and other documentary evidence.

As such, in the first part of their motion, Plaintiffs seek an Order granting them specific enforcement and/or damages with regard to each of the above-referenced payment defaults, and for dismissal of the counterclaims.

The second part of the motion concerns the consequences of Numerex's Payment Defaults.  Specifically, Exhibit D[3] of the APA constituted Mr. Ronsen's employment arrangement with Numerex.  Pursuant to Paragraph 3(c) of Exhibit D of the APA, should Mr. Ronsen terminate his employment for "Good Reason," Numerex is obligated to pay the entire amount of the earn out.  The payments are not accelerated, but the maximum revenue and EBITDA targets negotiated by the parties are deemed met.   (The "Guarantee Provision" or the "Earn out Guarantee").  Paragraph 3(a) of Exhibit D of the APA defines "Good Reason" as, *inter alia*:

> [A] material breach by [Numerex] of any of its obligations to Mr. Ronsen under this Agreement, which breach is not cured in all material respects within thirty (30) days (except in the case of a payment default for which the cure period shall be ten (10) days) . . . ."

Pursuant to the terms of the APA, Plaintiffs provided Numerex timely notice of each of the Payment Defaults.  More than ten days passed after each notice, and Numerex failed to cure, or made an inadequate offer to cure.  As such, the Guarantee Provision has been triggered.

In response to Plaintiffs' demand for payment and that Numerex acknowledge that failure to pay the earn out has triggered the Guarantee Provision,[4] Numerex has asserted that the earn out is not a payment obligation "under this Agreement."  (Plaintiffs anticipate a similar objection

---

[3]    Exhibit D is entitled "Severance and Non-Competition Agreement."  However, it sets forth, *inter alia*, the terms of Mr. Ronsen's employment by Numerex.

[4]    At the time of the referenced correspondence, the failure to pay the earn out was the only extant Payment Default.

from Numerex with regard to the Hold Back.)  Numerex claims that Exhibit D to the APA is somehow a separate and distinct agreement from the rest of the APA, the Earn Out Agreement (which is Exhibit B to the APA), and the Earn Out Matrix (Schedule B to the APA).  This argument cannot withstand summary judgment because:

(1)    By the clear and express terms of the APA, Exhibit D is incorporated into and made part of the APA.  Specifically, Paragraph 9.10 of the APA states: "All Exhibits and Schedules referred to herein are intended to be and hereby are specifically made a part of this Agreement."  Similarly, the Earn Out Agreement and the Earn Out Matrix are both attached and made part of the APA, as Exhibits B and Schedule B, respectively.  This clause alone is dispositive that the Employment Agreement, the Earn Out Agreement, and the Earn Out Matrix are all integrated into and part of the APA.  Moreover, the agreements all refer to one another, have mutual and dependent obligations and cannot be interpreted without reference to one another.

(2)    In addition to the express language of the APA, New York law concerning contract construction mandates that agreements signed together as part of the same transaction must be read as a single agreement.  The APA and all of its exhibits and schedules were drafted, negotiated, and executed at the same time and as part of the same transaction as the APA, and are all part of the same physical document.

(3)    The parties' interpretation of a contract is most strongly evidenced by the parties' conduct under that agreement.  In its counterclaims, and in its assertion of its purported set off, Numerex has asserted that Exhibit D of the APA was "integrated" with the APA and other agreements, and that Mr. Ronsen's failure to properly and faithfully perform his duties under Exhibit D of the APA constitutes a breach of the APA and justifies a set off against the earn out.

In its eagerness to deny Plaintiffs the benefit of their bargain, Numerex has untenably asserted inconsistent positions. Numerex's counterclaims turn on the notion that Ronsen's alleged misfeasance as an employee of Numerex under Exhibit D constitutes a breach of Orbit's obligations under the rest of the APA. Thus, the crux of the counterclaims is, as Numerex expressly pleads (and Plaintiffs agree) that all of the exhibits and schedules appended to the together form one agreement. If Numerex is correct in this, then it follows that the failure to pay the earn out or the Hold Back trigger the Guarantee Provision. However, in refusing to acknowledge the trigger of the Guarantee Provision, Numerex has asserted that the obligations under Exhibit D of the APA are somehow separate from those under the other parts of the APA, the Earn Out and the Earn Out Matrix.

Numerex cannot have it both ways. Either (a) the agreements are one, and the Earn out Guarantee in Exhibit D has been triggered by failure to pay the first tranche of the earn out, the Hold Bank (let alone the other payment defaults); or (b) the agreements are separate, and Numerex cannot assert the counterclaims based on Mr. Ronsen's conduct against Orbit, nor assert them as a set off against Orbit's past due entitlement to the earn out.

Even were Numerex able to assert such contradictory positions at once, the Earn out Guarantee would have been triggered by the failure to provide Mr. Ronsen's health insurance, and to pay his proper bonus. Both of those obligations expressly appear in Exhibit D to the APA.

As such, in the second part of their motion, Plaintiffs request a declaration that the Payment Defaults described in Part I of the motion provided Mr. Ronsen with "Good Reason" to terminate his employment, and that, therefore, *inter* alia, the Guarantee Provision has been

triggered, with the attendant consequences under the APA.  They also seek damages and/or specific performance with regard to these defaults.

In the alternative, should the Court disagree that the agreements form a single contract, Plaintiffs are entitled to:  (1) dismissal of all counterclaims against Orbit; and (2) to the immediate payment of the first tranche of the earn out and the Hold Back, the bonus, because those obligations appear in the APA.

### FACTS

### Background

Plaintiff David Ronsen is the founder of Plaintiff Orbit, and owner of 84% of its stock. While Orbit had operations, he was its President.  Declaration of David Ronsen dated September 3, 2008 ("Ronsen Decl."), at ¶ 1.

Mr. Ronsen's interest in satellite-based communications systems arose during his work as a firefighter.  After leaving an urban the fire service, Mr. Ronsen started a business that managed and fought wildfires for federal and state land management agencies.  While engaged in that work, often in remote and mountainous terrain, Mr. Ronsen experienced first-hand the superiority of satellite-based communications systems.  *Id.* at  ¶ 10.

Inspired by those experiences, Mr. Ronsen founded Orbit in 2000.  Orbit's principal line of business has evolved, and it is now the premier provider and manufacturer of satellite-based tracking devices and related services.  In particular, Orbit sells units that, when affixed to remote assets (e.g., trucks, trailers, heavy equipment), provide GPS tracking.  Orbit also markets the satellite data delivery service that communicates the tracking information back to a customer.  *Id.* at ¶ 11.

Orbit is a Montana Subchapter S corporation.  *Id.* at ¶ 12.

By 2007, Orbit was one of the leading providers of satellite GPS tracking devices and services. It had some twenty employees and revenues averaging some $10 million per year. *Id.* at ¶ 13.

A.    *Negotiations with Numerex*

In late 2006, Orbit was approached by Numerex, wholly unsolicited, regarding a potential acquisition of Orbit. Orbit had never been in any kind of sale process, nor had its shareholders (all three of whom were also employees) ever contemplated selling the business. *Id.* at ¶ 14.

Ultimately, Numerex wished to pay only a nominal amount of guaranteed, up-front consideration for Orbit. The initial, and the only guaranteed payment was some $5 million (followed by an additional $550,000). This was a "nominal" amount because Numerex claimed over $5 million of good will on the deal, and the contracts Orbit had in hand would provide over $3 million in revenue between the closing of the deal and the end of 2007. In fact, the contracts in hand yielded $4.02 million of revenue for Numerex in just the last two quarters of 2007, and in that period generated $1.8 million of the $3.3 million EBITDA Numerex earned for all 2007. *Id.* at ¶ 15. The purchase price is set forth in Paragraph 1.3 of the APA. A true and correct copy of the APA with its attached and integrated Exhibits and Schedules are annexed to the Ronsen Decl. as Exhibit 1.

The bulk of the consideration was based on an "earn out" matrix. That is, to the extent New Orbit, Numerex's vehicle for the acquisition, reached certain revenue and EBITDA targets, at set intervals over two and one half years, Numerex would pay to Plaintiffs certain additional amounts in cash and stock. If New Orbit hit 150% (the highest level on the earnout matrix) of all the targets over a two and one half year period, Plaintiffs would receive approximately $20 million in additional consideration. Ronsen Decl., at ¶ 16. The terms of the earn out are set forth in Paragraph 1.3 of the APA, Exhibit B of the APA (the "Earn Out Agreement"), Schedule 1.3 of

the APA ("Earn out Matrix"), and as an exhibit to Exhibit D, all of which are expressly incorporated and made part of the APA.  Ronsen Decl., Ex. 1, at ¶ 1.3 and Schedule 1.3; Ex. 1, Ex. B; Ex. 1, Ex. D.

As a quid pro quo for accepting the contingent nature of the bulk of the purchase consideration, Plaintiffs insisted that Mr. Ronsen remain in control of New Orbit.  Ronsen Decl., at ¶ 17.  That is, because Plaintiffs would bear the risk with regard to meeting the earn out targets, they would be entitled to control the management and operation of the business during the entire earn out period.  If Numerex terminated or even reduced that control (other than for cause), or if Mr. Ronsen was compelled to give up that control (as a result of Numerex's conduct), the earn out would be guaranteed in its entirety.  That is, if Numerex deprived Mr. Ronsen of control, the risk of performance shifted to Numerex.  This shift of risk was memorialized in Paragraph 3(a) of Exhibit D of the APA, which provides that Mr. Ronsen may terminate his employment for "Good Reason," *inter* alia, should Numerex not give him the title and customary authority of president of New Orbit.  Ronsen Decl., Ex. 1, Ex. D, at ¶ 3(a)(ii).

### B.    *Integration of the Various Agreements*

This central bargain dictated the structure of the entire, integrated transaction.  In particular, it required not only that there would be an APA, but also that Mr. Ronsen would be employed by Numerex post-acquisition.  Indeed, the APA is expressly conditioned on Mr. Ronsen's execution of Exhibit D, his employment agreement.  Ronsen Decl., Ex. 1, ¶ 2.2(b)(v). The APA and all of its attachments and exhibits, including the Earn Out and Exhibit D were all drafted, negotiated, and executed together, as part of one transaction.[5]

---

[5]    Although Exhibit D of the APA states that it is dated June 31, 2007, this is a typographical error.  Notably, June has only 30 days.  The APA and all of its attached agreements were executed on July 31, 2007.

Given the nature of the transaction and the express language of the APA, the parties never intended that they stand alone or be read separately. First, and most importantly, the parties expressly agreed that the documents were all subsumed in the APA. Specifically, Paragraph 9.10 of the APA mandates that: "All Exhibits and Schedules referred to herein are intended to be and hereby are specifically made a part of this Agreement." Ronsen Decl., Ex. 1, at ¶ 9.10.

Second, the rights and obligations of the parties are often established and cross-referenced in multiple documents, thus rendering the agreements inextricably intertwined and interdependent. For instance, the body of the APA sets forth the period for the earn outs and the obligations to pay, but expressly references "Exhibit B" of the APA for the method of determining the amount of the earn out. Exhibit B is the Earn Out Agreement, which attaches its own "Exhibit B" bearing the title "Earn Out Matrix." That Matrix is, in turn, attached again as an exhibit to Exhibit D of the APA. *Id.* at Ex. 1, at ¶ 1.3; Ex. 1, Ex. B.

Paragraphs 2(c) and 4(a) of Exhibit D of the APA also make express reference to the APA and the "Business Plan," which is Schedule 1.6 to the APA, but nowhere defined in Exhibit D of the APA. *Id.* at Ex. 1, Ex. D, at ¶¶ 2(c) and 4(a).

Similarly, Exhibit D of the APA expressly references the APA itself. The first recital provides:

> WHEREAS, [New Orbit] and [Numerex] have entered into an Asset Purchase Agreement, dated the date hereof . . . providing for the purchase by New Orbit of substantially all of the assets of [Orbit].

As noted above, the APA was expressly conditioned on the execution of Exhibit D. *Id.* at Ex. 1 at ¶ 2.2(b)(v).

-9-

Likewise, Exhibit D of the APA states in a number of places that if Mr. Ronsen breaches his obligations under the Severance Agreement, Numerex is absolved of various obligations under the APA.  For example, Paragraph 2(c) of Exhibit D of the APA states:

> (c)     In the event of a termination by [Numerex] of Mr. Ronsen for cause, [Numerex] shall have the right notwithstanding anything to the contrary in Section 1.6 of the Asset Purchase Agreement, to manage the Division without regard to the Business Plan . . .

In addition, Paragraph 5(c) of the APA provides that:

> (c) In the event that a court of competent jurisdiction has determined  . . . that Mr. Ronsen has materially breached [the non-competition provision of the Severance Agreement] . . .  [Orbit] shall forfeit the right to receive the [Numerex] Stock referenced in [the earn out provisions of the APA] as well as the cash consideration specified in [the earn out provisions of the APA] . . . .

These provisions mirror the provisions of Paragraph 3(c) of Exhibit D of the APA, which triggers a guarantee of the earn out amounts going forward, should Numerex breach its obligations.  *Id.* at Ex. 1, Ex. D, at ¶¶ 2(c), 5(c), and 3(c).

The transaction closed on July 31, 2007.

### C.     *Numerex's Payment Defaults*

The parties' agreement imposed a number of payment obligation on Numerex that would fall due over the two and one half years following the closing.  Numerex has failed to comply with at least four such obligations:

#### i.     *Failure to Pay the Earn Out*

As noted above, the agreements provide for additional "earn out" compensation to Plaintiffs should New Orbit meet certain revenue and EBITDA targets.  *Id.* at Ex. 1, at ¶¶ 1.3(a)(iv)-(vi), Ex. 1, Ex. B.; Ex. 1, Ex. D, at ¶ 1(d) and Ex. A.  The Earn Out Agreement specifies the procedure for determining the amount, if any, of the earn out payments in each of the three earn out periods.  The first such period ended December 31, 2007.  *Id.* at Ex. 1, Ex. B.

Paragraph 1.3(a)(iv) of the APA provides that stock earned pursuant to the December 31, 2007 earn out period shall be released on March 31, 2008.  *Id.* at Ex. 1, at ¶ 1.3(a)(iv).

So long as the Plaintiffs did not object to the calculation on the Statement, Numerex was required to release the escrowed earn out payment.  *Id.* at Ex. 1, Ex. B, at ¶ 2.3.

Numerex never sent the Statement to Plaintiffs, and thus precluded payment of the earn out to Plaintiffs.  Ronsen Decl., at ¶ 22.  By letter dated April 11, 2008, counsel for Plaintiffs put Numerex on notice of a payment default for failure to pay the earn out, or even to provide the Statement called for by Exhibit B of the APA.  A true and correct copy of this April 11, 2008 letter is annexed to the Declaration of John J.D. McFerrin-Clancy (the "Clancy Decl.") as Exhibit 1.

In response, Numerex provided a letter from its general counsel and board member, Andrew Ryan, stating that it had provided the "statement," which it also attached to its letter.  A true and correct copy of this letter and the purported "statement" are annexed to the Clancy Declaration as Exhibit 2.  In that letter, Numerex stated that a "draft" calculation, which had purportedly been forwarded to a non-officer of New Orbit in January 2007, contained the correct calculation, and that that employee had been "told" that Mr. Ronsen "signed off on it."  Clancy Decl., Ex. 2.

In fact, Mr. Ronsen had seen the draft calculation, but since it was marked "draft," he did not understand it to be the Statement required under the APA.  In any event, Plaintiffs agree that the calculation is correct.  Ronsen Decl., at ¶ 24.  Significantly, Numerex's letter admits that New Orbit did in fact achieve 67% of its Revenue, and 112.1% of its EBITDA targets.  Clancy Decl., Ex. 2.  According to Numerex's own calculation, and as set forth in Mr. Ryan's letter,

Plaintiffs thereby are entitled to 320,833 shares of Numerex stock from the escrow. Ronsen Decl., at ¶ 24.

Numerex's 10k for 2007 reflects the award to Plaintiffs of 320,833 shares of Numerex stock. Clancy Decl., Ex. 6, at p. 30.

While Mr. Ryan acknowledges Plaintiffs' due demand for payment of the shares, he stated that Numerex would not release them because of the pendency of Numerex's counterclaims based on Mr. Ronsen's conduct as an employee of Numerex. Clancy Decl., Ex. 2. To date, Numerex has failed to pay the first tranche of the earn-out. Ronsen Decl., at ¶ 26.

Notably, Numerex's share price has declined since it breached its obligations to turn over the shares. On March 31, 2008, the stock price was $7 per share. As of this writing, it is slightly over $5 per share.

        ii.    *Hold Back*

Pursuant to Paragraph 1.4(a) of the APA, Numerex was entitled to escrow $550,000 of the purchase price for one year from the July 31, 2008 closing:

> <u>Cash Escrow</u>. Ten (10%) percent of the aggregate cash consideration specified in Section 1.3(a)(i), (ii) and (iii) shall be escrowed pursuant to the Escrow Agreement (**"Cash Escrow"**) for a period of one (1) year from the date of Closing as a cash hold back and initial source of recovery for purposes of Seller's indemnity obligations under Article IX.

No indemnified claim has been asserted by any third party. Moreover, the only indemnity "claim" Numerex has asserted, as set forth below, was an obligation expressly carved out from the indemnity provisions of the APA.

By letter dated August 4, 2008, Plaintiffs demanded payment of this amount, but, again asserting its contingent counterclaims, Numerex refused to pay. Clancy Decl., Ex. 9.

### iii.     Health and Welfare Benefits

As set forth in his letter to Numerex, dated April 24, 2008, Mr. Ronsen terminated his employment as of April 24, 2008 due to Numerex's numerous breaches the parties' agreement. A true and correct copy of this April 24, 2008 letter is annexed to the Ronsen Declaration as Exhibit 2.

In that letter, Mr. Ronsen states, as Plaintiffs do in their Complaint, that Mr. Ronsen is terminating his employment for "Good Reason," as set forth in Exhibit D of the APA. Ronsen Decl., Ex. 2. Pursuant to Paragraph 3(c) of Exhibit D of the APA, if Mr. Ronsen properly terminated for "Good Reason," Plaintiffs are deemed, going forward, to be entitled to the highest earn out amount. Additionally, pursuant to Paragraph 3(b) of Exhibit D of the APA, Mr. Ronsen would be entitled to twelve months severance (upon signing a release), but Mr. Ronsen would not be entitled to "health and welfare benefits." *Id.* at Ex. 1, Ex. D, at ¶¶ 3(b) and 3(c).

Although Mr. Ronsen requested the release, Numerex refused to provide it and never provided him with any severance. Ronsen Decl., at ¶ 33. Instead, Numerex took the position, in a letter dated April 30, 2008, that Mr. Ronsen lacked "Good Reason" and that Mr. Ronsen had terminated his employment "Not for Good Reason." A true and correct copy of this April 30, 2008 letter is annexed to the Clancy Declaration as Exhibit 3.

However, even if Mr. Ronsen had terminated his employment on those terms, as Numerex baldly claims (and Plaintiffs dispute), Numerex would have been required to continue his "health and welfare benefits throughout the Non-Competition Period." Ronsen Decl., Ex. 1, Ex. D, at ¶ 4(c).

Notwithstanding its contention that Mr. Ronsen terminated his employment "Without Good Reason," Numerex cancelled his health insurance and other benefits immediately upon his leaving its employ. Ronsen Decl., at ¶ 35. By letter dated June 20, 2008, Plaintiffs' counsel

placed Numerex on notice of this payment default.  A true and correct copy of this June 20, 2008

letter is annexed to the Clancy Declaration as Exhibit 4.  By letter dated July 9, 2008, Numerex

offered to reimburse him to the extent his COBRA premiums exceed the amount he formerly

contributed to his company group health insurance.[6]  A true and correct copy of this July 9, 2008

letter is annexed to Clancy Declaration as Exhibit 5.  However, Numerex has not offered to

reimburse him for his used deductible, nor has it agreed to gross up this "reimbursement" to

offset the tax consequences of this "cure" arrangement -- which decreases the value of the

employer contribution to Mr. Ronsen's by more than 50%.  Ronsen Decl., at ¶ 35.

### iv.    Failure to Pay Full Bonus

Pursuant to Paragraph 1(d) of Exhibit D of the APA, Numerex was obligated to pay Mr.

Ronsen a bonus based "upon the achievement of Numerex company-wide EBITDA and revenue

objective [sic] . . . annually under Numerex's executive bonus plan."  Ronsen Decl., Ex. 1, Ex.

D, at ¶ 1(d).

Numerex reiterated this understanding in Mr. Ryan's letters to the Montana Department

of Labor regarding this matter.  In the first, dated May 5, 2008, he states, "[Mr. Ronsen's bonus]

is a performance-based bonus, the amount of which depends on the 2007 performance *of*

*Numerex as a whole*." (emphasis added).  Ronsen Decl., Ex. 3.  In a second letter, dated May 30,

2008 he again confirmed that Mr. Ronsen's bonus was to be based on "company-wide EBITDA

and revenue objectives..."

However, Mr. Ronsen's bonus was not calculated on company-wide EBITDA or revenue.

Rather, Numerex has admitted that his bonus was based on Numerex's financial results **without**

counting the EBITDA and revenue contributed by New Orbit, one of Numerex's divisions.

---

[6]    Numerex also conditioned these payments on the requirement that Mr. Ronsen advance the amounts to COBRA,
then submit a cancelled check to Numerex for "reimbursement" every month.

Ronsen Decl., at ¶ 45.  Had the bonus been calculated on a company-wide basis, it would have been some $4,895.88 (net of withholdings), rather than the $1958 Numerex paid.

Plaintiffs placed Numerex on notice of this Payment Default by letter dated August 4, 2008.  Clancy Decl., Ex. 9.

**Procedural Posture**

Plaintiffs commenced this action on January 8, 2008.  A true and correct copy of the Complaint in this action is annexed to the Clancy Declaration as Exhibit 11.

On March 10, 2008, Numerex answered and counterclaimed.  A true and correct copy of Numerex's Answer and Counterclaims in this action is annexed to the Clancy Declaration as Exhibit 12.  As set forth in more detail below the counterclaims allege that Ronsen breached his fiduciary duties as an employee of Numerex, under Exhibit D.  The sole claim against Orbit is that it breached the covenant of good faith and fair dealing, not by failing to fulfill its obligations under the APA, but by virtue of Mr. Ronsen's alleged misfeasance as an employee of Numerex.[7]

On March 31, 2008, Plaintiffs responded to the counterclaims.  A true and correct copy of Plaintiff's Answer and Defenses is annexed to the Clancy Declaration as Exhibit 13.

Discovery has begun, but the parties have not yet completed document discovery or scheduled depositions.

---

[7]    On July 9, 2008, Numerex sued Gary Naden and Scott Rosenzweig.  Messrs. Naden and Rosenzweig each own 8% of Orbit, and each was employed by Orbit before coming to work for Numerex through the acquisition. Each no longer works for Numerex.  That action was consolidated with this action, on consent of the parties, on July 29, 2008.

## ARGUMENT

### I.      Standard and Timing for Summary Judgment and Judgment on the Pleadings

While Plaintiffs are taking the unusual step of moving for summary judgment prior to discovery, they are confident both that the timing of the motion is proper, and that they can meet the standard to show their entitlement to judgment.

The summary judgment portion of the motion is timely.  Under Fed. R. Civ. Pro. 56(a), the claiming party may move for summary judgment once at least twenty days has passed from the commencement of the action.  A motion for judgment on the pleadings may be brought at any time after the pleadings have closed.  Fed. R. Civ. Pro. 12(c).  Plaintiffs' response to the counterclaims closed the pleadings.

The parties are mindful that in order to obtain summary judgment, they must show the absence of any genuine issue of material fact.  *See Ricci v. Stefano*, 530 F.3d 88, 109 (2nd Cir. 2008).  However, this motion is based almost entirely on documentary evidence.  The fact of the Payment Defaults is established by Numerex's letters in response to Plaintiffs' notices of default. Given the fact of these defaults, the only remaining issues are the interpretation of the plain language of the APA.  Plaintiffs do not base their motion on parol, nor do they believe the agreement is unclear or ambiguous.

Plaintiffs have moved under Rule 56(b), because their claims for affirmative relief rely on documents outside the pleadings.  However, certain of the counterclaims, as set forth below, fail as a matter of pleading.  With regard to those counterclaims, Plaintiffs seek, in the alternative, judgment on the pleadings.

## II.    Plaintiffs Are Entitled to Immediate Payment on Each Payment Default

### A.    *Plaintiffs Are Entitled to the First Tranche of the Earn Out*

In Numerex's April 17, 2008 letter, in response to Plaintiffs' demand for the earn out Statement, Numerex attached "the computation contemplated by section 2.2 of Exhibit B to the APA." (emphasis in original).  That computation states that New Orbit attained 67.1% of its revenue goals, and 112.1% of its EBITDA goals, and that this entitled Plaintiffs to payment of 320,288 shares of stock from the earn out escrow.  Further, Numerex noted in its February 28, 2008 10K (for YE 2008) that it was withholding distribution of "321,000" shares of stock in connection with the earn out.  A true copy of the relevant portion of the 10K is annexed to the Clancy Declaration as Exhibit 6.  As such, there is no genuine factual dispute that the first tranche earn out payment is due and owing in this amount.

Moreover, Plaintiffs are entitled to damages for Numerex's delay in releasing the shares. The price of the stock on March 31, 2008, the date they should have been released, was $7.00 per share.  The current price is just over $5.00.  As such, Numerex is required to pay to Plaintiffs the difference between the value of the shares on the day they are released and the value on March 31, 2008.  *See Lucente v. IBM*, 310 F.3d 243, 262 (2d Cir. 2002) (damages appropriately measured from date of breach).

### B.    *Plaintiffs Are Entitled to the Hold Back*

As noted above, Numerex was required to release the $550,000 hold back one year after the closing, that is on July 1, 2008.  It was only permitted to retain that money should an indemnified liability arise.  No such liability has arisen.  As such, the amount is immediately due and payable.

### C.     _Plaintiffs Are Entitled to the Gross-up for Insurance_

Numerex was expressly required to maintain Ronsen's heath and welfare benefits.  It undisputedly cancelled his health insurance.  Upon demand for cure, it offered to pay the difference between Ronsen's prior employee contribution for health insurance, and the cost of CORBRA coverage.  However, this amount comes to Mr. Ronsen as taxable, 1099 income, and thus is net only about 50% of the previous benefit.  Nor has Numerex offered to pay for his previously used deductible.  This failure to cure means that Numerex owes Mr. Ronsen the difference in payment necessary to make his net benefit the same as when employed.[8]

### D.     _Plaintiffs Are Entitled to the Full Bonus_

Exhibit D states, and Numerex has expressly conceded, that Ronsen's bonus is to be calculated on Numerex's "company wide" financial performance.  However, Numerex has expressly stated that Ronsen's bonus was calculated without reference to the performance of New Orbit, a wholly-owned subsidiary of Numerex.

On July 7, 2008, Plaintiffs sent Numerex a notice to cure this improper bonus calculation. A true and correct of this July 7, 2008 letter is annexed to the Clancy Declaration as Exhibit 7. In response to Plaintiffs' notice to cure, Numerex claimed in a July 14, 2008 letter that the New Orbit results were not included in the bonus calculation because the "Revenue and EBITDA targets" were established by Numerex before the acquisition of New Orbit.  A true and correct copy of Numerex's July 14, 2008 letter is annexed to the Clancy Declaration as Exhibit 14.  This makes no sense.  First, it is contrary to Paragraph 1(d) of Exhibit D of the APA, and to Numerex's admission to the DOL.  Second, one of the activities that generate (or decrease) EBITDA and revenue for a company is the making of acquisitions.  Here, as Numerex

---

[8]     Or, if the Court finds, as Plaintiffs request, that Mr. Ronsen had "Good Reason" to terminate his employment, Numerex owes him his severance.

anticipated at the time it signed the APA, its acquisition of Old Orbit's assets and the employment of Mr. Ronsen would increase both of these figures.  In short, there is no legal basis to exclude these figures.  Had Numerex included New Orbit's revenue and EBITDA in its bonus calculation, as it was contractually required to do, Mr. Ronsen's bonus payment would have been $4895.88 (net of withholdings).  However, Numerex has paid Ronsen only $1,958.  Ronsen Decl., at ¶ 49.

> **E.**    ***Numerex Cannot Use the Counterclaims as a Set Off***
>
>> *1.    Numerex Impermissibly Asserts Unliquidated Claims to Set Off A Liquidated Claim*

Even were there any merit to Numerex's counterclaims, they cannot serve as a set off against the known amounts currently due and owing Plaintiffs.  As noted above, Plaintiffs' claim to the 320,288 shares under the first tranche of the earn out is undisputed.  Indeed, it is no more than Numerex's own calculation and admission.  Plaintiffs' claims for the Hold Back, bonus and insurance are indisputable.  As such, the claims are uncontested, currently due, and fully liquidated (definite in amount).

In contrast, the basis of Numerex's set off, its counterclaims for indemnity, bad faith, and breach of fiduciary duty, are all hotly-contested, unliquidated and not yet due.  It is well-settled that such unliquidated, disputed claims cannot be set off against a claim for an amount certain that is currently due and owing.  *See Ferguson v. Lion Holding, Inc.* 312 F.Supp.2d 484, 505 (S.D.N.Y. 2004) (purported "set off" with disputed, not due claim no bar to summary judgment on undisputed, liquidated claim); *Willett v. Lincolnshire Mgmt., Inc.,* 302 A.D.2d 271, 756 N.Y.S.2d 9, 10 (1st Dep't 2003) (same).

Numerex has three alleged bases for its counterclaims.  First, it alleges that Mr. Ronsen tricked it into accepting and paying for certain parts from New Orbit's primary vendor, Axonn,

pursuant to a non-cancellable purchase order.  Clancy Decl., Ex. 12, at ¶ 44.  Second, it alleges that Mr. Ronsen tricked Mike Marett, the president of New Orbit, into signing a renewal of a contact with Stratix, New Orbit's largest customer.  *Id.* at ¶¶ 46-49.  Third, Numerex claims that Mr. Ronsen did a poor job managing New Orbit.  *Id.* at ¶¶ 43, 45, 50, 53.  As a matter of law, none of these claims can be asserted as a set off against the earn out claim.

*Lion Holding*, *supra*, is instructive.  That case also involved a suit by the sellers of a business against the purchaser, for failure to pay an earn out.  As here, the parties had conceded in writing that the amount of the earn out was certain, $12.5 million, and then due and owing.  Just as here, the *Lion Holding* defendant asserted counterclaims for indemnity and breach of fiduciary duty against the plaintiffs.  As here, the defendant asserted that these uncertain and unliquidated counterclaims should serve as a set off of the liquidated earn out payment owed to plaintiffs.  The Court rejected this argument, holding that the disputed, unliquidated counterclaims were no bar to the entry of summary judgment on the undisputed and certain earn out claim.

Similarly, in *Lincolnshire Management*, *supra,* the defendant had failed to pay various distributions to the plaintiff, one of its investors.   Again, defendant did not dispute the amount of or entitlement to these distributions.  Rather, it asserted various liabilities and debts of the plaintiff as a set off.  Citing the rule that these disputed claims could not set off the undisputed claim of the plaintiff, the court affirmed summary judgment in plaintiff's favor.

As such, Numerex's disputed counterclaims do not provide it with any right of set off against the Payment Defaults, which continue to be overdue and immediately payable.

2.      *Plaintiffs Are Entitled to Judgment on the Counterclaims*

a.      *Indemnity Claim (Count III)*

Numerex sets forth the factual predicate for its indemnity claim in Paragraph 44 of its

Answer and Counterclaims:

> 44.  *Second*, in October 2007, Ronsen advised Numerex to pay a
> supplier called Axonn LLC ("Axonn") for 20,000 units of the key
> component for the SX-1 product, even though Axonn and Old
> Orbit One had unresolved disagreements as to which Old Orbit
> One and Ronsen have indemnified Numerex.  Numerex agreed to
> make the payment on the representation of Ronsen that he could
> sell the 10,000 SX-1 units already built plus another 20,000 SX-1
> units that would use the new components.  (By the time he made
> that representation, he had already sent his October 5 letter of
> complaint.)  Through February 2003, the Satellite Division sold
> only 144 SX-1 units.  By causing *Numerex* to pay millions of
> dollars to Axonn for units that were not promptly saleable, Ronsen
> derived direct financial benefit for himself, to the extent that those
> payments reduce damages that Axonn might otherwise claim
> against Older Orbit One.  In other words, if Ronsen understood
> that he could not sell the SX-1s, Ronsen was causing Numerex to
> make payments to Axonn in lieu of payment that Old Orbit One
> (and ultimately Ronsen) would otherwise have had to pay out of
> their own pockets.

(original emphasis).

Incredibly, Numerex makes this claim even though it is directly contradicted by the

express terms of the APA.  In sum, the counterclaim asserts that:  (a) Numerex paid for the

20,000 units because of Mr. Ronsen's self-interested statements in October 2007; (b) Ronsen

benefited from Numerex's purchase, because he shifted the payment obligation from Orbit to

New Orbit, by getting Numerex to agree to pay; and (c) Orbit/Ronsen would have been liable for

any breach of the Axonn agreement in October 2007.  Clancy Decl., Ex. 12, at ¶ 44.

Each of these statements is false.  Numerex did not agree to pay for the 20,000 units

because of anything Mr. Ronsen said in October 2007.  Numerex was already obligated to pay

for the units.  Paragraph 1.5 of the APA, entitled "Assumption of Liability," states that Numerex

"shall assume and agree to pay, discharge or perform, as appropriate, only the following liabilities and obligations of" Orbit. Paragraph 1.5(a)(ii) lists as assumed liabilities: "those other liabilities that are expressly set forth on attached Schedule 1.5 . . . ." Ronsen Decl., Ex. 1, at Paragraphs 1.5 and 1.5(a)(ii).

Schedule 1.5 of the APA lists, among other liabilities, the purchase order to Axonn, for $1.1 million. *Id.*, Ex. 1, at Schedule 1.5. This is a reference to the purchase order for the 20,000 units. That is clear from the documents because the liability of Orbit to Axonn is "for approximately 20,000 STX devices . . . payable in the amount of $1,100,000 upon receipt of the devices." *Id.*

Notably, the purchase order between Orbit One and Axonn is dated June 2007, two months prior to closing, when the deal with Numerex was still being negotiated. Thus, it could not have been Mr. Ronsen's plan to order these units to foist off on Numerex, as he had no assurance that the deal with Numerex would close when he ordered them. Even if that were somehow his intention, Numerex agreed to assume the Axonn purchase order as a bargained for term of the APA.[9]

Indeed, the listing of the Axonn purchase order on Schedule 1.5 of the APA is fatal to any indemnification claim by Numerex. Paragraph 7.2(c) of the APA expressly excludes from Plaintiffs' duty to indemnify Numerex any Losses relating to items listed on Schedule 1.5. Ronsen Decl., Ex. 1, at ¶ 7.2(c).

Numerex's assertion that a breach of the agreement with Axonn would create liability for Plaintiffs is also contradicted by the APA. Paragraph 3.17 of the APA states that Numerex assumes all contracts set forth on Schedule 3.17, and is liable for any breach, liability, or

---

[9]    As Mr. Ronsen states in his declaration, the decision to submit the purchase order was made in consultation with and with the express agreement of Numerex.

obligation post-closing. Schedule 3.17 of the APA lists Orbit's agreements with Axonn as assumed contracts. *Id.*, Ex. 1, at Schedule 3.17, items 36 and 37. Indeed, the liability for the 20,000 units pursuant to the Axonn agreements is also expressly set forth on Schedule 3.17: "Seller has an open purchase order to Axonn for approximately 20,000 STX devices and expects a corresponding payable in the amount of $1,100,000 upon receipt of the devices." *Id.*, Ex. 1, at Schedule 3.17, page 23.

Nor can there be any question that Numerex was fully aware of the threats by Axonn (which have never amounted to any litigation or proceeding), or the state of the relationship. Schedule 3.3 of the APA, entitled "Relations with Customers and Suppliers," is a two-page, single-spaced summary of the Axonn relationship, which describes, in great detail, the "dispute" between Axonn and Orbit One. *Id.*, Ex. 1, at Schedule 3.3.

Thus, Numerex was aware of and became obligated to pay for the 20,000 Axonn STX units on July 31, 2007, when it signed the APA. It was not induced to pay for them by Mr. Ronsen in October 2007, but was already required to do so. Mr. Ronsen did not trick Numerex into purchasing anything; indeed he merely reminded Numerex of its own obligation and agreement to pay a non-cancellable purchase order upon receipt of the devices ordered months before closing of the Orbit One/Numerex transaction.

Finally, Numerex misleads this Court with artful pleading with regard to whether the purchase caused it any harm. Numerex refers to the units as "not promptly saleable." Clancy Decl., Ex. 12, at ¶ 44. This is an intentional gloss on the fact that the STX units can, in fact, be sold, and sold at a profit. These units are a component in many other products made by other manufacturers and are in demand. Ronsen Decl., at ¶¶ 59-60. In fact, Mr. Ronsen received and forwarded to Numerex a third party offer in January 2008 to purchase 3,000 of the STX units

from Numerex at a price of $65 per unit, which represented an 18% markup from the price at which Numerex acquired the units. *Id.* at ¶ 60.

For these reasons, Numerex's counterclaim for indemnity, insofar as it is based on the purchase of the Axonn STX units, must be dismissed.

### b.      Good Faith and Fair Dealing (Count II)

This counterclaim is based principally on the renewal of the Stratix agreement, the factual predicate of which is set forth at some length in Paragraphs 47-49 of the Answer and Counterclaims. It fails to state any claim on its face, and its central allegations are contradicted by the documentary evidence.

Stratix is by far the largest customer of New Orbit (as it was of Orbit). Ronsen Decl., at ¶ 61. Stratix holds the primary contract with FEMA that accounted for virtually all of New Orbit's post-acquisition revenue. Orbit One's contract with Stratix expired at the end of 2007. *Id.* at ¶ 62. Mr. Ronsen received the details of the required purchase order from Stratix to exercise Option Period 1 of the contract, and forwarded it to Mike Marett, President of New Orbit, on December 21, 2007, noting that New Orbit needed to renew it. A true and correct copy of the email to Mr. Marett is annexed to the Ronsen Declaration as Exhibit 5. Eighteen days later, Mr. Marett approved the purchase order, in effect exercising Option Period 1 and renewing the contract with Stratix. Ronsen Decl., at ¶ 66.

Numerex claims that Mr. Ronsen caused Mr. Marett to approve the purchase order by concealing from him that Plaintiffs would be entitled to a payment under the APA upon Numerex's acceptance of the renewal. Clancy Decl., Ex. 12, at ¶¶ 46-49. This claim fails for two reasons.

First, Numerex fails to allege that, had Mr. Marett known of the terms of the APA, he would not have given approval to renew the Stratix contract. Nor could Numerex make such an

assertion.   Indeed, Numerex's CEO, Mr. Nicolaides, who executed the APA on Numerex's behalf, gave his approval of the purchase order even after Mr. Ronsen provided the information about Stratix to Mr. Marett.   Specifically, on January 8, 2008, a full two weeks after Mr. Marett received the information from Mr. Ronsen and just hours before officially accepting the purchase order, Mr. Marett was traveling with Scott Rosenzweig, (another Numerex employee and shareholder of Orbit).   During this trip, Mr. Marett informed Mr. Rosenzweig that he had to make some telephone calls while Mr. Rosenzweig attended a meeting with a vendor. Immediately following the meeting, Mr. Marett informed Mr. Rosenzweig that he had had a telephone conversation with Mr. Nicolaides about the Stratix purchase order and that Mr. Nicolaides had approved it   Declaration of Scott Rosenzweig, at ¶ 4.   Thus, the decision to approve the purchase order was made with the direct involvement of Mr. Nicolaides, who was well aware of the terms of the APA.

Moreover, Numerex's theory is tantamount to a charge of mismanagement against Mr. Marett.   He was the President of New Orbit.   Presumably, he was capable of making his own impendent business judgment about the renewal, simply by comparing it to the old contract, and assessing the value to Numerex of the proposed terms.   Notably, there is no allegation that Mr. Ronsen misrepresented anything about the terms of the purchase order or APA whatsoever. Further, Mr. Marett had a some nineteen days to make his decision and/or seek any necessary information in order for him to properly perform his duties as President of New Orbit.

Second, the payment that Numerex made to Plaintiffs, based on the acceptance of the renewal, was not discretionary.   Numerex was obligated to make that payment.   Schedule 1.3(a)(iii) of the APA states that Numerex will pay $2 million to Plaintiffs upon contract renewal.   Ronsen Decl., Ex. 1, at Paragraph 1.3(a)(iii).   Numerex relies on the subparagraph (ii)

of Schedule 1.3(a)(iii), which states that "if there are changes to the terms and conditions of the Original 2007 Stratix Agreement . . . then the conditions to payment contained in this provision will be deemed to have been met, with such provisions as to which NMRX and Seller will have agreed at the time." *Id.*

In other words, Numerex claims that because the volume of the renewal was lower than the 2007 agreement, there must be some adjustment to the amount owed, pursuant to subparagraph (ii). However, there was no change to the terms and conditions of the Stratix agreement. To the contrary, the only difference between the original contract one and option year one was the quantity of units and prepaid messages purchased. The consequences of a reduction in quantity of units is set forth in subparagraph (i) of Schedule 1.3(a)(iii) of the APA, which states that: "to the extent that there are less than 16,000 units in service under such extension, there shall be pro rata reduction in the cash payable such that an amount of $125 shall be deducted for every unit in service that is less than 16,000 total units . . . ." *Id.* The agreement does not allow Numerex to decrease the payment based on a decrease in the quantity of prepaid messages.

Numerex adjusted the payment accordingly by reducing its payment to Orbit to $1.75 million. Ronsen Decl., at ¶ 68. Because Numerex was obligated to make that (reduced) payment, it was not harmed, and Plaintiffs were not improperly benefited.

### c. Breach of Fiduciary Duty (Count I)

Numerex's other allegations (all false), that Mr. Ronsen did not hire the staff he should have, or that he was never truly loyal to Numerex, simply do not rise to the level of cognizable claims. Clancy Decl., Ex. 12, at ¶¶ 58-59. However, Numerex does not allege either any quantifiable damage nor demand any injunctive relief in connection with this poor performance. If he did a poor job, Numerex had the option of every employer: termination. Mr. Ronsen's

employment relationship with Numerex was "at will." It never exercised this right, and cannot bring up a claim now that Mr. Ronsen has terminated his employment. In fact, Numerex chose to keep Mr. Ronsen employed for months after making their claims.

### d.    Claims Against Orbit (Count III)

The only claim asserted against Orbit is for breach of the "covenant of good faith and fair dealing." However, as noted above, the only breaches alleged are for the "conduct of Mr. Ronsen." Because that conduct does not give rise to any claim, and because Plaintiffs have failed to identify even a single breach by Orbit, all claims against Orbit must also be dismissed. In fact, Orbit's complete obligation to Numerex was expressly limited to those of delivering its assets, and it is undisputed that Orbit has satisfied that obligation.

## III.    Numerex's Various Payment Defaults Have Triggered the Guarantee Provision

As noted above, the Earnout Guarantee is triggered, *inter alia*, when Mr. Ronsen terminates his employment with Numerex for "Good Reason." "Good Reason" includes, among other things, "a material breach by Numerex of any of its obligations to Mr. Ronsen under this Agreement, which breach is not cured in all material respects within thirty (30) days (except in the case of a payment default for which the cure period shall be ten (10) days . . . " Ronsen Decl., Ex. 1, Ex. D, at ¶ 3(a).

In Part I, Plaintiffs showed that a payment of 320,288 shares of Numerex, $550,000 from the hold back, $2,900 from the bonus, and substantial costs with relation to the health insurance, are all due and owing to Plaintiffs. They also demonstrated that Numerex has refused to make that payments, on the grounds that it was asserting its counterclaims as a set off. Finally, Plaintiffs showed that Numerex could not, as a matter of law, set off those claims against the earn out, which meant it was in default of its payment obligation. In addition, it is undisputed

that Numerex has failed to pay Ronsen's proper bonus or to cure its failure to continue his health and welfare benefits.

The consequence of these defaults is that Plaintiffs are entitled to summary judgment on their claim for a declaration that they be deemed to have attained the highest level of each of the earn out tranches.

### A.    *Failure to Pay the Earn Out and Hold Back Has Triggered the Earnout Guarantee*

In refusing to pay the first tranche of the earn out, Numerex has asserted that, even if the earn out were overdue, it would not trigger the Earnout Guarantee, because the earn out is not an obligation "under this Agreement," in the meaning of Paragraph 3(b) of Exhibit D of the APA. Plaintiffs anticipate a similar argument with regard to the Hold Back. In other words, Numerex contends that the Earn out Guarantee is triggered only by violation of a payment obligation that is specified in Exhibit D of the APA itself, and not to the other parts of the APA.

Numerex's position is wholly at odds with the express terms of the APA, New York's rules of contract interpretation, its own assertions to this Court in its Answer and Counterclaims, and its position in asserting a set off against the earn out. As a matter of law, the earn out and the Hold Back are obligations under "this Agreement," and Plaintiffs are entitled to judgment.

### 1.    *"This Agreement" Incorporates the Earn Out*

As noted, by the express terms of the parties' agreement, the Employment Agreement, the Earn Out Agreement, and the Earn Out Matrix are all integrated into and part of the unified APA. Specifically, Paragraph 9.10 of the APA states: "All Exhibits and Schedules referred to herein are intended to be and hereby are specifically made a part of **this Agreement**." (Emphasis added). The Employment Agreement, the Earn Out Agreement, and the Earn Out Matrix are all exhibits of the APA, Exhibit D, Exhibit B, and Exhibit B1, respectively.

Accordingly, by the clear and unequivocal language negotiated and agreed to by the parties, the various agreements are all one, and Numerex's self-serving assertions to the contrary are unavailing.

Aside from the unambiguous language of the APA, New York law also commands a finding that the various agreements are all part of the APA. "Under New York law, instruments executed at the same time, by the same parties, for the same purpose and in the course of the same transaction will be read and interpreted together." *Commercial Oil v. Advance Food Svs. Equip.*, 991 F.2d 49, 53 (2d Cir. 1993) *quoting Carvel Corp. v. Diversified Management Group, Inc.*, 930 F.2d 228, 233 (2d Cir. 1991). In such a circumstance, the agreements "are, in the eye of the law, one instrument." *BWA Corp. v. Alltrans Exp. U.S.A., Inc.*, 112 A.D.2d 850, 852, 493 N.Y.S.2d 1, 3 (1st Dep't 1985). The agreements here go well beyond this test, and are, as a matter of law, "one instrument."

In *Commercial Oil*, the plaintiff seller of a business brought suit against the buyer, seeking indemnification for environmental cleanup costs pursuant to one of the many documents executed at closing. The deal involved an asset purchase agreement that contained an indemnification clause obligating the buyer to take over certain broad categories of "litigations" from the seller and a Lease that contained a more narrow indemnification obligation for the buyer. In evaluating the scope of the buyer's indemnification obligations, the Second Circuit considered whether the two documents were required to be interpreted together. The court concluded that because the documents were part of a single transaction, and depended on and referenced each other, they should be interpreted together. *Commercial Oil*, 991 F.2d. at 52-53.

Here, as in *Commercial Oil*, the agreements were negotiated, drafted, and executed simultaneously, as part of the single transaction of the acquisition. Beyond that, they were

physically prepared and executed as a single agreement. The APA itself does not contain all of the material terms of the agreement. It could not stand alone as a contract. For instance, the manner and rules for calculating the earn out in each period are set forth in the "Earn Out Agreement," which is Exhibit B to the APA. Similarly, the actual targets for the earn out and the concomitant pay out for meeting such targets are set forth on Schedule B.

In addition, Exhibit D of the APA begins with a recital noting that Orbit and Numerex have entered into the APA. Although not a binding part of the agreement, such recitals indicate a manifestation of the parties' intent that the agreements be read together. *See Chappelow v. Savastano*, 195 Misc.2d 346, 350, 758 N.Y.S.2d 782, 786 (N.Y. Sup. Ct. 2003).

Another strong indication that the obligations under the "Agreement" refer to all of the APA documents is that the obligations under the APA and Exhibit D of the APA are expressly reciprocal. *Commercial Oil*, 991 F.2d at 53 (affirming the interpretation of two contracts as a single agreement, emphasizing that the agreements were "intertwined" and that "[e]ach depended on the other"). If Ronsen failed to discharge his obligations under Exhibit D of the APA, Numerex was relieved of certain obligations under the rest of the APA. Paragraph 2(c) of Exhibit D of the APA states:

> In the event of a termination by [Numerex] of Mr. Ronsen for cause, [Numerex] shall have the right notwithstanding anything to the contrary in Section 1.6 of the Asset Purchase Agreement, to manage the Division without regard to the Business Plan . . . .

Similarly, Paragraph 5(c) of Exhibit D of the APA provides that:

> In the event that a court of competent jurisdiction has determined . . . that Mr. Ronsen has materially breached [the non-competition provision of the Severance Agreement] . . [Orbit] shall forfeit the right to receive the [Numerex] Stock referenced in [the earn out provisions of the APA] as well as the cash consideration specified in [the earn out provisions of the APA] . . . .

These provisions mirror the provisions of Paragraph 3(c) of Exhibit D of the APA, which triggers a guarantee of the earn out amounts going forward, should Numerex breach its obligations.  Ronsen Decl., Ex. 1, Ex. D, at ¶¶ 2(c), 3(c), and 5(c).

Where, as here, the obligations are mutual, and the agreements are interdependent -- that is, there would be no APA without an Exhibit D of the APA, and vice versa -- a breach of one agreement is a breach of the other.  *Carvel*, 930 F.2d at 233 (2d Cir. 1991).  In *Carvel*, the defendant opened a Carvel Ice Cream franchise.  Insodoing, he executed two agreements with Carvel: a distributor agreement, which governed his rights and liabilities and provided his rights to distribute the Carvel products, and a series of promissory notes, which were the mechanism for payment of the rights he received under the distributor agreement.  Significantly, the agreements did not refer to one another.  Indeed, the promissory note had the usual "absolute" language, indicating that the amount was owed, without any conditions.  Nevertheless, the Second Circuit accepted the defendant's argument that the agreements had to be read together, and that a breach of one was a breach of the other.

Given the unambiguous language of Paragraph 9.10 of the APA, Numerex cannot credibly argue that these agreements, attached as exhibits to the APA, are separate from the APA.  When it suits its needs, Numerex concedes as much.  For example, in its Answer and Counterclaims and in arguing for a set off, Numerex acknowledges that the agreements are all one, and that its obligation to pay the earn out pursuant to the APA is contingent upon Mr. Ronsen's performance under Exhibit D of the APA.  However, in refusing to acknowledge the trigger of the Guarantee Provision, Numerex has baldly asserted that its payment obligations under Exhibit D of the APA are somehow separate from its obligations under the APA, the Earn Out, and the Earn Out Matrix.

2.    *Numerex Has Affirmed the View that the Agreements Are One*

In its counterclaims filed with this Court, Numerex concedes that the agreements are one:

> 9.    At the Closing, Numerex also hired Ronsen to serve as "President of NRMX's Orbit One division (the "Division") pursuant to a contract document called the Severance and Non-Competition Agreement, *which was integrated into the APA*.

Clancy Decl., Ex. 12, at ¶ 9 (emphasis added).

Nor was this an unintended characterization.  Rather, the integration of Exhibit D into the APA is an essential allegation for Numerex's counterclaim against Orbit.

Numerex's counterclaims go on at length about the supposed conspiracy by, and misconduct of, Mr. Ronsen.  However, they are completely silent as to a single breach or bad act by Orbit.  This is not surprising, because Orbit's only obligations under a strict reading of the APA are to turn over assets, which it unquestionably did.

Nevertheless, Numerex asserts a claim against Orbit for breach of the covenant of good faith and fair dealing.  Yet, the only basis for this claim are the actions of Mr. Ronsen as an employee of Numerex.  *Id.* at ¶¶ 62-65.  Numerex  asserts to this Court that Orbit has breached contractual obligations by virtue of: Mr. Ronsen's actions with Stratix; his failure "to achieve the objectives of the Business Plan;" and his failure to "devote his full time and efforts to the business of the Satellite Division."  *Id.* at ¶ 63.

Of course, the covenant of good faith and fair dealing does not add obligations to a party contrary to those in the express terms of the agreement.  *D&L Holdings, LLC v. RCG Goldman Co., LLC,* 287 A.D.2d 65, 73 (1st Dep't 2001).  Rather, Numerex states to this Court that Mr. Ronsen's breach of his obligations under Exhibit D of the APA constitutes a breach of the APA. Clancy Decl., Ex. 12, at ¶¶ 62-65.  Numerex's counterclaim against Orbit is premised on the fact -- and, by implication admits -- that the agreements are a single, integrated contract.  Because

-32-

such an admission is contained in a Numerex pleading, this Court is bound to hold that the various agreements are all incorporated into and made part of the APA. *Gibbs v. Cigna Corp.*, 440 F.3d 571, 578 (2d Cir. 2006) ("Facts admitted in . . . any pleading[] are judicial admissions that bind the defendant throughout this litigation.").

Moreover, in refusing to pay over the earn out, Numerex asserted a set off based on the counterclaims. *See* Clancy Decl. Ex. 8. In that letter, Numerex states that Orbit has "breached its covenant of good faith and fair dealing under the APA." Significantly, Numerex goes on to state that "[Orbit's] breaches have been caused by the conduct of David Ronsen." In other words, as a justification for refusing to pay the earn out under the APA, Numerex asserted again that a breach by Mr. Ronsen under Exhibit D of the APA constituted a breach of obligations under the APA.[10]

In light of these admissions, it is plain that Numerex too considers the agreements as one unified contract and their obligations reciprocal. As such, the failure to pay the earn out triggers the Guarantee.

In any event, Numerex's failure to pay the bonus, or to cure the termination of health insurance, without more, trigger the Guarantee Provision, because those obligations appear in Exhibit D itself.

Finally, should the Court disagree that judgment for Plaintiffs is appropriate on this issue, it must then dismiss the counterclaims as to Orbit. Numerex cannot have it both ways. If, as Plaintiffs contend and Numerex alleges, the agreements are integrated, the Guarantee has been triggered. If they are not integrated, then Mr. Ronsen's alleged breaches of Exhibit D cannot be

---

[10]  Numerex also made the self-serving and contradictory assertion that, nevertheless, the failure to pay the earn out did not trigger the Earnout Guarantee.

imputed to Orbit.  As such, the first tranche of the earn out and the Hold Back must be paid immediately.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request judgment in their favor and against Numerex:  (a) directing Numerex to immediately release to Plaintiffs the 320,288 shares of the first tranche of the earn out, or pay to Plaintiffs the shares' cash equivalent, plus damages for the diminution in price since March 31, 2008; (b) ordering Numerex to cure the other Payment Defaults; (b) dismissing all counterclaims; (c) declaring that Mr. Ronsen has terminated his employment for "Good Reason," and that, *inter alia*, the Earnout Guarantee has been triggered; and (d) awarding such other and further relief  to Plaintiffs as to this Court seems just and proper.

Respectfully submitted,

//s//   John J.D. McFerrin-Clancy
John J.D. McFerrin-Clancy
**LOWENSTEIN SANDLER, PC**
1251 Avenue of the Americas
New York, New York  10020
(212) 262-6700
Attorneys for Plaintiffs

Dated: September 4, 2008
New York, New York