John J.D. McFerrin Clancy
**LOWENSTEIN SANDLER P.C.**
1251 Avenue of the Americas
New York, NY 10020
212.262.6700
Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ORBIT ONE COMMUNICATIONS, INC.,<br>DAVID RONSEN,**<br><br>*Plaintiffs,*<br><br>-against-<br><br>**NUMEREX CORP.,**<br><br>*Defendant.* | Civil Action No. 08-CV-0905 (LAK)<br><br><br>**DECLARATION OF<br>JOHN J.D. MCFERRIN-CLANCY, ESQ.** |

Pursuant to 28 U.S.C. § 1746, **JOHN J.D. MCFERRIN-CLANCY,** under penalty of perjury, hereby declares:

1.  I am an attorney with Lowenstein Sandler, P.C., attorneys for the Plaintiffs, Orbit One Communications, Inc. and David Ronsen in the above-captioned matter. I am admitted to practice in this Court.

2.  I am familiar with the facts and circumstances as set forth herein and make this Declaration in support of Plaintiffs' instant Motion for Summary Judgment and/or Judgment on the Pleadings..

3.  Annexed as Exhibit 1 is a true and correct copy of an April 11, 2008 letter sent by me to Numerex, putting Numerex on notice of a payment default for failure to pay to Plaintiffs the earn out, or even to provide the Statement called for by Exhibit B of the APA.

4.   Annexed as Exhibit 2 is a true and correct copy of an April 17, 2008 letter, Andrew Ryan, to me, which states that Numerex had provided the "statement," which Mr. Ryan also attached to his letter.

5.   Annexed as Exhibit 3 is a true and correct copy of an April 30, 2008 letter from Numerex's CEO, Stratton Nicolaides, to David Ronsen, which claims that Mr. Ronsen lacked "Good Reason" for his termination, and that Mr. Ronsen had terminated his employment "Not for Good Reason."

6.   Annexed as Exhibit 4 is a true and correct copy of a June 20, 2008 letter from me to Numerex, putting Numerex on notice of its payment default for cancelling Mr. Ronsen's health insurance and other benefits.

7.   Annexed as Exhibit 5 is a true and correct copy a July 9, 2008 letter from Numerex to Mr. Ronsen offering to reimburse him to the extent his COBRA premiums exceed the amount he formerly contributed to his company group health insurance.

8.   Annexed as Exhibit 6 is a true and correct copy of the relevant portion of Numerex's March 17, 2008 10K (for Year End 2007), which notes that Numerex met certain revenue and EBITDA targets for the "first measurement period, ending December 31, 2007", and as a result, "320,833 shares of the Company's Class A common stock were issued to Orbit One Communications, Inc."

9.   Annexed as Exhibit 7 is a true and correct copy of a July 7, 2008 letter from me to from me to Numerex putting Numerex on notice of its payment default related to its obligations under the Severance Agreement.

10. Annexed as Exhibit 8 is a true and correct copy of a March 27, 2008 letter from Andrew Ryan to Orbit One Communications, Inc., in which Numerex refuses to pay over the earn out, asserting a set off based on Numerex's counterclaims.

11. Annexed as Exhibit 9 is a true and correct copy of a August 4, 2008 letter from me to Numerex putting Numerex on notice of its payment default related to its obligations under the Severance Agreement.

12. Annexed as Exhibit 10 is a true and correct copy of a August 8, 2008 letter from Andrew Ryan to me refusing release of funds held in escrow under the Asset Purchase Agreement.

13. Annexed as Exhibit 11 is a true and correct copy of the Complaint in this action dated January 7, 2008.

14. Annexed as Exhibit 12 is a true and correct copy of the Answer and Counterclaims in this action, dated March 10, 2008.

15. Annexed as Exhibit 13 is a true and correct copy of Plaintiffs "Answer and Defenses" to Counterclaims, dated March 31, 2008.

16. Annexed as Exhibit 14 is a true and correct copy of a July 14, 2008 letter from Andrew Ryan to me responding to Plaintiff's July 7, 2008 notice to cure.

17. I hereby certify that all of the foregoing statements made by me are true.

Dated:  New York, New York
        September 4, 2008

By: //s// John J.D. McFerrin-Clancy
    John J.D. McFerrin-Clancy

# EXHIBIT 1



**Lowenstein Sandler**
ATTORNEYS AT LAW

**John J.D. McFerrin-Clancy**
Member of the Firm
Tel  646 414 6910
Fax  973 422 6897
jmcferrin-clancy@lowenstein.com

April 11, 2008


VIA FEDEX

Attention: Chief Executive Officer
Numerex Corp.
1600 Parkwood Circle
Suite 500
Atlanta, Georgia  30339


## NOTICE OF DEFAULT

Dear Sir or Madam:

NOTICE is hereby given you, pursuant to sections 3(a) and 9 of that certain Severance and Non-Competition Agreement between David Ronsen ("Ronsen") and Numerex Corp. ("Numerex" or "you") dated as of June 31, 2007 (the "Severance Agreement"), that Numerex and Orbit One Communications, LLC ("New Orbit") are in **DEFAULT** of their payment obligations under the Severance Agreement and of section 1.3 of that certain Asset Purchase Agreement by and between Orbit One Communications, Inc. ("Old Orbit"), New Orbit and Numerex, dated as of July 31, 2007 (the "APA"), and of sections 2.2 and 2.3 of Exhibit B to the APA, and you are hereby given ten (10) days from the date hereof to make all payments that are due and otherwise to cure any and all defaults.

By virtue of the financial performance of the Satellite Division, measured under the criteria set forth, *inter alia*, in Exhibit B of the APA, Numerex and if necessary New Orbit were required to give a joint instruction to the escrow agent to release certain shares of Numerex stock and to pay certain monies in cash from the escrow, as of March 31, 2008.

"As soon as practicable" after the publication of Numerex's audited financials for 2007, you were required to forward to Old Orbit a schedule setting forth the amounts earned under the earn out set forth in Exhibit B of the APA.  You have failed and refused to do so.

By letter dated March 27, 2008, you have stated that Numerex and New Orbit will not make any payment with regard to the amounts of the earn out for the first earn out period.

This conduct and the letter violate section 1.3 of the APA, which requires that New Orbit, whose performance is guaranteed by Numerex, and/or Numerex shall issue joint instructions to

Lowenstein Sandler PC                                                                **www.lowenstein.com**

Reply:  1251 Avenue of the Americas  New York, New York 10020  Tel 212 262 6700  Fax 212 262 7402
65 Livingston Avenue  Roseland, New Jersey 07068  Tel 973 597 2500  Fax 973 597 2400

Attention:  Chief Executive Officer                                    April 11, 2008
Numerex Corporation
Page 2

the escrow agent for the release of certain shares of Numerex stock and certain monies to Old
Orbit on March 31, 2008.

This conduct and the letter violate 2.2 and 2.3 of Exhibit B of the APA, which require that
Numerex forward to Old Orbit the statement of the earn out as soon as practicable after the
publication of Numerex's audited financials, and which calls for payment within ten days where
no dispute letter is issued.  The conduct and letter has also prevented Old Orbit from taking
advantage of the dispute process or the timing of payment provisions in section 2.4.

This conduct and the letter, constitute a material breach of a payment obligation pursuant to
section 3(a) of the Severance Agreement, under which you have ten (10) days to cure all
defaults.

Very truly yours,

John J.D. McFerrin-Clancy /BJC

John J.D. McFerrin-Clancy

JM-C:eap

20543/2
04/11/08 5977028.1

cc:      Andrew J. Ryan, Esq.



# EXHIBIT 2

# SALISBURY & RYAN LLP

### ATTORNEYS AT LAW

7TH FLOOR
1325 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6026
TEL: 212-977-4660
FAX: 212-977-4668

April 17, 2008

<u>Via Email & First Class Mail</u>

John J.D. McFerrin-Clancy, Esq.
Lowenstein Sandler PC
1251 Avenue of the Americas
New York, NY 10020

Re:    Orbit One Communication Inc. ("OOCI")
      <u>and David Ronsen v. Numerex Corp.</u>

Dear John:

Thank you for your letter of April 11, 2008. On behalf of Numerex, I have several responses.

First, I enclose the computation contemplated by Section 2.2 of <u>Exhibit B</u> to the APA. This document was originally forwarded by Tim Farrow at Numerex to Byron Webb at Orbit One on February 11, 2008. A revised version was sent later that same day. The attached final version was sent February 21, 2008. On February 22, 2008 Mr. Webb informed Mr. Farrow that Mr. Ronsen was "good with what we have." I do not believe that there is any dispute as to the calculation of the stock earned which is what would implicate the dispute process contained in <u>Exhibit B</u> of the APA.

Second, I disagree with the statement in your letter that Numerex "will not make any payment" pursuant to Section 2.2 of <u>Exhibit B</u>. The purpose of my letter of March 27 was to create a record of the fact that the parties have a dispute as to whether the escrowed stock should be released and to invite Old Orbit One to join with Numerex in crafting a method of bringing this dispute to the attention of the Court for resolution at whatever pace you wish. The shares are already in escrow, and Numerex is not prepared to release the shares in light of the pending counterclaims. Note that the shares are not in Numerex's custody or control – they are in the custody of a reliable escrowee, agreed upon in advance. We believe that they should stay in escrow until the dispute is resolved.

Third, I also disagree with the suggestion in your letter that the foregoing matters constitute a payment breach of the Severance Agreement triggering a ten (10) day cure period. The Severance Agreement is personal to Mr. Ronsen. It has specific payment obligations set

John J.D. McFerrin-Clancy, Esq.
April 17, 2008
Page 2

forth in Section 1.  Numerex has fulfilled every single payment obligation to Mr. Ronsen.
Invoking an earn-out dispute as a basis for a so-called "good reason" termination under the
Severance Agreement would be transparently pretextual under the circumstances.

I look forward to discussing these issues at your convenience.

Very truly yours,

Andrew J. Ryan

cc:    Kent Yalowitz, Esq.

01/21/08
02:06 PM

CONFIDENTIAL

**ORBIT ONE COMMUNICATIONS LLC**
Management P&L - Preliminary Earnout Calculation
For the Twelve Months Ending December 31, 2007

| DESCRIPTION | OO Total YTD 12/31/07 | Corp YTD 12/31/07 | OO No Corp YTD 12/31/07 | Jul-07 | Deal Exp | Jul-07 No Deal Exp | OO No Corp Plus July YTD 12/31/2007 | Target | % Target | Shares Earned | Pool 1 Bonus Shares | Pool 2 Bonus Cash |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Product Gross Sales | 501,443 | | 501,443 | 53,180 | | 53,180 | 554,623 | | | | | |
| Less: Returns & Allowances | | | | | | - | - | | | | | |
| Total Net Sales | 501,443 | | 501,443 | 53,180 | - | 53,180 | 554,623 | | | | | |
| | | | | | | | | | | | | |
| Product COS: | | | | | | | | | | | | |
| Materials | 641,902 | | 641,902 | 67,671 | | 67,671 | 709,573 | | | | | |
| Labor | 11,367 | | 11,367 | | | - | 11,367 | | | | | |
| Bonus | | | | | | - | - | | | | | |
| Benefits | 984 | | 984 | | | - | 984 | | | | | |
| Travel | | | | | | - | - | | | | | |
| Contract Labor | | | | | | - | - | | | | | |
| Overhead | | | | | | - | - | | | | | |
| Outside services | | | | | | - | - | | | | | |
| Other | | | | | | - | - | | | | | |
| Logistics Allocation | | | | | | | | | | | | |
| Total Product COS | 654,253 | - | 654,253 | 67,671 | - | 67,671 | 721,924 | | | | | |
| Product Gross Profit - $ | (152,810) | - | (152,810) | (14,491) | - | (14,491) | (167,301) | | | | | |
| Product Gross Profit - % | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| Service Gross Sales | 3,123,746 | | 3,123,746 | 340,447 | | 340,447 | 3,464,193 | | | | | |
| Less: Returns & Allowances | | | | | | - | - | | | | | |
| Total Net Sales | 3,123,746 | | 3,123,746 | 340,447 | - | 340,447 | 3,464,193 | | | | | |
| | | | | | | | | | | | | |
| Service COS: | | | | | | | | | | | | |
| Material | 21,247 | | 21,247 | | | - | 21,247 | | | | | |
| Labor | 100,252 | | 100,252 | | | - | 100,252 | | | | | |
| Bonus | | | | | | - | - | | | | | |
| Benefits | 14,826 | | 14,826 | | | - | 14,826 | | | | | |
| Contract Labor | | | | | | - | - | | | | | |
| Travel | | | | | | - | - | | | | | |
| Overhead/Telecom | | | | | | - | - | | | | | |
| Outside services/Carrier Fees | 530,767 | 249,522 | 281,245 | 58,585 | | 58,585 | 339,830 | | | | | |

G:\AR Clients\Numerex\OOPremlimEarnoutCal20071231draft.xls-Report

| | | | | | | | | |
|---|---:|---:|---:|---:|---:|---:|---:|---:|
| Other | | | | | | | | |
| NOC Allocation | | | | | | | | 0 | 0 |
| Total Service COS | 667,092 | 249,522 | 249,522 | 58,585 | | 58,585 | 476,155 | |
| Service Gross Profit - $ | 2,456,654 | (249,522) | (249,522) | 281,862 | | 281,862 | 2,988,038 | |
| - % | | | | | | | | |
| | | | | | | | | |
| Total Net Sales | 3,625,189 | | 3,625,189 | 393,627 | | 393,627 | 4,018,816 | 6,000,000 |
| Total COS | 1,321,345 | 249,522 | 1,071,823 | 126,257 | | 126,257 | 1,198,080 | |
| Total Gross Profit - $ | 2,303,844 | (249,522) | 2,553,366 | 267,371 | | 267,371 | 2,820,737 | |
| - % | | | | | | | 67.0% | 45,833 |
| | | | | | | | | |
| Selling, general & administrative: | | | | | | | | |
| Salaries | 284,638 | (44,365) | 240,273 | 394,727 | (277,687) | 117,040 | 357,313 | |
| Commissions | 64,286 | | 64,286 | 90,000 | (77,143) | 12,857 | 77,143 | |
| Bonus | - | | - | - | | - | - | |
| Stock Option Expense | 67,949 | | 67,949 | 24,684 | | 24,684 | 92,633 | |
| Benefits | 380 | | 380 | | | | 380 | |
| Recruiting | 3,400 | | 3,400 | 597 | | 597 | 3,997 | |
| Contract Labor | 53,650 | (50,250) | 32,163 | 8,730 | (462) | 8,268 | 40,431 | |
| Travel | 70,471 | (38,308) | (42,795) | 45,000 | 2,205 | 2,205 | | |
| Outside Services | | | | | | | - | |
| Legal Fees | 1,512 | | 1,512 | 11,781 | (9,239) | 2,543 | 4,055 | |
| Audit/SOX Fees | | | | 47,847 | (47,847) | - | - | |
| Tax Fees | 176 | | 176 | | | | 176 | |
| Promotional expenses | 88,161 | | 88,161 | 17,107 | (225) | 16,882 | 105,043 | |
| Supplies | 13,470 | | 13,470 | 2,178 | | 2,178 | 15,648 | |
| Telecommunications | 25,992 | | 25,992 | 4,978 | (73) | 4,905 | 30,897 | |
| Facility expenses | 72,622 | | 72,622 | 3,180 | | 3,180 | 75,802 | |
| Insurance | | | | | | | - | |
| Bad debt expense | | | | | | | - | |
| Other | 15,882 | | 15,882 | 780 | (317) | 463 | 16,345 | |
| Corporate Allocation | | (132,923) | | | | | - | |
| Total S,G&A | 759,189 | (132,923) | 626,266 | 563,794 | (367,993) | 195,801 | 822,067 | |
| | | | | | | | | |
| Research & Development: | | | | | | | | |
| Salaries, wages & bonuses | 198,729 | | 198,729 | | | - | 198,729 | |
| Commissions | | | | | | - | - | |
| Bonus | 33,286 | | 33,286 | | | - | 33,286 | |
| Benefits | 1,935 | | 1,935 | | | - | 1,935 | |
| Contract Labor | | | | | | | | |

G:\AR Clients\Numerax\OOPrenlimEarnoutCal20071231draft.xls-Report

| | | | | | | |
|---|---|---|---|---|---|---|
| Travel | 7,926 | 7,926 | | | - | 7,926 |
| Outside Services | | | | | | - |
| Supplies | 7,810 | | 4,660 | 4,660 | | 12,470 |
| Equipment & furniture rents | | | | - | | - |
| Maintenance agreements | | | | - | | - |
| Telecommunications | | | | - | | - |
| Other | (77,791) | (77,791) | | | - | (77,791) |
| Allocations | | | | | | |
| Total R&D | 171,895 | - | (51,865) | 56,525 | 4,660 | 176,555 |
| | | (116,599) | | | | |
| EBITDA | 1,372,760 | 1,755,205 | (244,559) | 311,468 | 66,909 | 1,822,114 | 1,625,000 |

112.1%    275,000    0    0

320,833    0

Total

**Corp Expenses**

| Sum of Amount | |
|---|---|
| Category | Total |
| Airfare | $ 28,794.58 |
| Black Travel | $ 11.32 |
| Corp Salaries | $ 44,365.28 |
| Feinberg Travel | $ 7,111.89 |
| John Altamura | $ 50,250.00 |
| Naden Travel ATL | $ 70.08 |
| Naden Travel PA | $ 500.37 |
| Ronsen Travel NYC ATL | $ 1,126.56 |
| Ronsen Travel ATL | $ 397.26 |
| Ronsen Travel NC | $ 296.23 |
| Grand Total | $ 132,923.57 |

G:\AR Clients\Numerex\OOPremlimEarnoutCal20071231draft.xls-Dept010summary

System: HISTORICAL L
Orbit One Communications LLC
General Ledger

2/16/2008   1:10:31 PM Page:   1   $ 39,496.00

| Date | Reference | Transaction ID | Description | Acct Description | Acct Number | Amount | Category |
|---|---|---|---|---|---|---|---|
| 10/31/2007 | 956 | GLTRX00000418 | Feinberg/Migliaro | Salary Exp-Corp Expenses-Corp-ORB1 | 6000-010-100-15 | $ 26,250.00 | Corp Salaries |
| 11/30/2007 | 501 | GLTRX00000805 | Fienberg | Salary Exp-Corp Expenses-Corp-ORB1 | 6000-010-100-15 | 10,260.42 | Corp Salaries |
| 11/30/2007 | 1,154 | GLTRX00000527 | Fienberg | Salary Exp-Corp Expenses-Corp-ORB1 | 6000-010-100-15 | 14,583.34 | Corp Salaries |
| 11/30/2007 | 1,155 | GLTRX00000528 | Fienberg | Salary Exp-Corp Expenses-Corp-ORB1 | 6000-010-100-15 | (5,833.34) | Corp Salaries |
| 11/30/2007 | 1,147 | GLTRX00000519 | Other | Vacation Exp-Corp Expenses-Corp-ORB1 | 6012-010-100-14 | (1,457.13) | Corp Salaries |
| 11/30/2007 | 1,147 | GLTRX00000519 | Other | Vacation Exp-Corp Expenses-Corp-ORB1 | 6012-010-100-14 | 561.39 | Corp Salaries |
| 12/30/2007 | 957 | GLTRX00000417 | Altamura | Contract Labor-Corp Expenses-Corp-ORB1 | 8110-010-100-15 | 30,250.00 | John Altamura |
| 10/31/2007 | 1,145 | GLTRX00000581 | Altamura | Contract Labor-Corp Expenses-Corp-ORB1 | 8110-010-100-15 | 10,000.00 | John Altamura |
| 11/30/2007 | 1,308 | GLTRX00000585 | Altamura | Contract Labor-Corp Expenses-Corp-ORB1 | 8110-010-100-15 | 10,000.00 | John Altamura |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE 807 | Travel Exp Airfare-Corp Expenses | 6300-010-100-15 | 722.54 | Feinberg Travel |
| 12/31/2007 | 1,251 | GLTRX00000577 | DR NC Trip 010 JE 809 | Travel Exp Airfare-Corp Expenses | 6300-010-100-15 | 157.39 | Ronsen Travel NC |
| 12/31/2007 | 1,251 | GLTRX00000577 | GN PA Trip 010 JE 651 | Travel Exp Airfare-Corp Expenses | 6300-010-100-15 | 385.50 | Naden Travel PA |
| 12/31/2007 | 1,252 | GLTRX00000578 | Corporate Airfare JE 178 | Travel Exp Airfare-Corp Expenses | 6300-010-100-15 | 12,889.93 | Airfare |
| 12/31/2007 | 1,252 | GLTRX00000578 | Corporate Airfare JE 513 | Travel Exp Airfare-Corp Expenses | 6300-010-100-15 | 5,028.84 | Airfare |
| 12/31/2007 | 1,252 | GLTRX00000578 | Corporate Airfare JE 737 | Travel Exp Airfare-Corp Expenses | 6300-010-100-15 | 6,207.80 | Airfare |
| 12/31/2007 | 1,252 | GLTRX00000578 | Corporate Airfare JE 1128 | Travel Exp Airfare-Corp Expenses | 6300-010-100-15 | 4,666.01 | Airfare |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE1091 | Travel Exp Lodging-Corp Expenses | 6305-010-100-15 | 823.92 | Feinberg Travel |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE 183 | Travel Exp Lodging-Corp Expenses | 6305-010-100-15 | 674.70 | Feinberg Travel |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE 378 | Travel Exp Lodging-Corp Expenses | 6305-010-100-15 | 1,671.45 | Feinberg Travel |
| 12/31/2007 | 1,251 | GLTRX00000577 | SB Meals Travel JE1092 | Travel Exp Meals-Corp Expenses | 6310-010-100-15 | 11.32 | Black Travel |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE1061 | Travel Exp Meals-Corp Expenses | 6310-010-100-15 | 30.00 | Feinberg Travel |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE 183 | Travel Exp Meals-Corp Expenses | 6310-010-100-15 | 15.00 | Feinberg Travel |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE 183 | Travel Exp Meals-Corp Expenses | 6310-010-100-15 | 393.25 | Feinberg Travel |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE 378 | Travel Exp Meals-Corp Expenses | 6310-010-100-15 | 50.00 | Feinberg Travel |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE 807 | Travel Exp Meals-Corp Expenses | 6310-010-100-15 | 70.06 | Naden Travel ATL |
| 12/31/2007 | 1,251 | GLTRX00000577 | GN ATL MEALS 010 | Travel Exp Meals-Corp Expenses | 6310-010-100-15 | 213.46 | Ronsen Travel NYC ATL |
| 12/31/2007 | 1,251 | GLTRX00000577 | DR NYC/ATL Trips 010 | Travel Exp Meals-Corp Expenses | 6310-010-100-15 | 849.58 | Ronsen Travel NYC ATL |
| 12/31/2007 | 1,251 | GLTRX00000577 | DR NYC/ATL Trips 010 | Travel Exp Meals-Corp Expenses | 6310-010-100-15 | 25.51 | Ronsen Travel ATL |
| 12/31/2007 | 1,251 | GLTRX00000577 | DR ATL Trip 010 JE 809 | Travel Exp Meals-Corp Expenses | 6310-010-100-15 | 9.50 | Ronsen Travel NC |
| 12/31/2007 | 1,251 | GLTRX00000577 | DR NC Trip 010 JE 809 | Travel Exp Meals-Corp Expenses | 6310-010-100-15 | 12.60 | Naden Travel PA |
| 12/31/2007 | 1,251 | GLTRX00000577 | GN PA Trip 010 JE 651 | Travel Exp Meals-Corp Expenses | 6310-010-100-15 | 72.28 | Naden Travel PA |
| 12/31/2007 | 1,251 | GLTRX00000577 | GN PA Trip 010 JE 651 | Travel Exp Entertainment-Corp Expenses | 6311-010-100-15 | 53.10 | Feinberg Travel |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE 183 | Travel Exp Entert-Corp Expenses | 6311-010-100-15 | 153.50 | Feinberg Travel |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE1091 | Travel Exp Auto-Corp Expenses | 6320-010-100-15 | 570.48 | Feinberg Travel |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE 183 | Travel Exp Auto-Corp Expenses | 6320-010-100-15 | 261.52 | Feinberg Travel |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE 378 | Travel Exp Auto-Corp Expenses | 6320-010-100-15 | 304.69 | Feinberg Travel |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE 807 | Travel Exp Auto-Corp Expenses | 6320-010-100-15 | 688.04 | Feinberg Travel |
| 12/31/2007 | 1,251 | GLTRX00000577 | DR NYC/ATL Trips 010 | Travel Exp Auto-Corp Expenses | 6320-010-100-15 | 8.50 | Ronsen Travel NYC ATL |
| 12/31/2007 | 1,251 | GLTRX00000577 | DR ATL Trip 010 JE 809 | Travel Exp Auto-Corp Expenses | 6320-010-100-15 | 371.75 | Ronsen Travel ATL |
| 12/31/2007 | 1,251 | GLTRX00000577 | DR NC Trip 010 JE 809 | Travel Exp Auto-Corp Expenses | 6320-010-100-15 | 90.85 | Ronsen Travel NC |
| 12/31/2007 | 1,251 | GLTRX00000577 | DR NC Trip 010 JE 809 | Travel Exp Auto-Corp Expenses | 6320-010-100-15 | 11.19 | Ronsen Travel NC |
| 12/31/2007 | 1,251 | GLTRX00000577 | GN PA Trip 010 JE 651 | Travel Exp Auto-Corp Expenses | 6320-010-100-15 | 25.00 | Naden Travel PA |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE 378 | Travel Exp Park n Toll-Corp Expenses | 6330-010-100-15 | 136.00 | Feinberg Travel |
| 12/31/2007 | 1,251 | GLTRX00000577 | DR NYC/ATL Trips 010 | Travel Exp Park n Toll-Corp Expenses | 6330-010-100-15 | 204.80 | Feinberg Travel |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE 183 | Travel Exp Park n Toll-Corp Expenses | 6330-010-100-15 | 55.00 | Ronsen Travel NYC ATL |
| 12/31/2007 | 1,251 | GLTRX00000577 | DR NC Trip 010 JE 809 | Travel Exp Park n Toll-Corp Expenses | 6330-010-100-15 | 27.50 | Ronsen Travel NC |
| 12/31/2007 | 1,251 | GLTRX00000577 | GN PA Trip 010 JE 651 | Travel Exp Park n Toll-Corp Expenses | 6330-010-100-15 | 4.75 | Naden Travel PA |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE 807 | Travel Exp Mileage-Corp Expenses | 6340-010-100-15 | 48.75 | Feinberg Travel |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE 807 | Travel Exp Mileage-Corp Expenses | 6340-010-100-15 | 310.40 | Feinberg Travel |
| | | | | | | $ 132,923.57 | |

G:\AR Clients\Numerex\OOPremlmEarnout\Cal\20071231\draft.xls-Dept010

| Journal Entry | Originating TRX Source | Series | TRX Date | Originating Posted Date | Account Number | Account Description | Credit Amount | Debit Amount | Description |
|---|---|---|---|---|---|---|---|---|---|
| 1252 | GLTRX00000578 | Financial | 12/31/2007 | 1/2/2008 | 6300-100-100-15 | Travel Exp Airfare-Admin-Corp-ORB1 | $7,268.63 | $0.00 | Corporate Airfare JE 178 |
| 1252 | GLTRX00000578 | Financial | 12/31/2007 | 1/2/2008 | 6300-200-100-15 | Travel Exp Airfare-Finance-Corp-ORB1 | $1,493.10 | $0.00 | Corporate Airfare JE 178 |
| 1252 | GLTRX00000578 | Financial | 12/31/2007 | 1/2/2008 | 6300-310-100-15 | Travel Exp Airfare-Sales-Corp-ORB1 | $1,493.10 | $0.00 | Corporate Airfare JE 178 |
| 1252 | GLTRX00000578 | Financial | 12/31/2007 | 1/2/2008 | 6300-500-100-15 | Travel Exp Airfare-RnD-Corp-ORB1 | $2,635.10 | $0.00 | Corporate Airfare JE 178 |
| 1252 | GLTRX00000578 | Financial | 12/31/2007 | 1/2/2008 | 6300-010-100-15 | Travel Exp Airfare-Corp Expenses | $0.00 | $12,889.93 | Corporate Airfare JE 178 |
| 1252 | GLTRX00000578 | Financial | 12/31/2007 | 1/2/2008 | 6300-100-100-15 | Travel Exp Airfare-Admin-Corp-ORB1 | $2,164.42 | $0.00 | Corporate Airfare JE 513 |
| 1252 | GLTRX00000578 | Financial | 12/31/2007 | 1/2/2008 | 6300-310-100-15 | Travel Exp Airfare-Sales-Corp-ORB1 | $778.10 | $0.00 | Corporate Airfare JE 513 |
| 1252 | GLTRX00000578 | Financial | 12/31/2007 | 1/2/2008 | 6300-500-100-15 | Travel Exp Airfare-RnD-Corp-ORB1 | $2,086.32 | $0.00 | Corporate Airfare JE 513 |
| 1252 | GLTRX00000578 | Financial | 12/31/2007 | 1/2/2008 | 6300-010-100-15 | Travel Exp Airfare-Corp Expenses | $0.00 | $5,028.84 | Corporate Airfare JE 513 |
| 1252 | GLTRX00000578 | Financial | 12/31/2007 | 1/2/2008 | 6300-100-100-15 | Travel Exp Airfare-Admin-Corp-ORB1 | $5,345.30 | $0.00 | Corporate Airfare JE 737 |
| 1252 | GLTRX00000578 | Financial | 12/31/2007 | 1/2/2008 | 6300-310-100-15 | Travel Exp Airfare-Sales-Corp-ORB1 | $862.50 | $0.00 | Corporate Airfare JE 737 |
| 1252 | GLTRX00000578 | Financial | 12/31/2007 | 1/2/2008 | 6300-010-100-15 | Travel Exp Airfare-Corp Expenses | $0.00 | $6,207.80 | Corporate Airfare JE 737 |
| 1252 | GLTRX00000578 | Financial | 12/31/2007 | 1/2/2008 | 6300-100-100-15 | Travel Exp Airfare-Admin-Corp-ORB1 | $2,436.81 | $0.00 | Corporate Airfare JE 1128 |
| 1252 | GLTRX00000578 | Financial | 12/31/2007 | 1/2/2008 | 6300-310-100-15 | Travel Exp Airfare-Sales-Corp-ORB1 | $1,497.90 | $0.00 | Corporate Airfare JE 1128 |
| 1252 | GLTRX00000578 | Financial | 12/31/2007 | 1/2/2008 | 6300-500-100-15 | Travel Exp Airfare-RnD-Corp-ORB1 | $733.30 | $0.00 | Corporate Airfare JE 1128 |
| 1252 | GLTRX00000578 | Financial | 12/31/2007 | 1/2/2008 | 6300-010-100-15 | Travel Exp Airfare-Corp Expenses | $0.00 | $4,668.01 | Corporate Airfare JE 1128 |
| | | | | | | | | $28,794.58 | |

G:\AR Clients\Numerex\OOPremiimEarnout\Cal2007\1231draft.xls-Airfare010

NewTree                SX1

| Ordinary Income/Expense | DataTracking | Operating | (R&D) | (R&D) | Total R&D | Voice | VSAT | Unclassified | TOTAL | Less Sale related or Discontinued Operations | REVISED TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Income | | | | | | | | | | | |
| 3000 · Income | | | | | | | | | | | |
| 3100 · Voice Sales Income | | | | | | | | | | | |
| 3100 · Voice Sales Income | | | | | | | | | 0.00 | 0.00 | 0.00 |
| 3110 · Sales-Equipment | | | | | | | | | 0.00 | 0.00 | 0.00 |
| 3120 · Airtime | | | | | | | | | 0.00 | 0.00 | 0.00 |
| 3140 · Repairs | | | | | | | | | 0.00 | 0.00 | 0.00 |
| 3170 · Shipping-Voice Sales | | | | | | | | | 0.00 | 0.00 | 0.00 |
| Total 3100 · Voice Sales Income | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 3500 · Data Income | | | | | | | | | | | |
| 3310 · Equipment | | | | | | | | | | | |
| 3310.03 · Orbfrax | 51,145.00 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 51,145.00 | 0.00 | 51,145.00 |
| 3310 · Equipment - Other | 2,035.00 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 2,035.00 | 0.00 | 2,035.00 |
| Total 3310 · Equipment | 53,180.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 53,180.00 | 0.00 | 53,180.00 |
| 3320 · Airtime/Message | 231,745.98 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 231,745.98 | 0.00 | 231,745.98 |
| 3325 · Nav/FAX/ Fees | 16,958.75 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 16,958.75 | 0.00 | 16,958.75 |
| 3330 · Activation | 89,920.00 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 89,920.00 | 0.00 | 89,920.00 |
| 3355 · Supplies | 400.00 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 400.00 | 0.00 | 400.00 |
| Total 3500 · Data Income | 385,204.73 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 385,204.73 | 0.00 | 385,204.73 |
| 3800 · VSAT Income | | | | | | | | | | | |
| 3820 · Airtime | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,422.31 | 0.00 | 4,422.31 | 0.00 | 4,422.31 |
| Total 3800 · VSAT Income | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,422.31 | 0.00 | 4,422.31 | 0.00 | 4,422.31 |
| Total 3000 · Income | 385,204.73 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,422.31 | 0.00 | 389,627.04 | 0.00 | 389,627.04 |
| Total Income | 385,204.73 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,422.31 | 0.00 | 389,627.04 | 0.00 | 389,627.04 |
| Cost of Goods Sold | | | | | | | | | | | |
| 4000 · Cost of Goods Sold | | | | | | | | | | | |
| 4100 · Voice Sales COGS | | | | | | | | | | | |
| 4110 · Sales-Equipment | | | | | | | | | 0.00 | 0.00 | 0.00 |
| 4160 · Shipping | | | | | | | | | 0.00 | 0.00 | 0.00 |
| Total 4100 · Voice Sales COGS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 4200 · Voice Rental COGS | | | | | | | | | | | |
| 4210 · Rental-Equipment | | | | | | | | | 0.00 | 0.00 | 0.00 |
| 4220 · Rental-Airtime | | | | | | | | | 0.00 | 0.00 | 0.00 |
| 4250 · Shipping | | | | | | | | | 0.00 | 0.00 | 0.00 |
| Total 4200 · Voice Rental COGS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 4300 · Data COGS | | | | | | | | | | | |
| 4310 · Equipment | | | | | | | | | | | |
| 4310.03 · OrbiTrax | 54,035.53 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 54,035.53 | 0.00 | 54,035.53 |
| 4310 · Equipment - Other | 9,987.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 9,987.14 | 0.00 | 9,987.14 |
| Total 4310 · Equipment | 64,022.67 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 64,022.67 | 0.00 | 64,022.67 |
| 4320 · Airtime/Message Costs | 46,694.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 46,694.52 | 0.00 | 46,694.52 |
| 4330 · Data Activation | 525.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 525.00 | 0.00 | 525.00 |
| 4340 · Mapping | | | | | | | | | | | |
| 4343 · Felix | | | | | | | | | | | |
| 4343.04 · Hosting | 4,081.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,081.25 | 0.00 | 4,081.25 |
| Total 4343 · Felix | 4,081.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,081.25 | 0.00 | 4,081.25 |
| Total 4340 · Mapping | 4,081.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,081.25 | 0.00 | 4,081.25 |
| 4350 · Shipping | 712.65 | 298.24 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 420.63 | 1,431.52 | 0.00 | 1,431.52 |
| 4360 · Supplies Data | 113.85 | 125.25 | 0.00 | 1,378.00 | 1,378.00 | 0.00 | 0.00 | 0.00 | 1,617.10 | 0.00 | 1,617.10 |
| Total 4300 · Data COGS | 116,749.94 | 423.48 | 0.00 | 1,378.00 | 1,378.00 | 0.00 | 0.00 | 420.63 | 118,972.06 | 0.00 | 118,972.06 |

NavTrax                    SXI

| | Date/Tracking | Operating | (R&D) | (R&D) | Total R&D | Voice | VSAT | Unclassified | TOTAL | Less Sale related or Discontinued Operations | REVISED TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4800 · VSAT COGS | 0.00 | 4,269.00 | 0.00 | 0.00 | 0.00 | 0.00 | 846.60 | 2,044.70 | 7,159.30 | 0.00 | 7,159.30 |
| 4820 · Airtime | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 91.91 | 91.91 | 91.91 | 0.00 | 91.91 |
| 4850 · Shipping | 34.27 | 4,288.00 | 0.00 | 0.00 | 0.00 | 0.00 | 937.51 | 2,544.76 | 7,250.21 | 0.00 | 7,250.21 |
| **Total 4800 · VSAT COGS** | | | | | | | | | | | |
| 4900 · Supplies | 34.27 | | | | | | | 2,465.33 | 34.27 | 0.00 | 34.27 |
| **Total 4900 · Cost of Goods Sold** | 116,784.21 | 4,691.49 | | 1,378.00 | 1,378.00 | | 937.51 | 2,465.33 | 126,256.54 | 0.00 | 126,256.54 |
| | | | | | | | | | | | |
| **Total COGS** | | | | | | | | | 126,256.54 | 0.00 | 126,256.54 |
| | | | | | | | | | | | |
| **Gross Profit** | 272,420.52 | -4,691.49 | | -1,378.00 | -1,378.00 | | 3,484.80 | -2,465.33 | 267,370.50 | 0.00 | 267,370.50 |

**Expense**

**5000 · General & Administrative**

**5100 · Payroll**

| | Date/Tracking | Operating | (R&D) | (R&D) | Total R&D | Voice | VSAT | Unclassified | TOTAL | Less Sale related or Discontinued Operations | REVISED TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5101 · Officer's Salaries | 57,594.10 | -21,153.34 | 0.00 | 0.00 | 0.00 | 0.00 | 6,154.24 | 0.00 | 36,730.66 | 0.00 | 36,730.66  Voice and deal expenses |
| 5102 · Employee Wages | 351,567.51 | -12,340.47 | 0.00 | 0.00 | 0.00 | 13,115.29 | 481.61 | 0.00 | 307,966.37 | 223,023.74 | 84,942.63  Voice and deal expenses |
| 5103 · Payroll Taxes | 10,089.52 | 1,506.71 | 0.00 | 0.00 | 0.00 | 1,036.10 | 481.61 | 0.00 | 13,490.94 | 4,606.02 | 8,888.92  Voice and deal expenses |
| 5104 · Work Comp Insurance | | 595.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 596.62 | 0.00 | 596.62  Voice and deal expenses |
| 5105 · Employee Group Health Ins | 965.55 | -431.81 | 0.00 | 0.00 | 0.00 | -877.98 | 121.80 | 0.00 | -222.44 | -477.08 | 495.54  Voice and deal expenses |
| 5107 · 401K Employer | 10,144.62 | -1,020.74 | 0.00 | 0.00 | 0.00 | 246.18 | 246.18 | 0.00 | 9,008.59 | 524.53 | 8,584.09  Voice and deal expenses |
| 5150 · Bonus Expense | 0.00 | 90,000.00 | 0.00 | 0.00 | 0.00 | 524.53 | 0.00 | 0.00 | 60,000.00 | 77,142.96 | 12,857.14  Voice and deal expenses |
| 5160 · Moving Expenses | 0.00 | 1,566.63 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,566.63 | 0.00 | 1,566.63 |
| 5100 · Payroll - Other | 0.00 | -220.49 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -220.49 | 0.00 | -220.49 |
| **Total 5100 · Payroll** | 430,651.30 | 57,778.91 | 0.00 | 0.00 | 0.00 | 13,509.94 | 6,093.81 | 0.00 | 500,410.98 | 354,830.07 | 154,580.91 |

**5200 · Travel**

| | Date/Tracking | Operating | (R&D) | (R&D) | Total R&D | Voice | VSAT | Unclassified | TOTAL | Less Sale related or Discontinued Operations | REVISED TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5210 · Transportation | | | | | | | | | | | |
| 5211 · Air | 2,916.65 | 80.00 | 0.00 | 0.00 | 2,378.62 | 0.00 | 0.00 | 0.00 | 5,378.28 | 0.00 | 5,378.28 |
| 5212 · Rental Car | 5.39 | 262.90 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 268.29 | 0.00 | 268.29 |
| 5215 · Taxi | 108.70 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 108.70 | 0.00 | 108.70 |
| **Total 5210 · Transportation** | 3,031.74 | 342.90 | 0.00 | 0.00 | 2,378.62 | 0.00 | 0.00 | 0.00 | 5,755.28 | 0.00 | 5,755.28 |
| 5220 · Lodging | 333.31 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 333.31 | 0.00 | 333.31 |
| 5250 · Misc (Parking, Tolls, Etc) | 70.55 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 70.55 | 0.00 | 70.55 |
| 5200 · Travel - Other | 1,040.11 | 425.70 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,465.90 | 0.00 | 1,465.90 |
| **Total 5200 · Travel** | 4,475.66 | 768.60 | 0.00 | 0.00 | 2,378.62 | 0.00 | 0.00 | 0.00 | 7,622.97 | 0.00 | 7,622.97 |

**5300 · Automobile Expense**

| | Date/Tracking | Operating | (R&D) | (R&D) | Total R&D | Voice | VSAT | Unclassified | TOTAL | Less Sale related or Discontinued Operations | REVISED TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5310 · Gas | 0.00 | 17.62 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 17.62 | 0.00 | 17.62 |
| **Total 5300 · Automobile Expense** | 0.00 | 17.62 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 17.62 | 0.00 | 17.62 |

**5400 · Fees, Dues, & Interest Etc**

| | Date/Tracking | Operating | (R&D) | (R&D) | Total R&D | Voice | VSAT | Unclassified | TOTAL | Less Sale related or Discontinued Operations | REVISED TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5409 · Fees, Dues, & Interest Etc | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 75.00 | 0.00 | 75.00 |
| 5410 · Bank Fees | 0.00 | 75.00 | 0.00 | 0.00 | 0.00 | 30.88 | 0.00 | 0.00 | 30.88 | 0.00 | 30.88 |
| 5420 · Credit Card Fees | 75.00 | 75.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 110.00 | 0.00 | 110.00 |
| 5440 · Dues, Memberships, & Fees | 85.00 | 25.00 | 0.00 | 0.00 | 0.00 | 258.41 | 0.00 | 0.00 | 258.41 | 258.41 | 0.00 |
| 5460 · Merchant Processing Fees | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 296.29 | 0.00 | 0.00 | 296.29 | 296.29 | 163.00 |
| **Total 5400 · Fees, Dues, & Interest Etc** | 65.00 | 100.00 | 0.00 | 0.00 | 0.00 | 296.29 | 0.00 | 0.00 | 483.29 | | |

**5500 · Employee/Client Morale**

| | Date/Tracking | Operating | (R&D) | (R&D) | Total R&D | Voice | VSAT | Unclassified | TOTAL | Less Sale related or Discontinued Operations | REVISED TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5510 · Meals & Entertainment | 64.58 | 44.62 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 0.00 | 100.00 |
| 5515 · 100% Meals | 394.20 | 385.55 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 980.75 | 462.40 | 518.35 |
| **Total 5500 · Employee/Client Morale** | 459.18 | 630.57 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,088.75 | 462.40 | 627.35 |

| | Date/Tracking | Operating | (R&D) | (R&D) | Total R&D | Voice | VSAT | Unclassified | TOTAL | Less Sale related or Discontinued Operations | REVISED TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6600 · Postage/Shipping Expenses | -48.24 | 260.79 | 0.00 | 0.00 | 0.00 | -18.00 | -6.46 | 7.58 | 264.00 | 18.60 | 185.40 |
| 5700 · Meetings & Training | 92.77 | 92.77 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 92.77 | 0.00 | 92.77 |
| **5800 · Research & Development** | | | | | | | | | | | |
| 580003 · Materials | 3,628.07 | 739.35 | 0.00 | 0.00 | 4,367.42 | 0.00 | 0.00 | 0.00 | 4,367.42 | 0.00 | 4,367.42 |
| 580014 · Shipping | 188.75 | 0.00 | 0.00 | 0.00 | 188.75 | 0.00 | 0.00 | 0.00 | 188.75 | 0.00 | 188.75 |
| 580037 · Regulatory & Certifications | -56,525.00 | -56,525.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -56,525.00 | -56,525.00 | 0.00  Capitalize Approvals expensed in a prior period |

NextTrax          SX1

| | DataTracking | Operating | (R&D) | (R&D) | Total R&D | Voice | VSAT | Unclassified | TOTAL | Less Sale related or Discontinued Operations | REVISED TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total 5800 - Research & Development | 0.00 | -55,525.00 | 726.25 | 3,816.52 | 4,556.17 | 0.00 | 0.00 | 0.00 | -51,968.83 | -55,525.00 | 4,556.17 |
| 5900 - Office Supplies/Expenses | 0.00 | 1,751.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,751.27 | 0.00 | 1,751.27 |
| 5910 - ComputerTech <$1000 | 215.20 | 211.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 426.30 | 0.00 | 426.30 |
| Total 6000 - General & Administrative | 435,930.82 | 4,099.95 | 739.35 | 6,195.44 | 6,934.79 | 14,279.63 | 6,977.35 | 7.38 | 466,195.12 | 296,694.36 | 170,045.76 |
| 6000 - Indirect Support | | | | | | | | | | | |
| 6100 - Marketing | | | | | | | | | | | |
| 6110 - Marketing Consultant | 15,995.60 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15,995.60 | 0.00 | 15,995.60 |
| 6150 - Website (Ongoing) | 9.95 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 9.95 | 0.00 | 9.95 |
| 6150 - Advertising | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 225.00 | 0.00 | 0.00 | 225.00 | 225.00 | 0.00 |
| 6160 - CPA | 850.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 850.00 | 0.00 | 850.00 |
| 6170 - Trade Shows | | | | | | | | | | | |
| 6170A - Trade Show Supplies | 0.00 | 26.43 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 26.43 | | 26.43 |
| Total 6170 - Trade Shows | 0.00 | 26.43 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 26.43 | | 26.43 |
| Total 6100 - Marketing | 16,855.55 | 26.43 | 0.00 | 0.00 | 0.00 | 225.00 | 0.00 | 0.00 | 17,106.98 | 225.00 | 16,881.98 |
| 6200 - Accounting | 47,846.55 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 47,846.55 | 47,846.55 | 0.00 |
| 6350 - Legal/Professional | 955.50 | 10,825.75 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11,781.25 | 9,226.75 | 2,554.50 |
| 6400 - Other Consultants | 1,162.50 | -43,987.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -42,795.00 | -45,000.00 | 2,205.00 |
| 6500 - Contract Labor | 62.00 | 596.80 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 658.80 | 0.00 | 956.80 |
| Total 6000 - Indirect Support | 19,003.55 | 15,208.03 | 0.00 | 0.00 | 0.00 | 225.00 | 0.00 | 0.00 | 24,538.56 | 12,210.30 | 22,226.28 |
| 7000 - Facilities | | | | | | | | | | | |
| 7100 - Office Expenses | | | | | | | | | | | |
| 7101 - Rent | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 7102 - Insurance | 383.08 | 383.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 383.08 | 0.00 | 383.08 |
| Total 7100 - Office Expenses | 383.08 | 383.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 383.08 | 0.00 | 383.08 |
| 7200 - Utilities | | | | | | | | | | | |
| 7201 - Gas & Electric | 1,741.91 | 1,741.91 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,741.91 | 0.00 | 1,741.91 |
| 7202 - Water & Sewage | 777.83 | 777.83 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 777.83 | 0.00 | 777.83 |
| 7204 - Security | 111.00 | 111.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 111.00 | 0.00 | 111.00 |
| Total 7200 - Utilities | 2,630.74 | 2,630.74 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,630.74 | 0.00 | 2,630.74 |
| 7300 - Communications | | | | | | | | | | | |
| 7301 - Internet | 187.00 | 600.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 787.00 | 0.00 | 787.00 |
| 7302 - Telephone | 0.00 | 2,885.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,885.12 | 0.00 | 2,885.12 |
| 7303 - Cell | 1,055.40 | 4.42 | 0.00 | 0.00 | 0.00 | 73.39 | 161.96 | 0.00 | 1,296.16 | 73.39 | 1,222.77 |
| Total 7300 - Communications | 1,253.40 | 3,489.54 | 0.00 | 0.00 | 0.00 | 73.39 | 161.96 | 0.00 | 4,978.28 | 73.39 | 4,904.89 |
| 7400 - Repairs/Maint. | | | | | | | | | | | |
| 7401 - Equipment Lease/Maint | 68.56 | 68.56 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 68.56 | 0.00 | 68.56 |
| 7402 - Building Repairs & Maintenance | 97.98 | 97.98 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 97.98 | 0.00 | 97.98 |
| Total 7400 - Repairs/Maint. | 166.56 | 166.56 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 166.55 | 0.00 | 166.55 |
| 7500 - Shop Supplies/Expenses | 103.80 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 103.60 | 0.00 | 100.30 |
| Total 7000 - Facilities | 1,357.30 | 6,669.92 | 0.00 | 0.00 | 0.00 | 73.39 | 181.95 | 0.00 | 8,762.56 | 73.39 | 8,189.17 |
| Total Expense | 455,291.67 | 26,977.90 | 738.35 | 6,185.44 | 6,924.78 | 14,578.02 | 7,139.30 | 7.38 | 511,929.25 | 311,468.05 | 200,461.21 |
| Net Ordinary Income | -183,871.15 | -31,805.39 | -726.35 | -7,573.44 | -8,312.79 | -14,578.02 | -7,139.30 | -2,472.91 | -244,556.78 | -311,468.05 | 66,909.23 |

45K Placement Fee for MRI Boulder (written to 2,205.00 goodwill in September or October)

G:\AR Clients\Numerex\QO\Prentin\Earnout2a\20071231draft.xls-JulyDeloit

System:        HISTORICAL DETAILED TRIAL BALANCE I                          2/18/2008                    1:10.31 PM Page: 1                                    User Date: 12/31/2007    2/18/2008 User ID:    TFarrow
Orbit One Communications LLC
General Ledger

Ranges:        From:        To:        Date:        Sorted By:                          Print Currency In:  Functional (Z-US$)    Subtotal By:    No Subtotals  Include:    Posting
Account        -010-  -        -010-  -                                                                                      $0.00

**Account:** 6000-010-100-15                                                  Account:  Salary Exp-Corp Expenses-Corp-ORB1                  Account: 6000-010-100-15
| Trx Date | Jrnl No. | Orig. Audit Trail | Distribution Reference | Orig. Master Number | | Debit | Credit |
|---|---|---|---|---|---|---|---|
| | | | | Beginning Balance: | | $0.00 | |
| 10/31/2007 | 958 | GLTRX00000418 | | Salary Exp-Corp Expenses-Corp-ORB1 | 6000-010-100-15 | $26,250.00 | |
| 11/30/2007 | 501 | GLTRX00000605 | Allocate M. Marett | Salary Exp-Corp Expenses-Corp-ORB1 | 6000-010-100-15 | $10,260.42 | |
| 11/30/2007 | 1,154 | GLTRX00000527 | | Salary Exp-Corp Expenses-Corp-ORB1 | 0000-010-100-15 | $14,583.34 | |
| 11/30/2007 | 1,155 | GLTRX00000528 | | Salary Exp-Corp Expenses-Corp-ORB1 | 6000-010-100-15 | | $5,833.34 |

Net Change Ending Balance        $45,260.42        $51,093.76
Totals:        $45,260.42        $5,833.34

**Account:** 6012-010-100-15                                                  Account:  Vacation Exp-Corp Expenses-Corp-ORB1                  Account: 6012-010-100-15
| Trx Date | Jrnl No. | Orig. Audit Trail | Description: Distribution Reference | Orig. Master Number | | Debit | Credit |
|---|---|---|---|---|---|---|---|
| | | | | Beginning Balance: | | | $1,457.13 |
| 11/30/2007 | 1,147 | GLTRX00000513 | | Vacation Exp-Corp Expenses-Corp-ORB1 | 6012-010-100-15 | | $581.99 |
| 12/30/2007 | 1,147 | GLTRX00000587 | | | | | |

Net Change Ending Balance        ($895.14)        $581.99
Totals:        ($895.14)

**Account:** 6110-010-100-15                                                  Account:  Contract Labor Exp Expenses-Corp-ORB1                  Account: 6110-010-100-15
| Trx Date | Jrnl No. | Orig. Audit Trail | Description: Distribution Reference | Orig. Master Number | | Debit | Credit |
|---|---|---|---|---|---|---|---|
| | | | | Beginning Balance: | | $0.00 | |
| 10/31/2007 | 957 | GLTRX00000417 | | Contract Labor Exp Expenses-Corp-ORB1 | 6110-010-100-15 | $30,250.00 | |
| 11/30/2007 | 1,145 | GLTRX00000511 | Altamura | Contract Labor Exp Expenses-Corp-ORB1 | 6110-010-100-15 | $10,000.00 | |
| 12/31/2007 | 1,308 | GLTRX00000595 | | Contract Labor Exp Expenses-Corp-ORB1 | 6110-010-100-15 | $10,000.00 | |

Net Change Ending Balance        $50,250.00        $50,250.00
Totals:        $50,250.00        $0.00

**Account:** 6300-010-100-15                                                  Account:  Travel Exp Airfare-Corp Expenses                  Account: 6300-010-100-15
| Trx Date | Jrnl No. | Orig. Audit Trail | Description: Distribution Reference | Orig. Master Number | | Debit | Credit |
|---|---|---|---|---|---|---|---|
| | | | | Beginning Balance: | | $0.00 | |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE 807 | Travel Exp Airfare-Corp Expenses | 6300-010-100-15 | $722.54 | |
| 12/31/2007 | 1,251 | GLTRX00000577 | DR NYC Trip 010 JE 809 | Travel Exp Airfare-Corp Expenses | 6300-010-100-15 | $157.39 | |
| 12/31/2007 | 1,251 | GLTRX00000577 | DR PA Trip 010 JE 651 | Travel Exp Airfare-Corp Expenses | 6300-010-100-15 | $385.56 | |
| 12/31/2007 | 1,252 | GLTRX00000578 | Corporate Airfare JE 178 | Travel Exp Airfare-Corp Expenses | 6300-010-100-15 | $12,889.93 | |
| 12/31/2007 | 1,252 | GLTRX00000578 | Corporate Airfare JE 513 | Travel Exp Airfare-Corp Expenses | 6300-010-100-15 | $5,028.84 | |
| 12/31/2007 | 1,252 | GLTRX00000578 | Corporate Airfare JE 737 | Travel Exp Airfare-Corp Expenses | 6300-010-100-15 | $6,207.80 | |
| 12/31/2007 | 1,252 | GLTRX00000578 | Corporate Airfare JE 1128 | Travel Exp Airfare-Corp Expenses | 6300-010-100-15 | $4,668.01 | |

Net Change Ending Balance        $30,060.07
Totals:        $30,060.07        $0.00

**Account:** 6305-010-100-15                                                  Account:  Travel Exp Lodging-Corp Expenses                  Account: 6305-010-100-15
| Trx Date | Jrnl No. | Orig. Audit Trail | Description: Distribution Reference | Orig. Master Number | | Debit | Credit |
|---|---|---|---|---|---|---|---|
| | | | | Beginning Balance: | | $0.00 | |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE1091 | Travel Exp Lodging-Corp Expenses | 6305-010-100-15 | $823.92 | |
| 12/31/2007 | 1,251 | GLTRX00000577 | SB Meals Travel JE1092 | Travel Exp Lodging-Corp Expenses | 6305-010-100-15 | $674.70 | |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE 378 | Travel Exp Lodging-Corp Expenses | 6305-010-100-15 | $1,671.45 | |

Net Change Ending Balance        $3,170.07
Totals:        $3,170.07        $0.00

**Account:** 6310-010-100-15                                                  Account:  Travel Exp Meals-Corp Expenses                  Account: 6305-010-100-15
| Trx Date | Jrnl No. | Orig. Audit Trail | Description: Distribution Reference | Orig. Master Number | | Debit | Credit |
|---|---|---|---|---|---|---|---|
| | | | | Beginning Balance: | | $11.32 | |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE 183 | Travel Exp Meals-Corp Expenses | 6310-010-100-15 | $15.00 | |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE 378 | Travel Exp Meals-Corp Expenses | 6310-010-100-15 | $393.25 | |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE 807 | Travel Exp Meals-Corp Expenses | 6310-010-100-15 | $50.00 | |
| 12/31/2007 | 1,251 | GLTRX00000577 | DR ATL MEALS 010 | Travel Exp Meals-Corp Expenses | 6310-010-100-15 | $70.08 | |
| 12/31/2007 | 1,251 | GLTRX00000577 | SN ATL MEALS 010 | Travel Exp Meals-Corp Expenses | 6310-010-100-15 | $213.48 | |
| 12/31/2007 | 1,251 | GLTRX00000577 | DR NYC/ATL Trips 010 | Travel Exp Meals-Corp Expenses | 6310-010-100-15 | $849.53 | |
| 12/31/2007 | 1,251 | GLTRX00000577 | DR NYC/ATL Trips 010 | Travel Exp Meals-Corp Expenses | 6310-010-100-15 | $25.51 | |
| 12/31/2007 | 1,251 | GLTRX00000577 | DR ATL Trip 010 JE 809 | Travel Exp Meals-Corp Expenses | 6310-010-100-15 | | $30.00 |

System:        HISTORICAL DETAILED                          2/18/2008                    1:10:31 PM Page:    2 User Date:    2/18/2008 User ID:    TFarrow
Orbit One Communications LLC

**Account: 6310-010-100-15  Travel Exp Meals-Corp Expenses**
Beginning Balance: $0.00

| Trx Date | Jrnl No. | Orig. Audit Trail | Distribution Reference | Description | Orig. Master Number | Orig. Master Name | Debit | Credit |
|---|---|---|---|---|---|---|---|---|
| 12/31/2007 | 1,251 | GLTRX00000577 | DR NC Trip 010 JE 809 | Travel Exp Meals-Corp Expenses | 6310-010-100-15 | | | $9.50 |
| 12/31/2007 | 1,251 | GLTRX00000577 | GN PA Trip 010 JE 651 | Travel Exp Meals-Corp Expenses | 6310-010-100-15 | | | $12.80 |
| 12/31/2007 | 1,251 | GLTRX00000577 | GN PA Trip 010 JE 651 | Travel Exp Meals-Corp Expenses | 6310-010-100-15 | | | $72.28 |

Totals: $1,752.78
Net Change $1,752.78  Ending Balance $1,752.78

**Account: 6311-010-100-15  Travel Exp Entert-Corp Expenses**
Beginning Balance: $0.00

| Trx Date | Jrnl No. | Orig. Audit Trail | Distribution Reference | Description | Orig. Master Number | Orig. Master Name | Debit | Credit |
|---|---|---|---|---|---|---|---|---|
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE1091 | Travel Exp Entert-Corp Expenses | 6311-010-100-15 | | $53.10 | |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE 183 | Travel Exp Entert-Corp Expenses | 6311-010-100-15 | | $153.50 | |

Totals: $206.60
Net Change $206.60  Ending Balance $206.60

**Account: 6320-010-100-15  Travel Exp Auto-Corp Expenses**
Beginning Balance: $0.00

| Trx Date | Jrnl No. | Orig. Audit Trail | Distribution Reference | Description | Orig. Master Number | Orig. Master Name | Debit | Credit |
|---|---|---|---|---|---|---|---|---|
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE1091 | Travel Exp Auto-Corp Expenses | 6320-010-100-15 | | $570.48 | |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE 183 | Travel Exp Auto-Corp Expenses | 6320-010-100-15 | | $261.52 | |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE 378 | Travel Exp Auto-Corp Expenses | 6320-010-100-15 | | $304.69 | |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE 807 | Travel Exp Auto-Corp Expenses | 6320-010-100-15 | | $688.04 | |
| 12/31/2007 | 1,251 | GLTRX00000577 | DR NYC/ATL Trips 010 | Travel Exp Auto-Corp Expenses | 6320-010-100-15 | | $8.50 | |
| 12/31/2007 | 1,251 | GLTRX00000577 | DR NYC/ATL Trips 010 | Travel Exp Auto-Corp Expenses | 6320-010-100-15 | | $371.75 | |
| 12/31/2007 | 1,251 | GLTRX00000577 | DR ATL Trip 010 JE 809 | Travel Exp Auto-Corp Expenses | 6320-010-100-15 | | $90.65 | |
| 12/31/2007 | 1,251 | GLTRX00000577 | DR NC Trip 010 JE 809 | Travel Exp Auto-Corp Expenses | 6320-010-100-15 | | $11.19 | |
| 12/31/2007 | 1,251 | GLTRX00000577 | GN PA Trip 010 JE 651 | Travel Exp Auto-Corp Expenses | 6320-010-100-15 | | $25.00 | |

Totals: $2,331.82
Net Change $2,331.82  Ending Balance $2,331.82

**Account: 6330-010-100-15  Travel Exp Park n Toll-Corp Expenses**
Beginning Balance: $0.00

| Trx Date | Jrnl No. | Orig. Audit Trail | Distribution Reference | Description | Orig. Master Number | Orig. Master Name | Debit | Credit |
|---|---|---|---|---|---|---|---|---|
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE 378 | Travel Exp Park n Toll-Corp Expenses | 6330-010-100-15 | | $138.00 | |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE 807 | Travel Exp Park n Toll-Corp Expenses | 6330-010-100-15 | | $204.80 | |
| 12/31/2007 | 1,251 | GLTRX00000577 | DR NYC/ATL Trips 010 | Travel Exp Park n Toll-Corp Expenses | 6330-010-100-15 | | $55.00 | |
| 12/31/2007 | 1,251 | GLTRX00000577 | DR NC Trip 010 JE 809 | Travel Exp Park n Toll-Corp Expenses | 6330-010-100-15 | | $27.50 | |
| 12/31/2007 | 1,251 | GLTRX00000577 | GN PA Trip 010 JE 651 | Travel Exp Park n Toll-Corp Expenses | 6330-010-100-15 | | $4.75 | |

Totals: $428.05
Net Change $428.05  Ending Balance $428.05

**Account: 6340-010-100-15  Travel Exp Mileage-Corp Expenses**
Beginning Balance: $0.00

| Trx Date | Jrnl No. | Orig. Audit Trail | Distribution Reference | Description | Orig. Master Number | Orig. Master Name | Debit | Credit |
|---|---|---|---|---|---|---|---|---|
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE 183 | Travel Exp Mileage-Corp Expenses | 6340-010-100-15 | | $48.50 | |
| 12/31/2007 | 1,251 | GLTRX00000577 | LF Expenses 010 JE 807 | Travel Exp Mileage-Corp Expenses | 6340-010-100-15 | | $310.40 | |

Totals: $358.90
Net Change $358.90  Ending Balance $358.90

| | | Debit | Credit |
|---|---|---|---|
| | Accounts | Beginning Balance | Net Change | Ending Balance |

Grand Totals:  Accounts 10  Beginning Balance $0.00  Debit $140,214.04  Credit $132,923.57  Net Change $7,290.47  Ending Balance $132,923.57

**Corp Airfare**

| Corp | Y |
|------|---|

| Sum of Amount | Month | | | | |
|---|---|---|---|---|---|
| Employee | 8 | 9 | 10 | 11 | Grand Total |
| Black, Stephen | | $ 836.11 | | | $ 836.11 |
| Fienberg, Louis | $ 3,625.03 | $ 2,134.42 | $ 2,059.19 | $ 1,126.20 | $ 8,944.84 |
| Keene, Kelly | | | | $ 350.10 | $ 350.10 |
| Magliaro, Max | $ 633.50 | $ 624.11 | | | $ 1,257.61 |
| Naden, Gary | $ 1,348.10 | $ 768.10 | | | $ 2,116.20 |
| Panulla, Gary | $ 653.50 | $ 624.11 | | | $ 1,277.61 |
| Ronsen, David | $ 3,643.60 | | $ 888.30 | $ 1,241.10 | $ 5,773.00 |
| Ronsen, Michelle | | | $ 1,778.10 | | $ 1,778.10 |
| Roseinzweig, Scott | $ 1,493.10 | $ 768.10 | $ 948.10 | $ 529.80 | $ 3,739.10 |
| Webb, Byron | $ 1,493.10 | | | | $ 1,493.10 |
| Grand Total | $ 12,889.93 | $ 5,754.95 | $ 5,673.69 | $ 3,247.20 | $ 27,565.77 |

G:\AR Clients\Numerex\OOPremlimEarnoutCal20071231draft.xls-AirfareCorp

| NAME | GP DEPT | August | September | October | November | December |
|---|---|---|---|---|---|---|
| ALTAMURA | 100-100-15 | | | | | |
| Black, Stephen | 100-100-15 | | | 846.11 | | |
| Boxwell, Greg | 500-100-15 | | | | | |
| Dingman, Chris | 400-100-15 | | | | | |
| Dorland, Jeanelle | 100-100-15 | | | | | |
| DOWNS, DILLON | 310-100-15 | | | | | |
| EDWARDS, ELIZABETH | 100-100-15 | 3,625.03 | 2,174.42 | 1546.39 | 2,346.80 | |
| FIENBERG, L | 100-100-15 | | | | | |
| FRANKE, KEVIN | 400-100-15 | | | | | |
| FREMIER, ALLEN | 500-100-15 | | | | | 360.1 |
| Keene, K | 100-100-15 | | | | | |
| Kuhlken, William (Bill) | 400-100-15 | | | | | |
| Lanes, Troy | 500-100-15 | | 1,287.72 | | 1,245.10 | |
| MAGLIARO | 500-100-15 | 633.50 | 634.11 | | | |
| Moberley, Jon | 500-100-15 | 1,348.10 | 1,478.21 | 1010.1 | 2,593.49 | |
| NADEN, GARY | 500-100-15 | 653.50 | 634.11 | | 10.00 | |
| PANULA | 500-100-15 | 3,643.60 | 700.11 | 2744.1 | | 1266.1 |
| RONSEN, DAVID | 100-100-15 | | | 1803.1 | | |
| RONSEN, MICHELLE | 100-100-15 | | 778.10 | | 1,944.41 | |
| ROSENZWEIG, SCOTT | 310-100-15 | 1,493.10 | | 2480.9 | 1,245.10 | |
| Scheffel, Joe | 400-100-15 | | | | | 10 |
| Webb, Byron | 200-100-15 | 1,493.10 | | | | |
| Total | | 12,889.93 | 7,886.78 | 10,430.70 | 9,384.90 | 1,636.20 |

G:\AR Clients\Numerex\OOPremimEarnoutCal20071231draft.xls-Annex Airfare (3)

| Date | Employee | Blank1 | From | Blank2 | To | Open1 | Open2 | Amount | City | Corp | Month |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/20/2007 | Black, Stephen | | Bozeman, MT | | Denver , CO | | | $ 836.11 | Atlanta, GA | Y | 9 |
| 8/15/2007 | Fienberg, Louis | | | | | | | 3,625.03 | White Plains, NY | Y | 9 |
| 8/23/2007 | Fienberg, Louis | | Larguardia Int | | Atl, Ga | | | $ 633.80 | Atlanta, GA | Y | 9 |
| 9/18/2007 | Fienberg, Louis | | White Plains, NY | | Atl, Ga | | | $ 512.81 | White Plains, NY | Y | 9 |
| 9/22/2007 | Fienberg, Louis | | Atl, Ga | | San Hose, CA | | | $ 987.81 | San Jose, CA | Y | 9 |
| 10/4/2007 | Fienberg, Louis | | White Plains, NY | | Atl, GA | | | $ 420.80 | Atlanta, GA | Y | 10 |
| 10/13/2007 | Fienberg, Louis | | Larguardia, NJ | | Atl, GA | | | $ 572.79 | Atlanta, GA | Y | 10 |
| 10/18/2007 | Fienberg, Louis | | White Plains, NY | | Atl, GA | | | $ 522.80 | White Plains, NY | Y | 10 |
| 10/31/2007 | Fienberg, Louis | | Laguardia, Int | | Atl, Ga | | | $ 542.80 | Atlanta, GA | Y | 10 |
| 11/1/2007 | Fienberg, Louis | | O'Hare, IL | | Philadelphia, PA | | | $ 192.40 | Philadelphia, PA | Y | 11 |
| 11/15/2007 | Fienberg, Louis | | O'Hare, IL | | Philadelphia, PA | | | $ 100.00 | Philadelphia, PA | Y | 11 |
| 11/21/2007 | Fienberg, Louis | | White Plains, NY | | Atl, Ga | | | $ 833.80 | White Plains, NY | Y | 11 |
| 12/14/2007 | Keene, Kelly | | Seattle, WA | | Bozeman, MT | | | $ 350.10 | Seattle, WA | N | 8 |
| 8/23/2007 | Lanes, Troy | | Bozeman, MT | | Salt Lake City, Ut | | | $ 643.31 | Chicago, IL | N | 8 |
| 8/23/2007 | Lanes, Troy | | O'Hare Int | | Bozeman, MT | | | $ 634.41 | Chicago, IL | N | 8 |
| 11/20/2007 | Lanes, Troy | | Bozeman, MT | | Salt Lake City, UT | | | $ 550.30 | Chicago, IL | N | 11 |
| 11/20/2007 | Lanes, Troy | | O'Hare, IL | | Minneapolis, MN | | | $ 674.80 | Chicago, IL | N | 11 |
| 8/15/2007 | Magliaro, Max | | | | | Philadelphia, PA | | $ 633.50 | Philadelphia, PA | Y | 8 |
| 9/20/2007 | Magliaro, Max | | State College, PA | | Philadelphia, PA | | | $ 624.11 | Atlanta, GA | Y | 8 |
| 8/15/2007 | Naden, Gary | | | | | | | 1,348.10 | Atlanta, GA | N | 8 |
| 9/1/2007 | Naden, Gary | | Bozeman, MT | | Minneapolis, MN | | | $ 768.10 | Philadelphia, PA | N | 9 |
| 9/20/2007 | Naden, Gary | | Bozeman, MT | | Salt Lake City, UT | | | $ 690.11 | San Jose, CA | N | 9 |
| 10/2/2007 | Naden, Gary | | Bozeman, MT | | Minneapolis, MN | | | 1,226.09 | Washington, DC | N | 10 |
| 10/12/2007 | Naden, Gary | | Bozeman, MT | | Minneapolis, MN | | | (225.59) | Washington, DC | N | 10 |
| 10/27/2007 | Naden, Gary | | Bozeman, MT | | O'Hare, IL | | | $ 723.30 | Chicago, IL | N | 10 |
| 11/7/2007 | Naden, Gary | | Bozeman, MT | | Seattle, WA | | | $ 523.60 | Reno, NV | N | 11 |
| 11/21/2007 | Naden, Gary | | Bozeman, MT | | Salt Lake City, UT | | | $ 403.30 | Las Vegas, NV | N | 11 |
| 11/21/2007 | Naden, Gary | | Las Vegas, NV | | Denver, CO | | | $ 903.29 | Las Vegas, NV | N | 11 |
| 8/15/2007 | Panulla, Gary | | | | | | | $ 653.50 | Philadelphia, PA | Y | 9 |
| 9/20/2007 | Panulla, Gary | | State College, PA | | Philadelphia, PA | | | $ 624.11 | Philadelphia, PA | Y | 8 |
| 8/15/2007 | Ronsen, David | | | | | | | 3,643.60 | Atlanta, GA | N | 8 |
| 9/20/2007 | Ronsen, David | | Bozeman, MT | | Salt Lake City, UT | | | $ 690.11 | San Jose, CA | N | 9 |
| 9/20/2007 | Ronsen, David | | Bozeman, MT | | Salt Lake City, UT | | | $ 888.30 | Atlanta, GA | N | 10 |
| 10/6/2007 | Ronsen, David | | Atl, Ga | | Charlotte, NC | | | $ 206.40 | Charlotte, NC | N | 10 |
| 10/6/2007 | Ronsen, David | | Charlotte, NC | | Minneapolis, MN | | | $ 798.30 | Charlotte, NC | N | 10 |
| 10/20/2007 | Ronsen, David | | Bozeman, MT | | Salt Lake City, UT | | | $ 816.10 | San Francisco, CA | N | 10 |
| 11/29/2007 | Ronsen, David | | Bozeman, MT | | Minneapolis, MN | | | $1,241.10 | Laguardia, NY | Y | 11 |
| 10/6/2007 | Ronsen, Michelle | | Bozeman, MT | | Salt Lake City, UT | | | $1,778.10 | Atlanta, GA | N | 11 |
| 9/26/2007 | Roseinzweig, Scott | | San Francisco | | San Francisco, CA | | | $ 426.10 | San Francisco, CA | N | 9 |
| 10/2/2007 | Roseinzweig, Scott | | Bozeman, MT | | Minneapolis, MN | | | 1,000.10 | Washington, DC | N | 10 |
| 10/19/2007 | Roseinzweig, Scott | | Houston, TX | | Houston, TX | | | $ 416.40 | Houston, TX | N | 10 |
| 10/25/2007 | Roseinzweig, Scott | | Bozeman, MT | | Salt Lake City, UT | | | $ 56.20 | San Francisco, CA | N | 10 |
| 10/27/2007 | Roseinzweig, Scott | | Bozeman, MT | | Salt Lake City, UT | | | $ 948.10 | Atlanta, GA | N | 10 |
| 11/7/2007 | Roseinzweig, Scott | | Atl, Ga | | Salt Lake City, UT | | | $ 529.90 | Atlanta, GA | N | 11 |
| 11/7/2007 | Roseinzweig, Scott | | Reno, NV | | Seattle, WA | | | $ 380.30 | Reno, NV | N | 11 |
| 8/15/2007 | Roseinzweig, Scott | | | | | | | 1,493.10 | Atlanta, GA | Y | 8 |
| 9/12/2007 | Roseinzweig, Scott | | Bozeman, MT | | Minneapolis, MN | | | $ 768.10 | Philadelphia, PA | N | 9 |
| 9/26/2007 | Roseinzweig, Scott | | Houston, TX | | Denver, CO | | | $ 608.30 | Houston, TX | N | 9 |
| 11/20/2007 | Scheifel, Joe | | Bozeman, MT | | Salt Lake City, UT | | | $ 550.30 | Chicago, IL | N | 11 |
| 11/20/2007 | Scheifel, Joe | | O'Hare, IL | | Minneapolis, MN | | | $ 674.80 | Chicago, IL | N | 11 |
| 8/15/2007 | Webb, Byron | | | | | | | 1,493.10 | Atlanta, GA | Y | 8 |

G:\AR Clients\Numerex\OOPremlimEarnoutCal20071231draft.xls-Amex Airfare (3)

| Type | Date | Num | Name | Memo | Class | Split | Amount | Balance | Backed Out |
|------|------|-----|------|------|-------|-------|--------|---------|-----------|
| **6000 · Indirect Support** | | | | | | | | | |
| **6200 · Accounting** | | | | | | | | | |
| Bill | 07/31/2007 | 850506566 | HJ & Associates, Inc. | Audit Work | Operating | 2000 · Accounts Payable | 47,846.55 | 47,846.55 | 47,846.55 |
| **Total 6200 · Accounting** | | | | | | | 47,846.55 | 47,846.55 | 47,846.55 |
| **6300 · Legal/Professional** | | | | | | | | | |
| Bill | 07/23/2007 | 1225846 | Crowell & Moring | Project Big Sky Consulting | Operating | 2000 · Accounts Payable | 9,238.75 | 9,238.75 | 9,238.75 |
| **Total 6300 · Legal/Professional** | | | | | | | 9,238.75 | 9,238.75 | 9,238.75 |
| **TOTAL** | | | | | | | 57,085.30 | 57,085.30 | 57,085.30 |

G:\AR Clients\Numerex\OOPremiimEarnoutCat20071231draft.xls-Professional Service Backout

**5000 · General & Administrative**
**5500 · Employee/Client Morale**

| Type | Date | Num | Name | Memo | Class | Split | Amount | Balance | Backed Out |
|------|------|-----|------|------|-------|-------|--------|---------|-----------|
| **5515 · 100% Meals** | | | | | | | | | |
| Credit Card Charge | 07/06/2007 | | MacKenzie River Pizza | Athens | Data/Tracking | 2111 · Dave 72008 | 47.50 | 47.50 | 47.50 |
| Credit Card Charge | 07/09/2007 | | Wal-Mart | Auditor breakfast | Operating | 2120 · Byron 71208 | 12.62 | 60.12 | 12.62 |
| Credit Card Charge | 07/09/2007 | | Cafe Courier | Auditors | Operating | 2120 · Byron 71208 | 50.00 | 110.12 | 50.00 |
| Credit Card Charge | 07/10/2007 | | Wal-Mart | Auditor breakfast | Operating | 2120 · Byron 71208 | 29.06 | 139.18 | 29.06 |
| Credit Card Charge | 07/10/2007 | | Wal-Mart | Auditor breakfast | Operating | 2120 · Byron 71208 | 16.70 | 155.88 | 16.70 |
| Credit Card Charge | 07/10/2007 | | Cafe Courier | Auditors | Operating | 2120 · Byron 71208 | 103.20 | 259.08 | 103.20 |
| Credit Card Charge | 07/11/2007 | | Cafe Courier | Auditors | Operating | 2120 · Byron 71208 | 55.34 | 314.42 | 55.34 |
| Credit Card Charge | 07/12/2007 | | Cafe Courier | Auditors | Operating | 2120 · Byron 71208 | 61.28 | 375.70 | 61.28 |
| Credit Card Charge | 07/13/2007 | | Cafe Courier | Auditors | Operating | 2120 · Byron 71208 | 45.42 | 421.12 | 45.42 |
| Credit Card Charge | 07/16/2007 | | Cafe Courier | Auditors | Operating | 2120 · Byron 71208 | 41.28 | 462.40 | 41.28 |
| **Total 5515 · 100% Meals** | | | | | | | 462.40 | 462.40 | 462.40 |
| **Total 5500 · Employee/Client Morale** | | | | | | | 462.40 | 462.40 | 462.40 |
| **Total 5000 · General & Administrative** | | | | | | | 462.40 | 462.40 | 462.40 |
| **TOTAL** | | | | | | | 462.40 | 462.40 | 462.40 |

G:\VAR Clients\Numerex\OOPremiimEarnoutCalc20071231draft.xls-Meal Backout

| Type | Date | Num | Name | Memo | Class | Amount | Balance | Backed Out |
|------|------|-----|------|------|-------|--------|---------|------------|
| **5000 · General & Administrative** | | | | | | | | |
| **5100 · Payroll** | | | | | | | | |
| | | | | | | | | |
| **5102 · Employee Wages** | | | | | | | | |
| Paycheck | 07/31/2007 | DD | Rosenzweig, Scott A | | Data/Tracking | 104,723.12 | 104,723.12 | 104,723.12 |
| Paycheck | 07/31/2007 | DD | Naden, Gary | | Data/Tracking | 155,195.33 | 259,918.45 | 155,195.33 |
| Total 5102 · Employee Wages | | | | | | 259,918.45 | 259,918.45 | 259,918.45 |
| | | | | | | | | |
| **5103 · Payroll Taxes** | | | | | | | | |
| Paycheck | 07/31/2007 | DD | Rosenzweig, Scott A | | Data/Tracking | 1,518.49 | 1,518.49 | 1,518.49 |
| Paycheck | 07/31/2007 | DD | Naden, Gary | | Data/Tracking | 2,250.33 | 3,768.82 | 2,250.33 |
| Total 5103 · Payroll Taxes | | | | | | 3,768.82 | 3,768.82 | 3,768.82 |
| | | | | | | | | |
| **5150 · Bonus Expense** | | | | | | | | |
| General Journal | 07/31/2007 | BW xxx471 | | 7/12 accrual for year end bonus | Operating | 90,000.00 | 90,000.00 | 77,142.86 |
| Total 5150 · Bonus Expense | | | | | | 90,000.00 | 90,000.00 | 77,142.86 |
| | | | | | | | | |
| Total 5100 · Payroll | | | | | | 353,687.27 | 353,687.27 | 340,830.13 |

G:\AR Clients\Numerex\OOPRemIIntEarnoutCa\20071231draft.xls-Payroll Backout

# EXHIBIT 3



**Numerex**   Experience. Excellence.

April 30, 2008

*Via Email and Certified Mail* ✓

David Ronsen
504 South Willson Avenue
Bozeman, MT 59715

      Re:    <u>Purported Termination for Good Reason</u>

Dear David:

I am in receipt of your letter dated April 24, 2008 purporting to terminate your Severance and Non-Competition Agreement dated as of July 31, 2007 (the "Severance Agreement") between yourself and Numerex Corp ("NMRX") for "Good Reason". I am also in receipt of your counsel's letter dated that same day providing a "Notice of Default" and a ten day cure period to NMRX with regard to bonus obligations contained in Section 1(d) of your Severance Agreement.

With regard to your counsel's letter, attached is the NMRX executive bonus plan for 2007 (the "Plan") as well as <u>Exhibit A</u> demonstrating the calculation of your bonus calculated under the Plan. Your 2007 bonus under the Plan comes to $1,957. You are paid this bonus on achievement of NMRX company-wide benchmarks per your Severance Agreement. As you well know, we previously paid in full on April 15th your MBO bonus per Section 1(d) of the Severance Agreement. The amount of $1,957 will be paid to you by check on April 30, 2008. For your information, no other executives at NMRX have been paid their bonuses that are due to be paid May 15th.

With regard to your assertion in your letter of April 24 that you are terminating the Severance Agreement for "Good Reason", we firmly disagree that you have "Good Reason" to terminate your Severance Agreement. Instead what you have done is terminate your Severance Agreement "Not for Good Reason" within the meaning of Section 4 thereof. For months now you have immobilized the progress of NMRX's satellite division by making every commercial issue part of your lawsuit against NMRX. Your purported termination for "Good Reason" is a transparent attempt to shift attention away from the abysmal financial performance of the satellite division under your leadership and avoid NMRX's pending right in July to terminate you "For Cause" for financial reasons pursuant to Section 2(a) (iv) of your Severance Agreement. Moreover, your counsel is incorrect in the asserted linkage between the APA and the Severance Agreement as this was the basis of extended discussion and agreement between the parties prior to closing. I am sure that the corporate lawyers at Lowenstein Sandler and Tom Stoughton will refresh your recollection on that point.

The consequence of terminating your Severance Agreement "Not for Good Reason" is as specified in Section 4. In such circumstances you are not entitled to severance and accordingly no release is necessary. We will let the Court decide the bona fides of your conduct in circumstances where you engaged counsel within 60 days after closing and then spent the better part of the next three months setting NMRX up prior to filing your lawsuit in January.

Sincerely,

Stratton Nikolaides,
Chief Executive Officer

cc:    Andrew J. Ryan, Esq.
       Kent Yalowitz, Esq.
       John J.D. McFerrin-Clancy, Esq. ✓

Attachments: 2

## EXHIBIT A
## David Ronsen Executive Bonus

| | | Actual | Target at 105% of Exec Plan | Plan Payout | |
|---|---|---|---|---|---|
| **Revenue** | Q3 | $15,464 | $20,176 | | |
| | Q4 | $19,559 | $22,733 | | |
| | Total | $35,023 | $42,908 | 5.0% | Per the exec compensation plan for 81.6% of revenue target attainment |
| **EBITDA** | Q3 | $770 | $2,410 | | |
| | Q4 | $1,107 | $3,618 | | |
| | Total | $1,877 | $6,028 | 0.0% | |

**Calculation**

| | |
|---|---|
| Base Salary | $235,000 |
| Eligible | 40% |
| Pro-rata | 0.42  5 months |
| Plan Payout | 5.0% |
| **Bonus** | **$1,958** |

Actual revenue & EBITDA excludes O.O. and is for Q3 and Q4. The executive plan also also excludes O.O.

Exhibit A - Continued

*Numerex Corp. - Proprietary and Confidential Information - for internal discussions only*

*Note: This schedule does not constitute an employment contract between the employee and Numerex.*

Numerex Corp.
D Ronsen Executive Bonus Calculation
For the Year Ending 12/31/07

| | Position | Current Salary | Salary Increase (D'creas) | New Salary | | Max.Bonus @ 100% of Target | Total |
|---|---|---|---|---|---|---|---|
| D Ronsen | Div. President | | | 235000 | | 94000 | 329000 |
| | | | | ProRata | | | 39167 |

Bonus Percentage of Base Salary
40% of base.

Ronsen                    Bonus Based On:
                          Revenue    25%
                          EBITDA     75%

Revenue Growth Target (35 to 45%)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Revenue Target | $31.6 | $33.3 | $35.1 | $36.9 | $38.9 | $40.9 | $42.9 |
| Percentage award | 2.5% | 5.0% | 7.5% | 12.5% | 17.5% | 21.25% | 25% |
| EBITDA Target | $3.4 | $3.7 | $4.2 | $4.6 | $5.1 | $5.7 | $6.0 |
| Percentage award | 7.5% | 15.0% | 22.5% | 37.5% | 52.5% | 63.75% | 75% |
| Total Bonus | 10% | 20% | 30% | 50% | 70% | 85% | 100% |

| | Target | | Ronsen |
|---|---|---|---|
| Actual bonus earned | | | |
| Revenue target achieved: | 5% | | $1,958 |
| EBITDA target achieved: | 0% | | $0 |
| Total Bonus Earned | | | $1,958 |

Note: 25% of bonuses (MBO Targets not included) earned will depend upon meeting revenue targets and 75% upon meeting EBITDA targets.
Note: Revenue and EBITDA targets established by the Compensation Committee
Note: Upon a sale of a business unit or asset, credit will be received at the rate of 100% of budget for purposes of earning bonus.
Note: Employee is not entitled to any accrued bonus if not employed through year-end audit.
Note: Bonuses will be determined on annual performance compared to targets (noted above) and will be paid out upon the conclusion of the Company's audit.
Note: EBITDA calcuitons are net of executive and MBO bonuses and allowances.
Note: Actual Revenue was $35.023 million in the last six months of 2007
Note: Actual EBITDA was $1.877 million in the last six months of 2007

# EXHIBIT 4



John J.D. McFerrin-Clancy
Member of the Firm

Tel  646 414 6910
Fax  973 422 6897

jmcferrin-clancy@lowenstein.com

June 20, 2008

**VIA FEDEX**

Attention:  Chief Executive Officer
Numerex Corp.
1600 Parkwood Circle SE
Suite 200
Atlanta, Georgia  30339

   And

Attention:  Chief Executive Officer
Numerex Corp.
1600 Parkwood Circle
Suite 500
Atlanta, Georgia  30339

## <u>NOTICE OF DEFAULT</u>

Dear Sir or Madam:

NOTICE is hereby given you, pursuant to sections 3(a) and 9 of that certain Severance and Non-Competition Agreement between David Ronsen ("Ronsen") and Numerex Corp. ("Numerex" or "you") dated as of June 31, 2007 (the "Severance Agreement"), that Numerex and Orbit One Communications, LLC ("New Orbit") are in **DEFAULT** of their payment obligations under section 1(d) and 3(a) the Severance Agreement and you are hereby given ten (10) days from the date hereof to make all payments that are due and otherwise to cure any and all defaults.

Per section 1(d), Mr. Ronsen "will be eligible to receive an annual cash bonus of up to 40% of Base Salary upon the achievement of NMRX company-wide EBITDA and revenue objective determined by NMRX's board of directors (or compensation committee thereof) annually under NMRX's executive bonus plan."

In addition to prior uncured breaches, referenced in his prior notice, you are also in default because the purported bonus you paid to Mr. Ronsen was based upon Numerex's performance for only the second two quarters of 2007, rather than on its "annual" performance, as required by the Severance Agreement.

Lowenstein Sandler PC            www.lowenstein.com

Reply: 1251 Avenue of the Americas  New York, New York 10020  Tel 212 262 6700  Fax 212 262 7402
   65 Livingston Avenue  Roseland, New Jersey 07068  Tel 973 597 2500  Fax 973 597 2400

Attention:  Chief Executive Officer                                      June 20, 2008
Page 2

By letter dated April 24, 2008, Mr. Ronsen informed you that he was terminating his employment for "Good Reason" per paragraph 3 of the Severance Agreement.  In response, Andrew Ryan, Esq. wrote back to Mr. Ronsen, on April 30, 2008.  In his letter, Mr. Ryan stated that Mr. Ronsen had terminated "not for Good Reason" and that his rights were therefore governed by paragraph 4 of the Severance Agreement.

Paragraph 4(c) of the Severance Agreement states:

> In the event of a termination by Mr. Ronsen other than for Good Reason, NRMX shall continue to provide Mr. Ronsen with health and welfare benefits throughout the Non-Competition Period.

Mr. Ronsen ceased his employment on April 24, 2008.  Numerex promptly cancelled his health insurance, and has failed to provide this "health and welfare benefit."

The conduct described above constitutes material breaches of payment obligations under section 3(a) of the Severance Agreement, pursuant to which you have ten (10) days to cure all defaults.

Very truly yours,

John J.D. McFerrin-Clancy

JMC:eap

20543/2
06/20/08 8005721.1

cc:     Andrew J. Ryan, Esq.



# EXHIBIT 5



**Numerex**   Experience. Excellence.

July 9, 2008

David Ronsen
504 South Willson Avenue
Bozeman, MT 59715

David,

Under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Numerex Corp. is required to offer COBRA (the Consolidated Omnibus Budget Reconciliation Act) coverage at group rates for 18 months following your resignation from employment with Numerex. Documents specifically explaining COBRA and the election process will come separately from both Blue Cross Blue Shield of Montana (BCBS-MT) and from Numerex for MetLife and VSP coverage options.

As per our "separation/severance" agreement, if elected, Numerex will provide you with an extended healthcare benefit through a combination of COBRA for an 18 month period, during which CBRA is available, followed by equivalent coverage. COBRA coverage will be available for 18 months as of your resignation date of April 24, 2008. Equivalent coverage will be provided thereafter, until December 31, 2010, consistent with your agreement. You will be responsible for paying the cost of coverage subject to reimbursement of the employee portion of that coverage by Numerex as further set forth below.

If elected, you will be reimbursed for the difference between the total monthly COBRA premium and what you would normally pay as an employee. This will include the employer portion premium(s), plus any administrative fees allowable by the law. You will of course be reimbursed for your May 2008 and June 2008 payments, as well as your payments going forward.

The administration of this process will be handled as follows:
1. You will be required to complete the election form(s) contained in the COBRA package(s) and submit them to the appropriate party/ parties with full payment, as directed in the package(s).
2. Numerex will require you to submit a standard expense report to Payroll, along with a copy/copies of your cancelled check(s).
   Please note that the expense report should reflect a request for payment for only the difference between what you paid as an employee versus the total COBRA premium. This will be honored for a total of 18 months effective as of the date of your resignation and cease on December 31, 2010.

Attached is a copy of our standard expense report for use in the reimbursement process.

Please do not hesitate to contact me with any questions in regard to this communication.

Regards,

Dawn Gibbons
Director, Human Resources

1600 Parkwood Circle, Fifth Floor    Atlanta, GA 30339    T 770-693-5950    F 770-693-5951    www.numerex.com

# EXHIBIT 6

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# Form 10-K
# ABBREVIATED

## ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2007

Commission file number: 0-22920

# Numerex Corp.
*(Exact Name of Registrant as Specified in Its Charter)*

| Pennsylvania | 11-2948749 |
|---|---|
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(I.R.S. Employer Identification No.)* |

1600 Parkwood Circle, Suite 500
Atlanta, GA 30339-2119

---

**NUMEREX CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**Years ended December 31, 2007, 2006 and 2005**

## ITEM 8.  FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

### NOTE B – ACQUISTIONS

#### Orbit One Communications, Inc. Acquisition

On July 31, 2007 the Company completed the acquisition of the assets of Orbit One Communications, Inc. through its wholly owned subsidiary, Orbit One Communications LLC ("Orbit One"). The results of Orbit One's operations have been included in the consolidated financial statements from August 1, 2007. The assets relate to Orbit One's satellite-based M2M solutions it provides to government agencies and emergency services markets in the United States. These solutions include hardware, software, data management, installation, maintenance, and use of its proprietary operational support platform. The acquisition expands the Company's M2M communications hardware and service technologies, its reach into the governmental markets and global reach to enable M2M applications in remote areas not well served by other terrestrial-based providers.

The assets acquired consist of software (including Orbit One's proprietary mapping and operational support platform), inventory, equipment (primarily communications related computer hardware) accounts receivable, trademarks and other intellectual property.

Initial consideration for the asset purchase was approximately $5.5 million paid in cash plus $384,000 of transaction costs. An additional $732,000 was paid 60 days after closing based on satisfying a net working capital test. On December 31, 2007 certain revenue and EBITA targets were met for the first measurement period, ending December 31, 2007. As a result, 320,833 shares of the Company's Class A common stock were issued to Orbit One Communications, Inc. These shares were valued using the average share price on the measurement date for meeting the contingencies on December 31, 2007 of $8.33 per share, thus increasing goodwill by $2.7 million and our common stock by the same amount. Subsequent to December 31, 2007 another $1.8 million in cash was paid in January 2008 after certain customer agreements were extended as well as other conditions were met. In addition, if certain revenue and EBITDA performance objectives and milestones are achieved, subsequent payments could include additional cash payments of $2.5 million as well as shares of Numerex Corp's common stock. If all earn-out objectives are achieved stock payments could be up to 1,100,000 shares of the Company's Class A common stock. If the performance targets are exceeded, Orbit One may receive up to an additional 471,729 shares of the Company's Class A common stock and an additional cash payment of $2.5 million. The earn-out milestones are measured over three periods: (i) from the closing date of the transaction through December 31, 2007; (ii) calendar year 2008; and (iii) calendar year 2009. The Company and Orbit One entered into an escrow agreement, whereby 10% of the cash payments not subject to performance-related milestones were placed in escrow for one year from the closing date in order to settle any indemnification claims under the Agreement and subject to the limitations described therein. Any additional payments of either cash or equity will be reflected as incremental goodwill.

# EXHIBIT 7



John J.D. McFerrin-Clancy
Member of the Firm

Tel  646 414 6910
Fax  973 422 6897

jmcferrin-clancy@lowenstein.com

July 7, 2008

**Via Fedex**

Attention:  Chief Executive Officer
Numerex Corp.
1600 Parkwood Circle SE
Suite 200
Atlanta, Georgia  30339

       And

Attention:  Chief Executive Officer
Numerex Corp.
1600 Parkwood Circle
Suite 500
Atlanta, Georgia  30339

<u>**NOTICE OF DEFAULT**</u>

Dear Sir or Madam:

NOTICE is hereby given you, pursuant to sections 3(a) and 9 of that certain Severance and Non-Competition Agreement between David Ronsen ("Ronsen") and Numerex Corp. ("Numerex" or "you") dated as of June 31, 2007 (the "Severance Agreement"), that Numerex and Orbit One Communications, LLC ("New Orbit") are in **DEFAULT** of their payment obligations under section 1(d) and 3(a) of the Severance Agreement and you are hereby given ten (10) days from the date hereof to make all payments that are due and otherwise to cure any and all defaults.

Per section 1(d), Mr. Ronsen "will be eligible to receive an annual cash bonus of up to 40% of Base Salary upon the achievement of NMRX company-wide EBITDA and revenue objective determined by NMRX's board of directors (or compensation committee thereof) annually under NMRX's executive bonus plan."

In addition to prior uncured breaches, referenced in his prior notice, you are also in default because the purported bonus you paid to Mr. Ronsen was based upon Numerex's performance for only the second two quarters of 2007, rather than on its "annual" performance, as required by the Severance Agreement.  Further, the bonus was not based upon Numerex company-wide results, or according to the targets set for the Numerex executive compensation plan.  Finally, the bonus was not calculated in the same manner as those of other Numerex executives.

Lowenstein Sandler PC         www.lowenstein.com

Reply:  1251 Avenue of the Americas  New York, New York 10020  Tel 212 262 6700  Fax 212 262 7402
65 Livingston Avenue  Roseland, New Jersey 07068  Tel 973 597 2500  Fax 973 597 2400

Attention: Chief Executive Officer                                July 7, 2008
Page 2

By letter dated April 24, 2008, Mr. Ronsen informed you that he was terminating his employment for "Good Reason" per paragraph 3 of the Severance Agreement. In response, Andrew Ryan, Esq. wrote back to Mr. Ronsen, on April 30, 2008. In his letter, Mr. Ryan stated that Mr. Ronsen had terminated "not for Good Reason" and that his rights were therefore governed by paragraph 4 of the Severance Agreement.

Paragraph 4(c) of the Severance Agreement states:

> In the event of a termination by Mr. Ronsen other than for Good Reason, NRMX shall continue to provide Mr. Ronsen with health and welfare benefits throughout the Non-Competition Period.

Mr. Ronsen ceased his employment on April 24, 2008. Numerex promptly cancelled his health insurance, and has failed to provide this "health and welfare benefit." If you concede that Mr. Ronsen terminated his employment for "Good Reason," please confirm this, and you will not be obligated to provide benefits. However, if you hold to the position that Mr. Ronsen terminated without "Good Reason," Numerex is in breach of its obligation to provide "health and welfare benefits."

The conduct described above constitutes material breaches of payment obligations under section 3(a) of the Severance Agreement, pursuant to which you have ten (10) days to cure all defaults. The defaults herein are in addition to those defaults as to which previous demands for cure have been made.

Very truly yours,

John J.D. McFerrin-Clancy

JMC:dkm

20543/2
07/07/08 8005721.1

cc:      Andrew J. Ryan, Esq.



# EXHIBIT 8

# SALISBURY & RYAN LLP

### ATTORNEYS AT LAW

7TH FLOOR
1325 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6026
TEL: 212-977-4660
FAX: 212-977-4668

March 27, 2008

**BY CERTIFIED MAIL**

Orbit One Communications, Inc.
2485 Manley Drive
Bozeman, MT 59715
Attention: David Ronsen

Re:    Asset Purchase Agreement by and between Orbit One Communications, LLC
(together with Numerex Corp., "Numerex") and Orbit One Communication, Inc.
("OOCI") dated as of July 31, 2007 (together with the Exhibits and Schedules
incorporated therein, the "APA")

Dear Mr. Ronsen:

Reference is made to the APA. Capitalized terms not defined herein are defined in the APA. As set forth in Numerex's answer and counterclaims filed in *Orbit One Communications, Inc., et al. v. Numerex Corp* (the "Action"), OOCI has breached its covenant of good faith and fair dealing under the APA. Accordingly, OOCI has forfeited its right to further payment under the APA.

In addition, notice is hereby given that Numerex is setting off any debt it might owe to OOCI under the APA against the debts owed to Numerex by OOCI, including any alleged duty to deliver shares pursuant to Exhibit B to the APA.

In order to preserve its rights under the APA, and in order to effectuate the setoff, please be advised that Numerex has no duty to participate in any joint instruction to the Escrow Agent and will not so participate until Numerex's counterclaims are adjudicated or unless ordered to do so in the Action.

Based on the information it has at present, Numerex believes that OOCI's breaches have been caused by the conduct of David Ronsen. In order to alleviate hardship on the other shareholders of OOCI, and without waiving any rights, Numerex is prepared to agree with OOCI that the parties can jointly instruct the Escrow Agent to deliver 14% of the shares due under the APA (allocable to the other OOCI shareholders), while preserving all other rights and remedies.

Please advise us promptly if OOCI will agree to this course of action, designed to alleviate potential hardship to shareholders of OOCI other than Mr. Ronsen.

Orbit One Communications, Inc
March 27, 2008
Page 2

This letter is sent without waiver of any of Numerex's rights or remedies, but rather with the express purpose of preserving all of Numerex's rights and remedies.

Sincerely,

Andrew J. Ryan

cc:    John D. Schupper, Esq.
       Anthony Pergola, Esq.
       Lowenstein Sandler PC
       65 Livinston Avenue
       Roseland, NJ  07068

       John J.D. McFerrin-Clancy, Esq.
       Lowenstein Sandler PC
       1251 Avenue of the Americas
       New York, NY 10020

       Scott Rosenzweig
       199 Skycrest Drive
       Bozeman, MT  59715

       Gary Naden
       4140 Clydesdale Ct.
       Bozeman, MT  59718

# EXHIBIT 9



John J.D. McFerrin-Clancy
Member of the Firm

Tel  646 414 6910
Fax  973 422 6897

jmcferrin-clancy@lowenstein.com

August 4, 2008

**VIA FEDEX**

Attention:  Chief Executive Officer
Numerex Corp.
1600 Parkwood Circle SE
Suite 200
Atlanta, Georgia  30339

> And

Attention:  Chief Executive Officer
Numerex Corp.
1600 Parkwood Circle
Suite 500
Atlanta, Georgia  30339

**NOTICE OF DEFAULT**

Dear Sir or Madam:

NOTICE is hereby given you, pursuant to sections 3(a) and 9 of that certain Severance and Non-Competition Agreement between David Ronsen ("Ronsen") and Numerex Corp. ("Numerex" or "you") dated as of June 31, 2007 (the "Severance Agreement") which is attached as Exhibit D to that certain Asset Purchase Agreement dated as of July 31, 2007 (the "APA"), that Numerex and Orbit One Communications, LLC ("New Orbit") are in **DEFAULT** of their payment obligations under section 1(d) and 3(a) of the Severance Agreement and you are hereby given ten (10) days from the date hereof to make all payments that are due and otherwise to cure any and all defaults.

Section 1.4(a) allows Numerex to withhold ten percent "of the aggregate cash consideration specified in Section 1.3(a)(i), (ii) and (iii)", a total of $550,000, that Numerex currently holds in escrow.  Pursuant to Section 1.4(a), Numerex must release that amount one year after the closing, i.e., August 1, 2008.

In addition to prior uncured breaches, referenced in prior notices, you are also in default because Numerex has retained and failed to pay out the escrow as required.

The conduct described above constitutes material breaches of payment obligations under section 3(a) of the Severance Agreement, pursuant to which you have ten (10) days to cure all

Reply:   1251 Avenue of the Americas  New York, New York 10020  Tel 212 262 6700  Fax 212 262 7402
         65 Livingston Avenue  Roseland, New Jersey 07068  Tel 973 597 2500  Fax 973 597 2400

Attention:  Chief Executive Officer                                    August 4, 2008
Page 2

defaults.  The defaults herein are in addition to those defaults as to which previous demands for cure have been made.

Very truly yours,

John J.D. McFerrin-Clancy

21292/5
08/01/08 9434218.1

cc:     Andrew J. Ryan, Esq.



# EXHIBIT 10

# SALISBURY & RYAN LLP

### ATTORNEYS AT LAW

7TH FLOOR
1325 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6026
TEL: 212-977-4660
FAX: 212-977-4668

August 8, 2008

**By Regular Mail & Email**

John McFerrin-Clancy, Esq.
Lowenstein Sandler PC
1251 Avenue of the Americas
New York, NY 10220

Re:    Notice of Default Dated August 4, 2008

Dear John:

This letter responds to your letter sent to Numerex Corp.'s CEO dated August 4, 2008. Your letter purports to identify two defaults by Numerex – under sections 1(d) and 3(a) of the Ronsen Severance Agreement – and demands release of funds being held in escrow under the Asset Purchase Agreement. None of your assertions have merit.

As set forth in Numerex's answer and counterclaims filed in *Orbit One Communications, Inc., et al. v. Numerex* (the "Action"), Ronsen has breached the Severance Agreement and violated fiduciary duties he owed to Numerex. In addition, according to your colleague Matt Savare's letter to Kent Yalowitz dated August 4, 2008, Ronsen stole confidential information from Numerex in order to support his lawsuit. Such behavior hardly qualifies Ronsen to receive payments under the Severance Agreement.

Accordingly because of Ronsen's misconduct and breach of the Severance Agreement, he has forfeited any rights to payment under section 1(d) of the Severance Agreement or other payment under section 3(a) of the Severance Agreement. Further, Numerex specifically rejects any assertion that Ronsen's employment was terminated "without Cause or . . . for Good Reason" as provided in section 3(a) of the Severance Agreement. Numerex has honored its contractual obligations to Ronsen whereas Ronsen has breached his contractual and fiduciary obligations to Numerex.

Finally, you assert that Numerex must release funds held in an escrow account pursuant to "Section 1.4(a)." Presumably you refer to section 1.4(a) of the Asset Purchase Agreement. We reject this demand. Numerex is not obligated to, nor will it, release these escrowed funds until its counterclaims are adjudicated or unless ordered to do so in the Action. As detailed in Numerex's prior demands to Ronsen and Orbit One for indemnification and exercise of

John McFerrin-Clancy, Esq.
August 8, 2008
Page 2

contractual and common-law rights of set-off, these funds are being held as a source of indemnification and recovery.

Sincerely,

Andrew J. Ryan

cc:   Kent A. Yalowitz, Esq.

# EXHIBIT 11

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| ORBIT ONE COMMUNICATIONS, INC.,<br>DAVID RONSEN,<br><br>                                Plaintiffs,<br><br>              -against-<br><br>NUMEREX CORP.,<br><br>                               Defendant. | Index No.: 600043/08<br><br>Date Purchased: Jan. 7 2008<br><br>**SUMMONS**<br><br>Plaintiff designates New York County as the place of trial.<br><br>Venue based on CPLR 501 |

TO:   NUMEREX CORP.
        1600 Parkwood Circle, Suite 500
        Atlanta, Georgia 30339

       **YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve a copy of your Answer, or, if the Complaint is not served with this Summons, to serve a Notice of Appearance, on the Plaintiff's attorneys within 20 days after the service of this Summons, exclusive of the day of service (or within 30 days after service is complete if this Summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

       The basis of venue designated is pursuant to a certain Asset Purchase Agreement between plaintiffs and Defendants designating New York County as the jurisdiction to resolve disputes arising out of the Asset Purchase Agreement.

Dated: New York, New York
       January 7, 2008

                               LOWENSTEIN SANDLER PC

                         By: _____
                               John McFerrin-Clancy, Esq.
                               Attorneys for Plaintiffs
                               1251 Avenue of the Americas
                               New York, NY 10220
                               Telephone: (212) 262-6700
                               Facsimile: (212) 262-740

01/04/2008 4155612.1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

ORBIT ONE COMMUNICATIONS, INC.,
DAVID RONSEN,

Index No.:

Plaintiffs,

**COMPLAINT**

-against-

NUMEREX CORP.,

Defendant.

Plaintiffs, Orbit One Communications, Inc. ("Orbit") and David Ronsen ("Ronsen" and together with Orbit "Plaintiffs"), by their undersigned counsel, for their Complaint against defendant Numerex Corp., ("Numerex"), hereby allege:

**Nature of the Action**

1.  This is an action by the sellers of a business against the buyer for breach of the purchase agreement and related agreements. Plaintiff David Ronsen is the founder and majority shareholder of Plaintiff Orbit. In August 2007, Plaintiffs sold substantially all of the assets of Orbit to defendant Numerex, pursuant to, *inter alia*, a written Asset Purchase Agreement dated "as of" July 31, 2007 (the "APA"). A true and complete copy of the APA, along with certain of its schedules is annexed hereto as Exhibit 1. The assets were placed into a new entity, Orbit One Communications LLC ("New Orbit"), which is a subsidiary of Numerex. At the same time, and as part of the same transaction, Ronsen entered into an employment agreement with Numerex, entitled the Severance and Non-Competition Agreement (the "Employment Agreement"), pursuant to which he would continue as President of New Orbit in its new incarnation as a

separate and self-contained subsidiary of Numerex. A true and complete copy of the Employment Agreement is annexed hereto as Exhibit 2.

2.      The consideration for Orbit's assets consisted principally of two types of payments. The first was approximately $5 million in cash paid at the closing (and $500,000 paid into an escrow account). The second, was a series of payments (in cash and stock) over the next 29 months, contingent on New Orbit hitting specified financial targets. These contingent payments were referred to as the "earn out." The earn out totaled approximately $4.5 million in cash and approximately 2.5 million shares of Numerex stock (worth, at that time, more than $20 million), for a total possible earn out of more than $25 million. The earn out monies and stock were placed into escrow.

3.      The $5 million up front payment was in reality only nominal consideration for the assets purchased. This is because Orbit had in hand government and commercial contracts pursuant to which this amount would almost certainly be earned. That is, as part of the acquisition, Numerex paid $5 million for a virtually guaranteed revenue stream of $4 million in the first five months following the closing, which in fact New Orbit delivered.

4.      Thus, the true consideration and principal inducement for the sellers to enter into the transaction, as Numerex was fully aware, was the substantial earn out opportunity, which was some five times greater than the up front payment.

5.      Of course, the earn out was subject to the risk that New Orbit would not meet the financial and other targets set forth in the APA. Sellers were confident that New Orbit would meet the targets, if Mr. Ronsen were able to run it, as he had Orbit, and if Numerex provided the corporate support it had promised to facilitate New Orbit's growth. As such, sellers were willing

to take that risk, but solely on the condition that Ronsen was left in control of New Orbit, and
that Numerex would provide those additional services.

6.      Numerex agreed to Plaintiffs' conditions.   This agreement is embodied in a
number of provisions in the APA and in the Employment Agreement. The agreements state that
Mr. Ronsen would have the title and full authority of corporate President of New Orbit, that he
would have full authority to spend his budget, and sole responsibility for his P&L.  They also
state that Numerex will provide, among other things, marketing, sales, human resources and
other support to New Orbit.  In sum, in exchange for the risks associated with the earn out,
Plaintiffs would have the support of a larger company's operational resources, and Mr. Ronsen
would have the freedom and authority of a corporate President to deploy these resources to
maximize New Orbit's performance.

7.      Unfortunately, almost from the closing of the APA, Numerex, first in action, then
explicitly, rejected these obligations. Mr. Ronsen was never given the title of President.  That
title was vested first in Numerex's CEO, and then in its COO.  Mr. Ronsen was informed that he
was not to sign any corporate agreements, other than the standard Non-Disclosure Agreement,
and then instructed to sign only as a "Senior Vice President of Numerex".  Nor was he given the
substantive role or authority of President.  He was never permitted to run New Orbit or given
authority to spend his budget or manage his P&L, without first obtaining the formal approval of
Numerex personnel, on virtually every decision.  He was ordered never to meet with key vendors
on his own, was not permitted to pay bills on time or to market New Orbit's products as he
thought fit, or even to buy a box of staples for New Orbit's office, without prior approval.  All
authority was vested in various corporate officers and administrative staff of the parent company,
Numerex.  Indeed, on more than one occasion, these corporate officers expressly stated to Mr.

Ronsen that they, and not he, controlled New Orbit's budget, and, eventually, made clear that he was not even President in name.

8.     Nor did Numerex provide the support services required under the APA.    It initially hired (without consultation with Ronsen) three individuals to act as marketing consultants for New Orbit's critical SX1 product launch. Weeks later, Numerex summarily (without even notice to Ronsen) dismissed them.  Numerex promised that its own sales force would sell New Orbit's products and offerings, but never provided a commission or other incentive for the sales force to sell for New Orbit.  Consistent with Mr. Ronsen's lack of actual authority, Numerex personnel in human resources, information technology, accounting and finance, ignored numerous problems and repeated requests for assistance from New Orbit, leaving New Orbit with almost no corporate support or back office functions.

9.     It is now clear that, despite the bargain it struck with Plaintiffs, Numerex never sought to buy a satellite service company for $30 million.  Rather, it sought to purchase a satellite service product line, for $5 million.  As such, Mr. Ronsen is not and never has been President of a Numerex subsidiary.  He has in both title and duties been relegated to position of product manager of "Numerex's" satellite services.  In keeping with this view, Numerex never made Mr. Ronsen President, and upon information and belief never even formally created the "satellite division" of which he was to be President.  These actions of Numerex and its officers constitute breaches of express provisions of both the APA and the Employment Agreement. They have also acted to frustrate Plaintiffs' ability to reach the earn out targets, and have thus deprived Plaintiffs of the benefit of their bargain.

10.     For the foregoing reasons, and as set forth more fully below, Numerex should be required to pay Plaintiffs the full value of the earn out.

**Parties**

11.     Plaintiff Orbit One Communications, Inc. is a corporation duly organized and existing under the laws of the state of Montana. Orbit was previously engaged in, among other things, the provision of satellite GPS tracking devices and services, primarily to governments and government agencies. Since the closing of the APA, it has discontinued operations and its principal remaining asset is its rights under the APA.

12.     Plaintiff David Ronsen is the founder and majority shareholder of Orbit. He also was the President, CEO and ran Orbit's business from its creation in 2000 through the closing of the APA, in August 2007. Mr. Ronsen is a resident of Montana. He is currently employed by Numerex, as a "Senior Vice President."

13.     Defendant Numerex Corp. is, upon information and belief, a corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania. Numerex is a public company listed on the NASDAQ. Its principal offices are in Atlanta, Georgia. However, its general counsel (who is also a member of its board of directors), an outside attorney, practices from an office in New York, New York. Numerex is engaged primarily in the provision of data transmission over cellular telephone networks.

**Jurisdiction and Venue**

14.     Jurisdiction and venue are proper in this Court, by virtue of the parties' agreement. This dispute arises, in part under the APA. In section 9.7 of the APA, the parties agreed that all disputes arising from the APA would be brought in either state or federal court in New York County.

**Background**

  **Origin of Orbit**

  15.  David Ronsen is a former firefighter.  After leaving the fire service, he started a business in which he managed and fought wildfires for federal and state land management agencies.  While engaged in that work, he managed and participated in fighting dozens of forest fires throughout the U.S. and Australia.

  16.  One substantial challenge in fighting wildfires, frequently far from any cell towers or land line telephones, and often in mountainous terrain, is communication.  In the course of his work, Ronsen eventually deployed and became familiar with satellite based communications systems.

  17.  While the existing satellite communications vendors provided a service that was better than the non-satellite alternatives, Ronsen still found them wanting.  He saw the opportunity for improved products, offerings and service.  With these ideas in mind, he founded Orbit in 2000.

  18.  Originally, Orbit focused on satellite communications.  However, in the aftermath of 9/11 and the subsequent active hurricane seasons, Mr. Ronsen marketed Orbit's global positioning systems ("GPS"), particularly, systems that allowed for remote tracking of response assets to the emergency services providers, who then became increasingly interested in said systems.

  19.  As a result, Orbit expanded into and became the industry leader in the provision of satellite GPS tracking devices and services.  It successfully negotiated substantial contracts with DHS/FEMA, the American Red Cross, and the State of Florida, and/or their prime response

contractors, to name a few. By the time its assets were acquired by Numerex, Orbit had over twenty employees and revenues averaging $10 million per year.

**Introduction to Numerex**

20.    As its business developed, Orbit sought ways to improve and expand its offerings and to become increasingly cost competitive. One way it hoped to achieve this was to incorporate cellular technology into its services. Originally, both the GPS signal that located the target and the signal sent back to the customer to report the asset's location were delivered via satellite. Orbit sought to shift the second signal, used to report the location, to a cellular network. This could both lower costs and allow Orbit to offer more features going forward to customers that did not require satellite transmissions.

21.    After an extensive search for a cellular data vendor, who could carry the tracking signal, Orbit was introduced to Numerex by a mutual acquaintance, John Altamura. Mr. Altamura operated a wireless communications company familiar to Numerex.

22.    Numerex offers cellular data transmission services. It has no background or experience in satellite communications.

23.    Although a public company, traded on the NASDAQ, Numerex, upon information and belief, is majority owned by its Chairman and CEO, Stratton Nicolaides, and members of his family.

24.    Orbit engaged Numerex as a provider of cellular data transmission for Orbit's tracking signals, in or about August 2006.

25.    Shortly thereafter, Numerex sought a meeting with Orbit. At that initial meeting, Mr. Nicolaides together with Mike Marett, Numerex's COO, traveled to Orbit's Bozeman, Montana offices. Out of the blue, he proposed a purchase of Orbit by Numerex. Mr. Ronsen

responded that Orbit's plan was to continue to develop and grow its business. However, Mr. Nicolaides ardently pressed the idea of an acquisition, and Plaintiffs became receptive to the idea.

### The Negotiation of the Acquisition

26.     Plaintiffs had not considered any sale of the business before Numerex's proposal. Ronsen, who had built the company from nothing, was confident in his ability to continue to develop the business. As such, he was reluctant to walk away simply for a one-time nominal payment. He wanted to participate in the future success of the business.

27.     As a result, the parties agreed to split the purchase consideration into two principal parts: an up front payment due at closing of the APA of approximately $5 million (with another $500,000 in held in escrow); and an earn out provision that gave Plaintiffs the right to up to an additional amount in excess of $25 million over the next 29 months if New Orbit met certain specified financial targets.

28.     The first portion of the purchase price, the lump sum of $5 million, was little more than the monetization of Orbit's existing contracts. Its largest contracts, with DHS/FEMA, Coach USA, the State of Florida, their prime contractors, and others were together virtually guaranteed to produce $4 million in revenue in the first earn out period alone (that is, within five months of the closing). As such, the principal consideration for the transaction was related to the earn out. In fact, Orbit did subsequently deliver as such.

29.     Consistently with Plaintiffs' focus on the development of Orbit's business, Mr. Nicolaides and others on behalf of Numerex stated that the acquisition would greatly facilitate and increase Orbit's growth.

30.    Numerex explained that it had substantial marketing, sales, billing, business development, finance, human resources and other capabilities that would be made available to New Orbit, and that these services would allow the business to develop far faster than Orbit could on its own. With Numerex to provide these services, Ronsen and the other employees of New Orbit would be able to focus more than ever on business development and product sales.

31.    For instance, Orbit desired to move more broadly into the commercial market, beyond government markets. Numerex had an established commercial customer base and experience in machine to machine communications. Numerex promised that its sales force would sell New Orbit's products and offerings.

32.    Similarly, Orbit had only a single full time marketing professional. Numerex represented that it had a robust internal professional marketing staff, and that this staff would be tasked with marketing New Orbit as well as Numerex and that they had additionally engaged substantial external marketing services expressly for New Orbit's benefit.

33.    Numerex represented that accounting, human resources, and finance resources would all be made available to New Orbit, if the parties agreed on the acquisition.

34.    The parties developed a business plan pursuant to which New Orbit would utilize these resources to build its business.

35.    Plaintiffs were persuaded that, with the substantial additional corporate resources offered by Numerex, the upside potential for New Orbit was significant and meaningful. However, they were unwilling to take on the risk of future performance, unless they were in control of that performance. As such, another key point in the negotiation was that Mr. Ronsen, Orbit's founder and principal, would remain at the helm, and would run New Orbit as he had run Orbit. Numerex agreed.

**The APA and Employment Agreement**

36.    Ultimately, the parties struck a deal.  The deal was memorialized in two written agreements, and various schedules:  the Asset Purchase Agreement, dated as of July 31, 2007, between Orbit, New Orbit and Numerex; and a "Severance and Non-Competition Agreement" (the "Employment Agreement"), dated as of June 31, 2007, between Mr. Ronsen and Numerex.

37.    Significantly, Plaintiffs' two chief inducements to enter into the transaction:  (a) that Ronsen run New Orbit; and (b) the corporate support of Numerex; were embodied in a number of express provisions of the agreements.

38.    For instance, Mr. Ronsen's title and authority to run New Orbit is set forth in the very first paragraph of the Employment Agreement:

> Mr. Ronsen shall serve on a full-time basis as President of [New Orbit] with such powers and responsibilities as are customarily incident to such position . . .

39.    Nor was he to be a mere middle manager, but he was "to report to [Numerex's] Chief Executive Officer," except from "time to time" when business required the CEO to task another senior officer to act as liaison.

40.    Indeed, any interference with Mr. Ronsen's authority to manage New Orbit's business, budget or personnel was made an express breach of the agreement, and required the payment of the full earn out amount.

41.    Section 3 of the Employment Agreement is entitled "Termination Without Cause or For Good Reason."  Section 3(a) defines such a termination:

> For purposes of this Agreement, "Good Reason" shall mean:  (i) a material breach by [Numerex] of any of its obligations to Mr. Ronsen, under this agreement . . . (ii)  a material reduction in Mr. Ronsen's duties, authority or responsibilities such that (regardless of title) he no longer has the customary duties and authority of the president of [New Orbit] (including, without limitation, authority to spend [New Orbit's] budget and determine the direction of [its] business within the confines of [its] operational budget pursuant to [Numerex's] processes and policies.

42.    In the event that Numerex gave Mr. Ronsen any of the "good reasons" set forth in section 3(a), it was required to deem the full earn out to have been earned. As set forth in section 3(c):

> [I]n the event of termination by . . . Mr. Ronsen for Good Reason, [Orbit] shall be deemed to have earned [the full earn out amount set forth in sections 1.3(a)(iv), (v) and (vi) of the APA] . . . and such [Numerex] stock and cash will be distributed to [Orbit] on the measurement dates specified in the Asset Purchase Agreement (without any conditions other than the passage of time).

43.    As these provisions make clear, Mr. Ronsen was to be President and have full authority over personnel, budget and management of New Orbit.

44.    The provision of corporate support by Numerex to New Orbit was also set forth in the agreements. As noted above, the parties had negotiated a business plan that incorporated, inter alia, the marketing, sales and other support from Numerex.    The APA expressly incorporated the business plan:

> 1.6 Operation of the Business.  Attached hereto as Schedule 1.6 is the three-year Business Plan prepared by Seller and agreed to by Buyer ("the Business Plan"). After the Closing, [Numerex] will operate the Business substantially in accordance with the Business Plan.

45.    Inadvertently, Schedule 1.6 was never attached to the APA when the final closing set of documents was provided by Numerex's counsel after the closing.  As of the closing, the Business Plan consisted of a projected budget for New Orbit for the years 2007-2009.  This budget contemplated the provision of services by Numerex.  There is no doubt that, as Section 1.6 plainly states, it was to govern operation of New Orbit.  Indeed, the parties even parsed out who was to pay for the support services contemplated by the Business Plan.  The financial targets that New Orbit had to meet to vest the earn out were stated in terms of revenue and EBITDA.  With regard to the support services, the parties therefore agreed when New Orbit's balance sheet would be "burdened" or charged for such services, thereby affecting the EBITDA:

-11-

In computing [New Orbit's] EBITDA, there shall be no charge or "burden" for general corporate overhead or other general expenses . . .

APA Schedule B, section 2.2(e).

In the event [New Orbit] requests and directly utilizes the services of an employee of [Numerex] . . . where at least one half of their time is directed towards [New Orbit] activities, New Orbit's annual income statement for earn-out calculation purposes will reflect a charge equal to the pro rata share of such employee's total compensation expense. It is agreed that the foregoing provision is not intended to include charges associated with general corporate overhead including without limitation administrative expenses such as accounting, billing, finance and collections, legal, human resources or corporate management.

APA Schedule B, section 2.2(f)

46.    As these provisions make clear, Numerex was obligated to provide the support envisioned by the Business Plan, and additional support as requested from New Orbit (albeit at New Orbit's expense).

**The Deal Closes and Numerex Breaches the Agreements**

47.    No sooner had Numerex closed the transaction, than it repudiated, first in deed, then by frank admission, its obligations under the agreements to make Mr. Ronsen President of and allow him to run New Orbit, and to provide support for New Orbit.

**Numerex Fails to Name Mr. Ronsen President of New Orbit**

48.    As set forth above, the APA and the Employment Agreement called for Mr. Ronsen to be named President of New Orbit upon closing. In fact, Mr. Ronsen was never given this position.

49.    Within days of the closing of the APA, Numerex's in-house counsel informed Mr. Ronsen that Mr. Ronsen was never to sign any agreement, except the standard Non-Disclosure Agreement, which he was instructed to sign only as "Senior Vice President of Numerex."

-12-

50.    Initially, Mr. Ronsen assumed this direction arose from some issue with the transition and integration of Orbit into New Orbit, post-closing. However, as evidence grew of his lack of authority over New Orbit, he became increasingly concerned and suspicious. Mr. Ronsen noted that he had never been permitted to obtain new business cards reflecting the change to New Orbit, nor was New Orbit ever officially issued post-acquisition letterhead (it still used the old Orbit letterhead). In short, Mr. Ronsen had no outward indication of his title. He then requested, on multiple occasions, organizational charts of Numerex. In each instance he was either ignored or flatly refused. The reason became crystal clear in a recent email exchange, concerning a new contract for New Orbit with the State of Florida.

51.    After the closing of the APA, Scott Rosenzweig, one of New Orbit's (formerly Orbit's) executives, solicited and obtained from the State of Florida a substantial new contract for New Orbit's offerings. Because Numerex prohibited New Orbit from using outside counsel, Mr. Rosenzweig had the agreement sent for review and execution to Numerex's Deputy General Counsel, Michael Kent.

52.    In the cover email returning the executed agreement to Mr. Rosenzweig, Mr. Kent off-handedly informed him:

> Note that Mike Marett is replacing Stratton [Nicolaides] as the official president of Orbit One, LLC, simply because Mike is more available here than Stratton is to sign contracts. (Mike performs the same function relative to Numerex Solutions.)

As this astonishing email revealed, Mr. Ronsen was never given the job of President of New Orbit. That position had been held first by Mr. Nicolaides (Numerex's CEO), and then by Mr. Marett (Numerex's COO).

53.    The fact that Mr. Ronsen was never President also explains both his complete lack of authority over New Orbit; and the failure of Numerex executives and administrative personnel

to respond appropriately (or at all) to his repeated requests for assistance for New Orbit. No one outside of the former Orbit personnel considered him President, or New Orbit as anything other than a product line purchased by Numerex.

### Numerex Strips Mr. Ronsen of Authority over New Orbit

54.     An essential element underlying the Business Plan was the successful launch and marketing of Orbit's new product, the SX1.  The SX1 is the world's smallest commercially available GPS satellite tracking device.  It is about the size of a small paperback book.  The SX1 was to account for some 40% of the revenue necessary to lift New Orbit's performance to the targets set in the APA (for the first earn-out period).  Moreover, because the SX1 was a new technology, it was essential that the launch take place no later than the end of the 2nd quarter or beginning of the 3rd quarter.  This is because customers generally do not place orders, particularly for new technologies, in Q4.

55.     In terms of support, it initially appeared that Numerex was making a good faith effort to provide the required marketing services for a successful product launch.  It hired (albeit without consultation with Ronsen) a two person marketing consulting team, and also Mr. Altamura.  (Mr. Altamura, upon information and belief, had no experience as a marketing professional, but was the person who had introduced Numerex and Orbit.).

56.     Prior to the closing of the APA, the Orbit team had created suitable marketing materials, press releases, and other materials to support the SX1 launch.  Mr. Ronsen reviewed and approved the materials, and was ready to launch the product at closing.

57.     However, Mr. Nicolaides unexpectedly interceded.  He began revising and demanding re-writes of the marketing materials.  He insisted on re-writing the press release, transforming it into a document more suited to a Numerex investor relations statement than a

marketing document for SX1. Mr. Ronsen's comments and input were shunted aside. So too was Mr. Ronsen's growing dismay that the launch was being delayed into the ordering "dead zone" of the fourth quarter of the year.

58.    Without even notice to Mr. Ronsen, the initial marketing team was dismissed and internal Numerex resources previously assigned to support New Orbit with business development, sales, and integration were pulled from these duties altogether. Mr. Ronsen learned this in September and October. Then, in October, Numerex's Senior Vice President of Marketing, Chuck Horne, who had not previously played any role with regard to New Orbit, provided him with a new set of marketing materials for the launch, which he had prepared.

59.    When Mr. Ronsen raised concerns that the materials were inferior and misguided, his comments were again shunted aside.

60.    Indeed, when the launch finally occurred in October, 2 1/2 months after New Orbit was originally ready to launch, and then, in the disastrous 4th quarter, it was Mr. Horne who set the date, and who set the terms of the press release, and set the spending limit on the circulation it would receive, not Mr. Ronsen.

61.    Mr. Ronsen had budgeted $50,000 per month for marketing and marketing related expenses for the SX1. For the initial press release, he had planned to have PR News Wire release it globally, at a cost (inclusive of translation) of $15,000. Mr. Horne over-rode this decision, and instead had PR News Wire put out the release on a much more limited basis, at a cost of $4,000. The launch was a flop by virtually every measure, and sales have seriously suffered.

62.    Thus, with regard to New Orbit's most critical undertaking to date, the SX1 product launch, his subordinate, Mr. Ronsen had no control over the marketing, materials,

announcements, timing or budget for the launch. That authority was initially usurped by Mr. Altamura, then Mr. Nicolaides, and then handed off to Mr. Horne. This was in direct contravention of the authority Mr. Ronsen was guaranteed under the agreements.

63.    While the SX1 launch was one of the most significant examples of his lack of authority, it was hardly the only one. Mr. Ronsen soon learned that he could not award bonuses or raises, hire personnel (even temporary personnel) or even buy basic office supplies without prior, formal approval from not one, but several Numerex employees and executives, and even then, only days, weeks, or even months after Ronsen requested them. He literally had to have prior, formal approval from a functionary at Numerex to get permission to buy a $20 box of blank CD's.

64.    At first, Louis Fienberg, a Numerex Senior Vice President, was in actual control of New Orbit. Indeed, Mr. Fienberg put a fine point on this in a conversation the two had in California, in the presence of Gary Naden, New Orbit's Vice President and CTO.

65.    In September, 2007, Mr. Ronsen was traveling to California to meet with one of New Orbit's primary vendors, to attempt to negotiate more favorable terms. He had a long relationship with the vendor, who had been Orbit's vendor since Orbit's inception. Mr. Ronsen informed Mr. Fienberg of the trip, in an off the cuff telephone conversation. Mr. Fienberg announced that he would attend the meeting.

66.    Mr. Ronsen arrived earlier than Mr. Fienberg, and had dinner with the vendor. When Mr. Fienberg arrived, he was furious. He instructed Mr. Ronsen that Mr. Ronsen was never to meet with a primary vendor of New Orbit's without Mr. Fienberg being present ever again. Mr. Ronsen challenged this statement and invoked his promised authority as President of New Orbit. In response, Mr. Fienberg, in a conversation later that day with Messrs. Ronsen and

-16-

Naden, dropped all pretense and candidly stated that it was he, and not Mr. Ronsen, who was in charge of New Orbit's P&L, would have authority over how New Orbit spent its budget, and in substance, would be in charge of New Orbit.

67.     In November, 2007 , Mike Marett, Numerex's Chief Operating Officer, made an unannounced visit from Atlanta to New Orbit's offices in Bozeman, Montana.  The purpose of the visit was soon clear -- he was getting up to speed on the company he was taking over from Mr. Fienberg.  Mr. Fienberg had apparently been reassigned, and now it was Mr. Marett who would be running New Orbit.  Indeed, when questioned by Mr. Ronsen and other New Orbit executives, Mr. Marett made no bones about the fact that he was stepping into Mr. Fienberg's shoes, and would have complete authority over budget, P&L, hiring and generally of New Orbit's business.

68.     In sum, Mr. Ronsen is President of New Orbit in the APA and Employment Agreement only, not in reality.  He was never given that position.  In practice, duties and authority, he is a mere product manager of satellite services. Mr. Nicolaides was the President of New Orbit, and delegated his authority to Mr. Fienberg, until Mr. Marett assumed both the title and the authority of New Orbit's President.

**Numerex Fails to Provide the Promised Support**

69.     In one area after another, Numerex failed to provide the support services agreed to in the Business Plan, and contemplated by the APA.

70.     For instance, Numerex had promised that its sales force would sell New Orbit's products and offerings, and would be properly incentivized to do so.  In early August, immediately after the closing, Numerex had New Orbit travel to Atlanta to educate its executives and management and to train its sales staff to sell for New Orbit.  New Orbit put substantial

effort into educating the Numerex sales force management about its markets, it products and its business. Numerex expressly stated to Mr. Ronsen that the Numerex sales force would be incentivized to sell for New Orbit, just as it was to sell for Numerex.

71.    In September, again at Numerex's request, two New Orbit Vice Presidents traveled to Pennsylvania for the express purpose of training the Numerex sales force. On both occasions, Numerex expressly stated to Mr. Ronsen that the Numerex sales force would be incentivized to sell for New Orbit, just as it was to sell for Numerex. This was false.

72.    As Mr. Ronsen learned in September, there was no such incentive. In other words, the Numerex sales people received no commission or other compensation for selling for New Orbit. Unsurprisingly, the sales people decided not to work for free, and did not sell the New Orbit products and offerings. Contrary to Numerex's obligation, it provided no sales force or cross-selling of New Orbit products and offerings whatsoever.

73.    Numerex also misrepresented and failed to provide marketing support. Numerex stated that it had a full professional marketing staff that would be available to New Orbit. Indeed, in reliance on that representation, Orbit did not retain its single, full time Marketing Director after the closing.

74.    In fact, New Orbit later learned that Numerex had only 1½ full time marketing staff, including its Vice President of Marketing, Mr. Horne. As described above in connection with the botched SX1 product launch, Mr. Horne did not take direction from or support New Orbit. Rather, he took his (inappropriate and misguided) marching orders from Numerex. Both during and beyond the product launch, he has been unresponsive to Mr. Ronsen's requests for assistance.

75.    In October, after conceding that Numerex had major marketing, branding, and public communications issues, Mr. Nicolaides communicated to Mr. Ronsen that Numerex was hiring a substantial marketing consulting firm, Zero to Five (0to5), and would make New Orbit a priority for 0to5.   In December, Mr. Ronsen visited 0to5's offices in Philadelphia. He met with the consultants to inquire about their thoughts and plans for New Orbit.  He was astonished to learn that the firm had not been retained to take any steps or provide any services to New Orbit, but only for Numerex's other businesses.  He was told that if he wanted the firm to assist New Orbit, it would require a new agreement, with separate compensation.

76.    These are just a few of the myriad instances, great and small, of Numerex's failure to provide the required support.  There are many other, almost comical examples of how on the one hand Mr. Ronsen has no authority to run New Orbit, and on the other of how Numerex's officers and functionaries refuse to take the most rudimentary steps to take care of even the day to day functions of the business.  New Orbit has never been a subsidiary or affiliate company largely run by Mr. Ronsen, but is a group of services and products acquired and now owned by Numerex.  Mr. Ronsen was never the President of anything; but was merely the product manager of "Numerex's" satellite solution, with only the authority customarily associated with the position of product manager.

77.    Under the agreements, Mr. Ronsen is to have control of his P&L and Numerex is to support New Orbit in accounting and finance.  In fact, Mr. Ronsen does not even have the authority to pay undisputed, routine invoices from New Orbit's vendors.  Numerex routinely pays these bills late, or not at all.  One surreal example is when Mr. Ronsen attempted to upgrade his corporate cell phone.  He was told by the carrier that they would not allow the upgrade because New Orbit's phone bill had not been paid.

-19-

78.    New Orbit's P&L is controlled, physically, in Atlanta. While Mr. Ronsen can review it, he does not control the actual entries or deletions to it. Thus, New Orbit recently discovered dozens of items on the P&L, totaling tens of thousands of dollars, that it did not authorize or request. These items are for charges, products and services purchased by persons at Numerex ostensibly "for" New Orbit, but without Mr. Ronsen's request, approval or even knowledge.

79.    Nor has New Orbit received remotely adequate human resources support. Indeed, for several months following the closing, New Orbit's employees had deductions made from their paychecks for benefits. However, Numerex had not properly enrolled them in any benefit programs, 401(k) contributions were not transferred or managed properly by Numerex, and health insurance deductions were not managed properly. Several Numerex employees not even working for New Orbit were discovered to be payrolled by New Orbit. Even though Mr. Ronsen repeatedly contacted Numerex's human resources department about this, it took months before these absurd, and unlawful, errors were corrected.

**Conclusion**

80.    It is no wonder that Mr. Ronsen could not get the back-office workers at Numerex to correct obvious problems. They correctly perceive that he is a person of no authority within Numerex. He is not the President of an affiliate company. Rather, he is a middle manager at the Bozeman, Montana office. Numerex has never afforded him the customary authority or even title of President of New Orbit, and he had only for the briefest period even reported to the CEO. Rather, he works for other managers, and they, not he, have been named President of New Orbit, and exercised all of the budget, spending, hiring and business authority customary to that position. It is clear that Numerex has decided to run New Orbit as it sees fit, without regard to

the Business Plan, and that it has no intention of ever providing the support required by the agreements.

81.    As such, Numerex has breached the APA and the Employment Agreement, and prevented Plaintiffs from even having the faintest opportunity to achieve the earn out which has been frustrated in all efforts by Numerex.  In light of this conduct, Numerex should be compelled to guarantee the full amount of the earn out.

## COUNT I
## (Declartory Judgment -- Employment Agreement)

82.    Plaintiffs repeat and reallege each of the allegations set forth in paragraph 1 through 81 above as if fully set forth herein.

83.    The Employment Agreement constitutes a valid, binding and enforceable contract between Mr. Ronsen and Numerex.

84.    Mr. Ronsen has fully performed all of his material obligations under that agreement.

85.    Numerex has breached the Employment Agreement by, inter alia:  (a) failing to make Mr. Ronsen President of New Orbit; (b) failing to give Mr. Ronsen the customary authority of a President of New Orbit; (c) requiring Mr. Ronsen to report to Numerex officers and personnel other than the CEO, without any business justification; and (d) depriving Mr. Ronsen of the authority of President, including depriving him of the authority to spend  New Orbit's budget without the approval of Numerex executives; and; (e) depriving Mr. Ronsen the authority to direct the business.

86.    Mr. Ronsen has raised these issues with Numerex, and Numerex disputes them. As such, there is an actual controversy among the parties.

87.    Pursuant to section 3(a) of the Employment Agreement, the actions set forth above constitute "Good Reason" for Mr. Ronsen to terminate his employment.

88.    Pursuant to section 3(c) of the Employment Agreement, in the event he has "Good Reason", Mr. Ronsen may terminate his employment with his severance and Numerex must then deem the full earn out amount to have been earned by Plaintiffs.

89.    Wherefore, Plaintiffs are entitled to a declaration that Numerex has given Mr. Ronsen "Good Reason" to terminate his employment, as that term is defined therein, and that Numerex must deem the earn out amount to have been earned by Orbit, and must pay it in the installments and the on the measurement dates referenced in Section 3(c) of the Employment Agreement.

## COUNT II
### (Breach of Contract — APA)

90.    Plaintiffs repeat and reallege each of the allegations set forth in paragraph 1 through 89 above as if fully set forth herein.

91.    The APA constitutes a valid, binding and enforceable contract between Orbit and Numerex.

92.    Orbit has at all times performed all of its material obligations under the APA.

93.    Numerex has breached the APA by, inter alia:  (a) failing to make Mr. Ronsen President of New Orbit; (b) depriving Mr. Ronsen of the authority of President of New Orbit; (b) failing to operate New Orbit, or allowing Mr. Ronsen to operate New Orbit in conformity with the Business Plan; and (c) failing to provide marketing, sales, human resources, IT, accounting and other support required by the APA to New Orbit.

94.    As a result of Numerex's actions, New Orbit has been and will be unable to meet the financial targets that would otherwise entitle Orbit to the full earn out compensation.

95.    By reason of the foregoing, Numerex is liable to Orbit for breach of contract in an amount to be calculated at trial, but currently believed to exceed $20 million, absent interest, costs and fees.

### COUNT III
### (Unjust Enrichment)

96.    Plaintiffs repeat and reallege each of the allegations set forth in paragraph 1 through 95 above as if fully set forth herein.

97.    A material component of the compensation Plaintiffs were to receive under the APA and the Employment Agreement was the earn out compensation.

98.    Numerex has taken a number of steps, both in terms of interference with New Orbit's operations, and in failing to provide support for those operations, that have and will continue to have the effect of preventing New Orbit from meeting the financial targets that would otherwise entitle Orbit to the full earn out.

99.    Numerex has obtained the benefit of its bargain; it has acquired the assets of Orbit, including its lucrative contracts. However, it has acted to frustrate the contract and to deprive Plaintiffs of the benefit of their bargain -- such that Numerex will have obtained the Orbit assets for little over the nominal up front payment, while preventing Plaintiffs from obtaining the full earn out compensation.

100.    Under these circumstances, it is unjust for Numerex to retain the earn out monies.

101.    By reason of the foregoing, Numerex is liable to Plaintiffs for unjust enrichment, in an amount to be calculated at trial, but currently believed to exceed $20 million, absent interest, costs and fees.

**Count IV**
**(Breach of the Covenant of Good Faith and Fair Dealing)**

102.    Plaintiffs repeat and reallege each of the allegations set forth in paragraph 1 through 101 above as if fully set forth herein.

103.    The APA and the Employment Agreement each constitute valid, binding and enforceable contracts between Orbit and Numerex and Ronsen and Numerex, respectively.

104.    Plaintiffs have at all relevant times fully performed their material obligations under these agreements.

105.    Numerex has acted to thwart Plaintiffs from reaching the earn out targets, and sought thereby to deprive Plaintiffs of the benefit of their bargain.

106.    By reasons of the foregoing, Numerex is liable to Plaintiffs for breach of the covenant of good faith and fair dealing, in an amount to be calculated at trial, but currently believed to exceed $20 million.

**WHEREFORE**, Plaintiffs Orbit One Communications, Inc. and David Ronsen demand judgment in their favor and against defendant Numerex Corp., as follows:

A. On Count I, for declaratory relief, awarding Plaintiffs a declaration that Numerex has given Mr. Ronsen "Good Reason" to terminate his employment, as that term is defined therein, and that Numerex must deem the earn out amount to have been earned by Orbit, and must pay it in the installments and the on the measurement dates referenced in section 3(c) of the Employment Agreement;

B. On Count II, for breach of contract, in excess of $20 million, exclusive of interest, costs and fees;

C. On Count III, for unjust enrichment, in excess of $20 million, exclusive of interest, costs and fees;

-24-

D.  On Count IV, for breach of the covenant of good faith and fair dealing, in excess of $20 million, exclusive of interest, costs and fees; and

E.  On All Counts, such other and further relief as to this Court seems just and proper.

Dated:     January 7, 2008
           New York, New York

John J.D. McFerrin-Clancy
LOWENSTEIN SANDLER, P.C.
1251 Avenue of the Americas
New York, New York  10020
(212) 262-6700
Attorneys for Plaintiffs

Exhibit 1

# EXHIBIT 11 - continued

# ASSET PURCHASE AGREEMENT

**By and Between**

**ORBIT ONE COMMUNICATIONS, LLC**

**and**

**ORBIT ONE COMMUNICATIONS, INC.**

**Dated as of July 31, 2007**

# TABLE OF CONTENTS

**Page**

ARTICLE I - PURCHASE AND SALE ................................................................................. 1

    1.1    Agreement to Sell ................................................................................. 1
    1.2    Agreement to Purchase ......................................................................... 2
    1.3    Purchase Price ...................................................................................... 3
    1.4    Adjustments to Purchase Price ............................................................. 4
    1.5    Assumption of Liabilities ..................................................................... 5

ARTICLE II - CLOSING ................................................................................................... 7

    2.1    Closing ................................................................................................. 7
    2.2    Items to be Delivered at Closing .......................................................... 7
    2.3    Third-Party Consents ........................................................................... 8
    2.4    Power of Attorney ................................................................................ 9
    2.5    Further Assurances .............................................................................. 9

ARTICLE III - REPRESENTATIONS AND WARRANTIES OF SELLER ............................ 9

    3.1    Corporate Existence .............................................................................. 9
    3.2    Corporate Power; Authorization; Enforceable Obligations .................... 9
    3.3    Relations with Customers and Suppliers ............................................. 10
    3.4    Noncontravention ............................................................................... 10
    3.5    No Third-Party Options ...................................................................... 10
    3.6    Financial Statements ........................................................................... 10
    3.7    Transactions with Affiliates ................................................................ 11
    3.8    Absence of Undisclosed Liabilities ..................................................... 11
    3.9    Tax and Other Returns and Reports ..................................................... 11
    3.10   Books of Account ............................................................................... 12
    3.11   Existing Condition ............................................................................. 12
    3.12   Title to Properties .............................................................................. 13
    3.13   Condition of Assets ............................................................................ 13
    3.14   Compliance with Law; Authorizations ............................................... 13
    3.15   Litigation .......................................................................................... 13
    3.16   Insurance .......................................................................................... 13
    3.17   Contracts and Commitments ............................................................... 14
    3.18   Inventory .......................................................................................... 15
    3.19   Receivables ....................................................................................... 15
    3.20   Personal Property ............................................................................... 16
    3.21   Other Intellectual Property Matters .................................................... 16
    3.22   Environmental Matters ....................................................................... 20
    3.23   Real Property ..................................................................................... 20
    3.24   Product and Service Warranties .......................................................... 20
    3.25   Suppliers ........................................................................................... 20
    3.26   Availability of Documents .................................................................. 20
    3.27   Restrictions ....................................................................................... 21
    3.28   Ability to Pay Debts ........................................................................... 21

3.29    Brokers' Fees ......................................................................................... 21
3.30    Fair Value ............................................................................................... 21
3.31    Government Contracts ........................................................................... 21
3.32    Export Controls ...................................................................................... 23
3.33    Disclosure ............................................................................................... 23

ARTICLE IV – REPRESENTATIONS, WARRANTIES AND COVENANTS OF
        SELLER AND STOCKHOLDERS ............................................................ 24

4.1     Names of Stockholders .......................................................................... 24
4.2     Representations, Warranties and Covenants of the Seller and Stockholders ........ 24

ARTICLE V – REPRESENTATIONS, WARRANTIES AND COVENANTS OF
        NUMEREX .................................................................................................. 25

5.1     Corporate Power and Authorization ...................................................... 25
5.2     Noncontravention ................................................................................... 25
5.3     Corporate Existence ............................................................................... 25
5.4     Numerex Stock ....................................................................................... 25
5.5     Brokers' Fees ......................................................................................... 26
5.6     Future Sales of Numerex Stock ............................................................. 26

ARTICLE VIII – TRANSFER AFTER THE CLOSING ........................................ 26

6.1     Further Instruments and Actions ........................................................... 26

ARTICLE VII – INDEMNIFICATION .................................................................. 26

7.1     Survival of Representations and Warranties .......................................... 26
7.2     Indemnification by the Seller ................................................................. 26
7.3     Indemnification by the Buyer ................................................................ 27
7.4     Limitation on Indemnity ........................................................................ 27
7.5     Exclusive Remedy .................................................................................. 28
7.6     Mitigation ............................................................................................... 28
7.7     Notice of Claims .................................................................................... 28
7.8     Offset Under Escrow Agreement ........................................................... 29
7.9     Survival ................................................................................................... 29

ARTICLE VIII - POST CLOSING MATTERS ...................................................... 29

8.1     Discharge of Business Obligations ........................................................ 29
8.2     Maintenance of Books and Records ...................................................... 29

ARTICLE IX - MISCELLANEOUS ...................................................................... 30

9.1     Sales Taxes ............................................................................................. 30
9.2     Expenses ................................................................................................. 30
9.3     Contents of Agreement; Parties in Interest ........................................... 30
9.4     Assignment and Binding Effect ............................................................. 30
9.5     Amendments and Waivers ..................................................................... 30
9.6     Notices .................................................................................................... 30
9.7     Governing Law; Consent to Jurisdiction .............................................. 31
9.8     Benefit to Others .................................................................................... 32
9.9     Headings, Gender and Person ................................................................ 32

9.10    Schedules and Exhibits ................................................................................ 32
9.11    Severability ................................................................................................. 32
9.12    Counterparts ................................................................................................ 32
9.13    Definitions.................................................................................................... 32

Exhibits

Exhibit A            Escrow Agreement
Exhibit B            Performance Objectives (Earnout Matrix)
Exhibit B1           Acceleration Provision
Exhibit C            Bill of Sale, Assignment and Assumption Agreement
Exhibit D            Severance Agreement
Exhibit D1           Confidentiality Agreement
Exhibit E            Form of Bozeman Lease
Exhibit F            Form of Seller Counsel Opinion
Exhibit G            Form of Buyer Counsel Opinion
Exhibit H            Piggyback Registration Rights Agreement
Exhibit I            Guaranty

Schedules

Schedule 1.1(a)         Included Assets
Schedule 1.1(b)         Excluded Assets
Schedule 1.3(a)(iii)    Payment Circumstances
Schedule 1.4            Adjusted Net Worth Calculation
Schedule 1.5            Assumed Liabilities
Schedule 3.1            Jurisdictions
Schedule 3.4            Required Consents
Schedule 3.7            Transactions with Affiliates
Schedule 3.14           Authorizations
Schedule 3.15           Litigation
Schedule 3.16           Insurance
Schedule 3.17           Assumed Contracts
Schedule 3.17A          Assumed Contracts – Consent Procured/No Consent
Schedule 3.17B          Assumed Contracts – Post Closing Assignments
Schedule 3.17C          Assumed Contract – Buyer's Risk
Schedule 3.18           Personal Property
Schedule 3.19           Intellectual Property
Schedule 3.20           Real Property
Schedule 3.22           Warranties
Schedule 3.23           Suppliers
Schedule 3.27           Seller's Broker's Fees
Schedule 3.31           Government Contracts
Schedule 32             Export Controls
Schedule 4.1            Names of Stockholders
Schedule 5.5            Buyer's Broker's Fees

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**") is entered into as of the 31st day of July 2007, by and between Orbit One Communications, LLC, a Georgia limited liability company ("Buyer"), Orbit One Communication, Inc., a Montana corporation (**"Seller'**) and Numerex Corp., a Pennsylvania corporation ("NMRX") as guarantor of Buyer's obligations under this Agreement.

WHEREAS, Seller is in the business of: (1) providing satellite and cellular GPS equipment tracking solutions to DHS – FEMA, the American Red Cross and numerous federal and state government agencies and private organizations; (2) sale and rental of VSAT solutions; and (3) deploying proprietary field logistic software for remote asset management, GPS tracking, mapping, display, reporting and data forwarding to meet customer needs (the "**Business**");

WHEREAS, Buyer is a newly formed limited liability company which is wholly owned by NMRX;

WHEREAS, Seller desires to sell to Buyer and Buyer desires to purchase from Seller, on the terms and conditions hereinafter set forth, all the assets, properties and rights of Seller used in the Business (the "**Transaction**");

Now, therefore, in consideration of the mutual agreements, representations, warranties and covenants set forth below, Buyer and Seller agree as follows:

## ARTICLE I - PURCHASE AND SALE

**1.1  Purchase/Sale**. Except as otherwise specifically provided in Section 1.1(b), Seller hereby grants, sells, conveys, assigns, transfers and delivers to Buyer all right, title and interest of Seller in and to (a) the Business as a going concern, and (b) all of the assets, properties and rights of Seller, of every kind and description, real, personal and mixed, tangible and intangible, wherever situated, that are used in the Business (which Business, assets, properties and rights are herein sometimes called the "**Assets**"), free and clear of all mortgages, liens, pledges, security interests, charges, claims, restrictions and encumbrances of any nature whatsoever (**"Liens"**) except for Permitted Liens and Liens created by or through Buyer.

(a)    Included Assets. The Assets include without limitation all of the assets, properties and rights of Seller used in the Business, except as otherwise expressly set forth in Section 1.1(b) hereof:

(i)    all computer software and hardware, including without limitation, the hardware and software set forth on Schedule 1.1(a);

(ii)    all technologies, methods, formulations, data bases, trade secrets, know-how, inventions and other intellectual property used or under development for use

in the Business including, without limitation, any proprietary software developed by Seller used in the operation of the Business;

(iii)     all rights under any binding agreements, leases, including without limitation Real Property (as defined below), plans, licenses, certificates used or held for use in the Business, including those set forth on Schedule 3.17;

(iv)     all rights under any patent, trademark, service mark, trade name or copyright, whether registered or unregistered, and any applications and registrations therefore, including without limitation, those set forth on Schedule 1.1(a);

(v)     all prepaid items, amounts received from customers for future services, customer deposits, unbilled costs and fees, including without limitation, those set forth on Schedule 1.1(a)(vi);

(vi)     all rights or choses in action arising out of occurrences before or after the Closing, including without limitation all rights arising under any Contract (as defined below) or under express or implied warranties relating to any of the Assets;

(vii)     all other assets, including cash (subject to adjustment as set forth in Section 1.4), accounts receivable, inventory, and assets reflected on the Most Recent Balance Sheet (as defined below) and listed on Schedule 1.1(a);

(viii)     all rights in toll free and other telephone numbers;

(ix)     all websites and e-mail addresses;

(x)     all information, files, records, data, plans, price lists, operations manuals, contracts and recorded knowledge, including customer, supplier, vendor, and subcontractor lists, related to any of the foregoing; and

(xi)     all other assets used in the Business.

(b)     Excluded Assets.  Notwithstanding the foregoing, the Assets do not include and Seller retains right, title and interest in and to the assets, properties or rights of Seller set forth on Schedule 1.1(b) (the "**Excluded Assets**").

1.2     **Agreement to Purchase**.  Buyer hereby purchases the Assets from Seller, upon and subject to the terms and conditions of this Agreement and in reliance on the representations, warranties and covenants of Seller contained herein, in exchange for the Purchase Price (as defined herein).  In addition, Buyer hereby assumes and agrees to pay, discharge or perform, as appropriate, certain liabilities and obligations of Seller only to the extent and as provided in Section 1.5 of this Agreement.  **EXCEPT AS SPECIFICALLY PROVIDED IN SECTION 1.5, BUYER DOES NOT ASSUME OR BECOME RESPONSIBLE FOR ANY LIABILITIES OR OBLIGATIONS OF THE BUSINESS OR SELLER.**

**1.3  Purchase Price.**

(a)  Purchase Price.  Buyer will pay to Seller an aggregate purchase price of up to $27,000,000, subject to adjustment as described below (the "**Purchase Price**").  The Purchase Price shall be payable as follows:

(i)  $5,500,000 in cash payable at Closing subject to the Cash Escrow (defined below);

(ii)  $500,000 in cash payable sixty (60) days after Closing subject to satisfaction of the Adjusted Net Working Capital test described in Section 1.4(c);

(iii)  $2,000,000 in cash payable under the circumstances specified in Schedule 1.3(a)(iii);

(iv)  1,100,000 shares of Numerex Corp. Class A Common Stock, subject to Rule 144 restrictions ("**NMRX Stock**"), to JP Morgan Chase as Escrow Agent, which stock shall be administered and disbursed pursuant to the terms and conditions of an escrow agreement substantially in the form attached hereto as Exhibit A (the "**Escrow Agreement**"), which Escrow Agreement shall provide for the release of shares of Numerex Stock on March 31, 2008, March 31, 2009 and March 31, 2010, by joint instructions provided and to the extent the financial goals set forth on Exhibit B attached hereto and incorporated herein by reference for calendar years 2007, 2008 and 2009, respectively, are met or as otherwise as extended in the event that extension of the measurement dates is sought by Seller in accordance with Exhibit B; and

(v)  471,429 shares of in NMRX Stock, which stock shall be administered and disbursed pursuant to the Escrow Agreement and which shall provide for the release of shares of Numerex Stock on March 31, 2008; March 31, 2009 and March 31, 2010 as specified on Exhibit B, provided and to the extent the financial goals set forth on Exhibit B attached hereto and incorporated herein by reference for calendar years 2007, 2008 and 2009, respectively, are met or exceeded or as otherwise as extended in the event that extension of the measurement dates is sought by Seller in accordance with Exhibit B; and

(vi)  $2,500,000 in cash payable on March 31, 2008, March 31, 2009 and March 31, 2010, provided and to the extent the financial goals set forth on Exhibit B attached hereto and incorporated herein by reference for calendar years 2007, 2008 and 2009 respectively, are met or exceeded or as otherwise as extended in the event extension of the measurement dates is sought by Seller in accordance with Exhibit B.

(b)  Payments.  All amounts paid by Buyer to Seller shall be paid wire transfer of immediately available U.S. dollar funds to an account designated in writing by Seller.

(c)  Change in Control.  Notwithstanding anything to the contrary contained herein, in the event of a Change in Control, the balance of the NMRX Stock referenced in Section 1.3(a)(iv) not previously earned shall be automatically delivered to Seller under the

Escrow Agreement and, in the event that Seller achieves trailing twelve month EBITDA as specified on <u>Exhibit B1</u> prior to the announcement of Change in Control, the NMRX Stock referenced in Section 1.3(a)(v) shall likewise be automatically delivered to Seller by joint instruction under the Escrow Agreement as indicated on <u>Exhibit B1</u>. Buyer, Seller and NMRX further agree that Seller shall be entitled to receive the same consideration for Seller's NMRX Stock as is received by all NMRX stockholders following a Change in Control of NMRX whether accelerated pursuant to this provision or as otherwise specified in this Agreement.

      (d)   <u>Fees of Escrow Agent</u>. The fees and expenses of the Escrow Agent pursuant to the Escrow Agreement shall be paid by Buyer.

**1.4**  **<u>Adjustments to Purchase Price.</u>** The Purchase Price shall be subject to hold backs and/or adjustments as follows:

      (a) <u>Cash Escrow</u>. Ten (10%) percent of the aggregate cash consideration specified in Section 1.3(a)(i), (ii) and (iii) shall be escrowed pursuant to the Escrow Agreement (**"Cash Escrow"**) for a period of one (1) year from the date of Closing as a cash hold back and initial source of recovery for purposes of Seller's indemnity obligations under Article IX.

      (b) **Reserved.**

      (c) <u>Working Capital Adjustment</u>. The Purchase Price, specifically, will be adjusted to the extent that the total of current assets reflected on the Seller's balance sheet at the Closing exceed the trade payables and accrued expenses assumed by Buyer at the Closing Date by $500,000 (**"Adjusted Net Working Capital Test"**). For purposes of calculating the Adjusted Net Working Capital Test, balance sheet items shall be determined in accordance with U.S. GAAP consistently applied. Also for purposes of calculating the Adjusted Net Working Capital Test, the calculation of accounts payable and accrued expenses shall (1) not include: any expenses related to the Transaction; (2) include liabilities related to the purchase of goods and services in the ordinary course of business; and (3) exclude all liabilities classified as debt obligations (whether long or short term) and any shareholder obligations. The Buyer and Seller shall agree the calculation of the Adjusted Net Working Capital Test at Closing and agree any necessary Purchase Price adjustments and shall attach such calculation to this Agreement as <u>Schedule 1.4</u>. At Closing, in the event that the Adjusted Net Working Capital exceeds $500,000 then the cash included in current assets would be excluded to the extent necessary to reduce the differential to $500,000. If the cash balance is zero and the Adjusted Net Working Capital Test still exceeds $500,000, any consequent difference would be added to the consideration to be paid pursuant to Section 1.3(a)(ii). In the event the Adjusted Net Working Capital Test results in a number less than $500,000, such shortfall would be deducted from the consideration to be paid pursuant to Section 1.3(a)(ii). During the 30-day period following closing, both Buyer and Seller shall be permitted to review the working papers and other underlying information utilized in the calculation of the Adjusted Net Working Capital Test to confirm the accuracy of the Adjusted Working Capital Test. The calculations shall become final and binding on both Buyer and Seller on the 30th day after the Closing unless either party gives the other written notice of disagreement with respect to the calculation prior to such date (a "Notice of Disagreement"). Any Notice of Disagreement shall (i) specify in reasonable detail the nature of any disagreement so asserted and (ii) only include disagreements based on mathematical errors or based on

Adjusted Net Working Capital Test not being calculated in accordance with this Section 1.4(c). If a Notice of Disagreement with respect to the Adjusted Net Working Capital Test is received in a timely manner, then the calculation of the Adjusted Net Working Capital Test (as revised in accordance with this sentence) shall become final and binding upon Seller and Buyer on the earlier of (A) the date Seller and Buyer resolve in writing any differences they have with respect to the matters specified in the Notice of Disagreement and (B) the date any disputed matters specified in the Notice of Disagreement are finally resolved in writing by the Accounting Firm (as hereinafter defined).  During the 30-day period following the delivery of a Notice of Disagreement, Seller and Buyer shall seek in good faith to resolve in writing any differences that they may have with respect to the matters specified in the Notice of Disagreement.  During such period auditors shall have access to the working papers and all other relevant information of the other party prepared in connection with the Notice of Disagreement.  At the end of such 30-day period, Seller and Buyer shall submit to an independent accounting firm (the "Accounting Firm") for arbitration any and all matters that remain in dispute and that were properly included in the Notice of Disagreement. The Accounting Firm shall be Habif, Arogeti & Wynne or, if such firm is unable or unwilling to act, such other nationally recognized independent public accounting firm as shall be agreed upon by the parties hereto in writing.  The Accounting Firm shall be instructed to render its determination of all matters submitted to it within 30 days following submission.  Judgment may be entered upon the determination of the Accounting Firm in any court having jurisdiction over the party against which such determination is to be enforced.  The fees and expenses of the Accounting Firm incurred pursuant to this Section 1.4(c) shall be borne 50% by Seller and 50% by Buyer.

(d) <u>Allocation of Purchase Price</u>.  The Purchase Price (and all other capitalized costs) as finally determined shall be allocated among the Assets acquired hereunder (for all purposes, including financial accounting and tax purposes) as agreed between Buyer and Seller within 60 days after closing.  The Parties hereby covenant and agree that they will not take a position on any income tax return, before any governmental agency charged with the collection of any income tax, or in any judicial proceeding that is in any way inconsistent with the agreed post-Closing allocation.  This Section shall survive termination of this Agreement.

**1.5    <u>Assumption of Liabilities</u>.**

(a)    At the Closing, Buyer shall assume and agree to pay, discharge or perform, as appropriate, only the following liabilities and obligations of Seller:

(i)    the liabilities under the Assumed Contracts (as defined in Section 3.17) solely to the extent arising and relating to periods from and after the Closing; and

(ii)    those other liabilities that are expressly set forth on attached <u>Schedule 1.5</u>; and

(iii)    the liabilities reflected on the Most Recent Balance Sheet, except items under "Current Liabilities" identified as "Accrued Pension," "Credit Cards Payable," "Telecommunication Taxes Payable" and "Due to Related Parties."

Except as expressly set forth in this <u>Section 1.5(a)</u>, Buyer is not assuming any liabilities or obligations of, or related to, Seller or the Business, and Seller agrees to pay and discharge all such nonassumed liabilities and obligations as and when the same become due and payable.

(b)     Without limiting the foregoing, in no event shall Buyer assume or incur any liability or obligation under this <u>Section 1.5</u> or otherwise in respect of any of the following:

(i)     any liability or obligation under any Assumed Contract (as defined in Section 3.17) arising or relating to any period prior to the Closing, or any liability under any Assumed Contract where the Required Consent to the assignment thereof has not been obtained unless Buyer has designated such Required Consent as a post-closing item as to which Buyer is assuming the risk on the Required Consent;

(ii)     other than as set forth on <u>Schedule 1.5(b)(ii)</u> any finance or equipment lease obligations, whether related to the Assets or otherwise;

(iii)     any indebtedness, whether related to the Assets or otherwise;

(iv)     any breach of contract, warranty, product liability or similar claim, regardless of when made or asserted, which arises out of or is based upon any express or implied representation, warranty, agreement or guarantee made by Seller, or alleged to have been made by Seller, or which is imposed or asserted to be imposed by operation of law, in connection with any service performed or product designed, sold, or leased by or on behalf of Seller on or prior to the Closing Date except to the extent reserved on the Most Recent Balance Sheet;

(v)     any federal, state or local income or other tax (x) payable with respect to the business, assets, properties or operations of Seller for any period ending on or before the Closing Date, or (y) incident to or arising as a consequence of the consummation by Seller of this Agreement and the transactions contemplated hereby except as required to be paid by Buyer pursuant to Section 9.1 hereof;

(vi)     any liability or obligation under or in connection with the Excluded Assets;

(vii)     any liability or obligation to any employees, agents or independent contractors of Seller or under any benefit arrangement with respect thereto;

(viii)     except to the extent reserved on the Most Recent Balance Sheet; any customer claims, charge-backs, or other related liability or obligation attributable to periods and arising from sales of goods or services occurring prior to the Closing Date;

(x)     any liability or obligation of Seller arising or incurred in connection with the negotiation, preparation and execution of this Agreement and the transactions contemplated hereby and fees and expenses of counsel, accountants and other experts; and

-6-

(xi)     except as expressly set forth on <u>Schedule 1.5</u>, any other pre-closing Liabilities of the Business.

**1.6   Operation of the Business.**  Attached hereto as <u>Schedule 1.6</u> is the three-year Business Plan prepared by Seller and agreed to by Buyer (the **"Business Plan"**).  After the Closing, Buyer will operate the Business substantially in accordance with the Business Plan.

## ARTICLE II - CLOSING

**2.1     <u>Closing</u>.**  The closing (the "Closing") of the sale and purchase of the Assets shall take place at 1325 Avenue of the Americas, New York simultaneously with the execution of this Agreement and shall be deemed affective as of 12:01 a.m. on such date (the "Closing Date") or such other date as the Parties may mutually determine (the **"Closing Date"**).  The Closing may take place by facsimile, overnight delivery or other means determined acceptable by the parties.

**2.2     <u>Items to be Delivered at Closing</u>.**  At the Closing and subject to the terms and conditions herein contained:

(a)     Seller shall deliver to Buyer the following:

(i)     a duly executed bill of sale, assignment and assumption agreement substantially in the form attached hereto as <u>Exhibit C</u> (the **"Assignment and Assumption Agreement"**);

(ii)     a duly executed counterpart of the Escrow Agreement in accordance with Section 1.3;

(iii)     a duly executed guaranty agreement from Messrs. David Ronsen Scott Rosenzweig and Gary Naden guaranteeing Seller's obligations to indemnify Buyer for a breach of <u>Section 3.8</u> and certain other liabilities substantially in the form of <u>Exhibit I</u>;

(iv)     all of the agreements, contracts, commitments, plans, bids, quotations, proposals, instruments, computer programs and software, data bases whether in the form of computer tapes or otherwise, related object and source codes, manuals and guidebooks, price books and price lists, customer and subscriber lists, supplier lists, sales records, files, correspondences, legal opinions, rulings issued by governmental entities, and other documents, books, records, papers, files, office supplies and data belonging to Seller which are part of the Assets;

(v)     a legal opinion from Lowenstein Sandler PC, addressed to Buyer, dated as of the Closing Date, in form and substance satisfactory to Buyer and its counsel substantially in the form of <u>Exhibit F</u>;

(vi)     a certified copy of Seller's Articles of Incorporation and all amendments thereto as in effect on the Closing Date and a certificate of good standing of Seller issued

-7-

by the Montana Secretary of State, dated a date not more than thirty (30) days prior to the Closing Date; and

(vii)    a signed copy of the Bozeman premises lease (the "Lease") substantially in the form of <u>Exhibit E</u>.

and simultaneously with such delivery, all such steps will be taken as may be required to put Buyer in actual possession and operating control of the Assets.

(b)    Buyer shall deliver to Seller or as indicated the following:

(i)    a duly executed counterpart of the Escrow Agreement and the Lease;

(ii)    a duly executed counterpart of the Assignment and Assumption Agreement;

(iii)    (x) $4,950,000 in cash representing the net consideration payable at Closing specified in Section 1.3(a)(i) and (y) and $550,000 to the Cash Escrow as specified in Section 1.4(a).

(iv)    the Numerex Stock to the Escrow Agreement to be held pursuant to the terms of the Escrow Agreement

(v)    duly executed severance agreements to David Ronsen, Scott Rosenzweig and Gary Naden, substantially in the form attached as <u>Exhibit D</u> (the **"Severance Agreements"**) and NMRX's standard confidentiality agreement substantially in the form of <u>Exhibit D1</u>.

(vi)    a legal opinion from Numerex's counsel, addressed to Seller, dated as of the Closing Date, in form and substance satisfactory to Seller and its counsel substantially in the form of <u>Exhibit G</u>.

(vii)    a duly executed counterpart of the Piggyback Registration Rights Agreement in the form of <u>Exhibit H</u>.

**2.3    <u>Third-Party Consents</u>**. To the extent that Seller's rights under any agreement, contract, commitment, or other Asset to be assigned or conveyed to Buyer hereunder may not be assigned without the consent of another person which has not been obtained at or prior to Closing, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful. If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Buyer's rights under the Asset in question so that Buyer would not in effect acquire the benefit of all such rights, Seller, to the maximum extent permitted by law and the Asset, shall act after the Closing as Buyer's agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by law and the Asset, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer.

2.4     **Power of Attorney**. Without limiting any provisions hereof, Seller hereby agrees constitutes and appoints Buyer, its successors and assigns, as the true and lawful attorney of Seller with full power of substitution in the name of Buyer or in the name of Seller but for the benefit of Buyer: (a) to institute and prosecute all proceedings which Buyer may deem proper in order to collect, assert or enforce any right or title of any kind in or to the Assets, to defend or compromise any and all actions, suits or proceedings in respect of any of the Assets and to do all such acts and things in relation thereto as Buyer shall deem advisable, and (b) to take all actions which Buyer may deem proper in order to provide for Buyer the benefits under any contracts, licenses, sales orders or purchase orders included in the Assets. Seller acknowledges that the powers provided pursuant to this Section 2.4 are coupled with an interest and shall be irrevocable by Seller or by its subsequent dissolution or in any manner or for any reason. Buyer shall be entitled to retain for its own account any amounts collected pursuant to Section 2.4, including any amounts payable as interest in respect thereof.

2.5     **Further Assurances**.  Seller, from time to time after the Closing, at Buyer's request, will execute, acknowledge and deliver to Buyer all such other instruments of conveyance and transfer and will take all such other actions and execute and deliver such other documents, certifications and further assurances as Buyer may require in order to vest more effectively in Buyer, or to put Buyer more fully in possession of, any of the Assets, or to better enable Buyer to complete, perform or discharge any of the liabilities or obligations assumed by Buyer at the Closing pursuant to Section 1.5 hereof. Each of the parties hereto will cooperate with the other and execute and deliver to the other parties hereto such other instruments and documents and take such other actions as may be reasonably requested from time to time by any other party hereto as necessary to carry out, evidence and confirm the intended purposes of this Agreement.

## ARTICLE III - REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that, except as set forth in the Disclosure Schedules, the statements contained in this Article III are correct and complete as of the Closing Date (as though made on such date except to the extent such representations and warranties expressly relate to an earlier date in which case such representations and warranties shall be true and correct on and as of such earlier date).

3.1   **Corporate Existence**.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the state of Montana. Seller is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the conduct of the Business by it requires it to be so qualified, all of which jurisdictions are listed on Schedule 3.1.

3.2   **Corporate Power; Authorization; Enforceable Obligations**.  Seller has all requisite corporate power and authority to own, lease and operate its properties and to carry on the Business as now being conducted, and Seller has all requisite power and authority to execute and deliver this Agreement and all other agreements, instruments and documents to be delivered by Seller hereunder (the "**Related Documents**") and to perform the obligations to be performed by Seller hereunder and thereunder, and to consummate the transactions contemplated hereby

and thereby. The execution, delivery and performance of this Agreement and the Related Documents by Seller have been duly authorized by all necessary corporate action. This Agreement has been, and the Related Documents will be, duly executed and delivered by a duly authorized officer of Seller, and this Agreement constitutes, and the Related Documents when executed and delivered will constitute, the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms.

3.3 **Relations with Customers and Suppliers.** During the twelve months ending on the date hereof, Seller has used commercially reasonable efforts to preserve Seller's relations with its vendors and customers and to keep available for the Business the services of its customers and suppliers in the normal and ordinary course of business consistent with past practice. During the twelve months ending on the date hereof, no customer of or vendor to the Business has given notice or threatened not to renew any Assumed Contract or to otherwise discontinue purchasing or procuring goods or services of or to the Business. As of the date of this Agreement, David Ronsen, Scott Rosenzweig and Gary Naden, the executive officers of Seller have no actual knowledge of any existing intent on the part of FEMA or any supplier of the Business to cease transacting business with the Business or that any loss of any customer or supplier will result because of the consummation of the Transaction contemplated hereby. All arrangements and agreements with customers and suppliers are on commercial arms length terms.

3.4 **Noncontravention.** Neither the execution, delivery or performance by Seller of this Agreement or any of the Related Documents, nor the consummation by Seller of the Transaction contemplated hereby or thereby, nor compliance by Seller with any provision hereof or thereof will: (a) conflict with or result in a breach of any provision of the certificate of Incorporation of By laws of the Seller or any agreement relating to the Business among the shareholders of Seller; (b) violate any provision of law, statute, rule or regulation, or any order, writ, injunction, permit, judgment, decree or award of any court, arbitrator or governmental or regulatory official, body or authority which is applicable to either Seller or the Business; or (c) violate, result in a breach of, constitute (with due notice or lapse of time or both) a default under, require the consent of any other person under, give any party the right to terminate, modify, accelerate or otherwise change the existing rights or obligations of such parties under, or result in the imposition of any Lien upon any Asset under any of the following: any Assumed Contract (as defined below), Authorization (as defined herein) or other instrument, document, understanding or obligation, whether oral or written, to which Seller is a party or by which it is bound or to which any of its properties or assets is subject. Except as set forth on Schedule 3.4, no authorization, approval or consent of, and no registration or filing with, any governmental or regulatory official, body or authority or third-person is required in connection with the execution and delivery of this Agreement and the Related Documents by the Seller pursuant hereto, or the consummation of the Transaction contemplated herby or thereby (collectively, the "**Required Consents**").

3.5 **No Third-Party Options**. There are no existing agreements, options, commitments or rights with, of or to any person to acquire any of the Assets, or any interest therein.

3.6 **Financial Statements**. Attached to the Disclosure Schedules are the following financial statements related to the Business (the "**Financial Statements**"): (a) audited balance sheets and related income statements as of and for the fiscal years ended 2005 and 2006, audited

-10-

by H.J. Associates, LLC (the "**Independent Accountants**") (the "**FYE Statements**"); (b) an unaudited balance sheet as of June 30, 2007 (the "**Most Recent Balance Sheet**"); and (c) unaudited income statement for the six month period ended June 30, 2007. Each of the Financial Statements (including the related notes and schedules) has been prepared in accordance with U.S. GAAP applied on a consistent basis throughout the periods covered thereby, presents fairly in all material respects the financial condition of the Business as of the indicated dates and the results of operations, retained earnings and changes in financial position of the Business for the indicated periods, and was prepared based on the books and records of Seller. Seller has not received any advice or notice from the Independent Accountants that it has used any improper accounting practice that would have the effect of not reflecting or incorrectly reflecting any assets, liabilities, revenues or expenses in any of the Financial Statements or in its books and records under the accounting method pursuant to which they were prepared.

 3.7 <u>**Transactions with Affiliates**</u>. <u>Schedule 3.7</u> sets forth the identity and relationship of any affiliate of the Seller that provides or has an interest in any services, products or the use of tangible or intangible property (whether subject to a written agreement or otherwise) related to the Business or the Assets (whether or not such affiliate is compensated for such services, products or property). Without limiting the foregoing, <u>Schedule 3.7</u> sets forth any goods or services which the Seller utilizes in the Business which are also utilized by any affiliates of Seller and/or which are obtained by affiliates of Seller for the benefit of Seller.

 3.8 <u>**Absence of Undisclosed Liabilities**</u>. Seller has no Liabilities except (i) as included or specifically reserved against in the Most Recent Balance Sheet and (ii) liabilities that have arisen after the date of the Most Recent Balance Sheet in the normal and ordinary course of the Business consistent with past practice. For purposes of this Agreement, the term "**Liabilities**" shall mean liabilities of a type or nature such that U.S. GAAP would require that it be included on Seller's financial statements, including without limitation, any direct or indirect indebtedness, guaranty, endorsement, claim, loss, damage, deficiency, cost, expense, obligation or responsibility, fixed or unfixed, asserted or unasserted, liquidated or unliquidated, secured or unsecured.

 3.9 <u>**Tax and Other Returns and Reports**</u>. All federal, state, local and foreign tax returns, reports, statements and other similar filings required to be filed by Seller (the "**Tax Returns**") with respect to any federal, state, local or foreign taxes, assessments, interest, penalties, deficiencies, fees and other governmental charges or impositions, (including without limitation all income tax, unemployment compensation, social security, payroll, sales and use, excise, privilege, property, ad valorem, franchise, license and any other tax or similar governmental charge or imposition under laws of the United States or any state of municipal or political subdivision thereof or any foreign country or political subdivision thereof) (the "**Taxes**") have been filed with the appropriate governmental agencies in all jurisdictions in which such Tax Returns are required to be filed, and all such Tax Returns properly reflect the liabilities of Seller for Taxes for the periods, property or events covered thereby. All Taxes, including those without limitation which are called for by the Tax Returns, have been properly accrued or paid. The accruals for Taxes contained in the Most Recent Balance Sheet are adequate to cover the tax liabilities of Seller with respect to the Business as of that date and include adequate provision for all deferred taxes, and nothing has occurred subsequent to that date to make any of such accruals inadequate. Seller has not received any notice of assessment

or proposed assessment in connection with any Tax Returns and there are not pending tax examinations of or tax claims asserted against Seller or any of its assets or properties. Seller has not extended, or waived the application of, any statute of limitations of any jurisdiction regarding the assessment or collection of any Taxes. There are no tax liens (other than any lien for current taxes not yet due and payable) on any of the assets or properties of Seller. Seller has made all deposits required by law to be made with respect to employees' withholding and other employment taxes, including without limitation the portion of such deposits relating to taxes imposed upon Seller.

    **3.10  Books of Account**. The books, records and accounts of Seller maintained with respect to the Business accurately and fairly reflect, in all reasonable detail, the transactions and the assets and liabilities of Seller with respect to the Business. Seller has not engaged in any transaction with respect to the Business, except for transactions which have been and are reflected in the normally maintained books and records of the business.

    **3.11  Existing Condition**. Since the date of the Most Recent Balance Sheet, Seller with respect to the Business has not (except pursuant to this Agreement and except as disclosed on Schedule 3.11):

        (a)    incurred any liabilities, other than liabilities incurred in the ordinary course of business consistent with past practice, or discharged or satisfied any lien or encumbrance, or paid any liabilities, other than in the ordinary course of business consistent with past practice, or failed to pay or discharge when due any liabilities of which the failure to pay or discharge has caused or would reasonably be expected to cause any material damage or risk of material loss to it or any of its assets or properties;

        (b)    sold, encumbered, assigned or transferred any assets or properties which would have been included in the Assets if the Closing had been held on the date of the Most Recent Balance Sheet or on any date since then, except for the sale of inventory in the ordinary course of business consistent with past practice;

        (c)    created, incurred, assumed or guaranteed any indebtedness for money borrowed, or mortgaged, pledged or subjected any of its Assets to any mortgage, lien, pledge, security interest, conditional sales contract or other encumbrance or any nature whatsoever;

        (d)    made or suffered any amendment or termination of any Assumed Contract, or canceled, modified or waived any substantial debts or claims held by it or waived any rights of substantial value, whether or not in the ordinary course of business;

        (e)    suffered any damage, destruction or loss, whether or not covered by insurance, materially and adversely affecting its business, operations, assets or properties or suffered any repeated, recurring or prolonged shortage, cessation or interruption of supplies or utility or other services required to conduct its business and operations;

        (f)    suffered any Material Adverse Effect;

-12-

(g)    made commitments or agreements for capital expenditures or capital additions or betterments in excess of $50,000 without the prior written consent of Buyer;

(h)    changed any of the accounting principles followed by it or the methods of applying such principles, or

(i)    entered into any transaction other than in the ordinary course of business consistent with past practice.

**3.12    Title to Properties**.  Seller has good, valid and marketable title to all of the Assets, including without limitation all properties and assets reflected in the Most Recent Balance Sheet, free and clear of all Liens other than Permitted Liens.

**3.13    Condition of Assets**.  All facilities, equipment and other material items of tangible property and assets included in the Assets are in good operating condition and repair and are usable in the normal and ordinary course of business consistent with past practice, subject to ordinary wear and tear.  The Assets are all the assets, rights and interests necessary to permit the Buyer to conduct the Business substantially as it is currently being conducted and operated and in material compliance with all applicable Regulations (as defined below), Assumed Contracts and Authorizations as of the Closing.  No person other than Seller owns any Assets situated on the premises of Seller or necessary to or used in the operation of the Business.

**3.14    Compliance with Law; Authorizations**.  Seller has complied with each, and is not in violation of any, law, ordinance, or governmental or regulatory rule or regulation, whether federal, state, local or foreign, to which the Business, Seller or any of the Assets is subject ("**Regulations**").  Seller owns, holds, possesses or lawfully uses in the operation of the Business all franchises, licenses, permits, easements, rights, applications, filings, registrations and other authorizations from governmental authorities ("**Authorizations**") which are in any manner necessary for it to conduct its business as now conducted or for the ownership and use of the assets owned or used by Seller in the conduct of the Business.  Schedule 3.14 sets forth a correct and complete list of all Authorizations.  Seller is not in default, nor has it received any notice of any claim of default, with respect to any such Authorization, and each Authorization is in full force and effect, and each Authorization may be fully transferred to Buyer.

**3.15    Litigation**.  Except as set forth on Schedule 3.15, no litigation, including any arbitration, mediation, claim, investigation or other proceeding of or before any court, arbitrator or governmental or regulatory official, body or authority is pending or, to the knowledge of Seller, threatened, against Seller, the Business or any of the Assets, or which in any manner challenges or seeks to prevent, enjoin, alter or delay the Transaction contemplated by this Agreement.  Neither Seller nor any of its affiliates is a party to or subject to the provisions of any judgment, order, writ, injunction, decree or award of any court, arbitrator or governmental or regulatory official, body or authority.

**3.16    Insurance**.  The assets, properties and operations of Seller are insured under various policies of general liability and other forms of insurance, all of which are described in Schedule

<u>3.16</u>, which discloses for each policy the risks insured against, coverage limits, deductible amounts, all outstanding claims thereunder, and whether the terms of such policy provide for retrospective premium adjustments.  All such policies are in full force and effect in accordance with their terms, no notice of cancellation has been received, and there is no existing default or event that, with the giving of notice or lapse of time or both, would constitute a default thereunder.  Such policies are in amounts that are adequate in relation to the business and assets of Seller and all premiums to date have been paid in full.  Seller has not been refused any insurance, nor has its coverage been limited, by any insurance carrier to which it has applied for insurance or with which it has carried insurance at any time.  <u>Schedule 3.16</u> also contains a true and complete description of all outstanding bonds and other surety arrangements issued or entered into in connection with the business, assets and liabilities of Seller.

    **3.17  <u>Contracts and Commitments</u>**.  Except as set forth on <u>Schedule 3.17</u>, Seller is not a party to any written or oral:

        (a)    agreement, contract or commitment for the future purchase of, or payment for, supplies or products, or for the performance of services by a third party which supplies, products or services are used in the conduct of the Business;

        (b)    agreement, contract or commitment to provide goods or services in connection with the Business;

        (c)    agreement, contract or commitment relating to the Business or the Assets not otherwise listed on <u>Schedule 3.17</u> and continuing over a period of more than six months from the date hereof;

        (d)    distribution, dealer, representative or sales agency agreement, contract or commitment relating to the Business;

        (e)    lease installment sale or financing arrangement under which Seller is either lessor, lessee or payee relating to the Business, the Assets or any property at which the Assets are located;

        (f)    note, debenture, bond, equipment trust agreement, letter of credit agreement, loan agreement or other contract or commitment for the borrowing or lending of money relating to the Business or the Assets or agreement or arrangement for a line of credit or guarantee, pledge or undertaking of the indebtedness of any other person relating to the Business or the Assets;

        (g)    commitment or agreement for any capital expenditure or leasehold improvement relating to the Business or the Assets;

        (h)    agreement, contract or commitment limiting or restraining Seller or the Business, or purporting to limit any successor thereto, from engaging or competing in any manner or in any business, nor, to the knowledge of Seller, is any employee of Seller

-14-

engaged in the conduct of the Business subject to any such agreement, contract or commitment;

(i)     license, franchise, distributorship or other agreement which relates in whole or in part to any software, patent, trademark, trade name, service mark or copyright or to any ideas, technical assistance or other know-how of or used by Seller in the conduct of the Business; or

(j)     material agreement, contract or commitment relating to the Business not made in the ordinary course of business.

With respect to each of the agreements, contracts, commitments, leases, plans and other instruments, documents and undertakings listed on Schedule 3.17 (the "**Assumed Contracts**"), (i) each such Assumed Contract is valid and enforceable in accordance with its terms, (ii) Seller is, and to the knowledge of Seller all other parties thereto are, in compliance with the provisions thereof, (iii) Seller is not, and to the knowledge of Seller no other party thereto is, in default in the performance, observance or fulfillment of any obligation, covenant or condition contained therein; and (iv) no event has occurred which with or without the giving of notice or lapse of time, or both, would constitute a default thereunder.  Seller has provided Buyer with correct and complete copies of all such agreements, contracts, commitments, leases, plans and other instruments, documents and undertakings listed on Schedule 3.17.  Except as set forth on Schedule 3.17, no written or oral agreement, contract or commitment described therein requires the consent of any party to its assignment in connection with the transactions contemplated hereby.  Schedule 3.17A identifies the Assumed Contracts that either do not require consent to assignment or where consent to assignment has been procured prior to Closing.  Schedule 3.17B identifies those Assumed Contracts where consent to assignment will be obtained by Seller post Closing.  Schedule 3.17C identifies those Assumed Contracts where no consent to assignment will be procured and where the failure to get an assignment is Buyer's risk and no indemnity obligations attach.

3.18  **Inventory**.  Except as specifically reflected in the Financial Statements, and subject to the reserves reflected thereon as of the date hereof, the items of inventory included in the Assets are merchantable and fit for the purpose for which they were procured or manufactured and are valued at lower of cost or market, and are not obsolete, damaged or defective, in each case within the meanings assigned to such terms under U.S. GAAP.

3.19  **Receivables**.  The accounts receivable included in the Assets represent valid obligations arising from sales actually made or services actually performed by Seller in the normal and ordinary course of business, which are current and collectible, consistent with Seller's historical practices with respect to the timing of collection subject to only an allowance for bad and doubtful receivables specifically reflected on the Most Recent Balance Sheet.  There is no contest, claim or right of set-off that has, prior to the date hereof, been asserted by any debtor of an accounts receivable relating to the amount or validity of any such accounts receivable.

**3.20  Personal Property**.  Schedule 3.20 contains accurate lists and summary descriptions of all computer hardware, equipment and furniture and fixtures of Seller included in the Assets as of the date of the Most Recent Balance Sheet.

**3.21  Intellectual Property Matters**.

(a)  All Necessary Rights; Absence of Actions and Judgments.  Seller owns and has good and, except as set forth on Schedule 3.21(a), exclusive title, or has a valid, subsisting and enforceable license (sufficient for the conduct of Business) to (i) all United States, international and foreign patents and applications therefor and all reissues, divisions, renewals, extensions, provisionals, continuations and continuations-in-part thereof; (ii) all inventions (whether patentable or not), invention disclosures, improvements, trade secrets, proprietary information, know how, technology, technical data and customer lists, and all documentation relating to any of the foregoing; (iii) all copyrights, copyright registrations and applications therefor, and all other rights corresponding thereto throughout the world; (iv) all industrial designs and any registrations and applications therefor throughout the world; (v) all domain names, uniform resource locators ("URLs") and other names and locators associated with the Internet; (vi) all trade names, logos, common law trademarks and service marks, trademark and service mark registrations and applications therefor throughout the world; (vii) all databases and data collections and all rights therein throughout the world; (viii) all (A) computer programs, systems, applications and code, including any and all software implementations of algorithms, models and methodologies and any and all source code, object code, development and design tools, applets, compilers and assemblers, (B) databases and compilations, including any and all data and collections of data, whether machine readable, on paper or otherwise, (C) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, (D) the technology supporting, and the contents and audiovisual displays of any Internet site(s) operated by or on behalf of Seller, and (E) all documentation, other works of authorship and media, including user manuals and training materials, relating to or embodying any of the foregoing or on which any of the foregoing is recorded (this subpart (viii) collectively, the "**Software**"); and (ix) any similar or equivalent rights to any of the foregoing anywhere in the world, in each case that is either owned by Seller or that is Used in or necessary for the conduct of the Business (collectively, the "**Seller Intellectual Property**").  For purposes of this Agreement, "**Use**" or "**Used**" means to use, make, have made, develop, market, sell, offer to sell, import, transfer, practice, license (or sublicense), transmit, broadcast, reproduce, perform, display, modify, create derivative works based upon, distribute (electronically or otherwise) and disclose.  Except as set forth in Schedule 3.21(a), there are no proceedings or actions currently before any court, tribunal or equivalent authority anywhere in the world relating to the Seller Intellectual Property owned by the Seller (or, to the knowledge of Seller, any other Seller Intellectual Property) and no Seller Intellectual Property owned by the Seller (or, to the knowledge of Seller, any other Seller Intellectual Property) is subject to any outstanding decree, order, judgment, settlement agreement, injunction, stipulation or decree restricting in any manner the Use, transfer, or licensing thereof by Seller, or which may affect the validity, Use or enforceability thereof.  Seller has the right to bring actions

-16-

for infringement of all Seller Intellectual Property owned by to Seller.

(b)    Itemization of Seller Intellectual Property.  Schedule 3.21(b) sets forth a complete and accurate listing of: (i) all patents, registrations and applications for Seller Intellectual Property that are owned by the Seller, and all common law trademarks included in the Seller Intellectual Property owned by the Seller that are material to the Business; (ii) all licenses, sublicenses, options, covenants not to sue and other contracts by which any options, licenses or other rights with respect to any Seller Intellectual Property are granted by Seller to any person, including any contracts pursuant to which Seller has agreed to any restriction on the right of Seller to Use or enforce any Seller Intellectual Property ("**Outbound Licenses**") and (iii) all licenses, sublicenses, options, covenants not to sue and other contracts pursuant to which Seller is granted any options, licenses or other rights with respect to any Intellectual Property (other than commercially available off-the-shelf software licenses with an acquisition cost of less than $1,000 per copy, seat, CPU, or named user ("**Off-The-Shelf Software**")) ("**Inbound Licenses**"). The Inbound Licenses, the Outbound Licenses and any agreements relating to Off-The-Shelf Software constitute all of the contracts relating to any Seller Intellectual Property, and each of the Inbound Licenses and the Outbound Licenses is in full force and effect and is valid and binding on all parties thereto and enforceable in accordance with its terms.  There exists no event of default or condition that does or will result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default by Seller or, to the knowledge of Seller, any other party under any of the Inbound Licenses and the Outbound Licenses.  All of Seller's Use of Intellectual Property owned by persons other than Seller is in accordance with the terms of the applicable Inbound License or Outbound License.  Except as set forth on Schedule 3.21(b), none of the Outbound Licenses grant any person any exclusive rights to or under any Seller Intellectual Property or any right to sublicense Seller Intellectual Property.  Prior to the Closing Date, Seller has provided Buyer with true and complete copies of all Outbound Licenses and Inbound Licenses.  The rights of Seller in and to the Intellectual Property owned by Seller and the rights granted to Seller pursuant to the Inbound Licenses or with respect to Off-The-Shelf Software constitute all of the Intellectual Property rights used in and/or necessary for the Business.  All Seller Intellectual Property that is registered with a governmental authority is valid and subsisting, all necessary registration, maintenance and renewal fees currently due in connection with such Seller Intellectual Property have been made and all necessary documents, recordations and certificates in connection with such Seller Intellectual Property have been filed with the relevant patent, copyright, trademark or other authorities in the United States or foreign jurisdictions, as the case may be, for the purposes of prosecuting, maintaining or perfecting such Seller Intellectual Property, except where the failure to do so would not be reasonably likely to adversely affect Seller's rights in such Seller Intellectual Property.

(c)    Software.  Schedule 3.21(c) lists all Software (other than Off-The-Shelf Software) that is both Used in and material to the Business, including as embodied in any hardware sold, leased out or otherwise disposed of by Seller (the "**Seller Software**"), and accurately identifies which of such Seller Software is owned by Seller, which is licensed under any form of public source or "open source" license (and discloses the specific type

-17-

of public source or "open source" license), and which is licensed to Seller on a proprietary basis. Except as set forth on Schedule 3.21(c), no source code for any Seller Software owned by Seller has been delivered, licensed, or is subject to any source code escrow obligation by Seller, to any person. Except as set forth on Schedule 3.21(c), none of the Seller Software owned by Seller listed on Schedule 3.21(c) incorporates or is based on or is a derivative work of any third party code that is subject to the terms of, or licensed to Seller pursuant to, any form of public source or "open source" license, such that the public source or "open source" license imposes conditions on the terms and conditions under which such Seller Software may be used or distributed (an "**Open Source Work**"). Except as set forth on Schedule 3.21(c), none of such Seller Software distributed by Seller contains any Open Source Work.   Except as disclosed in Schedule 3.21(c), (a) there is no contractual or other obligation imposed on or undertaken by Seller restricting the right or power of Seller (or after the consummation of the Transaction contemplated by this Agreement, Buyer or any successor thereto) to Use any Seller Software owned by Seller on any terms and conditions Buyer or any successor thereto may choose in its sole discretion and (b) there is no such obligation compelling Seller or Buyer or any successor thereto, to copy, license and/or distribute any Seller Software to any person, whether on fee for service basis, royalty basis or without compensation.

(d)     No Violation; Post Closing Rights.  Except as set forth on Schedule 3.21(d), the execution, delivery and performance of this Agreement and the consummation of the Transaction contemplated by this Agreement (including the assignment or transfer to Buyer by operation of law or otherwise of the contracts to which Seller is a party), will not (i) breach, violate or conflict with, or result in the modification, cancellation, or suspension of any instrument or other contract relating to any Seller Intellectual Property, (ii) cause the forfeiture or termination or give rise to a right of forfeiture or termination of any such Seller Intellectual Property or any of Seller's rights therein or thereto, (iii) in any way impair any existing right of Seller to Use, or to bring any action for the infringement of, any such Seller Intellectual Property, or any portion thereof, or (iv) give rise to any right or acceleration of any, royalties, fees or other payments to any person. Except as set forth on Schedule 3.21(d), immediately following the Closing Date, Buyer will be permitted to exercise all of Seller's rights under all contracts relating to such Seller Intellectual Property to the same extent Seller would have been able to in the absence of the transactions contemplated hereby and Buyer shall have the identical right to Use, transfer, convey or assign such Seller Intellectual Property and any rights with respect thereto as Seller had immediately prior to the execution of this Agreement and the Closing. The execution, delivery or performance of this Agreement and the consummation of the transactions contemplated by this Agreement, will not result in (a) Buyer granting to any person any right or license to or with respect to any Intellectual Property right owned, by or licensed to either of them prior to the Closing Date; (b) Buyer being bound by, or subject to, any non-compete, covenant not to sue, or other restriction on the operation or scope of their respective businesses, or (c) Buyer being obligated to pay any royalties, honoraria, fees or other payments to any person in excess of those payable by Seller prior to the Closing.

(e)    Absence of Payments.  Except as set forth on Schedule 3.21(e), other than pursuant to the Inbound Licenses and any agreements relating to the Off-The-Shelf Software, there are no royalties, honoraria, fees or other payments payable by Seller to any person for the  license (or sublicense) or Use of Seller Intellectual Property.

(f)    Absence of Liens.  Seller owns and has good and, except as set forth on Schedule 3.21(a), exclusive title to all Seller Intellectual Property (other than the Intellectual Property which the Seller is authorized or otherwise permitted to Use pursuant to an Inbound License and any Off-The-Shelf Software) free and clear of any lien or encumbrance, and after the Closing, all such Seller Intellectual Property will be fully transferable, alienable or licensable by Buyer without restriction and without payment of any kind to any person.

(g)    No Infringement.  No Use of any product or service offered or sold by Seller breaches, has violated or conflicted with, or violates or conflicts with any license (or sublicense) or other contract of Seller with any person.  Neither the Seller Intellectual Property nor the Use of the products and services offered or sold by Seller or the conduct of the Business, infringes upon or misappropriates any common law or statutory rights of any person or entity.  To the knowledge of Seller, no person has breached or violated or is breaching or violating any contract with Seller relating to any Seller Intellectual Property, or has infringed or misappropriated or is infringing or misappropriating any Seller Intellectual Property.  Seller has received no notice (whether in the form of invitation to license or otherwise) from any person that any Seller Intellectual Property, the Use of any product or service offered or sold by Seller, or the conduct of the Business, has infringed or misappropriated or does or will infringe or misappropriate any common law or statutory rights of any other person or entity, nor is there any basis for any such assertion.  Except as set forth Schedule 3.21(g), there is no pending or threatened claim, litigation or proceeding contesting or challenging the ownership of or the validity or enforceability of, or Seller's right to Use, any Seller Intellectual Property nor is there any basis for any such claim, litigation or proceeding.

(h)    Proprietary Information.  All current and former officers, employees and consultants and independent contractors of or to Seller who are primarily involved in the development of any material Seller Intellectual Property for or on behalf of Seller, have executed and delivered to and in favor of Seller an agreement regarding the protection and use of all confidential and proprietary information (whether or not Seller's) provided by or on behalf of Seller to, or generated by, such officer, employee or consultant and providing for the assignment to Seller of all Intellectual Property and all rights with respect thereto arising from the services performed for Seller by such persons.  Seller has taken and will continue through the Closing Date to take all commercially reasonable steps necessary, appropriate or desirable to safeguard and maintain the secrecy and confidentiality of, and its proprietary rights in, all of its confidential information and trade secrets, including, without limitation, all unpublished patent applications and provisional patent applications and all patentable inventions for which Seller has not filed a patent application. Seller, its current and former officers, employees, consultants and independent contractors have not disclosed to any third party who is not under a duty of

-19-

confidentiality or who is not entitled to receive such information or materials any confidential information or trade secret of Seller or any confidential information or trade secret of any third party that has been disclosed to Seller pursuant to a nondisclosure obligation.

(i)    Assignment of Inventions.  All current and former officers, employees, consultants and independent contractors of or to Seller involved in the development of any Seller Intellectual Property for or on behalf of Seller or which is incorporated into any product or service offered or sold by Seller, have entered into valid and enforceable written agreements with Seller pursuant to which Seller has obtained complete, unencumbered and unrestricted ownership of, and is the exclusive owner of all such third party's Intellectual Property in such work, material or invention and such third party has not retained any rights with respect thereto.

**3.22    Environmental Matters**.  Seller has owned the Assets and the Business in compliance with all applicable federal, state, foreign and local laws and regulations relating to pollution or protection of the environment, including regulations relating to emissions, discharges, releases or threatened releases of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or wastes into the environment (including without limitation ambient air, surface water, groundwater, or land), or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, or handling of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or wastes.

**3.23    Real Property**.  Except as set forth on Schedule 3.23, no real property, whether owned or leased, is included in the Assets and all rights of Seller in and to any real property included in the Assets and not owned by Seller are pursuant to written agreements included in the Assumed Contracts set forth on Schedule 3.17.

**3.24    Product and Service Warranties**.  Except as set forth on Schedule 3.24 or as reflected in specific reserves on the Financial Statements, (i) there are no outstanding enforceable warranties, express or implied, written or oral, with respect to any products or services of Seller; (ii) there are no pending or, to Seller's knowledge, threatened claims with respect to any such warranty, and Seller has no liability with respect to any such warranty, whether known or unknown, absolute, accrued, contingent or otherwise and whether due or to become due; and (iii) there are no product or service liability claims (whether arising for breach of warranty or contract, or for negligence or other tort, or under any statute) against or involving Seller or any product or service of Seller, and no such claims have been settled, adjudicated or otherwise disposed of since June 30, 2007.

**3.25    Suppliers**.  Schedule 3.25 contains a correct and complete list of the names and addresses of all suppliers supplying goods or services in excess of $5000 per annum of or to the Business, including any licensor of any Intellectual Property.

**3.26    Availability of Documents**.  Seller has made available to Buyer copies of all material documents, including without limitation all agreements, contracts, commitments, insurance policies, leases, plans, instruments, undertakings, authorizations, permits, licenses and

Intellectual Property listed in the Disclosure Schedules hereto or referred to herein.  Such copies are true, correct and complete and include all amendments, supplements and modifications thereto or waivers currently in effect thereunder.

**3.27  Restrictions**.  Seller is not a party to any indenture, agreement, contract, commitment, lease, plan, license, permit, authorization or other instrument, document or understanding, oral or written, or subject to any charter or other corporate restriction or any judgment, order, writ, injunction, decree or award which materially adversely affects or materially restricts the business, operations, assets, properties, or condition (financial or otherwise) of the Business after or would prohibit or materially restrict consummation of the Transactions contemplated hereby.

**3.28  Ability to Pay Debts**.  Upon Closing, Seller will have sufficient assets to pay the debts and liabilities of the Business that are not assumed by Buyer.  Seller covenants to pay all debts and liabilities as they come due in accordance with the terms applicable to such debts and liabilities.

**3.29  Brokers' Fees**.  Except as set forth on Schedule 3.29, Seller has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement..

**3.30  Fair Value**.  The Purchase Price was agreed upon by the parties based upon arm's length negotiations and represents the fair value of the Assets.  The Board of Directors of Seller has unanimously agreed that the consideration payable by the Buyer pursuant to this Agreement represents the fair market value of such Assets.

**3.31  Government Contracts.**

(i)     For purposes of this Agreement, (A) "Government Contract" means any Prime Contract and any subcontract between Seller and a prime contractor or higher-tier subcontractor under a Prime Contract; and (B) "Prime Contract" means any prime contract between Seller and any Governmental Entity during the past six years.

(ii)     Schedule 3.31 constitutes a complete and accurate list of all the Government Contracts.  Seller has made available to Buyer (A) true and complete copies of all of Seller's Government Contracts; and (B) true and complete copies of all quotations, bids and proposals associated with Seller's Government Contracts and all pending all quotations, bids and proposals for Government Contracts to be awarded in the future.

(iii)     All of Seller's Government Contracts were legally awarded, are binding on the parties thereto, and are in full force and effect.  Such Government Contracts (or, where applicable, the Prime Contracts under which such Government Contracts were awarded) are not currently the subject of bid or award protest proceedings, and such Government Contracts (or, where applicable, the Prime Contracts under which such Government Contracts were awarded) are not reasonably likely to become the subject of bid or award protest proceedings.

(iv)     Seller has complied in all material respects with all statutory and regulatory requirements, where and as applicable to each of Seller's Government Contracts and each of Seller's quotations, bids and proposals for the Seller's Government Contracts, including but not limited to the Federal Acquisition Regulation ("FAR"), and the General Services Administration Acquisition Manual,; there are no actual or alleged violations or breaches of any statute, regulation, representation, certification, disclosure obligation, or contract term with respect thereto.

(v)     All facts set forth in or acknowledged by any representations or certifications made or submitted by Seller in connection with each of Seller's Government Contracts and each of Seller's quotations, bids and proposals for the Seller's Government Contracts were current, accurate and complete in all material respects as of the date of submission.

(vi)     No facts exist which could give rise to a claim for price adjustment under the False Claims Act, the Truth in Negotiations Act or to any other request for a reduction in the price of any of Seller's Government Contracts or any of Seller's quotations, bids and proposals for the Seller's Government Contracts .

(vii)     (A) Seller has received no show cause, cure, deficiency, default or similar notice relating to any of Seller's Government Contracts, (B) none of Seller's Government Contracts has been terminated for default, (C) no facts exist that are reasonably likely to give rise to a termination for default of or to a claim for a price adjustment under any of Seller's Government Contracts; (D) Seller has received no notice, written or otherwise, terminating any of Seller's Government Contracts for convenience or indicating an intent to terminate any of Seller's Government Contracts for convenience; (E) there are no material outstanding claims or disputes relating to Seller's Government Contracts, and there exist no facts or allegations that could give rise to such a claim or dispute in the future; (E) neither Seller nor any of the Employees has not been and is not now suspended debarred, or proposed for suspension or debarment from government contracting, and no facts exist that could cause or give rise to such suspension or debarment; (F) Seller has not undergone and is not undergoing any audit, review, investigation, or examination of records relating to Seller's Government Contracts; (G) there are no material adverse or negative past performance evaluations or ratings in connection with Seller's Government Contracts; and (H) there has been no negative determination of responsibility issues against Seller in connection with Seller's Government Contracts.

(viii)     Neither any Governmental Entity nor any prime contractor or higher-tier subcontractor under any of the Seller's Government Contracts has questioned or disallowed any costs in excess of $5000 in the aggregate claimed by the Company under the Seller's Government Contracts.  There is no fact or occurrence that could be a basis for disallowing any such costs.

(ix)     Schedule 3.31 lists all government property that has been provided to the Seller pursuant to the Seller's Government Contracts.

(x)     Seller has complied in all material respects with all applicable requirements under each of the Seller's Government Contracts relating to the safeguarding of

and access to classified information, no facts currently exist which are reasonably likely to give rise to the revocation of the security clearances of Seller or any Employee.

**3.32  Export Controls.**

(i)     Seller is in compliance with all federal export laws and regulations including, but not limited to, the Arms Export Control Act and its implementing regulations, the International Traffic in Arms Regulations (22 CFR 120-130), the Export Administration Regulations (15 CFR 730-774) and the laws and regulations implemented by the Office of Foreign Assets Control, U.S. Department of the Treasury (31 CFR 500 et. seq) (collectively the "International Trade Laws").

(ii)     In connection with its matters relating to International Trade Laws, there are no adverse or negative past performance evaluations or ratings by the U.S. Government, voluntary disclosures under the export control and trade sanctions laws and regulations, any enforcement actions or threats of enforcement actions, or any facts that could result in any adverse or negative performance evaluation that could affect the evaluation of the Seller's obtaining approval for future export activity.

(iii)     Neither the U.S. Government nor any other person has notified the Seller of any actual or alleged violation or breach of any statute, regulation, representation, certification, disclosure obligation, licensing obligation or other export authorization or provision.

(iv)     Seller has not undergone and is not undergoing any audit, review, inspection, investigation, survey or examination of records relating to Seller's export activity, and there is no basis for any such audit, review, inspection, investigation, survey or examination of records.

(v)     Seller has not been and is not now under any administrative, civil or criminal investigation or indictment involving alleged false statements, false claims or other improprieties relating to the Seller's export activity, nor is there any basis for any such investigation or indictment.

(vi)     Seller has not been and is not now a party to any administrative or civil litigation involving alleged false statements, false claims or other improprieties relating to the Seller's export activity, nor is there any basis for any such proceeding.

**3.33  Disclosure.**  No representation or warranty by Seller in this Agreement contains any untrue statement of a material fact or omits or will omit to state a material fact required to be stated herein or necessary to make any statement herein or therein not misleading provided that as used in this Section 3.33 the term "material fact" must relate "to the Business as a whole" as further defined in Section 7.2(d).

# ARTICLE IV – REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER AND STOCKHOLDERS

**4.1 Names of Stockholders.** The names of the stockholders of Seller (the "Stockholders") are as set forth on Schedule 4.1.

**4.2 Representations, Warranties and Covenants of the Seller and Stockholders.** Seller and each Stockholder individually represents and warrants to the Buyer as follows:

a. The Numerex Stock that may be acquired by Seller and/or such Stockholder from the liquidation, dissolution or other distribution from the Seller will be acquired solely for Seller's/Stockholder's own account for investment purposes and not with a view to or for sale or distribution and without any present intention of selling, offering to sell or otherwise disposing of or distributing Numerex Stock or any portion thereof in any transaction other than a transaction complying with the registration requirements under applicable securities laws and regulations, including federal, state and provincial laws and regulations of the U.S., or pursuant to an exemption therefrom.

b. The Seller has had access to the Buyer's filings with the Securities and Exchange Commission and has utilized such access to the Seller's satisfaction for the purpose of obtaining information or verifying information. The Seller has had an opportunity to ask questions of and receive answers from the Buyer concerning the terms and conditions of this Transaction, and all questions asked by the Seller have been adequately answered to the satisfaction of the Seller.

c. The Seller has adequate net worth and means for providing for the Seller's current financial needs and contingencies, has no need for liquidity of investment with respect to the Numerex Stock that may be acquired and is in a financial position to bear the economic risk of, and withstand a complete loss of any investment being made.

d. The Seller is an "Accredited Investor" as defined in Rule 501 of Regulation D under the Securities Act.

e. The Seller understands that (i) none of the Numerex Stock has been registered under the Securities Act of 1933, as amended (the "**Securities Act**"), (b) and the Numerex Stock is characterized under the Securities Act as "restricted securities" and, therefore, cannot be sold or transferred unless the Numerex Stock is subsequently registered under the Securities Act or an exemption from such registration is available, and (c) the Seller/Stockholders may not be able to liquidate the investment in the event of any emergency or pledge of Numerex Stock as collateral security for loans. The Seller/Stockholders

understand that all certificates evidencing Numerex Stock will bear a legend restricting the transfer thereof.

f.    The Seller and the Stockholders covenant that they will not liquidate or dissolve Seller for a period of three (3) years from the Closing Date or otherwise distribute the shares of NMRX Stock to its Stockholders for a period of one year.

## ARTICLE V – REPRESENTATIONS, WARRANTIES AND COVENANTS OF NUMEREX

Buyer represents and warrants to Seller that the statements contained in this Article V are correct and complete as of the Closing Date (as though made on such date except to the extent that such representations and warranties expressly relate to an earlier date in which case such representations and warranties shall be true and correct on an as of such earlier date).

**5.1  Corporate Power and Authorization**.  Buyer has the power, authority and legal right to execute, deliver and perform the portions of this Agreement and the Related Documents to which it is a party.  The execution, delivery and performance of this Agreement and the Related Documents by Buyer have been duly authorized by all necessary action.  This Agreement has been, and the Related Documents to which Buyer will be a party will be, duly executed and delivered by Buyer, and this Agreement constitutes, and the Related Documents when executed and delivered will constitute, the legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

**5.2  Noncontravention**.  The execution, delivery and performance by Buyer of this Agreement and the Related Documents to which Numerex will be a party does not and will not violate, conflict with or result in the breach of any term, condition or provision of, or require the consent of any other party to (a) any existing law, ordinance, or governmental rule or regulation to which Buyer is subject, (b) any judgment, order, writ, injunction, decree or award of any court, arbitrator or governmental or regulatory official, body or authority which is applicable to Buyer, (c) the charter documents or bylaws of Buyer, or (d) any material provision of any mortgage, indenture, agreement, contract, commitment, lease, plan or other instrument, document or understanding, oral or written, to which Numerex is a party or by which Buyer is otherwise bound.  Except as aforesaid, no authorization, approval or consent of, and no registration or filing with, any governmental or regulatory official, body or authority is required in connection with the execution, delivery and performance of this Agreement by Buyer.

**5.3  Corporate Existence**.  Buyer is a corporation duly organized and validly existing under the laws of the State of Pennsylvania and has all requisite corporate power to own, lease and operate its properties and to carry on its business as presently conducted.

**5.4  Numerex Stock**.  The Numerex Stock delivered pursuant to the Escrow Agreement shall be duly authorized, validly issued, fully paid and non-assessable.  All shares of Numerex Stock to be issued in connection with the Transaction will be free of Liens created by or through Buyer except as contemplated by this Agreement.

**5.5** <u>Brokers' Fees</u>. Except as set forth on <u>Schedule 5.2</u>, Buyer has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement.

**5.6** <u>Future Sales of Numerex Stock</u>. Subject to its obligations to comply with applicable law, Buyer shall use reasonable commercial efforts to help Seller sell NMRX Stock delivered to Seller under this Agreement in order to facilitate payment of personal tax obligations of Seller's Stockholders related to the Transaction.

**5.7** <u>No Knowledge of Disqualify Events.</u> To Buyer's actual knowledge, no facts exist that would cause Buyer or its officers or directors to be determined not to be a presently responsible Government contractor or subcontractor under FAR 9.104.1

## ARTICLE VI – TRANSFER AFTER THE CLOSING

**6.1** <u>Further Instruments and Actions</u>. From time to time after the Closing Date, upon request of Buyer, Seller, without further consideration, shall reasonably cooperate with Buyer and shall duly execute, acknowledge and deliver all such further deeds, assignments, transfers, and conveyances, and take such other actions and give such assurances as may be reasonably required to convey to and vest in Buyer and to protect its right, title and interest in and enjoyment of the Assets of Seller intended to be assigned, transferred and conveyed pursuant to and as provided in and subject to the provisions of this Agreement and as may be appropriate otherwise to carry out the transactions contemplated by this Agreement. Seller shall promptly pay or deliver to Buyer any amounts, assets or items which may be received by Seller after the Closing which constitute Assets.

## ARTICLE VII – INDEMNIFICATION

**7.1** <u>Survival of Representations and Warranties</u>. All representations and warranties made by the parties in this Agreement or in Related Document in connection with negotiation, execution and performance of this Agreement shall survive the Closing for a period of twelve (12) months except that the representations and warranties identified in Section 7.2(e) shall survive the Closing Date for a period of seven (7) years. Notwithstanding any investigation or audit conducted before or after the Closing Date, each party shall be entitled to rely upon the representations and warranties set forth herein and therein.

**7.2** <u>Indemnification by the Seller</u>. The Seller shall indemnify, defend and hold Buyer, its members, directors, officers, affiliates, successors, assigns and agents (collectively, the **"Buyer Indemnified Parties"**) harmless from, against and in respect of, any and all claims, losses, damages, liabilities, expenses or costs, including reasonable attorneys' fees, costs ("Losses") incurred by any of Buyer Indemnified Parties to the extent related to:

        (a) any breach of any representation, or warranty or non-fulfillment of any covenant of Seller contained in this Agreement, or in any Exhibit, Schedule or ancillary document, including any Related Document, delivered pursuant hereto;

(b)    any Excluded Assets;

(c)    claims or demands from, or relating to, the conduct of the Business prior to the Closing Date including but not limited to claims of creditors of Seller to the extent not assumed by Buyer pursuant to Section 1.5.

(d)    any breach of a representation or warranty of Seller contained in this Agreement to the extent such breach is material to the Business as a whole (defined to mean related to Losses in excess of $250,000 in the aggregate) and Buyer proves the elements of common law fraud in New York related to such breach (exclusive of reliance);

(e)    any breach of the representations and warranties set forth in Section 3.2 (Corporate Power; Authorization; Enforceable Obligations); 3.9 (Tax and Other Returns and Reports); 3.22 (Environmental Matters) 3.24 (Product and Service Warranties); 3.31 (Government Contracts); or 3.32 (Export Controls) and, in the case of Sections 3.31 and 3.32, any Liabilities related to these matters that predate the Closing regardless of whether a representation or warranty is breached; and

(f)    the matters referenced to in <u>Schedule 3.3(1)</u>.

**7.3    <u>Indemnification by the Buyer</u>.**  Buyer shall indemnify, defend and hold Seller, its directors, shareholders, officers, employees, affiliates, successors, assigns and agents (collectively, the **"Seller Indemnified Parties"**) harmless from, against and in respect of, any and all Losses incurred by any of the Seller Indemnified Parties to the extent related to:

(a)    any breach of any representation, warranty or non-fulfillment of any covenant of Buyer or NMRX contained in this Agreement, or in any Exhibit, Schedule or ancillary document delivered pursuant hereto, including any Related Document; or

(b)    any claims or demands arising from, or relating to the conduct of, the Business on or following the Closing Date.

**7.4    <u>Limitation on Indemnity</u>.**

(a)    Except with regard to Section 7.2(g), Seller shall not be required to indemnify any Buyer Indemnified Party:

(i)    unless the aggregate of all Losses for which Seller would, but for this clause (i), be liable thereunder exceeds on a cumulative basis an amount equal to $250,000, and then only to the extent of any such excess; provided, however, that this clause (i) shall not apply to any indemnity obligation arising out of Section 7.2(d), (e) or (f) or indemnity obligations related to Assumed Contracts identified on <u>Schedule 3.17B</u>;

(ii)     in excess of $4 million in the aggregate for indemnity obligations arising out of Section 7.2(a), (b) or (c); provided, however, that this clause (ii) shall not apply to any indemnity obligation arising out of Section 7.2(d), (e) or (f);

(iii)     in the case of indemnity obligations arising out of Section 7.2(d), (e) and (f), limited to the amount of the Purchase Price actually received by Seller in the aggregate (less all prior indemnification payments made pursuant to any subsection of Section 7.2).

(b)     Seller's indemnity obligation limitation of $4 million specified in Section 7.4(ii) above shall be further limited to a recovery by Buyer from Seller of $2 million in cash and $2 million of Numerex Stock. Buyer shall be entitled to first recover cash from Seller and thereafter recover Numerex Stock delivered to Seller.

(c)     For purposes of indemnity recoveries against the NMRX Stock received shall be valued at $10.50 per share regardless of the actual value on the date of settlement of the indemnity obligation.

(d)     Buyer and Seller agree and acknowledge that with respect to indemnity claims under Section 7.2(a), (b) and (c), Buyer will be under no obligation to prove knowledge of Seller, materiality of the breach or reliance by Buyer; provided, however, that this subsection (e) shall not result in "reading out" of the representations and warranties of the Seller subject to Section 7.2(a) any knowledge or materiality qualifiers contained in the text of those representations and warranties.

(e)     Any liability for indemnification hereunder shall be determined without duplication of recovery by reason of the state of facts giving rise to such liability constituting a breach of one or more representations, covenants or agreements.

7.5     **Exclusive Remedy**. Except as otherwise specifically provided in this Agreement or in the Related Documents, Buyer and Seller acknowledge that their (and all Buyer and Seller Indemnified Parties) sole and exclusive remedy after the Closing with respect to any and all claims relating to this Agreement and the Related Documents, the Transaction shall be pursuant to the indemnification provisions set forth in this Article VII.

7.6     **Mitigation.** Buyer, on the one hand, and Seller, on the other hand, shall cooperate with each other with respect to resolving any claim or liability with respect to which one party is obligated to indemnify the other party hereunder, including by using reasonable efforts to mitigate or resolve any such claim or liability. In the event that Buyer, on the one hand, or Seller, on the other hand, shall fail to use reasonable efforts to mitigate or resolve any claim or liability, then notwithstanding anything else to the contrary contained herein, the other party shall not be required to indemnify any person for any Losses that would reasonably be expected to have been avoided if Buyer or Seller, as the case may be, had used such efforts.

7.7     **Notice of Claims**. With respect to any matter as to which any of the Seller Indemnified Parties or the Buyer Indemnified Parties (the "**Indemnified Person**") is entitled to indemnification from any other person or entity (the "**Indemnifying Person**") under this Article VII, the Indemnified Person shall have the right, but not the obligation, to contest, defend or

-28-

litigate, and to retain counsel of its choice in connection with, any claim, action, suit or proceeding by any third party alleged or asserted against the Indemnified Person in respect of, resulting from, relating to or arising out of such matter, and the costs and expenses thereof shall be subject to the indemnification obligations of the Indemnifying Person hereunder; provided, however, that if the Indemnifying Person acknowledges in writing its obligation to indemnify the Indemnified Person in respect of such matter to the fullest extent provided by this Article VII, then an Indemnifying Person shall be entitled, at its option, to assume and control the defense of such claim, action, suit or proceeding at its expense through counsel of its choice if it gives prompt notice of its intention to do so to the Indemnified Person. Neither an Indemnified Person nor an Indemnifying Person shall be entitled to settle or compromise any such claim, action, suit or proceeding without the prior written consent of the other party hereto, which consent shall not be unreasonably withheld or delayed, and for purposes of this provision the "**other party hereto**" shall be: (a) Buyer, for any Indemnified Person or Indemnifying Person who is one of the Seller Indemnified Parties; and (b) Seller, for any Indemnified Person or Indemnifying Person who is one of the Buyer Indemnified Parties.

**7.8**   **Offset Under Escrow Agreement**.   The Buyer may, but shall not be required to, offset any amounts otherwise payable pursuant to the Escrow Agreement against any amounts payable or reimbursable by the Seller to the Buyer under this Agreement, including any indemnifiable damages sustained by any Buyer Indemnified Party.

**7.9**   **Survival.**   This Article VII shall survive the Closing.

## ARTICLE VIII – POST CLOSING MATTERS

**8.1**   **Discharge of Business Obligations**.   From and after the Closing Date, Seller shall pay and discharge, in accordance with past practice but not less than on a timely basis, all obligations and liabilities incurred prior to the Closing Date in respect of the Business, its operations or the assets and properties used therein (except for those expressly assumed by Buyer hereunder), including without limitation any liabilities or obligations to employees, trade creditors and clients of the Business.

**8.2**   **Maintenance of Books and Records**.   Each of Seller and Buyer shall preserve until the seventh anniversary of the Closing Date all records possessed or to be possessed by such party relating to any of the assets, liabilities or business of the Business prior to the Closing Date, except that certain tax records shall be preserved until the statute of limitations for such taxes has passed. After the Closing Date, where there is a legitimate purpose, such party shall provide the other parties with access, upon prior reasonable written request specifying the need therefore, during regular business hours, to (i) the officers and employees of such party and (ii) the books of account and records of such party, but, in each case, only to the extent relating to the assets, liabilities or business of the Business prior to the Closing Date, and the other parties and their representatives shall have the right to make copies of such books and records; provided, however, that the foregoing right of access shall not be exercisable in such a manner as to interfere unreasonably with the normal operations and business of such party; and further, provided, that, as to so much of such information as constitutes trade secrets or confidential business information of such party, the requesting party and its officers, directors and representatives will use due care to not disclose such information except (i) as required by law,

-29-

(ii) with the prior written consent of such party, which consent shall not be unreasonably withheld, or (iii) where such information becomes available to the public generally, or becomes generally known to competitors of such party, through sources other than the requesting party, its affiliates or its officers, directors and representatives. A party may nevertheless destroy such records if such party sends to the other parties written notice of its intent to destroy records, specifying with particularity the contents of the records to be destroyed. Such records may then be destroyed after the 30th day after such notice is given unless another party objects to the destruction in which case the party seeking to destroy the records shall deliver such records to the objecting party.

## ARTICLE IX - MISCELLANEOUS

**9.1    Taxes.** Seller shall pay all federal, state and local income taxes, if any, due as a result of the purchase, sale or transfer of the Assets in accordance herewith and Buyer shall pay any state or local stamp or transfer taxes imposed as a result of the Transaction. Each party shall indemnify, reimburse and hold harmless the other party in respect of the liability for payment of or failure to pay any such taxes or the filing of or failure to file any reports required in connection therewith.

**9.2    Expenses.** Except as otherwise provided in this Agreement, each Party shall pay its own expenses incidental to the preparation of this Agreement, the carrying out of the provisions of this Agreement and the consummation of the transactions contemplated hereby. Buyer shall not assume any liabilities of Seller related to such expenses.

**9.3    Contents of Agreement; Parties in Interest.** This Agreement and the Related Documents set forth the entire understanding of the Parties hereto with respect to the Transactions contemplated hereby. It shall not be amended or modified except by written instrument duly executed by each of the Parties hereto. Any and all previous agreements and understandings between or among the Parties regarding the subject matter hereof, whether written or oral, are superseded by this Agreement.

**9.4    Assignment and Binding Effect.** This Agreement may not be assigned by any Party hereto without the prior written consent of the other party provided, however, that Buyer may assign its rights hereunder to a wholly owned entity subject to the proviso that Buyer remains responsible for the obligations hereunder.

**9.5    Amendments and Waivers.** No amendment or modification of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer and Seller. Any term or provision of this Agreement may be waived at any time by the party entitled to the benefit thereof by a written instrument duly executed by such party. No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

**9.6    Notices.** Any notice, request, demand, waiver, consent, approval or other communication which is required or permitted hereunder shall be in writing and shall be deemed

given only if delivered personally or sent by telegram or by registered or certified mail, postage prepaid, as follows:

if to Buyer, to:
    Numerex Corp.
    1600 Parkwood Circle SE
    Suite 200
    Atlanta, Georgia 30339
    Attention:  Chief Executive Officer
    Fax No.:  (770) 693-5951
    Phone No.: (770) 693-5950

With a required copy to:
    Andrew J. Ryan, Esq.
    Salisbury & Ryan LLP
    1325 Avenue of the Americas
    New York, NY 10019

if to Seller, to:

    Orbit One Communications, Inc.
    2485 Manley Drive
    Bozeman, MT 59715
    Attention:  David Ronsen
    Fax No.: (406) 922-3355
    Phone No.: (406) 922-3333

With a required copy to:

    John D. Schupper, Esq. and
    Anthony Pergola, Esq.
    Lowenstein Sandler PC
    65 Livingston Avenue
    Roseland, NJ 07068

or to such other address as the addressee may have specified in a notice duly given to the sender as provided herein.   Such notice, request, demand, waiver, consent, approval or other communication will be deemed to have been given as of the date so delivered, telegraphed or mailed.

    **9.7    Governing Law; Consent to Jurisdiction**.  This Agreement shall be governed by and interpreted and enforced in accordance with the laws of the State of New York.  The Parties each (a) submit to the jurisdiction of any state or federal court sitting in the Borough of Manhattan in New York, New York in any action or proceeding arising out of or relating to this Agreement, (b) agree that all claims in respect of such action or proceeding may be heard and

-31-

determined in any such court, and (c) agree not to bring any action or proceeding arising out of or relating to this Agreement in any other court. Each of the Parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto.

**9.8 Benefit to Others.** The representations, warranties, covenants and agreements contained in this Agreement are for the sole benefit of the Parties hereto, and their shareholders, heirs, executors, administrators, legal representatives, successors and assigns, and they shall not be construed as conferring any rights on any other persons.

**9.9 Headings, Gender and Person.** All section headings contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement. Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine, or neuter, as the context requires. Any reference to a **"person"** herein shall include an individual, firm, corporation, partnership, trust, governmental authority or body, association, unincorporated organization or any other entity.

**9.10 Schedules and Exhibits.** All Exhibits and Schedules referred to herein are intended to be and hereby are specifically made a part of this Agreement. The Schedules are sometimes referred to collectively as the **"Disclosure Schedules."**

**9.11 Severability.** Any provision of this Agreement that is invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**9.12 Counterparts.** This Agreement may be executed in any number of counterparts and any Party hereto may execute any such counterpart, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. This Agreement shall become binding when one or more counterparts taken together shall have been executed and delivered by the Parties. It shall not be necessary in making proof of this Agreement or any counterpart hereof to produce or account for any of the other counterparts.

**9.13 Definitions.** "Change in Control" means with respect to Buyer (i) any "person" or "group" within the meaning of Sections 13(d) and 14(d)(2) of the Securities Exchange Act of 1934, as amended, and the applicable rules and regulations thereunder other than Gwynedd Resources Ltd. shall become the "beneficial owners(s)" (as defined in said Rule 13d-3) of Numerex Stock on a fully diluted basis, either directly or indirectly, that entitle the holder thereof to control more than fifty percent (50%) of all voting rights with respect to all shares of Numerex Stock of Buyer, (ii) approval by the stockholders of Buyer of and consummation of any merger, reorganization, consolidation, exchange of shares, recapitalization, restructuring or other business combination which results in the holders of Numerex Stock holding less than fifty percent (50%) of all voting rights with respect to the shares of the surviving entity (iii) the sale,

assignment, or other disposition of all or substantially all of the assets of Buyer or (iv) the sale, assignment or other disposition of all or substantially all of the assets of the Satellite Division after the Closing.

"**Material Adverse Effect**" means a material adverse effect (i) on the business, financial condition or results of operations of the Business, or (ii) on the ability of Seller to consummate the Transaction contemplated hereby and by the Related Documents (a "Material Adverse Effect"); provided that, for all purposes of this Agreement, none of the following shall be deemed, either alone or in combination, to constitute, and none of the following shall be taken into account in determining whether there has been or will be, a "Material Adverse Effect"; (A) any change or disruption relating to United States or foreign economies in general and (B) any change in legal or regulatory conditions (including changes in the tax law or interpretation thereof).

"**Permitted Liens**" means (i) such Liens as are set forth in Schedule 1.1 (ii) mechanics', carriers', workmen's, repairmen's or other like Liens arising or incurred in the ordinary course of business, (iii) Liens for Taxes that are not yet due and payable and (iv) in the case of real property, easements, covenants, rights-of-way and other similar restrictions of record that do not effect use and enjoyment of the property or impair marketability.

"**Satellite Division**" shall mean the subsidiary or division of Numerex that conducts the Business after the Closing.

**[Remainder of Page Intentionally Blank; Signature Page Follows]**

EXECUTED as of the date first above written by duly authorized officers of the parties hereto, intending to be legally bound hereby.

BUYER:                              **ORBIT ONE COMMUNICATIONS, LLC**

                                    By: _____
                                    Name: _____
                                    Title: _____


SELLER:                             **ORBIT ONE COMMUNICATIONS, INC.**

                                    By: _____
                                    Name: David Ronsen
                                    Title: President


                                    **NUMEREX CORP., as guarantor of the obligations of Buyer**

                                    By: _____
                                    Name: _____
                                    Title: _____


**STOCKHOLDERS**-solely with regard to Section 2.2(a)(iv) and Section 4(f)

_____
DAVID RONSEN

_____  7-31-2007
SCOTT ROSENZWEIG

_____  7-31-07
GARY NADEN

**EXHIBIT B**

**EARN OUT**

This Exhibit B sets forth the agreement of the Buyer, Seller and NMRX with respect to the Earn Out portion of the Purchase Price payable pursuant to subsections 1.3(a)(iv), (v) and (vi) of the Agreement.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Agreement.

1. Definitions.

The following terms,  as used in this Exhibit B,  shall have the following meanings:

      1.1     "Calculation Period" shall have the meaning set forth in Section 2.1 of this Exhibit B.

      1.2     "Earn Out" shall have the meaning set forth in Section 2.2 of this Exhibit B.

      1.3     "EBITDA" means, for the purposes of this Exhibit B and the calculations made pursuant thereto net income before interest, taxes, depreciation and amortization for the Satellite Division in respect of an applicable Calculation Period, and calculated as provided herein below.

      1.4     "Notice of Disagreement" shall have the meaning set forth in Section 3 of this Exhibit B.

      1.5     "Revenues" means gross third party sales of the Satellite Division in respect of an applicable Calculation Period.  For clarification purposes, "Revenues" shall include any satellite related revenues,  both equipment and services,  sold by any of NMRX's business units, as well as any terrestrial - based revenues initiated by representatives of the Satellite Division.

      1.6     "Statement" shall have the meaning set forth in Section 2.2 of this Exhibit B.

2. Calculation Period; Delivery of Statement; Time and Manner of Payment; Budget.

      2.1     The Earn-Out shall be based upon the financial results of the Satellite Division for three consecutive periods (each a "Calculation Period").    The first Calculation Period shall begin on July 1, 2007 through December 31, 2007, and the second and third Calculation Periods shall be twelve months each and commence on January 1, 2008 and January 1, 2009, respectively. Unless consented to in writing by NMRX and Seller, until the expiration of the third Calculation Period, the Satellite Division shall not conduct any other line of business other than the Business.

2.2    As soon as practicable after completion of the NMRX audit for the applicable Calculation Period (or, in the case of the first Calculation Period, the audit for NMRX's fiscal year ending December 31, 2007) and public release of financial results, NMRX shall prepare and deliver to Seller a statement calculating Revenues, EBITDA and the Earn-Out (the "Statement"). With respect to each Calculation Period, the "Earn-Out" shall equal the sum of the "earnout amount" on the earnout matrix attached hereto for each of the Revenues Target and EBITDA Target, respectively, met for such Calculation Period. In calculating EBITDA, the statement of operations from which Revenues and EBITDA are derived shall be prepared in accordance with U.S. GAAP consistently applied, except as described below.   In addition, and notwithstanding anything herein to the contrary, the following rules will apply when calculating the Satellite Division's Revenues and EBITDA for the purposes of calculation the Earn Out with respect to any Calculation Period:

2.2.a    All satellite related revenues and direct expenses, generated or incurred among NMRX and its subsidiaries will be reflected in the Satellite Division's statement of profits and losses.

2.2.b    Any terrestrial based revenues and attendant direct expenses initiated by representatives of the Satellite Division's will be credited to the Satellite Division.

2.2.c    There will be no intercompany charge for working capital in the ordinary course, but if the Satellite Division's working capital utilization exceeds Division's budget there will be a 10% inter-company charge on such funds.

2.2.d.    EBITDA excludes any adjustment for capitalized internally developed software.

2.2.e    In computing the Satellite Division's EBITDA, there shall be no charge or "burden" for general corporate overhead or other indirect expenses for the first Calculation Period, ending on December 31, 2007. Furthermore, in lieu of an allocation for general corporate overhead or indirect expenses, for the Calculation Periods ended December 31, 2008 and 2009, respectively, the Satellite Division's EBITDA target's for 2008 and 2009 are increased by 8% and 14% respectively and are reflected in the specified EBITDA targets.  Charges incurred by the Satellite Division to attend NMRX corporate functions shall not be included in the computation of the Statement.

2.2.f    In the event the Satellite Division requests and directly utilizes the services of an employee of NMRX (other than those directly employed by the Satellite Division), where at least one half of their time is directed towards the Satellite Division activities, the Satellite Division's annual income statement for earn-out calculation purposes will reflect a charge equal to the pro rata share of such employee's total compensation expense . It is agreed that the foregoing provision is not intended to include charges associated with general corporate overhead including without limitation administrative expenses such as accounting, billing, finance and collections, legal, human resources or corporate management.  Buyer and Seller must agree to the allocation of these charges prior to inclusion in the Statement.

2.2g    For purposes of calculating Revenues and EBITDA for the six month period ending December 2007, the parties agree to calculate the results based on the Seller's results from July 1 to the Closing Date and based on the Revenues and EBITDA of the Satellite Division from the Closing Date to December 31, 2007. Seller's results will exclude any non-recurring expenses.

2.2h    For purposes of measuring the Satellite Division's achievement of Revenue and EBITDA targets, NMRX further agrees that:

Provided that the Satellite Division has then achieved at least 50% of its EBITDA targets (computed as described herein) for 2008 and/or 2009 respectively, Seller will have an option each year (exercisable by written notification to NMRX each year within five (5) days after NMRX delivers to Seller the Satellite Division's preliminary financial results) of extending the applicable calculation period for 2008 and/or 2009 such that the measured period commences on April 1, 2008 and/or April 1, 2009 respectively and is then calculated on a 12 month basis (for both EBITDA and Revenue Calculations). In the event Seller elects to move the twelve month measurement period for 2008 to April, then the correspondence measurement period for 2009 shall automatic commence on April 1, 2009. Failure or inability to exercise in respect of 2008 does not waive or abrogate in any way ability to qualify/exercise this option for 2009.

2.3    Within ten (10) days after the 30-day period referred to in Section 3 of this Exhibit B, if no Notice of Disagreement is provided, or within five (5) days after the date on which the matters raised in the Notice of Disagreement are finally resolved in accordance with the procedures set forth in Section 3 of this Exhibit B, if a Notice of Disagreement is provided, NMRX and Seller shall cause to be released from escrow pursuant to joint instructions sufficient NMRX Shares and/or cash to pay the Earn Out, if any, to Seller in accordance with subsections 1.3(a)(iv), (v) and (vi) of the Agreement.

2.4    As soon as practicable prior to the commencement of the initial Calculation Period and not later than forty-five (45) days prior to the commencement of each subsequent Calculation Period, the Satellite Division shall submit to NMRX a proposed budget for the Satellite Division for the upcoming Calculation Period. NMRX and Seller shall negotiate in good faith to finalize such budget (the "Final Budget") prior to the commencement of the Calculation Period. The Satellite Division shall not, without prior consent of NMRX, which may not be unreasonably withheld, incur liabilities or expenses, including compensation, above the amount budgeted from time to time in the Final Budget.

3. Dispute Resolution.

3.1    During the 30-day period following receipt of the Statement, Seller shall be given access to review the working papers and other detailed underlying material of NMRX relating to the Statement, and to ask questions, receive answers and request such other data and information as shall be reasonable under the circumstances. The Statement shall become final and binding upon, and deemed to have been accepted in full by, Seller on the 30th day following delivery thereof, unless either (a) NMRX shall not

have complied with Seller requests pursuant to the prior sentence not more than five (5) business days after any such request is made or (b) Seller gives written notice of its disagreement with the Statement ("Notice of Disagreement") to NMRX prior to such date. A Notice of Disagreement shall specify in reasonable detail the nature of any disagreement so asserted.

3.2     During the 15-day period following the delivery of the Notice of Disagreement that complies with the preceding paragraph or such longer period as Seller and NMRX shall agree, Seller and NMRX shall seek in good faith to resolve any differences that they may have with respect to the matters specified in the Notice of Disagreement. If, at the end of such 15-day period (or such longer period as agreed between Seller and NMRX), Seller and NMRX have not resolved such differences, Seller and NMRX shall submit the disagreement for resolution to an independent accounting firm which may be Habif, Arogeti & Wayne (the "Arbiter") for review and resolution of any and all matters that remain in disagreement and that were properly included in the Notice of Disagreement.  The Arbiter shall be a mutually acceptable nationally recognized independent public accounting firm agreed upon by Seller and NMRX or, provided that such firm may, but need not be, one of the so-called "Big Four" national public accounting firms.  Seller and NMRX shall use reasonable efforts to cause the Arbiter to render a decision resolving the matters in disagreement within thirty (30) days following the submission of such matters to the Arbiter or such longer period as Seller and NMRX shall agree.  The Arbiter shall determine, based solely on presentations by Seller and NMRX and their respective representatives, and not by independent review, only those issues in disagreement specifically and properly set forth in the Notice of Disagreement and shall render a written report as to the disagreement and the resulting calculation of Revenues or EBITDA.  In resolving any disagreed upon item, the Arbiter: (i) shall be bound by the principles set forth in this Exhibit B and (ii) shall limit its review to matters specifically and properly set forth in the Notice of Disagreement.  The Arbiter shall notify NMRX and Seller of its determination, which determination shall be final and binding on the parties and shall be the sole and exclusive remedy of Seller solely regarding the computation of Revenues and EBITDA.

3.3     The fees, costs and expenses of the Arbiter (i) shall be borne by Seller in the proportion that the aggregate dollar amount of the disagreed upon items so submitted that are unsuccessfully disagreed upon by Seller (as finally determined by the Arbiter) bears to the aggregate dollar amount of such items so submitted and (ii) shall be borne by NMRX as to the balance.

4.  Conduct of Business.

4.1     Within 60 days of closing the parties agree to establish quarterly budgets for the full earnout period.  NMRX agrees that all post-Closing transactions between NMRX's Affiliates and Seller shall be conducted on terms equally favorable to NMRX or its Affiliates compared with the terms and conditions upon which NMRX or its Affiliates conduct business with independent third parties.  Commencing at the beginning of the end of the first quarter 2008, in the event the Satellite Division misses the agreed EBITDA targets by 25% or more in two (2) consecutive quarters (the first measurement

periods are fourth quarter of 2007 and first quarter 2008), NMRX will be entitled to unilaterally implement budgetary changes to restore the Satellite Division's profitability in accordance with the Business Plan.

5. Earnout Matrix.

5.1    The attached Earnout Matrix sets forth the agreed financial goals for the purposes of the Agreement and this Exhibit B.

EXHIBIT B

ORBIT ONE

Numerex - Strictly Confidential

Bonus Paid In

**EARNOUT MATRIX - July to Dec. 2007 (000's)**

| | | Percent of Target | | | | | | Shares / Bonus Pool 1 125% | Cash / Bonus Pool 2 150% |
|---|---|---|---|---|---|---|---|---|---|
| | | 60% | 70% | 80% | 90% | 95% | 100% | | |
| Revenue Target at 100% | $6,000 | | | | | | | | |
| Payout Shares | | 50% | 60% | 70% | 80% | 90% | 100% | | |
| Earnout in shares | 91,667 | 45,833 | 55,000 | 64,167 | 73,333 | 82,500 | 91,667 | 19,643 | $125,000 |
| EBITDA Target at 100% - (half year) | $1,625 | | | | | | | | |
| Payout Shares | | 50% | 60% | 70% | 80% | 90% | 100% | | |
| Earnout in shares | 275,000 | 137,500 | 165,000 | 192,500 | 220,000 | 247,500 | 275,000 | 58,928 | $375,000 |

**EARNOUT MATRIX - 2008 (000's)**

| | | Percent of Target | | | | | | 125% | 150% |
|---|---|---|---|---|---|---|---|---|---|
| | | 60% | 70% | 80% | 90% | 95% | 100% | | |
| Revenue Target at 100% | $15,571 | | | | | | | | |
| Payout % | | 50% | 60% | 70% | 80% | 90% | 100% | | |
| Earnout in shares | 91,667 | 45,833 | 55,000 | 64,167 | 73,333 | 82,500 | 91,667 | 49,107 | $250,000 |
| EBITDA Target at 100% | $4,590 | | | | | | | | |
| Payout % | | 50% | 60% | 70% | 80% | 90% | 100% | | |
| Earnout in shares | 275,000 | 137,500 | 165,000 | 192,500 | 220,000 | 247,500 | 275,000 | 147,322 | $750,000 |

**EARNOUT MATRIX - 2009 (000's)**

| | | Percent of Target | | | | | | 125% | 150% |
|---|---|---|---|---|---|---|---|---|---|
| | | 60% | 70% | 80% | 90% | 95% | 100% | | |
| Revenue Target at 100% | $21,726 | | | | | | | | |
| Payout % | | 50% | 60% | 70% | 80% | 90% | 100% | | |
| Earnout in shares | 91,667 | 45,833 | 55,000 | 64,167 | 73,333 | 82,500 | 91,667 | 49,107 | $250,000 |
| EBITDA Target at 100% | $5,985 | | | | | | | | |
| Payout % | | 50% | 60% | 70% | 80% | 90% | 100% | | |
| Earnout in shares | 275,001 | 137,500 | 165,000 | 192,501 | 220,001 | 247,501 | 275,001 | 147,322 | $750,000 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Total Shares | 1,100,000 | | | | | | | 471,428 | 2,500,000 |

Notes:
Some figures subject to rounding.
Payouts earned when threshold achieved., e.g. if actual EBITDA equals 77%, then payout equals the 60% threshold.

EXHIBIT B1

Bonus Tranche #1 - 471,429 NMRX Shares

Calculation of Trailing EBITDA

| | | Measurement Period | 100% | 125% |
|------|----|---------------------|------|------|
| 2007 | Q3 | Six Months Trailing | 1.63 | 2.03 |
| | Q4 | Nine Months Trailing | 2.50 | 3.13 |
| 2008 | Q1 | Twelve Months Trailing | 3.75 | 4.69 |
| | Q2 | Twelve Months Trailing | 4.00 | 5.00 |
| | Q3 | Twelve Months Trailing | 4.25 | 5.31 |
| | Q4 | Twelve Months Trailing | 4.50 | 5.63 |
| 2009 | Q1 | Twelve Months Trailing | 4.75 | 5.94 |
| | Q2 | Twelve Months Trailing | 5.00 | 6.25 |
| | Q3 | Twelve Months Trailing | 5.25 | 6.56 |
| | Q4 | Twelve Months Trailing | | |

Determination of Shares Subject to Acceleration

In the event NMRX is acquired by a third party, and the deal is announced in the quarter noted in schedule OOCI would be entitled to acceleration of shares available in the bonus tranche (see schedule), or otherwise would be subject to meeting performance hurdles in the relevant period to receive shares in this bonus tranche

| Quarter of Transaction Announcement | Threshold to Achieve for Acceleration |
|--------------------------------------|----------------------------------------|
| Q3 2007 | No acceleration available |
| Q4 2007 | No acceleration available |
| Q1 2008 | If OOCI's EBITDA in the preceding 2 quarters exceeds $2.03 million. |
| Q2 2008 | If OOCI's EBITDA in the preceding 3 quarters exceeds $3.13 million |
| Q3 2008 | If OOCI's EBITDA in the preceding 4 quarters exceeds $4.69 million |
| Q4 2008 | If OOCI's EBITDA in the preceding 4 quarters exceeds $5.0 million |
| Q1 2009 | If OOCI's EBITDA in the preceding 4 quarters exceeds $5.31 million |
| Q2 2009 | If OOCI's EBITDA in the preceding 4 quarters exceeds $5.63 million |
| Q3 2009 | If OOCI's EBITDA in the preceding 4 quarters exceeds $5.94 million |
| Q4 2009 | If OOCI's EBITDA in the preceding 4 quarters exceeds $6.25 million |

Note:

If NMRX were to be acquired, OOCI would be entitled to receive all unearned shares of the first bonus tranche so long as OOCI's trailing 12 month EBITDA as measured the from quarter and preceding the deal announcement exceeds the threshold above for the corresponding qtr. With the following proviso any customer contract in place as of the measurement date which includes unused messages, such unused messages would be recognized for income purposes assuming the unused minutes were consumed ratably over the contract life

# EXHIBIT 11 - continued

Exhibit 2

<u>**EXHIBIT D**</u>

<u>**SEVERANCE AND NON-COMPETITION AGREEMENT**</u>

This Agreement is entered into effective as of the 31 day of June 2007 (the "Effective Date"), between **NUMEREX CORP.** ("NMRX") and **DAVID RONSEN**, a resident of Montana ("Mr. Ronsen").

WHEREAS, Orbit One Communications LLC ("Orbit One") and NMRX have entered into an Asset Purchase Agreement, dated the date hereof (the "Asset Purchase Agreement"), providing for the purchase by Orbit One of substantially all of the assets of Orbit One Communications, Inc. ("OOC, Inc.");

WHEREAS, NMRX is hiring Mr. Ronsen, under the terms and conditions of employment set forth below;

WHEREAS, the parties wish to document their understanding in the event that Mr. Ronsen is separated from NMRX.

THEREFORE, for and in consideration of the mutual promises and obligations set forth herein, the parties agree as follows:

1.     <u>Terms of Employment</u>.

    (a)     During the term of this Agreement, Mr. Ronsen shall serve on a full-time basis as President of NMRX's Orbit One division (the "Division"), with such powers and responsibilities as are customarily incident to such position and will diligently and competently perform such reasonable duties in connection with the Division's business as may be assigned to him by NMRX's Chief Executive Officer. Mr. Ronsen will report to NMRX's Chief Executive Officer, and, from time to time as reasonably required by the business needs of the Division, to such other members of NMRX's senior management team as NMRX's Chief Executive Officer directs. Notwithstanding Mr. Ronsen's full-time service commitment to the Division, Mr. Ronsen may, from time to time, devote business time and attention to his "Bridger Fire" business; provided however, that Mr. Ronsen is not permitted to devote more than two work days per month to "Bridger Fire."

    (b)     During the term of this Agreement, NMRX shall pay Mr. Ronsen an annual base salary ("Base Salary") (less appropriate withholding and deductions, as required by income tax, FICA and other applicable law) for all services to be rendered by Mr. Ronsen in the amount of $235,000, payable semi-monthly in accordance with NMRX's customary payroll practice. The Base Salary may be increased from time to time by NMRX pursuant to NMRX's normal performance review policies for management.

    (c)     In addition to the Base Salary, Mr. Ronsen shall receive those fringe benefits normally available to full-time management employees of NMRX in accordance with NMRX's established policies. Mr. Ronsen shall be credited with his prior service to OOC, Inc. for all benefit plans and arrangements which measure eligibility or benefits by length of service.

(d)    During the term of this Agreement, Mr. Ronsen will be eligible to receive an annual cash bonus of up to 40% of Base Salary upon the achievement of NMRX company-wide EBITDA and revenue objective determined by NMRX's board of directors (or compensation committee thereof) annually under NMRX's executive bonus plan. In addition, during the term of this Agreement, Mr. Ronsen shall be eligible to receive an annual bonus in the targeted amount of $50,000 based on his "Management Business Objectives (MBOs)" as determined annually by NMRX's Chief Executive Officer based on financial goals set by NMRX's board of directors (or compensation committee thereof).

(e)    During the term of this Agreement, Mr. Ronsen shall be entitled paid vacation and personal days for each full calendar year in accordance with NMRX's established policies for full time management employees. Mr. Ronsen shall also be entitled to all paid holidays given by NMRX to its management employees.

(f)    During the term of this Agreement, Mr. Ronsen shall be entitled to receive reimbursement for all reasonable expenses incurred by him (in accordance with the policies and procedures established from time to time by NMRX) in performing services hereunder, provided that Mr. Ronsen properly accounts therefor in accordance with NMRX policy.

(g)    Mr. Ronsen's employment relationship with NMRX is at-will. At either Mr. Ronsen's option or NMRX 's option, Mr. Ronsen's employment hereunder may be terminated at any time, with or without cause or notice, subject to the payment terms provided in this Agreement.

2.    For Cause Termination.

(a)    In the event of termination by NMRX of Mr. Ronsen for Cause under Sections 2(a)(i), (ii) or (iii) (as defined below), NMRX shall have no further obligations to Mr. Ronsen under this Agreement (but shall continue to have and fulfill its obligations to OOC, Inc. under the Asset Purchase Agreement) from and after such date of termination, except for amounts earned but unpaid prior to such termination and unreimbursed expenses, which shall be paid promptly. For purposes of this Agreement, a termination of employment is for "Cause" if: (i) Mr. Ronsen has been convicted of a felony; (ii) Mr. Ronsen materially breaches his obligations to NMRX under this Agreement, which breach continues for a period of thirty (30) days after written notice of demand to cure has been delivered to Mr. Ronsen, or is habitually and grossly negligent in the performance of his duties hereunder; (iii) Mr. Ronsen fails substantially to follow or perform the lawful and reasonable directives of NMRX's Chief Executive Officer, which failure continues for a period of at least thirty (30) days after written notice of demand to cure has been delivered to Mr. Ronsen; (iv) commencing with the quarter ending June 2008, the Division fails to attain 65% of the Revenue Target or 50% of the EBITDA Target on a trailing twelve month basis measured quarterly as set forth on the Schedule A attached hereto and incorporated by reference herein, provided that any such termination must occur within sixty (60) days of such determination; or (v) if Mr. Ronsen is deceased.

(b)    In the event of termination of Mr. Ronsen by NMRX for Cause under Section 2(a)(iv) or 2(a)(v), NMRX shall pay Mr. Ronsen (or to his estate, as applicable) six (6) months salary as severance provided Mr. Ronsen (or his estate, as applicable) executes NMRX's standard

release agreement, the form of which shall be reasonably acceptable to Mr. Ronsen, which shall provide for the release of NMRX, and its affiliates, officers, directors, etc. from any legal claims Mr. Ronsen may have, including but not limited to claims for disputed wages or bonuses, wrongful discharge and discrimination, but excluding any claims related to his status as a shareholder of NMRX or OOC, Inc. Such severance shall be paid to Mr. Ronsen in six (6) equal, semi-monthly installments less applicable withholding, in accordance with NMRX's payroll practices.

(c)    In the event of a termination by NMRX of Mr. Ronsen for Cause, NMRX shall have the right notwithstanding anything to the contrary in Section 1.6 of the Asset Purchase Agreement, to manage the Division without regard to the Business Plan, so long as it does so in a commercially reasonable manner consistent with the exercise of good business judgment.

(d)    The Non-Competition Period (as defined in Section 5) for termination by NMRX for Cause under subsections (a)(i), (ii) or (iii) above shall end on the later to occur of (A) two (2) years following termination or (B) December 31, 2010.   The Non-Competition Period (as defined in Section 5) for termination by NMRX for Cause under subsection (a)(iv) above shall end on the later to occur of (A) one (1) years following termination or (B) December 31, 2010.

(e)    In the event of a termination by NMRX of Mr. Ronsen for Cause pursuant to subsections (a)(iv) or (iv) above, NMRX shall continue to provide Mr. Ronsen (or, in the case of a termination on account of his death, his spouse or heirs, as applicable) with health and welfare benefits throughout the Non-Competition Period.

3.    <u>Termination Without Cause or For Good Reason.</u>

(a)    For purposes of this Agreement, "Good Reason" shall mean: (i) a material breach by NMRX of any of its obligations to Mr. Ronsen under this Agreement, which breach is not cured in all material respects within thirty (30) days (except in the case of a payment default for which the cure period shall be ten (10) days), in each case following written notice thereof from Mr. Ronsen to NMRX; or (ii) a material reduction of Mr. Ronsen's duties, authority or responsibilities such that (regardless of title) he no longer has the customary duties and authority of the president of the Division (including, without limitation, authority to spend the Division's operational budget and determine the direction of the Division's business within the confines of the Division's operational budget pursuant to NMRX's procesees and policies.

(b)    In the event of termination of Mr. Ronsen by NMRX without Cause or by Mr. Ronsen for Good Reason, NMRX shall pay Mr. Ronsen six (6) months salary as severance provided Mr. Ronsen executes NMRX's standard release agreement, , the form of which shall be reasonably acceptable to Mr. Ronsen, which shall provide for the release of NMRX, and its affiliates, officers, directors, etc. from any legal claims Mr. Ronsen may have, including but not limited to claims for disputed wages or bonuses, wrongful discharge and discrimination, but excluding any claims related to his status as a shareholder of NMRX or OOC, Inc.   Such severance shall be paid to Mr. Ronsen in twelve (12) equal semi-monthly installments less applicable withholding, in accordance with NMRX's payroll practices.   Companies shall also promptly pay Mr. Ronsen amounts earned but unpaid prior to such termination and unreimbursed expenses.

3

(c)     In addition to the compensation specified in (b) above, in the event of the termination of Mr. Ronsen by NMRX without Cause or by Mr. Ronsen for Good Reason, OOC, Inc. shall be deemed to have earned the NMRX Stock referenced in Section 1.3(a)(iv) and 1.3(a)(v) of the Asset Purchase Agreement as well as the cash consideration specified in Section 1.3(a)(vi) of the Asset Purchase Agreement and such NMRX Stock and cash will be distributed to OOC, Inc. on the measurement dates specified in the Asset Purchase Agreement (without any conditions other than the passage of time).

(d)     In the event that NMRX relocates the Division's headquarters away from OOC, Inc.'s present location in Bozeman, Montana, prior to December 31, 2009, or Mr. Ronsen is required to relocate from Bozeman, Montana such action shall constitute termination without Cause and Mr. Ronsen may elect to terminate employment for such reason and such reason shall be deemed to constitute a termination by NMRX without Cause.

(e)     The Non-Competition Period (as defined in Section 5) for termination by NMRX without Cause or by Mr. Ronsen for Good Reason shall be six (6) months.

(f)     In the event of a termination by NMRX of Mr. Ronsen without Cause, NMRX shall continue to provide Mr. Ronsen with health and welfare benefits throughout the Non-Competition Period.

4.     <u>Termination Not For Good Reason.</u>

(a)     In the event of a termination by Mr. Ronsen other than for Good Reason, NMRX shall have the right notwithstanding anything to the contrary in Section 1.6 of the Asset Purchase Agreement, to manage the Division without regard to the Business Plan, so long as it does so in a commercially reasonable manner consistent with the exercise of good business judgment.

(b)     In the event of a termination by Mr. Ronsen other than for Good Reason, the Non-Competition Period (as defined in Section 5) shall end on the later to occur of (A) one (1) years following termination or (B) December 31, 2010.

(c)     In the event of a termination by Mr. Ronsen other than for Good Reason, NMRX shall continue to provide Mr. Ronsen with health and welfare benefits throughout the Non-Competition Period.

5.     <u>Non-Competition.</u>

(a)     Mr. Ronsen hereby agrees that, during the term of his employment by NMRX and following the termination of his employment with NMRX, for the duration of the "Non Competition Period" he will not, directly or indirectly, in any way, whether as principal or as director, officer, employee, consultant, agent, partner or stockholder to another entity (other than by the ownership of a passive investment interest of not more than 5% in a company with publicly traded equity securities): (i) own, manage, operate, control, be employed by, participate in, or be connected in any manner with the ownership, management, operation or control of any business in which NMRX (or any affiliate or subsidiary of NMRX) was engaged during the one year immediately preceding such termination; (ii) for himself or another, interfere with, solicit or

attempt to entice away from NMRX (or any affiliate or subsidiary of NMRX) (x) any contract, agreement or arrangement that NMRX (or any affiliate or subsidiary of NMRX) has entered into prior to Mr. Ronsen's termination, and all extensions, renewals and re-solicitations of any such contract, agreement or arrangement, or (y) any contract, agreement, arrangement or current or prospective customer that NMRX (or any affiliate or subsidiary of NMRX) is actively negotiating with any other party at the time of Mr. Ronsen's termination, provided that Mr. Ronsen knew of such negotiation at the time of termination of employment; (iii) for himself or another, hire, attempt to hire, or assist in or facilitate in any way the hiring of any employee of NMRX (or any affiliate or subsidiary of NMRX), or any employee of any person, firm or other entity, the employees of which NMRX (or any affiliate or subsidiary NMRX) has agreed not to hire or endeavor to hire; or (iv) for himself or for another, solicit or attempt to entice away from NMRX (or any affiliate or subsidiary of NMRX) any customer or joint venture partner.

(b)    Because of Mr. Ronsen's knowledge of NMRX's business, in the event of Mr. Ronsen's actual or threatened breach of the provisions of this Section 5, NMRX may be entitled to, and Mr. Ronsen hereby consents to, an injunction restraining Mr. Ronsen from any of the foregoing, without limitation of any other remedy that may be available to NMRX at law or in equity. Mr. Ronsen agrees that the provisions of this Section 5 are necessary and reasonable to protect NMRX in the conduct of their business. If any restriction contained in this Section 5 shall be deemed to be invalid or unenforceable by reason of the extent, duration of geographic scope thereof, then, as applicable, the extent, duration, and geographic scope of such restriction shall be reduced to the maximum extent, duration and geographic scope permitted by applicable law.

(c)    In the event that a court of competent jurisdiction has determined after specific adjudication of the matter of Mr. Ronsen's breach, that Mr. Ronsen has materially breached the provisions of this Section 5, then as liquidated damages and not as a penalty, OOC, Inc. shall forfeit the right to receive the NMRX Stock referenced in Sections 1.3(a)(iv) and 1.3(a)(v) of the Asset Purchase Agreement as well as the cash consideration specified in Section 1.3(a)(vi) of the Asset Purchase Agreement. The parties hereby agree that the liquidated damage specified herein are a reasonable measure of damages that OOC would suffer as a result of a breach of this Section 5.

6.    Headings. Section headings are not to be considered a part of this Agreement and are not intended to be a full and accurate description of the contents hereof.

7.    Waiver. Waiver by one party hereto of breach of any provision of this Agreement by the other shall not operate or be construed as a continuing waiver.

8.    Assignment etc. Except as specified herein of the provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, if any, successors, and assigns. Mr. Ronsen shall not assign any of Mr. Ronsen's rights under this Agreement, or delegate the performance of any of Mr. Ronsen's duties hereunder, without the prior written consent of NMRX.

9.    Notices. Any and all notices, demands, or other communications required or desired to be given hereunder by any party shall be in writing and shall be validly given or made to another

party if personally served, or by a nationally recognized overnight carrier with proof of receipt as follows:

> If to Mr. David Ronsen:
> 504 S. Willson
> Bozeman, MT 59715

> If to NMRX:

> Numerex Corp.
> 1600 Parkwood Circle SE
> Suite 200
> Atlanta, Georgia 30339
> Attention: Chief Executive Officer

> With a copy to:
> Andrew J. Ryan, Esq.
> Salisbury & Ryan LLP
> 1325 Avenue of the Americas
> New York, NY 10019

Any party hereto may change its address for purposes of this paragraph by written notice given in the manner provided above.

10. <u>Modification or Amendment</u>. No amendment, change or modification of this Agreement shall be valid unless in writing signed by the parties hereto.

11. <u>Entire Understanding.</u> This document and any exhibit attached along with that certain Intellectual Property and Confidentiality Agreement dated on or about the date hereof constitute the entire understanding and agreement of the parties with respect to Mr. Ronsen's employment, and any and all prior agreements, understandings, and representations are hereby terminated and canceled in their entirety and are of no further force and effect.

12. <u>Unenforceability of Provisions</u>. If any provision of this Agreement, or any portion thereof, is held to be invalid and unenforceable, then the remainder of this Agreement shall nevertheless remain in full force and effect. Should a court or any other trier of fact or law determine not to enforce any covenant or provision of this Agreement as written due to overbreadth, then the parties agree that said covenant or provision shall be enforced to the extent reasonable, with the court or such trier to make any necessary revisions to said covenant or provision to permit its enforceability to meet the legitimate interests of the parties involved.

13. <u>Counterparts</u>. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute both one and the same instrument.

6

14.    <u>Capacity; No Conflict</u>.  Mr. Ronsen represents and warrants to NMRX that he is not now under any obligation, of a contractual nature or otherwise, to any person, firm, corporation, association or other entity that is inconsistent or in conflict with this Agreement or which would prevent, limit or impair in any way the performance by him of services to NMRX in the course of his employment.

15.    <u>Governing Law; Jurisdiction</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the choice of law provisions thereof.  The parties hereto consent to personal jurisdiction of any state or Federal court sitting in Borough of Manhattan, in order to enforce the rights of NMRX under this Agreement, and waive any objection that such forum is inconvenient.  Each party hereby consents to service of process in any such action by U.S. mail or other commercially reasonable means of receipted delivery.

16.    <u>Voluntary Execution</u>.  This Agreement is executed voluntarily and without any duress or undue influence on the part of the parties hereto.  The parties acknowledge that:

(a)    They have read this Agreement;

(b)    They have been represented in the preparation, negotiation, and execution of this Agreement by legal counsel of their own choice;

(c)    They understand the terms and consequences of this Agreement;

(d)    They are fully aware of the legal and binding effect of this Agreement.

**[Remainder of Page Intentionally Blank; Signature Page Follows]**

7

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.


**MR. DAVID RONSEN**, in his
individual capacity as an employee


**NUMEREX CORP.**

By: _____
Name:
Title:

SCHEDULE A

ORBIT ONE

Numerex – Strictly Confidential

**EARNOUT MATRIX - July to Dec. 2007**
(000's)

Bonus Paid In: Shares | Cash

| | | Percent of Target | | | | | | Bonus Pool 1 125% (Shares) | Bonus Pool 2 150% (Cash) |
|---|---|---|---|---|---|---|---|---|---|
| | | 60% | 70% | 80% | 90% | 95% | 100% | | |
| Revenue Target at 100% | $8,000 | | | | | | | | |
| Payout Shares | | 50% | 60% | 70% | 80% | 90% | 100% | | |
| Earnout in shares | 91,667 | 45,833 | 55,000 | 64,167 | 73,333 | 82,500 | 91,667 | 19,643 | $125,000 |
| EBITDA Target at 100% - (half year) | $1,625 | | | | | | | | |
| Payout Shares | | 50% | 60% | 70% | 80% | 90% | 100% | | |
| Earnout in shares | 275,000 | 137,500 | 165,000 | 192,500 | 220,000 | 247,500 | 275,000 | 58,928 | $375,000 |

**EARNOUT MATRIX - 2008**
(000's)

| | | Percent of Target | | | | | | 125% | 150% |
|---|---|---|---|---|---|---|---|---|---|
| | | 60% | 70% | 80% | 90% | 95% | 100% | | |
| Revenue Target at 100% | $16,571 | | | | | | | | |
| Payout % | | 50% | 60% | 70% | 80% | 90% | 100% | | |
| Earnout in shares | 91,667 | 45,833 | 55,000 | 64,167 | 73,333 | 82,500 | 91,667 | 49,107 | $250,000 |
| EBITDA Target at 100% | $4,890 | | | | | | | | |
| Payout % | | 50% | 60% | 70% | 80% | 90% | 100% | | |
| Earnout in shares | 275,000 | 137,500 | 165,000 | 192,500 | 220,000 | 247,500 | 275,000 | 147,322 | $750,000 |

**EARNOUT MATRIX - 2009**
(000's)

| | | Percent of Target | | | | | | 125% | 150% |
|---|---|---|---|---|---|---|---|---|---|
| | | 60% | 70% | 80% | 90% | 95% | 100% | | |
| Revenue Target at 100% | $21,728 | | | | | | | | |
| Payout % | | 50% | 60% | 70% | 80% | 90% | 100% | | |
| Earnout in shares | 91,667 | 45,833 | 55,000 | 64,167 | 73,333 | 82,500 | 91,667 | 49,107 | $250,000 |
| EBITDA Target at 100% | $5,985 | | | | | | | | |
| Payout % | | 50% | 60% | 70% | 80% | 90% | 100% | | |
| Earnout in shares | 275,001 | 137,500 | 165,000 | 192,501 | 220,001 | 247,501 | 275,001 | 147,322 | $750,000 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Total Shares | 1,100,000 | | | | | | | 471,429 | 2,500,000 |

Notes:
Some figures subject to rounding.
Payouts earned when threshold achieved., e.g. if actual EBITDA equals 77%, then payout equals the 60% threshold.

**EXHIBIT 12**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ORBIT ONE COMMUNICATIONS, INC.,
and DAVID RONSEN,

                           Plaintiffs,

       - against -

NUMEREX CORP.,

                       Defendant.

Civil Action No. 08-0905 (LAK)

**ANSWER AND**
**COUNTERCLAIMS**

**JURY TRIAL DEMAND**

## INTRODUCTION

1.      Plaintiffs' action is a concocted "preemptive strike." David Ronsen is the 84% owner of Orbit One Communications, Inc. ("Old Orbit One"). In August 2007, Old Orbit One sold substantially all of its assets to a subsidiary of Numerex Corporation ("Numerex"), and Numerex hired Ronsen to serve as president of its Satellite Division, which sells machine-to-machine satellite-based communication systems and services. The parties' agreements are governed by an extensively negotiated contract called the Asset Purchase Agreement, which incorporates other agreements including an Earn Out and a Severance and Non-Competition Agreement. The Asset Purchase Agreement (together with its Exhibits and Schedules, the "APA") is incorporated into this Answer and Counterclaim by reference.

2.      The APA provided for a generous multi-million dollar guaranteed cash payment to Old Orbit One, *plus* generous executive pay, cash bonuses, and benefits for Ronsen. The APA also calls for even larger incentive-based stock and cash bonuses if the Satellite Division performs in accordance with Ronsen's pre-closing financial projections. The contract documents call these bonuses an "Earn Out." The APA ties the

- 1 -

level of the bonus to the degree to which the Satellite Division achieves or exceeds a

Revenue Target and an EBITDA Target. These targets—derived directly from the

projections prepared by Ronsen himself—were incorporated into the APA as Schedule

1.6 and called the "Business Plan."

      3.    The future success of the Satellite Division—and the achievement of the

Earn Out revenue and earnings targets—depends to a large degree on the success of a

new product called the SX-1. Before the August 1 execution of the APA, Ronsen bought

supplies to build 10,000 units of the SX-1. In addition, he ordered another 20,000 units

of the key component of the SX-1, a transmitter called the STX. Ronsen assured

Numerex's senior management that he would be able to sell the 30,000 SX-1s. But in the

first seven months following the acquisition, Ronsen sold only 144 units of the SX-1. If

the current level of poor financial performance continues, Old Orbit One will not earn

further Earn Out bonuses and indeed Ronsen himself will be subject to termination for

"cause" pursuant to the contract documents.

      4.    On information and belief, Ronsen hired counsel after recognizing that he

was likely to fail to meet his projections. Under the APA, a termination by Ronsen of his

employment with Numerex for "good reason" (including a substantial diminution of his

responsibilities) would trigger immediate acceleration of all Earn Out bonuses. In order

to come within the "good reason" clause of his contract, Ronsen began making contrived

assertions that he lost "control" and "authority" within the Satellite Division. In other

words, Ronsen hopes to use the court system to recover the entire Earn Out even though

he has not earned it and may never earn it.

5.    Ronsen thus began to focus extensively on manufacturing evidence to support his impending lawsuit rather than selling products that he had projected he could sell. Ronsen has thus discharged his executive responsibilities in a manner designed to buttress his lawsuit against Numerex rather than achieve success for the company. His day-to-day communications with Numerex exhibit themes from his lawsuit rather than good faith decision making. He has peppered senior management with complaints that he does not have adequate control over the Satellite Division and conversely that Numerex has not provided adequate "support." By making these false claims and using Numerex's facilities and employees to manufacture evidence to support the false claims, Ronsen has breached his contractual and fiduciary duties to Numerex.

## ANSWER

1.    Numerex admits that it entered into the APA with Old Orbit One to acquire substantially all of the assets of Old Orbit One and that Numerex and plaintiff Ronsen entered into a Severance and Non-Competition Agreement, which was incorporated into the APA. Numerex states that since the Closing, and in accordance with the APA, Numerex has been conducting the business of Old Orbit One as the Numerex "Satellite Solutions Division." (The APA defines this business unit as the "Satellite Division"). Numerex states further that the contract documents specify that Ronsen would be employed as President of the Orbit One "Division." Numerex further admits that Ronsen represented himself to be the founder and 84% shareholder of Old Orbit One. Numerex respectfully refers the Court to the APA and denies any allegations in paragraph 1 inconsistent with the terms thereof. Numerex otherwise denies the allegations in paragraph 1.

- 3 -

2.      Numerex respectfully refers the Court to the APA, denies any allegations in paragraph 2 inconsistent with the terms thereof, and otherwise denies the allegations in paragraph 2.

3.      Numerex denies the allegations in paragraph 3.

4.      Numerex denies the allegations in paragraph 4.

5.      On information and belief, Numerex denies the allegations concerning plaintiffs' aversion to risk described in paragraph 5. Numerex respectfully refers the Court to the APA, and denies any allegations in paragraph 5 inconsistent with the terms thereof, and otherwise denies the allegations in paragraph 5.

6.      Numerex respectfully refers the Court to the APA, denies any allegations in paragraph 6 inconsistent with the terms thereof, and otherwise denies the allegations in paragraph 6.

7.      Numerex respectfully refers the Court to the APA, denies any allegations in paragraph 7 inconsistent with the terms thereof, and otherwise denies the allegations in paragraph 7.

8.      Numerex respectfully refers the Court to the APA, denies any allegations in paragraph 8 inconsistent with the terms thereof, and otherwise denies the allegations in paragraph 8.

9.      Numerex respectfully refers the Court to the APA, denies any allegations in paragraph 9 inconsistent with the terms thereof, and otherwise denies the allegations in paragraph 9.

10.     Numerex denies the allegations in paragraph 10.

11.    Numerex admits that Old Orbit One is organized under the laws of the State of Montana, that Old Orbit One was engaged in the business of providing satellite-based telephones and GPS tracking devices and services.  Numerex otherwise denies sufficient knowledge and information to form a belief as to the truth of the allegations in paragraph 11.

12.    Numerex admits that Ronsen is a resident of Montana.  Numerex states that Ronsen currently serves as Senior Vice President of Numerex and President of Numerex's Satellite Division as defined in the APA.  Numerex otherwise denies sufficient knowledge and information to form a belief as to the allegations in paragraph 12.

13.    Numerex admits the allegations in the first four sentences of paragraph 13 and but otherwise denies the allegations of paragraph 13.

14.    Numerex admits that section 9.7 of the APA provides for jurisdiction and venue of courts located in the Borough of Manhattan for any action arising out of or relating to the APA, and respectfully refers the Court to the APA for its contents.

15.    Numerex lacks information sufficient to form a belief as to the truth of the allegations set forth in paragraph 15.

16.    Numerex lacks information sufficient to form a belief as to the truth of the allegations set forth in paragraph 16.

17.    Numerex lacks information sufficient to form a belief as to the truth of the allegations set forth in paragraph 17.

18.    Numerex lacks information sufficient to form a belief as to the truth of the allegations set forth in paragraph 18.

19.    Numerex admits that Old Orbit One sold satellite GPS tracking devices and services, states that substantially all its revenue came from a single customer called Stratix Corporation ("Stratix"), under which Old Orbit One acted as a subcontractor and Stratix acted as the prime contractor with the Department of Homeland Security's Federal Emergency Management Agency ("FEMA"), and, on information and belief, otherwise denies the allegations set forth in paragraph 19.

20.    Numerex lacks information sufficient to form a belief as to the truth of the allegations set forth in paragraph 20.

21.    Numerex lacks information sufficient to form a belief as to the truth of the allegations set forth in paragraph 21.

22.    Numerex denies the allegations of paragraph 22 and states that it provides fixed and mobile machine-to-machine ("M2M") wireless solutions, as well as a broad range of reliable, competitive network services and technologies that enable real-time wireless data communications, monitoring, tracking, and service management tailored to the needs of each application, customer, and industry.

23.    Numerex states that its Chairman and Chief Executive Officer, Stratton Nicolaides, owns shares and options to purchase shares totaling approximately 2.5 percent of the fully diluted issued and outstanding shares of Numerex and that certain trusts of which he has disclaimed ownership own shares of Numerex. Numerex respectfully refers the Court to its most current proxy statement and Forms 4 on file with the Securities and Exchange Commission and denies any allegation in paragraph 23 that is inconsistent therewith.

24.    Admitted.

25.    Numerex admits that it discussed a potential transaction with Old Orbit One beginning in late 2006, and otherwise denies the allegations in paragraph 25.

26.    Numerex lacks information sufficient to form a belief as to the truth of the allegations concerning Ronsen's state of mind set forth in paragraph 26 and otherwise denies the allegations.

27.    Numerex respectfully refers the Court to the APA for its terms, denies any allegation in paragraph 27 inconsistent with that agreement, and otherwise denies the allegations in paragraph 27.

28.    Numerex respectfully refers the Court to the APA for its terms, denies any allegation in paragraph 28 inconsistent with that agreement, and otherwise denies the allegations in paragraph 28.

29.    Numerex denies the allegations in paragraph 29.

30.    Numerex denies the allegations in paragraph 30.

31.    Numerex lacks information sufficient to form a belief as to the truth of the allegations concerning Ronsen's state of mind set forth in paragraph 31, admits that it had an established commercial customer base and experience in machine-to-machine communications, and otherwise denies the allegations.

32.    Numerex lacks information sufficient to form a belief as to the truth of the allegations set forth in the first sentence but otherwise denies the remaining allegations of paragraph 32.

33.    Numerex denies the allegations in paragraph 33.

34.    Numerex denies the allegations in paragraph 34 and states that Ronsen developed the Business Plan attached to and made a part of the APA.

35.    On information and belief, Numerex denies the allegations concerning plaintiffs' aversion to risk described in paragraph 35. Numerex lacks information sufficient to form a belief as to the truth of the allegations of Ronsen's state of mind set forth in paragraph 35, and otherwise denies the remaining allegations of paragraph 35.

36.    Numerex admits that Numerex entered into the APA with Old Orbit One to acquire substantially all of the assets of Old Orbit One and that integrated into the APA were a number of other contract documents including a Severance and Non-Competition Agreement between Numerex and Ronsen. Numerex respectfully refers the Court to the APA, and denies any allegations in paragraph 36 inconsistent with the terms thereof.

37.    Numerex lacks information sufficient to form a belief as to Ronsen's state of mind, respectfully refers the Court to the APA denies any allegations in paragraph 37 inconsistent with the terms thereof.

38.    Numerex respectfully refers the Court to the APA and denies any allegations in paragraph 38 inconsistent with the terms thereof.

39.    Numerex respectfully refers the Court to the APA and denies any allegations in paragraph 39 inconsistent with the terms thereof.

40.    Numerex respectfully refers the Court to the APA and denies any allegations in paragraph 40 inconsistent with the terms thereof.

41.    Numerex respectfully refers the Court to the APA and denies any allegations in paragraph 41 inconsistent with the terms thereof.

42.    Numerex respectfully refers the Court to the APA and denies any allegations in paragraph 42 inconsistent with the terms thereof.

43.    Numerex denies the allegations in paragraph 43.

- 8 -

44.    Numerex respectfully refers the Court to the APA and denies any allegations in paragraph 44 inconsistent with the terms thereof.

45.    Numerex denies that Schedule 1.6 was "inadvertently omitted" at closing. Numerex respectfully refers the Court to the APA and denies any allegations in paragraph 45 inconsistent with the terms thereof.

46.    Numerex respectfully refers the Court to the APA and denies any allegations in paragraph 47 inconsistent with the terms thereof.

47.    Numerex denies the allegations in paragraph 47.

48.    Numerex denies the allegations in paragraph 48 and states that Ronsen currently serves as the President of the Satellite Division as defined in the APA.

49.    Numerex denies the allegations in paragraph 49.

50.    Numerex denies the allegations in paragraph 50.

51.    Numerex denies the allegations in paragraph 51. Numerex states further that Rosenzweig solicited and obtained a non-revenue contract for approximately one dozen "demo units" of the SX-1. Numerex states further that this figure may indeed be "substantial" (as plaintiffs allege) when measured by total SX-1 sales to date, it is not "substantial" when measured against the tens of thousands of unsold units in inventory or the projections that gave rise to the contractual Business Plan.

52.    Numerex respectfully refers the Court to the document referred to in paragraph 52 for its contents, denies any allegation inconsistent with the document, and otherwise denies the allegations contained in paragraph 52.

53.    Numerex denies the allegations in paragraph 53.

- 9 -

54.    Numerex admits that Ronsen projected a successful launch of the SX-1 product, respectfully refers the Court to the APA, denies any allegation in paragraph 54 inconsistent therewith, and otherwise denies the allegations in paragraph 54.

55.    Numerex states that at all times it made a good faith effort to integrate the business of Old Orbit One, that it provided appropriate marketing support, and denies any allegation in paragraph 55 inconsistent therewith.

56.    Numerex denies the allegations in paragraph 56.

57.    Numerex denies the allegations in paragraph 57.

58.    Numerex denies the allegations in paragraph 58.

59.    Numerex denies the allegations in paragraph 59.

60.    Numerex denies the allegations in paragraph 60.

61.    Numerex lacks information sufficient to form a belief as to the truth of the allegations concerning Ronsen's state of mind, respectfully refers the Court to the documents referenced in paragraph 61, denies any allegation inconsistent with such documents, and otherwise denies the allegations.

62.    Numerex denies the allegations in paragraph 62.

63.    Numerex denies the allegations in paragraph 63.

64.    Numerex denies the allegations in paragraph 64.

65.    Numerex admits that Ronsen traveled to California to meet with a former vendor of Old Orbit One and current vendor of the Satellite Division but otherwise denies the allegations in paragraph 65.

66.    Numerex denies the allegations in paragraph 66.

67.    Numerex denies the allegations in paragraph 67.

68.     Numerex denies the allegations in paragraph 68.

69.     Numerex denies the allegations in paragraph 69.

70.     Numerex denies the allegations in paragraph 70.

71.     Numerex denies the allegations in paragraph 71.

72.     Numerex denies the allegations in paragraph 72.

73.     Numerex denies the allegations in paragraph 73.

74.     Numerex denies the allegations in paragraph 74.

75.     Numerex admits that Ronsen traveled to Philadelphia in December, visited with Zeroto5 but otherwise denies the allegations in paragraph 75.

76.     Numerex denies the allegations in paragraph 76.

77.     Numerex lacks information sufficient to form a belief as to the truth of the allegations set forth in the last two sentences of this paragraph but otherwise denies the allegations contained in paragraph 77.

78.     Numerex denies the allegations in paragraph 78.

79.     Numerex denies the allegations in paragraph 79.

80.     Numerex denies the allegations in paragraph 80.

81.     Numerex denies the allegations in paragraph 81.

82.     In response to the allegations set forth in paragraph 82, Numerex reasserts and incorporates by reference its responses to paragraphs 1 through 81 of the Complaint as if restated herein.

83.     Numerex states that the allegations set forth in paragraph 83 are legal conclusions to which no response is required.

84.     Numerex denies all allegations in paragraph 84.

- 11 -

85. Numerex denies all allegations in paragraph 85.

86. Numerex denies all allegations in paragraph 86 and respectfully refers the Court to its Counterclaim.

87. Numerex denies all allegations in paragraph 87.

88. Numerex respectfully refers the Court to the APA (including the Non-Competition and Severance Agreement) and denies all allegations in paragraph 88 inconsistent therewith.

89. Numerex denies all allegations in paragraph 89.

90. In response to the allegations set forth in paragraph 90, Numerex reasserts and incorporates by reference its responses to paragraphs 1 through 89 of the Complaint as if restated herein.

91. Numerex states that the allegations set forth in paragraph 91 are legal conclusions to which no response is required.

92. Numerex denies all allegations in paragraph 92.

93. Numerex denies all allegations in paragraph 93.

94. Numerex denies all allegations in paragraph 94.

95. Numerex denies all allegations in paragraph 95.

96. In response to the allegations set forth in paragraph 96, Numerex reasserts and incorporates by reference its responses to paragraphs 1 through 95 of the Complaint as if restated herein

97. Numerex respectfully refers the Court to the APA, denies all allegations in paragraph 97 inconsistent therewith, and otherwise denies the allegations of paragraph 97.

98.     Numerex denies all allegations in paragraph 98.

99.     Numerex denies all allegations in paragraph 99.

100.    Numerex denies all allegations in paragraph 100.

101.    Numerex denies all allegations in paragraph 101.

102.    Numerex denies any and all factual allegations in paragraph 102.  To the extent paragraph 102 states a legal conclusion, no response is required.

103.    Numerex states that the allegations set forth in paragraph 103 are legal conclusions to which no response is required.

104.    Numerex denies all allegations in paragraph 104.

105.    Numerex denies all allegations in paragraph 105.

106.    Numerex denies all allegations in paragraph 106.

## DEFENSES

1.      Defendant Ronsen is not entitled to any recovery because he has breached his fiduciary duties to Numerex.

2.      Defendants' claims are barred by the doctrine of unclean hands.

3.      Defendants' claims are barred by the doctrine of prior material breach.

4.      Defendants' claims are barred by their superior knowledge and negligent or reckless misrepresentations to induce Numerex to acquire the assets of Old Orbit One.

5.      Defendants' claims are barred by their negligence or recklessness in the preparation of projections for the post-acquisition performance of the Satellite Division.

## COUNTERCLAIMS

**Negotiations**

1.      Numerex is a provider of machine-to-machine, or "M2M," services.  An M2M system uses a device to capture real-time data about an asset, such as the location

- 13 -

of a car or the flow rate of petroleum at a well head. The M2M device relays the data to a centralized computer for monitoring and analysis. Buyers of M2M services generally have unique needs and require customized applications. Numerex's business strategy is to be a single source provider for all M2M needs of its clients. Numerex has acquired and successfully integrated under its brand name several companies providing various M2M capabilities. In 2006, John Altamura, a representative of one of Numerex's vendors approached Numerex about Old Orbit One.

      2.      Old Orbit One provided satellite based communications services and asset tracking. The potential acquisition of Orbit One offered Numerex the opportunity to further diversity its M2M offerings into satellite-based communications. However, the vast majority of Old Orbit One's business came from one contract, with a company called Stratix Corporation ("Stratix"), under which Old Orbit One acted as a subcontractor and Stratix acted as the prime contractor with FEMA.

      3.      Ronsen admitted during negotiation of the transaction that 2006 was an unusually profitable year for Old Orbit One. This unusual profitability arose in part due to a number of extraordinary natural disasters including Hurricane Katrina, and in part because Stratix chose Old Orbit One to supply a product called the T3 in 2005. In 2006, FEMA deployed the T3 in over 20,000 FEMA assets. While Old Orbit One had customers besides Stratix, Stratix was by far its largest customer. Old Orbit One told Numerex that sales to Stratix contributed approximately 66% of Old Orbit One's total sales for 2005 and 68% for 2006. For 2007, Old Orbit One projected that sales to Stratix would contribute approximately 65% of its total sales.

4.      In addition, Ronsen acknowledged to Numerex that Old Orbit One was developing a replacement for the T3 product. The post-acquisition success of the Satellite Division would depend on a successful development and deployment of a replacement for the T3. During 2007, Old Orbit One was developing this replacement, called the SX-1, while the transaction was being negotiated. (By the time of closing, the SX-1 still had not been launched.)

5.      During negotiations, Ronsen admitted that it is "difficult to project with any degree of certainty what our sales will be looking forward each year." Nonetheless, he asked that almost all consideration to Old Orbit One be paid at closing and without conditions subsequent. Numerex rejected Ronsen's request. Numerex requested that Ronsen prepare financial projections and insisted that post-closing performance in accordance with the financial projections have financial consequences for Ronsen.

6.      From April through July 2007, Ronsen prepared several drafts of a detailed set of financial projections. In those projections, Ronsen set forth detailed information about the T3 and SX-1, such as the number of sales for each product per month, the type of buyers (government or commercial), and the cost of goods sold for both products. Ronsen's projections were the subject of extensive negotiations. In the evolution of these projections, Ronsen scaled down his forecasts at the urging of Numerex.

7.      At no time did Ronsen or anyone else representing Old Orbit One ever communicate to Numerex orally or in writing that Ronsen's projections could only be achieved with sales support from Numerex's pre-existing sales team.

- 15 -

**The APA**

8.     On August 1, 2007, after seven months of negotiations, Old Orbit One and a Numerex subsidiary called "Orbit One Communications, LLC" (the "LLC") executed the APA as of July 31, 2007.   Pursuant to the APA, Old Orbit One received $5.5 million in cash at closing and an additional $732,000 in cash within sixty days following closing. The APA provided for an additional cash payment to Orbit One if the Satellite Division succeeded in renewing the Stratix contract.

9.     At the Closing, Numerex also hired Ronsen to serve as "President of NMRX's Orbit One division (the 'Division')" pursuant to a contract document called the Severance and Non-Competition Agreement, which was integrated into the APA. Ronsen was to report to "NMRX's Chief Executive Officer, and, from time to time as reasonably required by the business needs of the Division, to such other members of NMRX's senior management team as NMRX's Chief Executive Offer directs."  Section 9.13 of the APA defines the Satellite Division as "the subsidiary or division of Numerex that conducts the Business after the Closing."

10.     At the Closing, a Business Plan (submitted by Ronsen and tied to his over-200-page financial projections) became a schedule of the APA and the fundamental economic driver of the APA's post-closing payment structure.   Ronsen and Numerex both committed "to operate the [Satellite Division] substantially in accordance with" the Business Plan.   The parties carefully negotiated the Business Plans' financial targets, agreeing to the following "Revenue Targets" and "EBITDA Targets":

| Year | Revenue Target | EBITDA Target |
|------|----------------|---------------|
| 2007 (July to Dec.) | $6.00 million | $1.62 million |
| 2008 | $16.57 million | $4.59 million |
| 2009 | $21.72 million | $5.98 million |

11.    Meeting, exceeding, or falling short of the objectives set forth in the Business Plan has important consequences, as follows:

12.    *First*, the Earn Out, incorporated into the APA as Exhibit B, provides for Old Orbit One to receive shares of Numerex's common stock and additional cash bonuses in accordance with a sliding scale tied to the extent to which the Satellite Division falls short of, meets, or exceeds specified revenue and cash-flow performance objectives called the Revenue Target and the EBITDA Target. In other words, if the Satellite Division achieves a percentage of the Targets, and subject to its terms and conditions, the APA calls for payment to Old Orbit One of a percentage of the incentive award. If the Satellite Division exceeds the Targets by 125% and 150%, again subject to terms and conditions, the APA calls for payment to Old Orbit One of additional stock and cash bonuses. The Business Plan thus provides a cushion for Numerex in the event that the Satellite Division's financial performance falls short of Ronsen's projections, and provides a bonus for Old Orbit One if Ronsen's financial projections prove to have been too conservative.

13.    *Second*, after March 31, 2008, if the Satellite Division misses the EBITDA Targets by 25% or more in two consecutive quarters (beginning with the fourth quarter of 2007), Numerex is "entitled to unilaterally implement budgetary changes to restore the Satellite Division's profitability in accordance with the Business Plan." *Id.* Ex. B § 4.1.

- 17 -

The Business Plan thus provides a mechanism for Numerex to exercise unilateral control over the Satellite Division's budget in the event that the Satellite Division underperforms in comparison to Ronsen's projections.

14.     *Third*, after June 30, 2008, Ronsen can be terminated for cause if the Satellite Division "fails to attain 65% of the Revenue Target or 50% of the EBITDA Target." *Id.* Ex. D. § 2(a)(iv). The Business Plan thus provides further protection for Numerex to remove Ronsen for cause in the event that the Satellite Division substantially underperforms in comparison Ronsen's projections.

15.     Ronsen agreed to provide a series of quarterly budgets within 60 days of closing and to update his projections as a Final Budget in advance of each calendar year of the earn-out period. Section 2.4 of Exhibit B to the APA states, in part, that "not later than forty-five (45) days prior to [January 1], the Satellite Division shall submit to NMRX [Numerex] a proposed budget for the Satellite Division for the upcoming [calendar year]. NMRX and [Old Orbit One] shall negotiate in good faith to finalize such budget (the "Final Budget") prior to the commencement of the [calendar year]."

**Projected and Actual Sales of the SX-1**

16.     In preparing the Business Plan, Ronsen projected that the Satellite Division would have two main sources of revenue: (a) a continuing stream of revenue from sales and service to Stratix; and (b) a successful launch of the new SX-1 product to government agencies and commercial businesses. For the remainder of 2007, Ronsen projected that revenue from Stratix would represent 65% of the Satellite Division's revenues. For subsequent years, Ronsen projected that sales to Stratix would constitute a smaller portion of revenue of the Satellite Division as its revenues from other sources

grew—so that revenue from Stratix would be 40% of all revenues in 2008 and 36% in 2009.

17.    For 2007, Ronsen projected the sale of 7,300 SX-1 units. He projected that this figure would rise to approximately 26,000 units for 2008 and approximately 3,000 units for 2009.

18.    Ronsen projected the following SX-1 sales, by month, from August 2007 to February 2008:

| Month | Sales (units) |
|---|---|
| August | 900 |
| September | 2,150 |
| October | 2,150 |
| November | 1,500 |
| December | 600 |
| January | 500 |
| February | 500 |

19.    In an August 13, 2007 presentation to senior management, Ronsen and his team set forth his marketing plan for the Satellite Division, with an emphasis on the SX-1. According to Ronsen's marketing plan, the Satellite Division was to pursue a "Shotgun Approach" to this product promotion. Ronsen intended to "spend a little to get the message out broadly" about the SX-1 through industry articles and trade show participation and then "respond to those who express interest."

20.    At the August 13 presentation, Ronsen presented what he called a "partial list" of existing Old Orbit One customers and predicted that they, as well as other and unidentified "existing customers" would be interested in buying SX-1s. The total units described in the presentation's opportunity funnel (of Old Orbit One customers and leads) was a multiple of the unit volumes in Ronsen's projections. Ronsen summarized his marketing plan as "Build it and they will come."

21. A key component of the SX-1 is called the STX. Manufacturing glitches delayed delivery of completed SX-1 units until mid-September of 2007. Additionally, the SX-1's principal satellite communication provider, Globalstar, did not certify the SX-1 for use on its network until October 1, 2007. Thus the Satellite Division did not launch the SX-1 product until late October 2007.

22. In October 2007, Ronsen induced Numerex to take delivery of and pay for 20,000 STX units that Old Orbit One had ordered prior to closing. Senior management of Numerex asked Ronsen if he could sell 20,000 units (on top of the 10,000 units already built or on order). Ronsen said that he could. Based on that representation, Numerex's senior management approved the payment.

23. The following chart shows the number of SX-1 units actually sold by the Satellite Division from August 2007 to February 2008, according to Numerex's accounting records:

| Month | Sales (units) |
|-----------|---------------|
| August | 8 |
| September | 3 |
| October | -6 |
| November | 5 |
| December | 2 |
| January | 78 |
| February | 54 |

24. Compounding this woeful performance in the sales of the SX-1, Stratix significantly curtailed its contract for T3 services. On information and belief, Ronsen knew that this was probable for an extended period before disclosing this fact to Numerex senior management in late December 2007. The Stratix curtailment will diminish the Satellite Division's effective monthly revenue from Stratix—its most important customer—by approximately 40% for 2008 as compared to 2007.

25.    So far in 2008, the Satellite Division's performance has fallen dramatically short of Ronsen's projections.

**Ronsen Retains Counsel and Begins Blaming Numerex**

26.    By the beginning of October, Ronsen understood that if the Satellite Division continued to perform at the level it had performed since closing, its financial performance would fall short of the Business Plan. He knew that if the Satellite Division's performance fell short of the Business Plan, he would personally suffer adverse financial and other consequences. He understood that such consequences would include not receiving Earn Out payments. He understood that such consequences could include losing his job for "cause."

27.    Although Ronsen had become a very wealthy man by selling Old Orbit One to Numerex, he deemed falling short of the Business Plan—with its consequent financial bonanza—to be a "failure." So he conceived and put into action a plan to avert this personal failure by pointing the finger at Numerex's senior management and, in the process, collecting the entire Earn Out whether he earned it or not.

28.    Before the closing, in an e-mail message dated July 13, 2007, counsel for Old Orbit One, the Lowenstein Sandler law firm, stated that it was acting "as counsel to Orbit One and not to any of the individual members of management."

29.    At some point following the closing, Ronsen retained Lowenstein Sandler to advise him personally in anticipation of this litigation.

30.    On October 5, 2007, Ronsen delivered a ten-page single-spaced letter to Numerex's senior management. On information and belief, the Lowenstein Sandler firm advised Ronsen in connection with the preparation of this letter.

- 21 -

31.     Guided by counsel, Ronsen complained that the "environment" at Numerex was "materially adversely affecting my ability to do my job as I understood it to be, and therefore achieve our (Orbit One's) revenue and EBITDA targets." This was false. In fact, by the time Ronsen delivered the October 5 letter, he was already personally aware of many efforts by Numerex to address the alleged administrative roadblocks cited in the letter.

32.     In the October 5 letter, Ronsen asserted that "my duties as President of Orbit One have been reduced considerably." This was false and was specifically designed to trigger Ronsen's ability to invoke his "good reason" termination clause. Ronsen also asserted that the Satellite Division was "being (or will be very soon) charged for services we simply do not receive." That too, was false and was designed to afford Old Orbit One relief from its contractual commitments in the APA.

33.     On October 8, 2007, Ronsen asked senior management of Numerex to "hold off" on the product launch of the SX-1 "until we work out some issues that you and I can discuss."

34.     Ronsen met with Numerex's senior management and attended an executive retreat and planning session among Numerex's very top executives in mid-October 2007. Senior management at Numerex made extensive efforts to discuss the topics cited in Ronsen's letter and to facilitate integration of the Satellite Division into Numerex. Indeed, during the retreat, Ronsen acknowledged that Numerex was already addressing the complaints in the letter.

35.     Following the executive retreat, senior management at Numerex accelerated efforts to help Ronsen and his team integrate smoothly into Numerex. These

- 22 -

included weekly and in some cases daily conference calls addressing human resources, financial and accounting support, back office support, and a variety of other integration issues.

36.    The Satellite Division did not make any SX-1 sales in October.

37.    On November 1, Numerex's CEO Stratton Nicolaides asked Ronsen to update his sales plan for the SX-1 units. Four days later, Ronsen responded with a list of 24 companies that had received demonstration units and an additional 27 companies that had expressed any interest in learning about the SX-1. Ronsen also re-circulated a marketing document he had prepared before the August 1 closing. Ronsen presented no detailed information about these potential customers, no dates for contacting them, and assigned no probability to their buying SX-1 units. Ronsen did not suggest that he would fail to achieve the sales he projected in advance of the August 2007 closing. To the contrary, during November, Ronsen advised senior Numerex management that he would sell at least 2,000 SX-1 units by year end.

38.    The Satellite Division sold 7 SX-1 units in November and December.

39.    On December 19, 2007, Numerex's Nicolaides visited the Satellite Division's office in Bozeman, Montana. At the meeting, Ronsen gave a presentation in which he blamed senior Numerex management for the Satellite Division's poor SX-1 sales. Ronsen then attempted to hand Nicolaides a letter from his attorneys. In this letter, Ronsen's counsel repeated allegations made by Ronsen in his presentation and subsequently made in his complaint in this case. Ronsen's counsel threatened to sue Numerex unless it negotiated a settlement before January 1.

40.    Ronsen and Old Orbit One then commenced this action on January 8.

- 23 -

**Ronsen's Breaches of Fiduciary Duty**

41.    Ronsen has neglected his responsibilities as a fiduciary of Numerex, peppered senior management with baseless and transparently self-serving e-mail messages, undermined senior management's efforts to help the Satellite Division achieve financial success, encouraged his subordinates to engage in the same behaviors, and made decisions as an executive that placed his own personal economic interests ahead of Numerex's.

42.    These activities are taking place on a daily basis. Several examples are set forth here, but these are not intended to be an exclusive list.

43.    *First*, Ronsen projected that the Satellite Division would have a staff of 21 employees. Yet Ronsen kept the staff at 16 through the end of December 2007. In the fall of 2007, senior management specifically approved Ronsen's request to hire two employees to provide marketing and sales support. Ronsen did not fill these positions. By failing to hire budgeted staff, Ronsen cut costs in the short run, helping him to meet the December 2007 EBITDA Target despite the shortfall in revenue. In this way, Ronsen placed his own short-term financial interests ahead of Numerex's interests.

44.    *Second*, in October 2007, Ronsen advised Numerex to pay a supplier called Axonn LLC ("Axonn") for 20,000 units of the key component for the SX-1 product, even though Axonn and Old Orbit One had unresolved disagreements as to which Old Orbit One and Ronsen have indemnified Numerex. Numerex agreed to make the payment on the representation of Ronsen that he could sell the 10,000 SX-1 units already built plus another 20,000 SX-1 units that would use the new components. (By the time he made that representation, he had already sent his October 5 letter of complaint.) Through February 2008, the Satellite Division sold only 144 SX-1 units. By

- 24 -

causing *Numerex* to pay millions of dollars to Axonn for units that were not promptly saleable, Ronsen derived direct financial benefit for himself, to the extent that those payments reduce damages that Axonn might otherwise claim against Old Orbit One. In other words, if Ronsen understood that he could not sell the SX-1s, Ronsen was causing Numerex to make payments to Axonn in lieu of payments that Old Orbit One (and ultimately Ronsen) would otherwise have had to pay out of their own pockets.

45.     *Third*, in January 2008, Ronsen submitted a budget for the calendar year 2008 in an effort to comply with Section 2.4 of the Earn Out. This budget was submitted late. The budget was also submitted in bad faith and did not honestly reflect realistically achievable results and operating needs of the Satellite Division. Most prominently, the budget projects sales of the SX-1 of 31,000 units. The Satellite Division sold virtually no SX-1 units from August 2007 through February 2008. Ronsen justified this jump from zero to 31,000, not based on any prospective or actual sales, but based on his supposed hope for a "significant increase in support and ability to operate the business unit, as previously promised and as expected."

46.     *Fourth*, Ronsen engaged in subterfuge in order to obtain a $1.75 million payment for renewal of the Stratix contract. Schedule 1.3(a)(iii) of the APA provides for a cash payment to Old Orbit One upon extension of the Stratix contract "on similar terms, conditions, economics and quantity" as the original contract. The APA specified that "if there are changes to the terms and conditions of the Original 2007 Stratix Agreement agreed to as a part of the extension described above, and NMRX shall have agreed to such changes, then the conditions to payment contained in this provision will be deemed

- 25 -

to have been met, **with such provisions as to which NMRX and Seller will have agreed at the time.**" Schedule 1.3(a)(iii) (emphasis supplied).

47.    Although, on information and belief, Ronsen had known for an extended period of time that the Stratix contract would be renewed on worse terms, he did not disclose this to senior Numerex Management responsible for the negotiation of the APA until late December. Rather, he sent an e-mail to another executive on the Friday before Christmas, saying that the size of the contract has "decreased somewhat" and asked him to "please approve today so that we can commit to our services to them in time to get their contract signed before the end of the year." That executive—who was not involved in the APA negotiations, and who would not have known the consequences of "acceptance" for the APA—responded that Ronsen should "move forward."

48.    Ronsen then applied extensive pressure on this executive to approve the Stratix reduction by January 7, without disclosing his own self-interest. When the executive gave a verbal approval, Ronsen sent a self-serving e-mail asking for confirmation that the executive had "accepted" Stratix's purchase order—again without disclosing the context in which he was asking for "acceptance." Indeed, Ronsen's email falsely made it appear that there was an urgent business reason to wrap up the negotiations with Stratix and that doing so would benefit Numerex.

49.    The executive's unknowing confirmation came on January 8. Immediately after the confirmation, Ronsen filed this action. Numerex paid the amount Ronsen demanded under Schedule 1.3(a)(iii) with a reservation of its rights.

50.    In short, Ronsen has not acted and is not acting in good faith. He is not attending to the business of the Satellite Division. Rather, he is taking every opportunity

to manufacture "evidence" that other executives within Numerex are responsible for the Satellite Division's failure to reach the agreed-upon Earn Out milestones for 2008 and 2009.

51.    Ronsen admitted to a confidential source that the source of the complaints he has made to this Court are due to personality conflicts.

**Ronsen's Financial Conflict**

52.    The motivation for Ronsen to complain falsely that he has been stripped of his authority is a massive financial windfall: If Ronsen is allowed to terminate his employment for "good reason" (as that term is defined in the contract documents integrated into the APA), then Ronsen will have been deemed to have earned the stock and cash based portions of the Earn Out.

53.    Because of Ronsen's abysmal performance at the helm of the Satellite Division, this is the only way that he has to obtain the funds available under the Earn Out. Indeed, if he continues to perform anywhere near the levels that he has achieved to date, he can be terminated for cause in July 2008.

**COUNT ONE**
**(Breach of Fiduciary Duty against Ronsen Individually)**

54.    Numerex hereby incorporates by reference, as if fully stated herein, each and every one of the foregoing paragraphs.

55.    As an executive of Numerex, Ronsen owes fiduciary duties of loyalty, care, and good faith to Numerex.

56.    As the 84% shareholder of Old Orbit One, Ronsen has an actual conflict of interest and of necessity engages in self-dealing in the execution of his fiduciary duties to

the extent that any decision he makes affects the revenues or EBITDA of the Satellite Division.

57.     Therefore, Ronsen's decisions affecting revenues and EBITDA of the Satellite Division are subject to review under the intrinsic fairness test rather than the business judgment rule.

58.     Ronsen has flunked that test.  He failed to hire the sales and marketing staff he had projected would be required, enhancing the short-term EBITDA performance of the Satellite Division at the expense of the long-term performance of Numerex.  He used Numerex funds to pay Axonn for thousands of SX-1 components that he has been unable to sell, thereby decreasing his personal indemnification obligations to Numerex.  He has peppered Numerex senior management on almost a daily basis with manufactured and contrived complaints to bolster his lawsuit and in order to deflect responsibility for the abysmal sales performance of the Satellite Division.  And he lured a Numerex executive into supposedly "accepting" the Stratix contract without mentioning that the "acceptance" supposedly would waive the opportunity to negotiate a commensurate reduction in the Schedule 1.3(a)(iii) payment to reflect the reduced economic value of the Stratix contract extension.

59.     In sum, Ronsen has elevated his own financial interests ahead of those of Numerex.  He has misused his position as a fiduciary to enrich himself.  He has devoted his own time to manufacturing evidence to use in his lawsuit against Numerex.  He has induced his subordinates to do the same.

60.     As a direct and proximate result of Ronsen's breach of fiduciary duty, Numerex has incurred substantial financial losses including, but not limited to, the costs

associated with nearly 30,000 unsold SX-1 units and the $1.75 million that Numerex paid to Old Orbit One with a full reservation of rights.

61.    Numerex is entitled to recover any and all damages it has sustained as a result of Ronsen's breaches, including recovery of his entire salary, all benefits and all payments made pursuant to the Earn Out from the time of Ronsen's first disloyal act, net of any set-offs.

## COUNT II
### (Breach of the Covenant of Good Faith and Fair Dealing)

62.    Numerex hereby incorporates by reference, as if fully stated herein, each and every one of the foregoing paragraphs.

63.    Ronsen, acting for himself and for Old Orbit One, has breached the covenant of good faith and fair dealing. He used subterfuge to extract a $1.75 million payment from Numerex for renewal of the Stratix contract without full and honest disclosure of the adverse economic consequences of that renewal. He has failed to make an honest effort to achieve the objectives agreed to in the Business Plan. He has failed to devote his full time and efforts to the business of the Satellite Division. Instead, Ronsen devoted substantial time in October through December to developing his lawsuit against Numerex. He has peppered senior Numerex management with daily e-mail messages transparently designed to bolster his litigation position without regard to the consequences for Numerex. He has taken opportunistic advantage of his position as President of the Satellite Division to divert resources for the purpose of enriching himself.

64.    As a direct and proximate result of Ronsen's breaches and misconduct, Numerex incurred losses including, but not limited to, the costs associated with the nearly

- 29 -

30,000 SX-1 units Ronsen has not sold and the $1.75 million that Numerex paid to Old Orbit One with a full reservation of rights, as well as lost profits and lost management time.

65.    For these reasons, Numerex is entitled to recover any and all damages sustained by it and resulting from Ronsen's and Old Orbit One's breaches, net of any set-offs.

## COUNT III
### (Indemnification)

66.    Numerex hereby incorporates by reference, as if fully stated herein, each and every one of the foregoing paragraphs.

67.    Before closing, Ronsen disclosed that he had a long-running dispute with Old Orbit One's principal supplier, Axonn.

68.    In the APA, Old Orbit One indemnified Numerex against losses arising out of that dispute, and Ronsen and the other Old Orbit One shareholders personally guaranteed that indemnity obligation.

69.    Numerex has expended and expects to expend considerable management time and other resources attempting to resolve the dispute. Despite these efforts, the dispute has not been resolved.

70.    Pursuant to Section 7.2 and Exhibit I of the APA, Numerex is entitled to payment for all losses, damages, liabilities, expenses or costs, including reasonable attorneys' fees, incurred to date or in the future in connection with the Axonn dispute, including the payments to Axonn for components of SX-1 units that Ronsen has been unable to sell.

## COUNT IV
### (Set-Off and Declaratory Judgment)

71.     Numerex hereby incorporates by reference, as if fully stated herein, each and every one of the foregoing paragraphs.

72.     Orbit One and Ronsen contend that Orbit One has a future right to receive cash and stock pursuant to the APA.

73.     Numerex disputes that contention.  Further, Numerex has a common-law and contractual right to withhold payments and to set off its damages.  Numerex intends to exercise those rights.

74.     A right of set-off is waived if not timely exercised.  Therefore, in order to preserve its rights, Numerex may exercise set-offs of debts allegedly owed to Plaintiffs as they arise.

75.     However, in order that the parties' rights and obligations with regard to the anticipated set-offs are fully preserved, Numerex respectfully requests that the Court adjudicate the availability of such set-offs.

### DEMAND FOR JURY TRIAL

Numerex demands trial by jury for all issues so triable.

### RELIEF REQUESTED

WHEREFORE, Numerex respectfully requests the following relief:

   A. Denial of plaintiffs' requests for any and all relief under any theory that is

      asserted or could be asserted with respected to the Complaint, including all

      requests for relief as stated with respect to each Count in the Complaint.

   B. Disgorgement by Ronsen of the value of all compensation and benefits received

      by him from Numerex since the date he began breaching his fiduciary duties;

C. An award of compensatory damages in an amount to be proved at trial, plus

   interest;

D. Punitive damages commensurate with Ronsen's disloyal conduct;

E. Indemnification for all losses, damages, liabilities, expenses or costs, including

   reasonable attorneys' fees, incurred to date or in the future in connection with the

   Axonn dispute;

F. Declaratory relief that any set-offs it exercises are just and proper;

G. Attorneys fees and costs; and

H. Such other relief as may be just and proper.

Dated: New York, New York
       March 10, 2008

                          ARNOLD & PORTER LLP

                          By _____
                             Kent A. Yalowitz
                               *Kent.Yalowitz@aporter.com*
                             Brandon H. Cowart
                          399 Park Avenue
                          New York, NY 10022-4690
                          Telephone: (212) 715-1000
                          Facsimile: (212) 715-1399

                          *Attorneys for Defendant, Numerex Corp.*

- 32 -

# EXHIBIT 13

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

ORBIT ONE COMMUNICATIONS, INC.,
DAVID RONSEN,

      Plaintiffs/Counterclaim Defendants,

      -against-

NUMEREX CORP.,

      Defendant/Counterclaim Plaintiff.

Civil Action No. 08-CV-0905 (LAK)

**ANSWER AND DEFENSES**

**<u>Document Electronically Filed</u>**

Plaintiffs/Counterclaim Defendants Orbit One Communications, Inc. and David Ronsen (collectively, the "Plaintiffs") by its attorneys, for its Answer and Defenses to the Counterclaims of Numerex Corp. ("Defendant"), allege as follows:

### <u>ANSWER TO COUNTERCLAIMS</u>

1.     Plaintiffs admit the first four sentences in paragraph 1. Plaintiffs are without knowledge or information sufficient to form a belief as to the truth of the allegation set forth in the fifth sentence in paragraph 1. Plaintiffs deny the allegations set forth in the sixth sentence in paragraph 1. Upon information and belief, Plaintiffs admit the last sentence in paragraph 1.

2.     Plaintiffs admit the first two sentences in paragraph 2. Plaintiffs deny the allegations set forth in the third sentence in paragraph 2, except admit that most of Old Orbit One's business came from it contract with Stratix.

3.     Plaintiffs deny the allegations set forth in paragraph 3, but aver that 2006 was Orbit One's most profitable year and that Stratix was Orbit One's largest customer, and deny knowledge or information sufficient to form a belief as to the accuracy of the percentages set forth therein.

20543/2

4.       Plaintiffs deny the allegations set forth in the first sentence in paragraph 4, but aver that Ronsen informed Defendant that Old Orbit One was developing a replacement for the T3 product.  Plaintiffs admit the second and third sentences in paragraph 4, but aver that while the transaction was being negotiated, the SX-1 was substantially complete.  Plaintiffs deny the allegations set forth in the last sentence in paragraph 4, but aver that at the time of the closing, Old Orbit One was prepared to launch the SX-1 and had indeed prepared the marketing materials and press releases announcing the launch of the product, but Defendant requested Old Orbit One not to launch the product until after the closing.

5.       Plaintiffs deny the allegations set forth in the first sentence in paragraph 5, but aver that Ronsen stated that it is difficult to project with any degree of certainty what Old Orbit One's sales will be looking forward each year.  Plaintiffs deny the remaining allegations set forth in paragraph 5.

6.       Plaintiffs deny the allegations set forth in the first sentence in paragraph 6, but aver that Orbit One, with the input and assistance of Defendant, jointly prepared several drafts of a detailed set of financial projections.  Plaintiffs deny the allegations set forth in the second sentence in paragraph 6, but aver that Plaintiffs and Defendant jointly developed detailed information about the T3 and SX-1; to the extent the allegations contained in paragraph 6 purport to characterize what was contained in these projections, the documents speak for themselves, and Plaintiffs deny any characterizations inconsistent therewith.  Plaintiffs deny the allegations set forth in the third sentence in paragraph 6, but aver that the projections were the joint work product of Plaintiffs and Defendant.  Plaintiffs deny the allegations set forth in the last sentence in paragraph 6.

7.       Plaintiffs deny the allegations set forth in paragraph 7.

8.    Plaintiffs deny the allegations set forth in paragraph 8, but admit that Old Orbit One and Defendant entered in the Asset Purchase Agreement (the "APA") as of July, 31, 2007.  To the extent the allegations contained in paragraph 8 purport to characterize Plaintiffs' and Defendant's rights and obligations under the APA, the document speaks for itself, and Plaintiffs deny any characterizations inconsistent therewith.

9.    Plaintiffs deny the allegations set forth in paragraph 9, but aver that although Ronsen was to serve as "President of NMRX's Orbit One division" pursuant to the Severance and Non-Competition Agreement, he was never given this position by Defendant.  To the extent the allegations contained in paragraph 9 purport to characterize Plaintiffs' and Defendant's rights and obligations under the APA, the document speaks for itself, and Plaintiffs deny any characterizations inconsistent therewith.

10.    Plaintiffs deny the allegations set forth in the first sentence in paragraph 10, but aver that the Business Plan was jointly-developed by Plaintiffs and Defendant and was supposed to be attached to the APA as Schedule 1.6, but inadvertently was not attached.  To the extent the allegations contained in the second sentence in paragraph 10 purport to characterize Plaintiffs' and Defendant's rights and obligations under the APA, the document speaks for itself, and Plaintiffs deny any characterizations inconsistent therewith.  Plaintiffs deny the allegations set forth in the last sentence in paragraph 10, but aver that the Earnout Matrix, which was attached to the APA as Exhibit B, specified certain financial targets.

11.    To the extent the allegations contained in paragraph 11 purport to characterize Plaintiffs' and Defendant's rights and obligations under the APA, the document speaks for itself, and Plaintiffs deny any characterizations inconsistent therewith, but aver that such allegations are legal conclusions to which no response is required.

12.    To the extent the allegations contained in paragraph 12 purport to characterize Plaintiffs' and Defendant's rights and obligations under the APA, the document speaks for itself, and Plaintiffs deny any characterizations inconsistent therewith, but aver that such allegations are legal conclusions to which no response is required.

13.    To the extent the allegations contained in paragraph 13 purport to characterize Plaintiffs' and Defendant's rights and obligations under the APA, the document speaks for itself, and Plaintiffs deny any characterizations inconsistent therewith, but aver that such allegations are legal conclusions to which no response is required.

14.    To the extent the allegations contained in paragraph 14 purport to characterize Plaintiffs' and Defendant's rights and obligations under the APA, the document speaks for itself, and Plaintiffs deny any characterizations inconsistent therewith, but aver that such allegations are legal conclusions to which no response is required.

15.    To the extent the allegations contained in paragraph 15 purport to characterize Plaintiffs' and Defendant's rights and obligations under the APA, the document speaks for itself, and Plaintiffs deny any characterizations inconsistent therewith, but aver that such allegations are legal conclusions to which no response is required.

16.    To the extent the allegations contained in paragraph 16 purport to characterize financial projections made by Plaintiffs, Plaintiffs respectfully refer the Court to such projections and aver that the document speaks for itself, and Plaintiffs deny any characterizations inconsistent therewith.

17.    To the extent the allegations contained in paragraph 17 purport to characterize financial projections made by Plaintiffs, Plaintiffs respectfully refer the Court to such projections and aver

-4-

that the document speaks for itself, and Plaintiffs deny any characterizations inconsistent therewith.

18.    To the extent the allegations contained in paragraph 18 purport to characterize financial projections made by Plaintiffs, Plaintiffs respectfully refer the Court to such projections and aver that the document speaks for itself, and Plaintiffs deny any characterizations inconsistent therewith.

19.    Plaintiffs deny the allegations set forth in paragraph 19.

20.    Plaintiffs are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 20.

21.    Plaintiffs admit the first sentence in paragraph 21.  Plaintiffs deny the allegations set forth in the second sentence of paragraph 21, except admit that there were some delays regarding the delivery of completed SX-1 units.  Plaintiffs admit the third sentence in paragraph 21.  Plaintiffs deny the allegations set forth in the last sentence in paragraph 21, except admit that the launch of the SX-1 did not occur until October 2007.

22.    Plaintiffs deny the allegations set forth in the first sentence in paragraph 22.  Plaintiffs admit the second sentence in paragraph 22.  Plaintiffs deny the allegations set forth in the third sentence in paragraph 22, but aver that Ronsen informed Defendant that he might be able to sell 20,000 STX units.  Plaintiffs deny the allegations set forth in the last sentence of paragraph 22, except admit that Defendant's senior management approved the payment for the 20,000 STX units.

23.    Plaintiffs are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 23.

24.    Plaintiffs deny the allegations set forth in the first sentence in paragraph 24, but aver that Stratix reduced the size and scope of its contract for T3 services. Plaintiffs deny the remaining allegations set forth in paragraph 24 and respectfully refer the Court to the Stratix agreement for information relating to monthly revenue.

25.    Plaintiffs are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 25, because "Ronsen's projections" is a vague, ambiguous, and undefined term.

26.    Plaintiffs deny the allegations of paragraph 26, except admit that Ronsen was aware of the terms of the APA and other agreements between Plaintiffs and Numerex. To the extent the allegations set forth in paragraph 26 purport to characterize Plaintiffs' and Defendant's rights and obligations under the APA and the Severance and Non-Competition Agreement, the documents speaks for themselves, and Plaintiffs deny any characterizations inconsistent therewith.

27.    Plaintiffs deny the allegations set forth in paragraph 27.

28.    To the extent the allegations contained in paragraph 28 purport to characterize the contents of the e-mail, the document speaks for itself, and Plaintiffs deny any characterizations inconsistent therewith.

29.    Plaintiffs admit the allegations contained in paragraph 29.

30.    Plaintiffs admit the allegations set forth in the first sentence in paragraph 30. Plaintiffs respectfully decline to respond to the allegations set forth in the second sentence of paragraph 30 that purport to describe attorney client communications and/or work product.

31.    Plaintiffs deny the allegations set forth in paragraph 31, respectfully refer the Court to the October 5 letter, which speaks for itself, and respectfully decline to respond to the allegations set

forth in paragraph 31 that purport to describe attorney client communications and/or work product.

32.    Plaintiffs deny the allegations set forth in paragraph 32, and respectfully refer the Court to the October 5 letter, which speaks for itself.

33.    Plaintiffs deny the allegations set forth in paragraph 33, respectfully refer the Court to the e-mail alluded to in paragraph 33, which speaks for itself, and aver that Ronsen objected to the improper and materially inaccurate press releases prepared by Defendant without his input.

34.    Plaintiffs admit the first sentence in paragraph 34. Plaintiffs deny the allegations set forth in the second sentence of paragraph 34. Plaintiffs deny the allegations set forth in the last sentence of paragraph 34, but aver that the day before the executive retreat, Stratton Nicolaides, Defendant's CEO, promised to address the complaints raised in Ronsen's letter.

35.    Plaintiffs deny the allegations set forth in paragraph 35, except admit that calls between Ronsen and Defendant took place, although few, if any, resolutions were ever reached.

36.    Plaintiffs are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 36.

37.    To the extent the allegations contained in the first sentence in paragraph 37 purport to characterize Nicolaides' November 1st e-mail to Ronsen, the document speaks for itself, and Plaintiffs deny any characterizations inconsistent therewith. To the extent the allegations contained in the second sentence in paragraph 37 purport to characterize Ronsen's response to Nicolaides' November 1st e-mail, the document speaks for itself, and Plaintiffs deny any characterizations inconsistent therewith. Plaintiffs are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the third sentence in paragraph 37. To the extent the allegations contained in the fourth and fifth sentence in

paragraph 37 purport to characterize what Ronsen stated in the subject e-mail, the e-mail speaks for itself, and Plaintiffs deny any characterizations inconsistent therewith. Plaintiffs deny the allegations set forth in the last sentence in paragraph 37, but aver that Ronsen said that it was possible to sell 2,000 SX-1 units by year end with additional support from Numerex.

38.    Plaintiffs are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 38.

39.    Plaintiffs admit the first sentence in paragraph 39. Plaintiffs deny the allegations set forth in the second sentence in paragraph 39, but aver that Orbit One gave a presentation on December 19, 2007, which was jointly prepared by Orbit One and Defendant's Chief Operating Officer, Michael Marett, which stated, in part, that Defendant's breaches have and will continue to impact negatively sales of the SX-1 units. Plaintiffs admit the third sentence in paragraph 39, but aver that prior to Ronsen's attempting to hand Nicolaides the letter, Nicolaides became verbally abusive to Ronsen and Ronsen's staff. With respect to the last two sentences in paragraph 39, Plaintiffs respectfully refer the Court to the subject letter, which speaks for itself, and deny any characterizations inconsistent therewith.

40.    Plaintiffs admit the allegations contained in paragraph 40.

41.    Plaintiffs deny the allegations set forth in paragraph 41.

42.    Plaintiffs deny the allegations set forth in paragraph 42.

43.    Plaintiffs deny the allegations set forth in the first sentence in paragraph 43, and respectfully refer the Court to the Business Plan, which speaks for itself. Plaintiffs deny the allegations set forth in the second and third sentences in paragraph 43. Plaintiffs deny the allegations set forth in the fourth sentence in paragraph 43, except admit that the positions were not filled. Plaintiffs deny the allegations set forth in the last two sentences in paragraph 43.

44.    Plaintiffs deny the allegations set forth in the first sentence in paragraph 44. Plaintiffs deny the allegations set forth in the second sentence in paragraph 44, except admit that Defendant agreed to purchase the 20,000 SX-1 units. Plaintiffs are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the third and fourth sentences in paragraph 44. Plaintiffs deny the allegations set forth in the last two sentences in paragraph 44.

45.    Plaintiffs deny the allegations set forth in the first sentence in paragraph 45, but aver that Ronsen submitted a budget for the 2008 calendar year in compliance with the Earn Out. Plaintiffs deny the allegations set forth in the second and third sentences in paragraph 45. With respect to the fourth sentence in paragraph 45, Plaintiffs respectfully refer the Court to the subject budget, which speaks for itself, and deny any characterizations inconsistent therewith. Plaintiffs are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the fifth sentence in paragraph 45. Plaintiffs deny the allegations set forth in the last sentence in paragraph 45, but aver that Ronsen had a good faith belief in projected sales of 31,000 SX-1 units, provided that Defendant honored its contractual obligations.

46.    Plaintiffs deny the allegations set forth in the first sentence in paragraph 46. With respect to the allegations set forth in the last two sentences in paragraph 46, Plaintiffs respectfully refer the Court to the APA, which speaks for itself, and deny any characterizations inconsistent therewith.

47.    Plaintiffs deny the allegations set forth in the first sentence in paragraph 47. Plaintiffs deny the allegations set forth in the last two sentences in paragraph 47, but aver that Ronsen sent the e-mail to his boss, the President of the Satellite Division, who, upon information and belief, conferred with Nicolaides, who ultimately approved Ronsen's request.

48.     Plaintiffs deny the allegations set forth in the first sentence in paragraph 48.  Plaintiffs deny the allegations set forth in the second sentence in paragraph 48, except admit that Ronsen's boss gave him verbal approval, and Ronsen sent an e-mail requesting confirmation.  Plaintiffs deny the allegations set forth in the last sentence in paragraph 48.

49.     Plaintiffs deny the allegations set forth in the first sentence in paragraph 49, except admit that Ronsen's boss provided confirmation.  Plaintiffs admit the second sentence in paragraph 49.  Plaintiffs deny the allegations set forth in the last sentence in paragraph 49, but aver that Defendant sent the amount required under Schedule 1.3(a)(iii).

50.     Plaintiffs deny the allegations set forth in paragraph 50.

51.     Plaintiffs deny the allegations set forth in paragraph 51.

52.     Plaintiffs deny the allegations set forth in paragraph 52, and insofar as those allegations purport to characterize the terms of the APA the document speaks for itself, and Plaintiffs deny any characterizations inconsistent therewith.

53.     Plaintiffs deny the allegations set forth in paragraph 53.

54.     Plaintiffs repeat and reallege each and every preceding response as if fully set forth herein.

55.     Plaintiffs aver that the allegations set forth in paragraph 55 are legal conclusions to which no response is required.

56.     Plaintiffs deny the allegations set forth in paragraph 56.

57.     Plaintiffs deny the allegations set forth in paragraph 57.

58.     Plaintiffs deny the allegations set forth in paragraph 58.

59.     Plaintiffs deny the allegations set forth in paragraph 59.

60.     Plaintiffs deny the allegations set forth in paragraph 60.

61.     Plaintiffs deny the allegations set forth in paragraph 61.

62.     Plaintiffs repeat and reallege each and every preceding response as if fully set forth herein.

63.     Plaintiffs deny the allegations set forth in paragraph 63.

64.     Plaintiffs deny the allegations set forth in paragraph 64.

65.     Plaintiffs deny the allegations set forth in paragraph 65.

66.     Plaintiffs repeat and reallege each and every preceding response as if fully set forth herein.

67.     Plaintiffs deny the allegations set forth in paragraph 67.

68.     To the extent the allegations contained in paragraph 68 purport to characterize Plaintiffs' and Defendant's rights and obligations under the APA, the document speaks for itself, and Plaintiffs deny any characterizations inconsistent therewith.

69.     Plaintiffs are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the first sentence in paragraph 69.  Plaintiffs deny the allegations set forth in the last sentence in paragraph 69, except admit that the dispute has not been resolved, and aver that no legal action has been taken by either party and all contractual and delivery obligations have been met by both parties.

70.     To the extent the allegations contained in paragraph 70 purport to characterize Plaintiffs' and Defendant's rights and obligations under the APA, the document speaks for itself, and Plaintiffs deny any characterizations inconsistent therewith.

71.     Plaintiffs repeat and reallege each and every preceding response as if fully set forth herein.

72.     Plaintiffs admit paragraph 72.

73.     Plaintiffs admit the first sentence in paragraph 73. Plaintiffs deny the allegations set forth the second sentence in paragraph 73. Plaintiffs are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the last sentences in paragraph 73.

74.     Plaintiffs deny the allegations of the first sentence of paragraph 74, except to the extent they consist of legal conclusions that require no response. Plaintiffs are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the second sentence of paragraph 74.

75.     Plaintiffs deny the allegations of paragraph 75, except to the extent that those allegations consist of legal conclusions that require no response.

## DEFENSES

### FIRST DEFENSE

The Counterclaims fail to state a claim upon which relief can be granted.

### SECOND DEFENSE

Defendant's claims are barred, in whole or in part, by the doctrines of estoppel, implied consent, and/or acquiescence.

### THIRD DEFENSE

Defendant's claims are barred, in whole or in part, by the doctrine of implied and/or express waiver.

### FOURTH DEFENSE

Defendant's claims are barred by the doctrines of unclean hands, *in pari delicto*, and/or other principles of equity.

-12-

## FIFTH DEFENSE

Defendant's claims are barred, in whole or in part, by Defendant's prior material breach of the APA and Severance and Non-Competition Agreement.

## SIXTH DEFENSE

To the extent that Defendant is entitled to any payment pursuant to any claim or demand for relief in this action, Plaintiffs are entitled to a set off in the amounts due to Plaintiffs pursuant to Plaintiffs' claims.

## SEVENTH DEFENSE

Plaintiffs reserve the right to assert additional affirmative defenses as may become apparent during the course of discovery in this matter.

## CLAIM FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests the following relief:

(a)     judgment in Plaintiffs' favor dismissing all of Defendant's counterclaims with prejudice and denying each and every prayer for relief contained therein;

(b)     Plaintiffs' attorneys' fees, costs, and expenses in this action;

(c)     such other and further relief as the Court deems just in the circumstances.

LOWENSTEIN SANDLER PC

By:     _/s/_____
        John J.D. McFerrin-Clancy (JM-C 6937)
        1251 Avenue of the Americas
        New York, NY 10220
        (212) 262-6700
        *Attorneys for Plaintiffs*

Dated: March 31, 2008

-13-

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

ORBIT ONE COMMUNICATIONS, INC.,
DAVID RONSEN,

        Plaintiffs/Counterclaim Defendants,

        -against-

NUMEREX CORP.,

        Defendant/Counterclaim Plaintiff.

Civil Action No. 08-CV-0905 (LAK)

**CERTIFICATE OF SERVICE**

      I certify under penalty of perjury pursuant to 28 U.S.C. § 1746 that on March 31, 2008, I caused a true and correct copy of Plaintiffs' Answer and Defenses to be served via ECF and via electronic mail upon Kent A. Yalowitz, Esq. and Brandon H. Cowart, Esq., at the firm of Arnold & Porter LLP, 399 Park Avenue, New York, NY 10022-4690.

                         /s/_____
                         John J.D. McFerrin-Clancy

20543/2

# EXHIBIT 14

# SALISBURY & RYAN LLP

ATTORNEYS AT LAW

LONDON
CITY TOWER
40 BASINGHALL STREET
LONDON EC2V 5DE, ENGLAND
TELEPHONE: (071) 374-4077
TELECOPIER: (071) 628-7710

7ᵗʰ FLOOR
1325 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6026
TEL: 212-977-4660
FAX: 212-977-4668

WRITER'S DIRECT DIAL
(212) 621-0301
PS@SALISBURYRYAN.COM

July 14, 2008

**VIA EMAIL & FEDERAL EXPRESS**
John J.D. McFerrin-Clancy, Esq.
Lowenstein Sandler PC
1251 Avenue of the Americas
New York, NY 10020

> Re:    David Ronsen
>        Notice of Default dated July 7, 2008

Dear John:

Numerex Corp. ("NMRX") is in receipt of your latest default notice dated July 7, 2008 and I am writing this letter in response.

NMRX disputes your first allegation that NMRX failed to comply with its obligations under Section 1(d) of the Severance and Non-Competition Agreement with David Ronsen (the "Severance Agreement"). Your position seems to be that NMRX is in default because: (1) the bonus paid to Mr. Ronsen was based on Q3 and Q4 of 2007 performance rather than the entire year; (2) the bonus was not based on NMRX companywide results; (3) that the bonus was not based on targets set by the NMRX executive compensation plan; and (4) the bonus was not calculated in the same manner as those of other NMRX executives. I will deal with each of these assertions.

1.    Q3/Q4 Performance – Mr. Ronsen joined NMRX on August 1, 2007 and hence actually only worked for NMRX for 5/12 of the 2007 calendar year. If your position is that Mr. Ronsen is entitled to a full year's bonus when he actually worked less than half a year for NMRX, your position is untenable.

2.    Measurement Period – NMRX logically based the measure of Mr. Ronsen's bonus on NMRX's performance when Mr. Ronsen was actually an employee of NMRX. If Mr. Ronsen's bonus was measured against the entire year performance of NMRX the difference to Mr. Ronsen would be an incremental $980. (See attached calculation) This is hardly a material breach even if your position were correct. To avoid further trivial arguments we will send Mr. Ronsen a check for $980

John J.D. McFerrin-Clancy, Esq.
July 14, 2008
Page 2

     3.    <u>Bonus Not Based on NMRX Companywide Results</u> – NMRX rejects this assertion as untrue. The bonus was calculated and paid on NMRX company wide results. The only business line excepted from the calculations is the satellite business and that is because the satellite business was not owned when the Revenue and EBITDA targets were established by the Compensation Committee.

     4.    <u>Bonus Not Based on Targets Set by Compensation Plan</u> – The February 19, 2007 Compensation Committee minute copied to you with our response to the Montana Department of Labor & Industry on May 30, 2008 is the 2007 NMRX bonus plan for executives.

     5.    <u>Bonus Not Calculated in the Same Manner</u> – Again this assertion is completely rejected. Mr. Ronsen's bonus was calculated in the same manner (with the exception of the Q3/Q4 which we are correcting herewith although continuing to disagree with your position) as those of all executives including Messrs. Nicolaides, Catherall, Marett, Lang, and Feinberg.

     Finally, you make the same assertion that Messrs. Naden and Rosenzweig have recently made with regard to medical benefits. On review of Mr. Ronen's Severance Agreement, NMRX agrees that it is obligated to pay Mr. Ronsen's health and welfare benefits pursuant to Section 4(c) of the Severance Agreement. Accordingly, NMRX will reimburse Mr. Ronsen's medical coverage for the months of May and June 2008 and provide coverage under COBRA and otherwise at NMRX's expense through April 2009. A copy of the letter from NMRX's human resource department confirming COBRA coverage is attached hereto.

Very truly yours,

Andrew J. Ryan

cc:    Mr. Stratton Nicolaides (w/ enclosures)
       Mr. Alan Catherall (w/ enclosures)
       Kent Yalowitz, Esq. (w/ enclosures)

## David Ronsen Executive Bonus
### (6 month basis)

| | | Actual | Target at 105% of Exec Plan | Achievement | Plan Payout |
|---|---|---|---|---|---|
| **Revenue** | Q3 | $15,464 | $20,176 | | |
| | Q4 | $19,559 | $22,733 | | |
| | Total | $35,023 | $42,908 | 81.6% | 5.0% |
| | | | | | |
| **EBITDA** | Q3 | $770 | $2,410 | | |
| | Q4 | $1,107 | $3,618 | | |
| | Total | $1,877 | $6,028 | 31.1% | 0.0% |

Per the exec compensation plan for 81.6% of revenue target attainment

**Calculation**

| | |
|---|---|
| Base Salary | $235,000 |
| Eligible | 40% |
| Pro-rata | 0.42    5 months |
| Plan Payout | 5.0% |
| **Bonus** | **$1,958** |

Actual revenue & EBITDA excludes O.O. and is for Q3 and Q4. The executive plan also excludes O.O.

## David Ronsen Executive Bonus
### (12 month basis)

| | Actual | Target at 105% of Exec Plan | Achievement | Plan Payout | |
|---|---|---|---|---|---|
| **Revenue** | $68,003 | | | | |
| OO | ($3,625) | | | | |
| **Net** | $64,378 | $78,200 | 82.3% | 7.5% | Per the exec compensation plan for revenue between $63.9m and $67.2m |
| | | | | | |
| **EBITDA** | $5,037 | | | | |
| OO | ($1,373) | | | | |
| **Net** | $3,664 | $9,800 | 37.4% | 0.0% | Per the exec compensation plan for EBITDA below $5.5million |

**Calculation**

| | | |
|---|---|---|
| Base Salary | $235,000 | |
| Eligible | 40% | |
| Pro-rata | 0.42 | 5 months |
| Plan Payout | 7.5% | |
| **Bonus** | **$2,938** | |

The executive plan excludes O.O and therefore the actuals have also been adjusted to remove OO
This is exactly the same method used for the bonus calc used for all executive officers



**Numerex**  Experience. Excellence.

July 9, 2008

David Ronsen
504 South Willson Avenue
Bozeman, MT 59715

David,

Under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Numerex Corp. is required to offer COBRA (the Consolidated Omnibus Budget Reconciliation Act) coverage at group rates for 18 months following your resignation from employment with Numerex. Documents specifically explaining COBRA and the election process will come separately from both Blue Cross Blue Shield of Montana (BCBS-MT) and from Numerex for MetLife and VSP coverage options.

As per our "separation/severance" agreement, if elected, Numerex will provide you with an extended healthcare benefit through a combination of COBRA for an 18 month period, during which CBRA is available, followed by equivalent coverage. COBRA coverage will be available for 18 months as of your resignation date of April 24, 2008. Equivalent coverage will be provided thereafter, until December 31, 2010, consistent with your agreement. You will be responsible for paying the cost of coverage subject to reimbursement of the employee portion of that coverage by Numerex as further set forth below.

If elected, you will be reimbursed for the difference between the total monthly COBRA premium and what you would normally pay as an employee. This will include the employer portion premium(s), plus any administrative fees allowable by the law. You will of course be reimbursed for your May 2008 and June 2008 payments, as well as your payments going forward.

The administration of this process will be handled as follows:
1. You will be required to complete the election form(s) contained in the COBRA package(s) and submit them to the appropriate party/ parties with full payment, as directed in the package(s).
2. Numerex will require you to submit a standard expense report to Payroll, along with a copy/copies of your cancelled check(s).
   Please note that the expense report should reflect a request for payment for only the difference between what you paid as an employee versus the total COBRA premium. This will be honored for a total of 18 months effective as of the date of your resignation and cease on December 31, 2010.

Attached is a copy of our standard expense report for use in the reimbursement process.

Please do not hesitate to contact me with any questions in regard to this communication.

Regards,

Dawn Gibbons
Director, Human Resources

1600 Parkwood Circle, Fifth Floor    Atlanta, GA 30339    T 770-693-5950    F 770-693-5951    www.numerex.com