**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**ORBIT ONE COMMUNICATIONS, INC., DAVID RONSEN,**

                   *Plaintiffs*,

-against-

**NUMEREX CORP.,**

                   *Defendant*.

Civil Action No. 08-CV-0905 (LAK)

**STATEMENT OF**
**UNDISPUTED MATERIAL FACTS**

---

Pursuant to Local Civil Rule 56.1, Plaintiffs respectfully submit this statement of undisputed material facts in support of their motion for summary judgment and/or judgment on the pleadings.

1. David Ronsen is the President of Plaintiff/Counterclaim Defendant Orbit One Communications, Inc. ("Orbit"), and owner of 84% of its outstanding stock, as well as a Plaintiff in the above-captioned action. Declaration of David Ronsen, dated September 4, 2008 ("Ronsen Decl."), ¶ 1.

2. On July 1, 2007, Plaintiffs, *inter alia*, entered into an agreement with Numerex Corp. ("Numerex"), and its specially-created vehicle, Orbit One Communications LLC ("New Orbit") for the sale of substantially all of the assets of Orbit to New Orbit. *Id.* at ¶ 18.

3. The sale of the assets was pursuant to a written Asset Purchase Agreement (the "APA"), a true and correct copy of which with all schedules and attachments is annexed to the Ronsen Decl. as Exhibit 1.

4. Exhibit D to the APA, at paragraph 3(c) provides, in part:

> [I]n the event of termination of Mr. Ronsen by [Numerex] without cause or by Mr. Ronsen for Good Reason, [Orbit] shall be deemed to have earned the [Numerex] stock referenced in [the earn out provisions of the APA] as well as the cash consideration specified [in the earn out provisions] . . . .

5.      Paragraph 3(a) lists as one of the grounds that constitute "Good Reason" for termination by Ronsen as:

> (i) a material breach by [Numerex] of any of its obligations to Mr. Ronsen under this Agreement, which breach is not cured in all material respects within thirty (30) days (except in the case of a payment default for which the cure period shall be ten (10 days) [sic], in each case following written notice thereof from Mr. Ronsen to [Numerex] . . .

## Background

6.      Ronsen's interest in satellite-based communications systems arose during my work as a firefighter. Ronsen Decl., at ¶ 9.

7.      Ronsen is a former firefighter. After leaving the fire service, he started a business in which he managed and fought wildfires for federal and state land management agencies. While engaged in that work, often in remote and mountainous terrain, he experienced first-hand the superiority of satellite-based communications systems. *Id.* at ¶ 10.

8.      Inspired by those experiences, he founded Orbit in 2000. Orbit's principal line of business has evolved and is now the provision of satellite tracking devices and related services. In particular, Orbit sells units that, when affixed to remote assets (e.g., trucks, trailers, heavy equipment) provides GPS tracking. Orbit also markets the satellite data delivery service that communicates the tracking information back to a customer. *Id.* at ¶ 11.

9.      Orbit is a Montana Sub-chapter S corporation. *Id.* at ¶ 12.

10.     By 2007, Orbit was one of the leading providers of satellite GPS tracking devices and services. *Id.* at ¶ 13.

11.     It had some twenty employees and revenues averaging some $10 million per year. *Id.*

### Negotiations with Numerex

12.     In late 2006, Orbit was approached by Numerex, unsolicited, regarding a potential acquisition of Orbit. *Id.* at ¶ 14.

13.     Orbit had never been in any kind of sale process, nor had its shareholders (all three of whom were also employees) ever contemplated selling the business. *Id.*

14.     Ultimately, Numerex wished to pay only a nominal amount of guaranteed, up-front consideration for Orbit. The initial and the only guaranteed payment was some $5 million (followed by an additional $550,000). *Id.* at ¶ 15.

15.     Numerex claimed over $5 million of good will on the deal, and the contracts Orbit had in hand would provide over $3 million in revenue between the closing of the deal and the end of 2007. *Id.*

16.     In fact, the contracts in hand yielded $4.02 million for Numerex between August 1 and December 31, 2007, and generated -- in just the last two quarters of 2007 -- $1.8 million of the $5.1 million in EBITDA Numerex earned for all 2007. The purchase price is set forth in section 1.3 of the APA. *See* Ronsen Decl., Exh. 1.

17.     As such, the bulk of the consideration was based on an "earn out", as memorialized in the "Earn-Out Matrix". That is, to the extent Orbit One

Communications LLC ("New Orbit"), Numerex's vehicle for the acquisition, reached certain revenue and EBITDA targets, Numerex would pay certain additional amounts in cash and stock. Ronsen Decl., at ¶ 16.

18.    If New Orbit hit 150% (the highest level on the earnout matrix) of all of those targets over a two and one half year period, we would receive an additional approximately $15 or $20 million in consideration. Again, the earn out is set forth in section 1.3 of the APA, Exhibit B of the APA (the "Earn Out Agreement"), schedule 1.3 of the APA, and as an exhibit to the Exhibit D of the APA (the Severance and Non-Competition Agreement or "Severance Agreement"), all of which are part of Exhibit 1 to the Ronsen Decl. As a quid pro quo for the contingent nature of the bulk of the purchase consideration, Plaintiffs insisted that Ronsen be placed in control of New Orbit. *Id.* at ¶¶ 16-17.

19.    That is, because Plaintiffs would bear the risk with regard to meeting the earn out targets, Plaintiffs would be entitled to control the management and operation of the business during the entire earn out period. *Id.* at ¶ 17.

20.    If Numerex terminated or even reduced that control (other than for cause), or if Ronsen were compelled to give up that control as a result of Numerex's conduct, the earn out would be guaranteed. That is, if Numerex deprived Ronsen of control, the risk shifted to Numerex. *Id.*

21.    This shift of risk was memorialized in Paragraph 3(a) of Exhibit D of the APA, which provides that Ronsen may terminate his employment for "Good Reason" should Numerex not give him the title and customary authority of president of New Orbit. *See* Exh. 1, at Exhibit D, ¶ 3(a)(ii).

**Integrated Agreements**

22.     This central bargain dictated the structure of the entire transaction. In particular, it required that not only would there be an Asset Purchase Agreement, but that Ronsen would be employed by Numerex post-acquisition. *Id.* at ¶ 18.

23.     As a result, the APA, its Exhibit D (the latter of which also sets forth the terms of my employment by Numerex), and the Earn Out were all negotiated and executed together, as part of one transaction. (While Exhibit D states that it is dated June 31, 2007, this is a typographical. In fact, the APA and all of its attached agreements were executed on July 31, 2007). *Id.*

24.     Ronsen would never have been employed by Numerex absent the execution of the APA, and he would not have executed the APA and attached agreements had the parties not executed Exhibit D. *Id.*

25.     The parties intended that the documents be read together, as one agreement. This was memorialized in section 9.10 of the APA ("All Exhibits and Schedules referred to herein are intended to be and hereby are specifically made a part of this Agreement").

**Numerex's Payment Defaults**

**Failure to Pay the Earn Out**

26.     The agreements provide for additional "earn out" compensation to Plaintiffs should New Orbit meet certain revenue and EBITDA targets. The Earn Out Agreement specifies the procedure for determining the amount, if any, of the earn out payments. *See* Rosen Decl., Exh 1, Exhibit B

27.  Paragraph 2.2 of the Earn Out Agreement provides that" "As soon as practicable after . . . public release of financial results" for the year ended December 31, 2007, Numerex "shall prepare and deliver to [Plaintiffs] a statement calculating Revenues, EBITDA and the Earn-Out (the "Statement") . . ." *See* Exh. 1, at Exhibit B, ¶ 2.2.

28.  If Plaintiffs do not object to the calculation on the Statement, then Numerex must cause the escrowed earn out payment to be released to Plaintiffs. *See* Exh. 1, at Exhibit B, ¶ 2.3.

29.  Numerex never sent the Statement to Plaintiffs, and thus precluded payment of the earn out to Plaintiffs. Ronsen Decl., at ¶ 22.

30.  By letter dated April 11, 2008, counsel for Plaintiffs put Numerex on notice of a payment default for failure to pay the earn out, or even to provide the Statement called for by the parties' agreements. *See* Declaration of John J. D. McFerrin-Clancy, ("Clancy Decl.") Exh. 1.

31.  In response, Numerex provided a letter from its general counsel and board member, Andrew Ryan, stating that it had provided the "statement" which it also attached to its letter. *See* Clancy Decl., Exh. 2.

32.  In that letter, Numerex stated that a "draft" calculation forwarded to a non-officer of New Orbit contained the correct calculation, and that it had been "told" that Ronsen "signed off on it." *Id.*

33.  In fact, Ronsen had seen the draft calculation, and Plaintiffs agree that the calculation is correct. Ronsen Decl., at ¶ 24.

6

34. The letter states that New Orbit reached 67% of Revenue, and 112.1% of EBITDA targets. According to Numerex's calculation, and as set forth in Mr. Ryan's letter, Plaintiffs thereby were entitled to 320,833 shares of Numerex stock from the escrow. *See* Clancy Decl., Exh. 2.

35. While Mr. Ryan acknowledges Plaintiffs' due demand for payment of the shares, he stated that Numerex refuses to release them because of the pendency of Numerex's counterclaims in this action. *See* Clancy Decl., Exh. 2.

36. By letter dated March 27, 2008, Numerex stated that it would not pay the earn out, because it was asserting it counterclaims in this action as a set off. See Clancy Decl., Exh. 8.

37. To date, Numerex has failed to pay the first tranche of the earn-out. Ronsen Decl., at ¶ 26.

**Hold Back**

38.   Pursuant to Paragraph 1.4(a) of the APA, Numerex was entitled to escrow $550,000 of the purchase price for one year from the July 31, 2007 closing: "Cash Escrow. Ten (10%) percent of the aggregate cash consideration specified in Section 1.3(a)(i), (ii) and (iii) shall be escrowed pursuant to the Escrow Agreement ('Cash Escrow') for a period of one (1) year from the date of Closing as a cash hold back and initial source of recovery for purposes of Seller's indemnity obligations under Article IX." *Id.* at ¶ 27.

39.   No indemnified claim has been asserted by any third party. Moreover, the only indemnity "claim" Numerex has asserted was an obligation expressly carved out from the indemnity provisions of the APA. *Id.* at ¶ 28.

40.   By letter dated August 4, 2008, Plaintiffs demanded payment of this $550,000. *See* Clancy Decl., Exh. 9.

41.   By letter dated August 8, 2008, Numerex refused to pay this $550,000, again asserting its contingent counterclaims as a set off. *See id.*, Exh. 10.

**Severance and Health and Welfare Benefits**

42.   As set forth in a letter from Ronsen to Numerex, dated April 24, 2008, Ronsen terminated his employment as of April 24, 2008 due to Numerex's numerous breaches of the APA and its Exhibit D (my Severance and Non-Competition Agreement). Ronsen Decl.*,* at ¶ 27.

43.   In that letter, Ronsen states that he is terminating his employment for "Good Reason," as set forth in the Severance Agreement. Pursuant to Paragraph 3(c) of the Severance Agreement, if he properly terminated for "Good Reason"

Plaintiffs are deemed, going forward, to have earned the full earn out amount. (the "Guarantee Provision"). *Id.* at ¶ 32.

44. Pursuant to Paragraph 3(b), Ronsen would be entitled to twelve months severance (upon signing a release), but would not be entitled to "health and welfare benefits." *Id.*

45. Although he requested the release, Numerex refused to provide it and refused to provide Ronsen with his severance. *Id.* at ¶ 33.

46. Instead, Numerex stated, in a letter dated April 30, 2008, that Ronsen lacked "Good Reason" and that he had terminated his employment "Not for Good Reason". Clancy Decl., Exh. 3.

47. However, in the event he terminates his employment on those terms, Numerex is required to continue to provide him with "health and welfare benefits throughout the Non-Competition Period." Ronsen Decl., Exh. 1, at Exhibit B, ¶ 4(c).

48. Numerex cancelled Ronsen's health insurance and all other benefits upon his leaving its employ. Ronsen Decl., at ¶ 35.

49. By letter dated June 20, 2008, Plaintiffs' counsel placed Numerex on notice of this payment default. *See* Clancy Decl., Exh. 4.

50. While more than ten days has passed since that letter, Numerex has failed to cure. Ronsen Decl., at ¶ 35.

51. Numerex has offered to reimburse Ronsen to the extent his COBRA premiums exceed the amount he formerly contributed to his company health insurance. However, Numerex has not offered to reimburse him for his used

9

deductible, nor has it agreed to gross up this "reimbursement" to offset the tax consequences of this "cure" arrangement -- which decreases the value of Numerex's contribution to him by more than 50%. *Id.*

52. If Numerex were correct that Ronsen terminated his employment "Not for Good Reason", it would be guilty of a payment default that triggers the Guarantee Provision. Numerex was required to pay either the benefits or the severance, depending on whether or not the Court concludes Ronsen had "Good Reason" to terminate his employment. Numerex has done neither. *Id.* at ¶ 36.

**Bonus**

53. Pursuant to Paragraph 1(d) of the Severance Agreement, Ronsen[E]ligible to receive an annual cash bonus of up to 40% of Base Salary upon achievement of [Numerex] company-wide EBITDA and revenue objective . . . annually under [Numerex's] executive bonus plan." *See* Ronsen Decl., Exh. 1, at Exhibit D, ¶ 1(d).

54. Ronsen's base salary, as set forth in Paragraph 1(b) was $235,000. As such, his maximum bonus was $94,000 on a full-year basis. Ronsen Decl., at ¶ 38.

55. While employed by Numerex, he made several requests for a copy of the "executive bonus plan." However, Numerex repeatedly refused to provide him with a copy. Ronsen was once referred to an SEC filing by the CFO, Alan Catherall. However, that filing gave no particulars or any information sufficient to calculate the bonus to which he was entitled. *Id.* at ¶ 39.

56.     Numerex did not pay him any bonus until April 30, 2008. At that time, it paid him a bonus of $1,958. *Id.* at ¶ 40.

57.     In response, Ronsen brought a wage claim before the Montana Department of Labor ("DOL"). It was only when Mr. Ryan filed a response to the DOL that Ronsen learned of the actual figures upon which the executive bonus plan was based. *Id.* at ¶ 41.

58.     The plan, as submitted by Numerex to the DOL, provides a payout of percentage of maximum bonus dependant on the "annual", "company-wide" revenue and EBITDA performance of Numerex "as a whole", against its annual targets. *Id.* at ¶ 42.

59.     A review of the Severance Agreement, and the information submitted by Numerex to the DOL show that Ronsen's bonus was improperly calculated. Paragraph 4 of the Severance Agreement states that his bonus shall be based on Numerex "company-wide performance" against the EBITDA and Revenue targets. *See* Ronsen Decl., Exh. 1, at Exhibit D, ¶ 4. This is echoed in the Board Minutes approving the executive plan, which states the company will "pay bonuses based on the *company* hitting both revenue & EBITDA projections . . . " (emphasis added). *See* Ronsen Decl., Exh. 3.

60.     Further, on the example bonus calculation attached to the Board Minutes provided by Mr. Ryan to the DOL, the figures used to measure Revenue and EBITDA performance are those for all of Numerex. This can be easily verified by comparing the figures used in the example with those published by Numerex. See Ronsen Decl., at Exh. 4.

61.     Numerex sets forth for the DOL a two-page chart showing how Ronsen's bonus was calculated. Inexplicably, that charts states that the bonus is not calculated based on Numerex company-wide results. Rather, it expressly states, in the note on each page, that the bonus is measured against Numerex revenue and EBITDA excluding the revenue and EBITDA for the Satellite Division (Orbit One, or "OO" as it is referred to in the note). Ronsen Decl., at ¶ 45.

62.     Significantly, on the example bonus calculation annexed to the Board Minutes, company-wide EBITDA and Revenue are used to compute Numerex's performance, including the contribution made to each by Orbit One. This can be verified by again referring to the published Numerex financial results for 2007. *See* Ronsen Decl., Exh. 4.

63.     Had Numerex included New Orbit's revenue and EBITDA in its bonus calculation, as it was contractually required to do, Ronsen's bonus payment would have been $4,895.88 (net of withholdings). Ronsen Decl., at ¶ 47.

64.     This calculation is based on the following: (i) Numerex achieved and publicly-reported company-wide revenue of $68,000,000 in 2007 (when the Satellite Division results are included); (ii) pursuant to Paragraph 1(d) of the Severance Agreement, Ronsen was eligible to receive a cash bonus of "up to 40% of Base Salary;" (iii) his Base Salary was $235,000; (iv) he worked at Numerex for five months in 2007; and (v) according to the documents and matrices submitted by Numerex to the DOL, the stated bonus percentage for $68,000,000 in revenue was 12.5%. Thus, the bonus should have been calculated as follows: $235,000 x 40% x 5/12 x 12.5 = $4,895.88. *Id.* at ¶ 48.

65. However, Numerex has paid him only $1,958. *Id.* at ¶ 49.

66. By letter dated July 7, 2008, Plaintiffs placed Numerex on notice of this payment default. See Clancy Decl., Exh. 7.

67. In a letter dated July 14, 2008, Numerex stated that it was not required to include New Orbit's contribution to Numerex's financial results, in calculating the bonus. See Clancy Decl., Exh. 14.

68. Numerex continues to refuse to pay the full bonus. Ronsen Decl., ¶ 49.

## Numerex's Counterclaims

### Axonn

69. Axonn LLC ("Axonn") is a supplier of a key component for the SX-1 product. Ronsen Decl., at ¶ 51.

70. It had been Orbit's and is now New Orbit's sole supplier of a key component for Orbit/New Orbit products, namely the "STX." *Id.*

71. Upon information and belief, Orbit was and New Orbit is Axonn's largest customer. *Id.* at ¶ 52.

72. Well before Numerex solicited Plaintiffs about an acquisition, Orbit hired Gary Naden, who also became a shareholder of Orbit. *Id.* at ¶ 53.

73. Mr. Naden had been employed by Axonn immediately prior to his employ with Orbit. *Id.*

74. As a result, Axonn made a number of complaints about alleged trade secret or restrictive covenant violations, supposedly arising from Mr. Naden's employment. *Id.* at ¶ 54.

75. Despite the complaints, the companies' continued to do substantial business with each other. *Id.* at ¶ 55.

76. Notably, Axonn never brought any kind of action or proceeding either against Mr. Naden or Orbit. *Id.* at ¶ 56.

77. In connection with the Numerex purchase, we made full disclosure to Numerex of the complaints made to us by Axonn. They are summarized in a two page singled-spaced description, attached to the APA. *Id.* at ¶ 57.

78. In or before June 2000, well before the July 31 closing of the acquisition, Ronsen discussed with Stratton Nicolaides, and others at Numerex, whether or not Orbit should go make a substantial order for components from Axonn. *Id.*

79. After extensive discussion, Numerex agreed that Orbit should put in an order for 20,000 STX units from Axonn. These would be delivered in or about October. *Id.*

80. Numerex also expressly agreed that, if the acquisition went forward, Numerex would bear the cost of this purchase order, because it would end up as inventory of New Orbit, when delivered. Thus, after full consultation with and the agreement of Numerex, Orbit then issued the purchase order in June 2007. *Id.*

81. This agreement by Numerex is memorialized on schedule 1.5 of the APA. That schedule lists, among other liabilities, Orbit's purchase order to Axonn, for $1.1 million. This is a reference to the Orbit purchase order for 20,000 STX units from Axonn, which Numerex agreed to pay for. *Id.* at ¶ 58.

82. That is clear from the documents, because the liability of Orbit to Axonn is "for approximately 20,000 STX devices . . . payable in the amount of $1,100,000 upon receipt of the devices." *Id.*

83. Although Numerex claims that the STX-1 units are not "promptly saleable," the STX units can, in fact, be sold, and sold at a profit. *Id.* at ¶ 59.

84. These units are a component in many other products made by other manufacturers and are in demand. *Id.* at ¶ 60.

85. Ronsen received and forwarded to Numerex a third-party offer in January, 2008 to purchase 3,000 of the STX units from Numerex at a price of $65 per unit, which represented an 18% markup from the price at which Numerex acquired the units. *Id.*

### Stratix

86. Stratix is by far the largest customer of New Orbit (as it was of Orbit). *Id.* at ¶ 61.

87. Stratix holds the primary contract with FEMA that accounted for virtually all of New Orbit's post-acquisition revenue. *Id.* at ¶ 62.

88. Orbit's original contract with Stratix expired at the end of 2007. *Id.*

89. Ronsen received the details of the required purchase order from Stratix to exercise a one-year extension, Option Period 1, of the contract, and forwarded it to Mike Marett, President of New Orbit, on December 21, 2007, noting that New Orbit needed to renew it. See Clancy Decl., Exh. 7.

90. Ronsen never misrepresented the terms of the purchase order to Mr. Marett, or anyone at Numerex. Ronsen Decl., at ¶ 63.

91.     Mr. Marett expressly discussed with Mr. Nicolaides, the CEO of Numerex, whether to accept the purchase order. *Id.* at ¶ 64.

92.     Mr. Nicolaides was fully familiar with the terms of the APA and the fact that Orbit would receive a payment upon the acceptance. *Id.* at ¶ 65.

93.     Approximately eighteen days after Ronsen informed him about the purchase order, Mr. Marett approved the purchase order, in effect exercising the Option Period 1 and renewing the contract with Stratix. *Id.* at ¶ 66.

94.     In Option Period 1, there was a reduction in units and prepaid messages from the initial contract. However, there were no changes to the terms and conditions of the Stratix agreement. *Id.* at ¶ 67.

95.     Pursuant to subparagraph (i) of Schedule 1.3(a)(iii) of the APA, Numerex adjusted the payment for this reduction accordingly by reducing its payment to Orbit to $1.75 million. *Id.* at ¶ 68.

## **Relief**

96.     Numerex was required to release the first tranche of the earn out to Plaintiffs on March 31, 2007. Ronsen Decl., Exh. 1, at ¶ 1.3(a)(iv).

97.     As of that date, Numerex stock traded at $7 per share.

98.     Numerex stock currently trades at approximately $5 per share.

Dated: September 4, 2008
      New York, New York

                                                <u>//s// John J.D. McFerrin-Clancy</u>
                                                John J.D. McFerrin-Clancy
                                                **LOWENSTEIN SANDLER, P.C.**
                                                1251 Avenue of the Americas
                                                New York, New York  10020
                                                (212) 262-6700
                                                Attorneys for Plaintiffs