```
UNITED STATES DISTRICT COURT            (ECF)
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - :
ORBIT ONE COMMUNICATIONS, INC.,    :
and DAVID RONSEN,                  : 08 Civ. 0905 (LAK) (JCF)
                                   :
       Plaintiffs/Counterclaim     :
            Defendants,            :
                                   :        MEMORANDUM
       - against -                 :        AND   ORDER
                                   :
NUMEREX CORP.,                     :
                                   :
       Defendant/Counterclaim      :
            Plaintiff.             :
- - - - - - - - - - - - - - - - - :
NUMEREX CORP.,                     :  08 Civ. 6233 (LAK) (JCF)
                                   :
       Plaintiff/Counterclaim      :
            Defendant,             :
                                   :
       - against -                 :
                                   :
SCOTT ROSENZWEIG, GARY NADEN, and  :
LAVA LAKE TECHNOLOGIES, LLC,       :
                                   :
       Defendants/Counterclaim     :
            Plaintiffs.            :
- - - - - - - - - - - - - - - - - :
GARY NADEN, DAVID RONSEN, SCOTT    : 08 Civ. 11195 (LAK) (JCF)
ROSENZWEIG, ORBIT ONE             :
COMMUNICATIONS, INC. and LAVA LAKE :
TECHNOLOGIES, LLC,                 :
                                   :
       Plaintiffs/Counterclaim     :
            Defendants             :
                                   :
       - against -                 :
                                   :
NUMEREX CORP.,                     :
                                   :
       Defendant/Counterclaim      :
            Plaintiff.             :
- - - - - - - - - - - - - - - - - :
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE
```

1

There is a pervasive risk that electronic information will be lost during the course of litigation, whether through inadvertence, intentional spoliation, or failure to institute and properly implement a litigation hold.  Consequently, the law provides a range of sanctions and remedies that may be imposed when the destruction of evidence occurs.  No matter how inadequate a party's efforts at preservation may be, however, sanctions are not warranted unless there is proof that some information of significance has actually been lost.

In these related cases, Numerex Corporation ("Numerex") contends that the jury should be instructed that it may draw an adverse inference against Orbit One Communications, Inc. ("Orbit One") and David Ronsen on the ground that these parties are responsible for the spoliation of electronically stored information.  Numerex further seeks an award of attorneys' fees and costs incurred in connection with this motion.  Because Numerex has been unable to demonstrate that relevant information has in fact been destroyed, its motion is denied.

<u>Background</u>[1]

    A. <u>Origins of the Litigation</u>

    In 2000, David Ronsen established Orbit One, a corporation dedicated to selling satellite communications services and manufacturing tracking devices that rely on satellite technology. <u>Orbit One III</u>, 692 F. Supp. 2d at 375-76. The business operated out of a facility in Bozeman, Montana. <u>Id.</u> at 375. Although Mr. Ronsen was initially the sole shareholder, two other company executives, Scott Rosenzweig and Gary Naden, later became equity owners, though Mr. Ronsen retained eighty-four percent of the stock. <u>Id.</u> at 376. Prior to joining Orbit One, Mr. Naden had been an engineer at Axonn, the communications company that supplied Orbit One's satellite transmitters. <u>Id.</u>

    Beginning in 2006, Numerex, a satellite communications company, began negotiations to acquire Orbit One. <u>Id.</u> These discussions culminated with the execution of an asset purchase agreement on July 31, 2007. (Asset Purchase Agreement dated July 31, 2007 (the "APA"), attached as Exh. 1 to Declaration of Dorothy N. Giobbe dated April 17, 2009). Pursuant to the APA, Numerex,

---

    [1] The factual background is set forth in detail in three prior opinions: <u>Orbit One Communications, Inc. v. Numerex Corp.</u>, No. 08 Civ. 905, 2008 WL 3361376 (S.D.N.Y. Aug. 12, 2008) ("<u>Orbit One I</u>"); <u>Orbit One Communications, Inc. v. Numerex Corp.</u>, 255 F.R.D. 98 (S.D.N.Y. 2008) ("<u>Orbit One II</u>"); and <u>Orbit One Communications, Inc. v. Numerex Corp.</u>, 692 F. Supp. 2d 373 (S.D.N.Y. 2010) ("<u>Orbit One III</u>").

through a specially created subsidiary, acquired substantially all of Orbit One's assets in return for approximately 5.5 million dollars.  Orbit One II, 255 F.R.D. at 101.  In addition, Numerex agreed to provide Orbit One with "earn out" payments if the new division of Numerex that had been Orbit One met a series of revenue and earnings targets for 2007 through 2009.  Id. at 101-02.  Based on the success of the new division, these payments could amount to up to 4.5 million dollars in cash and 2.5 million shares of Numerex stock.  Id. at 102.

At the same time that the parties executed the APA, Numerex and the principals of Orbit One entered into employment agreements pursuant to which Mr. Ronsen would continue as President of the new division, with Mr. Rosenzweig as Vice President of Business Development and Mr. Naden as Chief Technology Officer.  Orbit One III, 692 F. Supp. 2d at 376.  The agreements contained non-competition covenants that varied in duration depending upon whether the executives departed from their employment for "good reason" or "other than good reason."  Id. at 376-77.  In addition, Mr. Ronsen's employment agreement provided that he could be terminated for cause, which included failure to meet the performance targets set forth in the APA.  Orbit One II, 255 F.R.D. at 102.  On the other hand, if he were terminated without cause or if he resigned "for good reason," he would be entitled to the full

4

earn out.  Id.

During the fall of 2007, Orbit One's sales were poor, and its revenues were not meeting projections.  Id.  On January 7, 2008, Orbit One and Mr. Ronsen filed an action in New York State Supreme Court, New York County, alleging that Numerex had interfered with Mr. Ronsen's ability to receive compensation from the earn out by impeding his management of Orbit One.  Numerex removed the case to this Court and asserted counterclaims.[2]  In April 2008, Mr. Ronsen resigned from Numerex, and Mr. Naden and Mr. Rosenzweig departed in June 2008.  Numerex then sued Mr. Naden and Mr. Rosenzweig in this Court, asserting, among other things, that they had stolen proprietary information from Numerex upon their resignation.[3]  The defendants filed counterclaims, alleging that Numerex had violated the APA as well as their employment agreements.  Finally, in July 2008, Mr. Ronsen, Mr. Naden, and Mr. Rosenzweig filed an action in the United States District Court for the District of Montana contending that their covenants not to compete were overbroad and therefore unenforceable.  That action was transferred to this Court on Numerex's motion, and Numerex filed counterclaims.[4]

---

[2] This is the case designated 08 Civ. 905 (LAK) (JCF).

[3] This case was filed as 08 Civ. 6233 (LAK) (JCF).

[4] Following transfer, this case was designated 08 Civ. 11195 (LAK) (JCF).

B. <u>Information Management</u>

Prior to the sale of Orbit One's assets to Numerex, Mr. Ronsen utilized a laptop computer and a desktop computer in his office at Orbit One's facility in Bozeman. (Tr. at 3-4, 104).[5] The desktop was initially purchased on behalf of another of Mr. Ronsen's companies, Bridger Fire, Inc. (Tr. at 9; Deposition of David Ronsen ("Ronsen Dep."), attached as Exh. A to Declaration of Emily A. Kim dated March 8, 2010 ("Kim Decl.") at 413, 426).[6] Both the Orbit One laptop (when it was in the office) and the desktop were linked to Orbit One's network of servers. (Tr. at 4, 104). This network included an exchange server for e-mail, a shared server where electronic documents resided (the "U-drive"), and a portion of a server that could be accessed by anyone at the facility (the "O-drive"). (Tr. at 4-5, 104-05; Declaration of David A. Ronsen dated Oct. 3, 2008 ("Ronsen Decl."), attached as Exh. D to Kim Decl., ¶¶ 8-9).

Mr. Ronsen's laptop and desktop were both synchronized with the shared drive on the server. (Tr. at 105). Consequently, whenever he logged on or off, anything he had saved to a folder on the shared drive (including his "My Docs" folder) would

---

[5] "Tr." refers to the transcript of an evidentiary hearing held in connection with the instant motion on July 28, 2010.

[6] He also possessed a laptop that had been issued to him by the Federal Emergency Management Agency, which he used in connection with Orbit One business as well. (Tr. at 5).

automatically be saved on the server as well.[7]   (Tr. at 105).
There was no backup for local hard drives.  (Tr. at 106).  The
servers were backed up to disks on a daily basis, and the disks
were preserved for a two-week period before being rotated and
written over.  (Tr. at 106).  In addition, two additional disks
were used for monthly and yearly backups.  (Tr. at 106).

In August 2007, shortly after its acquisition by Numerex but
before Numerex physically took over the Bozeman facility, Orbit One
received a communication from Axonn, Mr. Naden's former employer,
threatening litigation, apparently because Axonn believed that
Orbit One had misappropriated certain intellectual property.  (Tr.
at 13-14).  Axonn's letter demanded that Orbit One preserve all
documents, including electronic information, relevant to the issues
that Axonn had raised.  (Tr. at 14).  Mr. Ronsen consulted with an
attorney, Antoinette M. Tease, regarding Axonn's letter.  (Tr. at
14).  Ms. Tease, in turn, orally advised Mr. Ronsen on August 27 to
retain relevant information, and she subsequently issued a
litigation hold in the form of an e-mail addressed to Mr. Ronsen
and copied to Mr. Naden and Mr. Rosenzweig.  (Tr. at 14-15; Exh. U-
7).[8]  The e-mail, dated September 17, 2007, directed Orbit One to

_____

[7] Documents saved only to a local folder, on the C-drive of
his laptop, for example, would not be synchronized with the server.
(Tr. at 106).

[8] This document was introduced at the evidentiary hearing on
July 28, 2010, and referred to by its exhibit number in the

7

"take all steps necessary to preserve all hard copy and electronic files, including, but not limited to, emails" relating to Axonn's concerns. (Exh. U-7). It further stated:

> If possible, it would be advisable to back up all electronic files (including emails) using an external hard drive or some other method so that those files are preserved in the event of litigation. Please forward this email to anyone else in your company who may be in possession of relevant files, and please let me know if you have any questions.

(Exh. U-7).

Beginning in August 2007, Christopher Dingman, Orbit One's information technology administrator, began requesting Orbit One executives, and particularly Mr. Ronsen, to remove data from the servers. (Tr. at 18-22, 101, 112-13; Ronsen Decl., ¶ 18). The purpose of this initiative was to increase available storage space and improve computer performance. (Tr. at 18, 20, 113; Ronsen Decl., ¶ 18). According to Mr. Ronsen, Mr. Dingman asked for the removal of "personal information or older information that wasn't needed on a day-to-day basis." (Tr. at 18). Mr. Dingman did not specifically direct the deletion of business-related information. (Tr. at 22, 113). He did, however, ask Mr. Ronsen to remove and archive e-mail dated prior to 2007. (E-mail from Chris Dingman to David Ronsen dated Oct. 17, 2007, attached as Exh. 1 to Ronsen Decl.). At the time Mr. Dingman requested that data be removed

---

pretrial order. It bears bates number ORBIT00022830.

from the servers, Mr. Ronsen did not advise him of the litigation hold that Ms. Tease had imposed. (Tr. at 22, 113-14).

During the first week of December 2007, Mr. Ronsen, with Mr. Dingman's assistance, archived over six gigabytes of data. (Tr. at 22-23, 27, 33, 75, 114; Ronsen Decl., ¶¶ 22, 27, 29). According to Mr. Ronsen, "over eighty percent (80%) of that information was very old, personal, and not related in any way to Numerex, the APA, or Orbit's business or operations." (Ronsen Decl., ¶ 29). Furthermore, "[o]f the remaining files, the vast majority were files created before August 1, 2007 (i.e., prior to the closing of the APA), and some of the files were pre-acquisition, confidential, and privileged communications between Orbit and its counsel relating to the drafting and negotiation of the APA." (Ronsen Decl., ¶ 30). Mr. Ronsen stored the archived files on an external hard drive that he had obtained for that purpose. (Tr. at 23; Ronsen Decl., ¶ 21). He then deleted from the server personal items, such as music files. (Tr. at 22-24). He also deleted at least some of the business e-mails that predated the acquisition by Numerex; however, he insists that he simply copied many of these e-mails, such that they remained on the server. (Tr. at 23-27). In response to a request by Numerex's counsel for the archived documents, Mr. Ronsen eventually gave the external hard drive to his attorneys. (Tr. at 71; Ronsen Decl., ¶ 32).

Meanwhile, Mr. Dingman had also requested that Mr. Ronsen remove his personal desktop computer from the network and use only the laptop. (Tr. at 108). This change was intended to bring the company into compliance with a computer security protocol known as ISO 27001 and also to improve performance. (Tr. at 108). In October 2007, Mr. Dingman assisted Mr. Ronsen with the transition by instructing him how to save any files that he wanted to retain. (Tr. at 108-10). Mr. Ronsen did not inform him of the Axonn litigation hold. (Tr. at 109). Nevertheless, because the desktop and the laptop were synchronized with each other through the network, the folders that resided on the desktop remained on the laptop and the server when the desktop was removed. (Tr. at 68-70). According to Mr. Dingman, the desktop computer was then moved to a storage area next to his work space. (Tr. at 110). Mr. Ronsen, however, states that he removed the computer directly from his office to the garage at his home. (Tr. at 29-30). Later, sometime after he left Numerex, Mr. Ronsen gave that computer along with two others he owned to a technician to cannibalize the best components and build one computer. (Tr. at 60-61). The reconstituted computer did not contain the hard drive from the desktop. (Tr. at 61). However, when the preservation of information became an issue in this case, Mr. Ronsen contacted his technician, recovered the hard drive, and turned it over to his

counsel.  (Tr. at 61-62).

On November 28, 2007, Mr. Ronsen had set up a meeting with attorneys at Lowenstein Sandler PC to discuss his legal options in light of his view that Numerex was violating the APA by impeding his ability to do his job.  (Email from David Ronsen to Anthony O. Pergola dated Nov. 28, 2007, attached as Exh. B to Kim Decl.).  That meeting took place on December 6, 2010; at that time, Mr. Ronsen did not tell his counsel about the steps he had taken a few days before to remove data from Orbit One's servers.  (Tr. at 27).  On December 19, 2007, Mr. Ronsen's attorneys sent a letter to Stratton Nicolaides, the Chief Executive Officer of Numerex, threatening litigation in the event that Numerex did not resolve the issues raised by Mr. Ronsen (Tr. at 35; Letter of John McFerrin Clancy dated Dec. 19, 2007, attached as Exh. H to Kim Decl.), and on January 7, 2008, the plaintiffs made good on this threat and filed the first of the related actions.  On January 28, 2008, counsel for Numerex sent plaintiffs' counsel a comprehensive preservation letter, demanding that the plaintiffs implement a litigation hold.  (Letter of Kent A. Yalowitz dated Jan. 25, 2007,[9] attached as Exh. I to Kim Decl.).  In response, Mr. Dingman took several then-current backup disks out of rotation and stored them

-----

[9] This date is obviously a typographical error, as is confirmed by the fact that the header of the second page of the letter contains the correct date, January 25, 2008.

in what he considered the safest location in the Bozeman facitlity: the safe in Mr Ronsen's office.  (Tr. at 1006-08, 115).  Mr. Ronsen subsequently took the disks home.  (Tr. at 115).

Mr. Ronsen remained employed by Numerex even after he filed suit.  However, by late March or early April of 2008, he was contemplating resigning.  (Tr. at 45-46; Ronsen Dep. at 417).  At about the same time, he reported to Mr. Dingman that he was experiencing difficulties with his laptop computer.  (Tr. at 44-45, 116; Ronsen Dep. at 416).  When Mr. Dingman conducted an analysis and discovered "bad sector" errors, Mr. Ronsen asked him to replace the hard drive, and Mr. Dingman complied.  (Tr. at 49, 116; Ronsen Dep. at 417).  According to Mr. Dingman, he loaded operating system programs onto the new hard drive and synched the laptop to the shared drive so that the laptop acquired Mr. Ronsen's files.  (Tr. at 117).  At that time, Mr. Ronsen did not tell Mr. Dingman that he was on the verge of leaving Numerex.  (Tr. at 117; Ronsen Dep. at 417).

As part of this litigation, a forensic expert, Robert Bolstad of Daylight Forensic and Advisory, LLC, conducted an analysis of information obtained from Orbit One, and specifically of the laptop and its new hard drive.  (Tr. at 83, 87).  The data was collected in September 2008 and analyzed in November 2008.  (Tr. at 93).  Mr. Bolstad first observed that although the laptop contained Mr.

12

Ronsen's e-mail file, there were few if any user-created word processing documents.  (Tr. at 87-88).  Second, Mr. Bolstad compared the backup disk for January 3, 2008 with e-mail contained on the laptop, on the shared drive, and on the exchange server. (Tr. at 90). He determined that there were some 2,089 unique items on the backup disk that did not exist on any of the active files. (Tr. at 91, 93).

Following his resignation in April 2008, Mr. Ronsen asked Mr. Dingman to fix a forwarding protocol that Mr. Ronsen had previously established that forwarded e-mail that he received at Numerex to his personal Yahoo account.  (Tr. at 64-65, 118).  Mr. Ronsen told Mr. Dingman that he wanted to stay current with events at Numerex because he had only resigned to prove a point and expected to return.  (Tr. at 119).  Approximately 200 e-mails were forwarded to the Yahoo account, which Mr. Ronsen deleted because they were "useless" to him.  (Tr. at 64-65; Ronsen Dep. at 429-34).  Sometime shortly thereafter, Mr. Dingman deleted the forwarding rule.  (Tr. at 125).  A few days after his resignation from Numerex, Mr. Ronsen also returned the backup disks that Mr. Dingman had taken out of rotation in January 2008.  (Declaration of Stephen Black dated Oct. 10, 2008, attached as Exh. C to Kim Decl., ¶ 4).

Discussion

    A. <u>The Law of Sanctions</u>

    Spoliation is "'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" <u>Byrnie v. Town of Cromwell, Board of Education</u>, 243 F.3d 93, 107 (2d Cir. 2001) (quoting <u>West v. Goodyear Tire & Rubber Co.</u>, 167 F.3d 776, 779 (2d Cir. 1999)); <u>accord</u> <u>Pension Committee of the University of Montreal Pension Plan v. Banc of America Securities, LLC</u>, 685 F. Supp. 2d 456, 465 (S.D.N.Y. 2010); <u>Richard Green (Fine Paintings) v. McClendon</u>, 262 F.R.D. 284, 288 (S.D.N.Y. 2009). Where a party's spoliation violates a court order, Rule 37(b) of the Federal Rules of Civil Procedure empowers the court to impose various sanctions, including dismissing the complaint or entering judgment by default, precluding the introduction of certain evidence, imposing an adverse inference, or assessing attorneys' fees and costs. Fed. R. Civ. P. 37(b); <u>see</u> <u>Residential Funding Corp. v. DeGeorge Financial Corp.</u>, 306 F.3d 99, 106-07 (2d Cir. 2002); <u>Richard Green (Fine Paintings)</u>, 262 F.R.D. at 288; <u>Metropolitan Opera Association, Inc. v. Local 100, Hotel Employees and Restaurant Employees International Union</u>, 212 F.R.D. 178, 219 (S.D.N.Y. 2003). "'The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is

assessed on a case-by-case basis.'" Zubulake v. UBS Warburg LLC,
229 F.R.D. 422, 430 (S.D.N.Y. 2004) ("Zubulake V") (quoting Fujitsu
Ltd. v. Federal Express Corp., 247 F.3d 423, 436 (2d Cir. 2001));
see Harkabi v. SanDisk Corp., No. 08 Civ. 8203, 2010 WL 3377338, at
*8 (S.D.N.Y. Aug. 23, 2010).

A party may be sanctioned for violating a preservation order
directly; but it may also be liable for sanctions under Rule 37(b)
if it fails to produce information when ordered to do so because it
has destroyed the evidence. See Residential Funding, 306 F.3d at
106-07; Richard Green (Fine Paintings), 262 F.R.D. at 288.
Sanctions are appropriate even where a party's spoliation occurred
before the issuance of the discovery order -- thus rendering
compliance impossible -- because the inability to comply with the
order was "self-inflicted." Turner v. Hudson Transit Lines, Inc.,
142 F.R.D. 68, 72 (S.D.N.Y. 1991); accord Pipes v. United Parcel
Service, Inc., Civ. A. No. 07-1762, 2009 WL 2214990, at *1 n.3
(W.D. La. July 22, 2009); In re NTL Securities Litigation, 244
F.R.D. 179, 192 (S.D.N.Y. 2007), aff'd, Gordon Partners v.
Blumenthal, No. 02 Civ. 7377, 2007 WL 1518632 (S.D.N.Y. May 17,
2007). Furthermore, a court may impose discovery sanctions even
absent an order pursuant to "its inherent power to manage its own
affairs." Residential Funding, 306 F.3d at 106-07; accord Richard
Green (Fine Paintings), 262 F.R.D. at 288; NTL, 244 F.R.D. at 191;

15

Metropolitan Opera, 212 F.R.D. at 220.

Where, as here, a party seeks an adverse inference instruction based on the spoliation of evidence, it must establish:

> (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed "with a culpable state of mind"; and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

Residential Funding, 306 F.3d at 107; accord ACORN (New York Association of Community Organizations for Reform Now) v. County of Nassau, No. 05 CV 2301, 2009 WL 605859, at *2 (E.D.N.Y. March 9, 2009); Richard Green (Fine Paintings), 262 F.R.D. at 289; Treppel v. Biovail Corp., 249 F.R.D. 111, 120 (S.D.N.Y. 2008); Zubulake V, 229 F.R.D. at 430.  I will address each of these factors in turn.

### 1. The Preservation Obligation

One court has observed that "[i]dentifying the boundaries of the duty to preserve involves two related inquiries: when does the duty to preserve attach, and what evidence must be preserved?" Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) ("Zubulake IV").  There are also two additional questions pertinent to satisfying preservation requirements: how must a party go about fulfilling its ultimate obligation, and who is responsible for seeing that it is fulfilled?

16

a. <u>When</u>

With respect to the first inquiry, the

obligation to preserve evidence arises when the party has
notice that the evidence is relevant to litigation --
most commonly when suit has already been filed, providing
the party responsible for the destruction with express
notice, but also on occasion in other circumstances, as
for example when a party should have known that the
evidence may be relevant to future litigation.

<u>Kronisch v. United States</u>, 150 F.3d 112, 126 (2d Cir. 1998),
<u>overruled on other grounds</u>, <u>Rotella v. Wood</u>, 528 U.S. 549 (2000);
<u>see</u> <u>Fujitsu Ltd. v. Federal Express Corp.</u>, 247 F.3d 423, 436 (2d
Cir. 2001).  Thus, the preservation requirement arises when a party
"reasonably anticipates litigation."  <u>Pension Committee</u>, 685 F.
Supp. 2d at 466; <u>Treppel</u>, 249 F.R.D. at 118; <u>Zubulake IV</u>, 220
F.R.D. at 218.

b. <u>What</u>

Although some cases have suggested that the definition of what
must be preserved should be guided by principles of "reasonableness
and proportionality," <u>Victor Stanley, Inc. v. Creative Pipe, Inc.</u>,
No. 06-2662, 2010 WL 3703696, at *24 (D. Md. Sept. 9, 2010); <u>see</u>
<u>Rimkus Consulting Group, Inc. v. Cammarata</u>, 688 F. Supp. 2d 598,
613 (S.D. Tex. 2010), this standard may prove too amorphous to
provide much comfort to a party deciding what files it may delete

or backup tapes it may recycle.[10]   Until a more precise definition is created by rule, a party is well-advised to "retain all relevant documents (but not multiple identical copies) in existence at the time the duty to preserve attaches."[11]  Zubulake IV, 220 F.R.D. at 218.  In this respect, "relevance" means relevance for purposes of discovery, which is "an extremely broad concept."  Condit v. Dunne, 225 F.R.D. 100, 105 (S.D.N.Y. 2004); see Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978); Convolve, Inc. v. Compaq Computer Corp., 223 F.R.D. 162, 167 (S.D.N.Y. 2004); Melendez v. Greiner, No. 01 Civ. 7888, 2003 WL 22434101, at *1 (S.D.N.Y. Oct. 23, 2003).  "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1).

---

[10] Reasonableness and proportionality are surely good guiding principles for a court that is considering imposing a preservation order or evaluating the sufficiency of a party's efforts at preservation after the fact.  Because these concepts are highly elastic, however, they cannot be assumed to create a safe harbor for a party that is obligated to preserve evidence but is not operating under a court-imposed preservation order.  Proportionality is particularly tricky in the context of preservation.  It seems unlikely, for example, that a court would excuse the destruction of evidence merely because the monetary value of anticipated litigation was low.

[11] It may not always be obvious, however, what constitutes an "identical" copy.  For example, there may be multiple copies of an e-mail, all containing the same text.  However, it may be important in the litigation to identify who actually received the communication.  Therefore, it would be necessary to preserve, if not all copies of the document, at least the data (or, more precisely, the metadata) identifying the recipients.

c. <u>How</u>

To meet its obligations, the litigant "must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." <u>Zubulake V</u>, 229 F.R.D. at 431; <u>accord</u> <u>NTL</u>, 244 F.R.D. at 194.  This step, however, is only the beginning of a party's discovery obligations.  <u>Zubulake V</u>, 229 F.R.D. at 432.  "Once a 'litigation hold' is in place, a party and [its] counsel must make certain that all sources of potentially relevant information are identified and placed 'on hold' . . . ."  <u>Id.</u>  Then, "[c]ounsel must take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched." <u>Id.</u>  Thereafter, the duty to preserve discoverable information persists throughout the discovery process; a litigant must ensure that all potentially relevant evidence is retained.  <u>Id.</u> at 432-33; <u>see also</u> Fed. R. Civ. P. 26(e); <u>R.F.M.A.S., Inc. v. So</u>, No. 06 Civ. 13114, 2010 WL 3322639, at *6 (S.D.N.Y. Aug. 11, 2010); <u>Richard Green (Fine Paintings)</u>, 262 F.R.D. at 289.

There is something of a split of authority with respect to whether permitting the downgrading of data -- for example, deleting information from active files but preserving backup media containing the same data -- constitutes spoliation.  In <u>Treppel v. Biovail Corp.</u>, 233 F.R.D. 363, 372 n.4 (S.D.N.Y. 2006), I found

that "permitting the downgrading of data to a less accessible form -- which systematically hinders future discovery by making the recovery of the information more costly and burdensome -- is a violation of the preservation obligation." <u>Accord</u> <u>Scalera v. Electrograph Systems, Inc.</u>, 262 F.R.D. 162, 175 (E.D.N.Y. 2009). By contrast, in <u>Quinby v. WestLB AG</u>, No. 04 Civ. 7406, 2005 WL 3453908, at *8 n.10 (S.D.N.Y. Dec. 15, 2005), the court "decline[d] to sanction defendant for converting data from an accessible to inaccessible format, even if they should have anticipated litigation." This disagreement, however, seems to be more semantic than real. Even those courts that do not denominate downgrading as a violation of the preservation obligation appear prepared to remedy any prejudice that it causes. Indeed, in a subsequent decision in <u>Quinby</u>, the court refused to shift discovery costs in favor of the party that had allowed the downgrading, reasoning that:

> if a party creates its own burden or expense by converting into an inaccessible format data that it should have reasonably foreseen would be discoverable material at a time when it should have anticipated litigation, then it should not be entitled to shift the costs of restoring and searching the data.

245 F.R.D. 94, 104 (S.D.N.Y. 2006).

### d. <u>Who</u>

"'The preservation obligation runs first to counsel, who has a duty to advise his client of the type of information potentially

relevant to the lawsuit and of the necessity of preventing its destruction.'" <u>NTL</u>, 244 F.R.D. at 197-98 (quoting <u>Heng Chan v. Triple 8 Palace, Inc.</u>, No. 03 Civ. 6048, 2005 WL 1925579, at *6 (S.D.N.Y. Aug. 11, 2005) (internal quotation mark omitted)); <u>see also</u> <u>Zubulake V</u>, 229 F.R.D. at 433 n.80; <u>Fayemi v. Hambrecht and Quist, Inc.</u>, 174 F.R.D. 319, 326 (S.D.N.Y. 1997). Moreover, this responsibility is "heightened in this age of electronic discovery." <u>Qualcomm Inc. v. Broadcom Corp.</u>, No. 05 Civ. 1958-B, 2008 WL 66932, at *9 (S.D. Cal. Jan. 7, 2008), <u>vacated in part on other grounds</u>, 2008 WL 638108 (S.D. Cal. March 5, 2008). Indeed,

> for the current "good faith" discovery system to function in the electronic age, attorneys and clients must work together to ensure that both understand how and where electronic documents, records and emails are maintained and to determine how best to locate, review, and produce responsive documents. Attorneys must take responsibility for ensuring that their clients conduct a comprehensive and appropriate document search.

<u>Id.</u>; <u>see also</u> <u>Phoenix Four, Inc. v. Strategic Resources Corp.</u>, No. 05 Civ. 4837, 2006 WL 1409413, at *5-6 (S.D.N.Y. May 23, 2006) (emphasizing counsels' affirmative duty to search for sources of electronic information); <u>Zubulake V</u>, 229 F.R.D. at 433 (noting that "active supervision of counsel" is of particular importance when electronically-stored information is involved). Where the client is a business, its managers, in turn, are responsible for conveying to their employees the requirements for preserving evidence. <u>See</u> <u>id.</u> at 433 & n.80; <u>Turner</u>, 142 F.R.D. at 73.

2. Culpability

In this circuit, a "culpable state of mind" for purposes of a spoliation inference includes ordinary negligence. Residential Funding, 306 F.3d at 108. This standard protects the innocent litigant from the destruction of evidence by a spoliator who would otherwise assert an "empty head, pure heart" defense:

> "[The] sanction [of an adverse inference] should be available even for the negligent destruction of documents if that is necessary to further the remedial purpose of the inference. It makes little difference to the party victimized by the destruction of evidence whether that act was done willfully or negligently. The adverse inference provides the necessary mechanism for restoring the evidentiary balance. The inference is adverse to the destroyer not because of any finding of moral culpability, but because the risk that the evidence would have been detrimental rather than favorable should fall on the party responsible for its loss."

Id. (quoting Turner, 142 F.R.D. at 75); accord Harkabi, 2010 WL 3377338, at *4; Pension Committee, 685 F. Supp. 2d at 464. It is cold comfort to a party whose potentially critical evidence has just been destroyed to be told that the spoliator did not act in bad faith.[12]

---

[12] The rationale of the adverse inference in this context is sometimes misconstrued. For example, in Victor Stanley, 2010 WL 3703696, at *27, the court stated that:

> an adverse inference instruction makes little logical sense if given as a sanction for negligent breach of the duty to preserve, because the inference that a party failed to preserve evidence because it believed that the evidence was harmful to its case does not flow from mere negligence -- particularly if the destruction was of ESI

### 3. Assistive Relevance

Sanctions are not warranted merely because information is lost; the evidence must be shown to have been "relevant."  As the Second Circuit has explained in connection with an application for an adverse inference,

> "[R]elevant" in this context means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence.  Rather, the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction.

Residential Funding, 306 F.3d at 108-09 (quotation marks, citations, and alterations omitted); see also Zubulake V, 229 F.R.D. at 431 ("[T]he concept of 'relevance' encompasses not only the ordinary meaning of the term, but also that the destroyed

---

and was caused by the automatic delete function of a program that the party negligently failed to disable once the duty to preserve was triggered.  The more logical inference is that the party was disorganized, or distracted, or technically challenged, or overextended, not that it failed to preserve evidence because of an awareness that it was harmful.

But an adverse inference need not require the finder of fact to impute any particular state of mind to the spoliator.  An adverse inference is imposed to ameliorate any prejudice to the innocent party by filling the evidentiary gap created by the party that destroyed evidence.  The logical link suggested by Victor Stanley -- that the spoliator destroyed evidence because it was harmful to his case -- is simply unnecessary.  Of course, that link is present in cases where there is proof of the deliberate destruction of evidence.  But where there is not, an adverse inference may nevertheless be critical to assisting the innocent party in establishing the nature of the evidence that has gone missing.

evidence would have been favorable to the movant.").

When evidence is destroyed in bad faith, that fact alone is sufficient to support an inference that the missing evidence would have been favorable to the party seeking sanctions: that it would have been of assistive relevance. Residential Funding, 306 F.3d at 109. Indeed, under certain circumstances "a showing of gross negligence in the destruction or untimely production of evidence" will support the same inference. Id. (citing Reilly v. NatWest Markets Group, Inc., 181 F.3d 253, 267-68 (2d Cir. 1999)). The conduct, however, must be egregious. See Toussie v. County of Suffolk, No. 01 CV 6716, 2007 WL 4565160, at *8 (E.D.N.Y. Dec. 21, 2007) (declining to award adverse inference even though defendant failed to implement litigation hold and delayed litigation through "foot dragging"); cf. Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp., 602 F.2d 1062, 1068 (2d Cir. 1979) (finding preclusion of evidence justified where plaintiff's gross negligence froze litigation for four years); Cordius Trust v. Kummerfeld, No. 99 Civ. 3200, 2008 WL 113664, at *4 (S.D.N.Y. Jan. 11, 2008) (defendant's "long-term and purposeful evasion of discovery requests," standing alone, was sufficient to support a finding of relevance for purpose of imposing sanctions).

In the absence of bad faith or other sufficiently egregious conduct, "'it cannot be inferred from the conduct of the spoliator

24

that the evidence would even have been harmful to him.'" Zubulake
IV, 220 F.R.D. at 221 (quoting Turner, 142 F.R.D. at 77); accord
Harkabi, 2010 WL 3377338, at *6; Pension Committee, 685 F. Supp. 2d
at 467-68; cf. Rimkus, 688 F. Supp. 2d at 607-08 (finding that loss
of relevant evidence may be harmful as well as helpful to
spoliator). The party seeking sanctions in such cases must
therefore affirmatively "demonstrate that a reasonable trier of
fact could find that the missing [evidence] would support [his]
claims." Zubulake IV, 220 F.R.D. at 221; see also Residential
Funding, 306 F.3d at 109 ("[T]he party seeking an adverse inference
must adduce sufficient evidence from which a reasonable trier of
fact could infer that the destroyed or unavailable evidence would
have been of the nature alleged by the party affected by its
destruction.") (internal quotation marks, citation, and alterations
omitted). Such a showing can be made on the basis of extrinsic
evidence. Residential Funding, 306 F.3d at 109 ("purposeful
sluggishness" in turning over e-mails suggests that they were
supportive of opponent's position); Byrnie, 243 F.3d at 109-10
(relevance of missing interview notes could be inferred from
weakness of defendant's purported reasons for not hiring plaintiff,
suggesting that the reasons were a "pretext [for] the real
explanation that would be disclosed by the [notes]"); Harkabi, 2010
WL 3377338, at *6 (affidavits describing contents of missing

25

laptops); <u>Great Northern Insurance Co. v. Power Cooling, Inc.</u>, No. 06 CV 874, 2007 WL 2687666, at *11 (E.D.N.Y. Sept. 10, 2007) ("'[W]here the culpble party was negligent, there must be extrinsic evidence to demonstrate that the destroyed evidence was relevant and would have been unfavorable to the destroying party.'" (quoting <u>Reino de Espana v. American Bureau of Shipping</u>, No. 03 Civ. 3573, 2007 WL 1686327, at *6 (S.D.N.Y. June 6, 2007)); <u>Heng Chan</u>, 2005 WL 1925579, at *8-9 (relevance of spoliated employment and business records could be inferred from other documentary and testamentary evidence of defendant's business practices); <u>Zubulake V</u>, 229 F.R.D. at 427-29 (relevance of deleted e-mails inferred from other e-mails that had been recovered and eventually produced); <u>Barsoum v. New York City Housing Authority</u>, 202 F.R.D. 396, 400-01 (S.D.N.Y. 2001) (notes of meeting between employment discrimination plaintiff and supervisor suggesting non-discriminatory motive for adverse action tended to show that audiotape of meeting destroyed by plaintiff would have been unfavorable to her). Without such evidence, severe sanctions are not warranted. <u>See Great Northern</u>, 2007 WL 2687666, at *12 (adverse inference not warranted without showing that missing evidence was favorable to plaintiff); <u>Reino de Espana</u>, 2007 WL 1686327, at *8 (adverse inference inappropriate because "[t]here is no evidence that [party seeking sanctions] asked any deponent whether lost or destroyed e-mails included information concerning

its proposed adverse inferences"); <u>Sovulj v. United States</u>, No. 98 CV 5550, 2005 WL 2290495, at *5 (E.D.N.Y. Sept. 20, 2005) (same result where any assertion that missing evidence was relevant was "pure speculation"); <u>Zubulake IV</u>, 220 F.R.D. at 221 (same result where there was no evidence that missing e-mails were "likely to support [plaintiff's] claims"); <u>Turner</u>, 142 F.R.D. at 77 (in personal injury action regarding motor vehicle accident, plaintiff not entitled to adverse inference where there was "no evidence that the destroyed records would have shown whether the brakes were in good working order").  It is not sufficient for the moving party merely to point to the fact that the opposing party has failed to produce requested information.  <u>See</u> <u>Mitchell v. Fishbein</u>, No. 01 Civ. 2760, 2007 WL 2669581, at *5 (S.D.N.Y. Sept. 13, 2007); <u>Cortes v. Peter Pan Bus Lines, Inc.</u>, 455 F. Supp. 2d 100, 103 (D. Conn. 2006).

Nevertheless, "[T]he burden placed on the moving party to show that the lost evidence would have been favorable to it ought not be too onerous, lest the spoliator be permitted to profit from its destruction."  <u>Heng Chan</u>, 2005 WL 1925579, at *7; <u>see also</u> <u>Residential Funding</u>, 306 F.3d at 109; <u>Kronisch</u>, 150 F.3d at 128 ("[To] hold[] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence would subvert the prophylactic and punitive purposes of the adverse

inference, and would allow parties who have intentionally destroyed evidence to profit from that destruction."). Thus, "it is not incumbent upon the plaintiff to show that specific documents were lost." <u>Treppel IV</u>, 233 F.R.D. at 372.

### 4. Discovery Relevance

Use of the term "relevance" in <u>Residential Funding</u>, where the court was referring to assistive relevance, should not be confused with broad discovery relevance; for discovery purposes, information is relevant to the extent that it "appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). Thus, prior to assessing whether a party has breached a preservation obligation, whether it did so with a culpable state of mind, and whether the lost information would have been helpful to the innocent party, a court considering a sanctions motion must make a threshold determination whether any material that has been destroyed was likely relevant even for purposes of discovery.

Some decisions appear to omit such a requirement. In <u>Pension Committee</u>, for example, the court stated that "[r]elevance <u>and</u> prejudice may be presumed when the spoliating party acted in bad faith or in a grossly negligent manner."[13] 685 F. Supp. 2d at 467

---

[13] As authority for this proposition, <u>Pension Committee</u> cites <u>Residential Funding</u>, 306 F.3d at 109. <u>Pension Committee</u>, 365 F. Supp. 2d at 467 n.31. That decision, however, dealt solely with a presumption of prejudice -- that is, with assistive relevance. The court made clear that when it spoke of "relevance" in connection

(emphasis added).  Indeed, the court drew a distinction between the
types of sanctions available based on whether information had in
fact been lost at all:

> For less severe sanctions -- such as fines and cost-
> shifting -- the inquiry focuses more on the conduct of
> the spoliating party than on whether documents were lost,
> and, if so, whether those documents were relevant and
> resulted in prejudice to the innocent party. . . . [F]or
> more severe sanctions -- such as dismissal, preclusion,
> or the imposition of an adverse inference -- the court
> must consider, in addition to the conduct of the
> spoliating party, whether any missing evidence was
> relevant and whether the innocent party has suffered
> prejudice as a result of the loss of evidence.

685 F. Supp. 2d at 467.  The implication of <u>Pension Committee</u>,
then, appears to be that at least some sanctions are warranted as
long as any information was lost through the failure to follow
proper preservation practices, even if there has been no showing
that the information had discovery relevance, let alone that it was
likely to have been helpful to the innocent party.  If this is a
fair reading of <u>Pension Committee</u>, then I respectfully disagree.

"[F]or sanctions to be appropriate, it is a necessary, but
insufficient, condition that the sought-after evidence <u>actually
existed and was destroyed</u>."  <u>Farella v. City of New York</u>, Nos. 05

---

with sanctions, it meant evidence likely to be harmful to the
spoliator and helpful to the innocent party.  <u>Residential Funding</u>,
306 F.3d at 108-09.  The court did not address the need to
demonstrate the relevance of the information for discovery purposes
because there was no dispute: the missing (and tardily produced)
evidence was directly responsive to discovery requests.  <u>Id.</u> at
102-06.

Civ. 5711 & 05 Civ. 8264, 2007 WL 193867, at *2 (S.D.N.Y. Jan. 25, 2007).  To be sure, once it has been established that discovery-relevant material has been destroyed in bad faith or through gross negligence, it may be presumed that it would have been harmful to the spoliator.  See Residential Funding, 306 F.3d at 109.  But that is a far cry from presuming that evidence is discovery-relevant merely because it has been destroyed as the result of a party's failure to abide by recommended preservation practices.

It is difficult to see why even a party who destroys information purposefully or is grossly negligent should be sanctioned where there has been no showing that the information was at least minimally relevant.  Demonstrating discovery relevance is not a difficult burden to meet, even in the face of spoliation.  Thus, for example, in Pension Committee, the court concluded that relevant records had been lost on the basis of the failure of fiduciary parties to produce documents that they must "surely" have maintained: "records . . . documenting the due diligence, investments, and subsequent monitoring of these investments." 685 F. Supp. 2d at 476.

The consequences of omitting any requirement that a party seeking sanctions demonstrate the loss of discovery-relevant information could be significant.  Because of the likelihood that some data will be lost in virtually any case, there is a real

danger that "litigation [would] become a 'gotcha' game rather than a full and fair opportunity to air the merits of a dispute." Id. at 468. In order to avoid sanctions, parties would be obligated, at best, to document any deletion of data whatsoever in order to prove that it was not relevant or, at worst, to preserve everything.

Nor are sanctions warranted by a mere showing that a party's preservation efforts were inadequate. In Pension Committee, the court held that "[a]fter a discovery duty is well established, the failure to adhere to contemporary standards can be considered gross negligence." Id. at 471. Those standards, according to the court, include issuing a written litigation hold, identifying all key players to ensure that their records are preserved, ceasing the deletion of e-mails or otherwise preserving the records of relevant former employees, and preserving backup tapes that contain unique relevant information from key players that is not otherwise readily available. Id. Indeed, the court found one set of parties grossly negligent precisely because they failed to issue a written litigation hold in a timely manner.[14] Id. at 476-77.

---

[14] As the court pointed out in Victor Stanley, if the the showing of a failure to follow a preferred practice leads both to a presumption that relevant and prejudicial material has been destroyed and also warrants a finding that the producing party was grossly negligent, then the innocent party may be immediately entitled to a sanction as severe as an adverse inference. 2010 WL 3703696, at 35 n.34.

But, depending upon the circumstances of an individual case, the failure to abide by such standards does not necessarily constitute negligence, and certainly does not warrant sanctions if no relevant information is lost.   For instance, in a small enterprise, issuing a written litigation hold may not only be unnecessary, but it could be counterproductive, since such a hold would likely be more general and less tailored to individual records custodians than oral directives could be.   Indeed, under some circumstances, a formal litigation hold may not be necessary at all.   See Victor Stanley, 2010 WL 3703696, at *25; Haynes v. Dart, No. 08 C 4834, 2010 WL 140387, at *4 (N.D. Ill. Jan. 11, 2010).   Rather than declaring that the failure to adopt good preservation practices is categorically sanctionable, the better approach is to consider such conduct as one factor, see Haynes, 2010 WL 140387, at *4, and consider the imposition of sanctions only if some discovery-relevant data has been destroyed.

B. Application to the Facts

There are numerous respects in which Mr. Ronsen and Orbit One failed to adopt appropriate preservation procedures in this case:

- The initial litigation hold for Axonn documents was established by counsel without any apparent input from persons familiar with Orbit One's computer system; it lacked detailed instructions; there is no indication that

it was disseminated to all persons who might have possessed relevant data; and the attorney who issued the hold evidently did not monitor compliance in any way.

- There is no evidence that litigation counsel imposed any formal litigation hold when the instant litigation was commenced.

- When information was deleted from servers, archived, or otherwise manipulated, the employee responsible for information technology was not informed of the Axonn litigation hold or of the pendency of the instant case.

- Primary responsibility for safeguarding information often remained with Mr. Ronsen, the very individual with the greatest incentive to destroy evidence harmful to Orbit One and to his own interests.

- Mr. Ronsen's treatment of the information within his control was cavalier: he removed computer hardware from Orbit One's premises, he permitted it to leave his control, and he failed to document his archiving practices.

Nevertheless, as will be discussed in further detail, there is insufficient evidence of any loss of discovery-relevant information.

### 1. Removal of Data from Servers

Numerex's application for sanctions relates first to Mr.
Ronsen's purging of some six gigabytes of information from the
Orbit One servers during the first week of December 2007.  In a
number of respects, this process was poorly designed to preserve
information for litigation.  First, when Mr. Dingman requested that
Mr. Ronsen remove data from the servers, Mr. Ronsen failed to
advise him that Orbit One was subject to a litigation hold in
connection with Axonn's threat of litigation.  By the time Mr.
Ronsen implemented Mr. Dingman's request and actually began purging
information, there is little doubt that he was contemplating
litigation against Numerex and should have so advised Mr. Dingman
as part of a further litigation hold.  Then, after archiving the
removed files on an external hard drive, Mr. Ronsen apparently kept
possession of the hard drive for some period before turning it over
to his counsel.

However ill-advised this conduct might be, it does not amount
to spoliation.  First, Mr. Dingman requested the removal of data
from the servers for reasons entirely independent of any potential
lawsuit; indeed, he was unaware that any litigation was
anticipated.  Although the purge was undertaken without regard for
the Axonn litigation hold then in effect, a violation of a
preservation obligation in that matter does not provide a basis for

34

sanctions in this case.[15]  More to the point, although Mr. Ronsen removed information when he was under a duty to retain it because he was then contemplating litigation, he did not breach his obligation because the data was archived and there is no evidence that any of it was lost.  There has also been no showing that the information on the external drive was more expensive or burdensome for Numerex to obtain in discovery by virtue of its having been deleted from the servers.  To be sure, once Numerex took physical possession of the Bozeman facility, it could no longer simply download that information from the servers.  But it was in no worse position than any litigant who obtains discovery at arm's length from an adversary.

### 2. Removal of the Desktop Computer

Next, Numerex contends that Mr. Ronsen's removal of the desktop constituted spoliation.  Again, his conduct was less than exemplary.  When Mr. Ronsen complied with Mr. Dingman's request to take the desktop off the network, he again failed to inform Mr. Dingman of the Axonn litigation hold.  He removed the computer to his home and retained it there, apparently after this litigation was commenced and certainly after it was contemplated.  Then, he actually permitted the hard drive to be extracted and removed from

---

[15] Evidence of "serial" spoliation would of course be relevant to establishing the willfulness of any destructive conduct.  See Victor Stanley, 2010 WL 3703696, at *3 n.10.

35

his possession.

As cavalier as this conduct might be, it again did not amount to spoliation.  As with the culling of data from the servers, the request to remove the desktop originated with Mr. Dingman.  Because the desktop was part of the network, it was synchronized with the servers and, through them, with the laptop.  Consequently, any information not stored exclusively on the desktop's local drive would have been preserved in those locations.  Furthermore, the hard drive from the desktop was ultimately recovered and provided to counsel.  Again, though Mr. Ronsen was careless with this information, there is no basis for finding that any of it was destroyed.

### 3. Removal of the Laptop Hard Drive

The "swapping out" of the hard drive from Mr. Ronsen's laptop computer also did not result in spoliation.  It is true that the exchange occurred when Mr. Ronsen was about to resign and that he did not tell Mr. Dingman, who effected the swap, of his intentions. In addition, it was ultimately determined that as of September 2008, neither the reconstituted laptop nor the servers contained certain information that had been on the system in January 2008 and was retained on the backup drive from that time.

However, there is no credible evidence that the need to replace the hard drive was fabricated.  The idea that Mr. Ronsen

would damage the hard drive and then seek its replacement in order
to destroy evidence is far-fetched.  And there is no dispute that
Mr. Dingman properly diagnosed a serious malfunction.  Furthermore,
the process of swapping the drives was conducted by Mr. Dingman,
not Mr. Ronsen, and he explained that he synched the laptop with
the servers both before and after the exchange so that it should
have acquired all of the information that had been on the old hard
drive.

It is, of course, conceivable that, after January 3, 2008 but
prior to swapping the hard drives, Mr. Ronsen deleted the "missing"
documents from the laptop and synched the laptop with the network
so that they were removed from the servers as well.  The documents
would then be retained only on the backup tape from January 3,
2008.  But Mr. Bolstad, Numerex's own forensic expert, testified
that it would be "speculative" to conclude that this is what
happened.  (Tr. at 89).  Furthermore, when Numerex proffered 114
documents as examples of the "missing" files, Mr. Ronsen's counsel
demonstrated that every one had previously been produced by the
plaintiffs in discovery with the exception of a very few privileged
or non-substantive documents.  (Letter of R. Scott Thompson dated
July 30, 2010 & Exhs. 1-114; Declaration of Robert Bolstad dated
March 5, 2010, Exh. A).

Of course, it is always possible that other documents were

deleted from the system but did not appear on the backup disk because they were created after January 3, 2008. But there is no evidence that this in fact is the case. No witness has identified any significant document that has not been produced in discovery. This is true even though former employees of Mr. Ronsen's, like Mr. Dingman, are now employees of Numerex and might well be expected to provide such information if it would assist their current employer.

### 4. <u>Preservation of Backup Disks</u>

It is not clear whether Numerex is contending that any spoliation took place with respect to the backup disks. At the time the disks were removed from rotation, this litigation had already been commenced. Yet there is no indication that Mr. Ronsen, Orbit One, or plaintiffs' counsel initiated any formal litigation hold at that time. Instead, it was Numerex, and specifically Mr. Nicolaides, who directed that the backup disks be preserved. Yet Mr. Dingman stored them in the office of Numerex's litigation adversary. Moreover, that adversary, Mr. Ronsen, removed them from the premises and took them home.

Still, there had been no showing that the integrity of the disks was compromised in any way, and therefore there is no basis for sanctions.

### 5. <u>E-mail Forwarding Protocol</u>

Finally, it is not clear whether Numerex considers the e-mail

forwarding protocol to be a ground for spoliation sanctions. Whatever the propriety of Mr. Ronsen's continuing an e-mail forwarding rule after he had resigned from Numerex, his perpetuation of that protocol is not spoliation, since the rule created copies of information rather than destroying it. And there is no allegation that the 200 forwarded e-mails that Mr. Ronsen did delete were lost; they remained not only in the individual accounts of the senders, but also on the Numerex exchange server.

*     *     *

The plaintiffs did not engage in model preservation of electronically stored information in this case. But they are not liable for spoliation sanctions, much less a severe sanction such as an adverse inference, because there is insufficient evidence that any relevant information has been destroyed.

Conclusion

For the reasons set forth above, Numerex's motion for sanctions is denied.


SO ORDERED.

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       October 26, 2010

39

Copies mailed this date:

R. Scott Thompson, Esq.
Khizar A. Shiekh, Esq.
Lowenstein Sandler, PC
1251 Avenue of the Americas
New York, NY 10220

Kent A. Yalowitz, Esq.
Emily A. Kim, Esq.
Arnold & Porter LLP
399 Park Avenue
New York, NY 10022-4690